**FILED**

NOV 18 2020

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. **20 CR 812** |
| | ) | |
| v. | ) | |
| | ) | Violations: Title 18, United States |
| MICHAEL McCLAIN, | ) | Code, Sections 371, 666(a)(2), and |
| ANNE PRAMAGGIORE, | ) | 2; and Title 15, United States |
| JOHN HOOKER, and | ) | Code, Sections 78m(b)(5) and |
| JAY DOHERTY | ) | 78ff(a) |

JUDGE LEINENWEBER

MAGISTRATE JUDGE VALDEZ

<u>COUNT ONE</u>

The SPECIAL JANUARY 2019 GRAND JURY charges:

1.    At times material to this indictment:

<u>Commonwealth Edison Company and Affiliates</u>

a.    Commonwealth Edison Company ("ComEd"), with headquarters located in Chicago, delivered electricity to industrial, commercial and residential customers across northern Illinois and was the largest utility company in the State.

b.    As a utility, ComEd was subject to extensive regulation by the State of Illinois.   The State of Illinois regulated the rates that ComEd could charge its customers, as well as the rate of return ComEd could realize from its business operations.

c.    ComEd maintained a summer internship program (the "ComEd Internship Program") that provided paid internship positions to students.   Based on their performance during the internship, participating students could be considered for subsequent summer internship positions or full-time jobs within ComEd.

d.  ComEd was a majority-owned indirect subsidiary of Exelon Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states.  ComEd and Exelon had a class of securities registered pursuant to Section 12 of the Securities and Exchange Act of 1934 (15 U.S.C. § 78a *et seq.*) and were required to file reports with the Securities and Exchange Commission under Section 15(d) of the Exchange Act.  ComEd and Exelon were therefore each an "issuer" under the Foreign Corrupt Practices Act of 1977 (the "FCPA").

e.  Exelon Business Services Company, LLC ("Exelon Business Services") was a limited liability company organized under the laws of the State of Delaware.  Exelon was the sole member of Exelon Business Services.  Exelon Business Services provided support functions for companies affiliated with Exelon such as ComEd, including but not limited to contracting, accounting, and vendor payment functions.

## ComEd and Exelon's Internal Controls Program

f.  Pursuant to the FCPA, issuers, such as ComEd and Exelon, were required to maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets was permitted only in

2

accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action was taken with respect to any differences. The FCPA prohibited any person from knowingly and willfully circumventing or failing to implement the required system of internal accounting controls or knowingly and willfully falsifying any book, record, or account that issuers were required to keep.

g. Exelon, together with ComEd and Exelon Business Services, maintained a system of internal controls to detect and prevent improper payments, including bribe payments. These controls included various policies, programs and procedures designed to ensure that Exelon's books and records, and those of their majority-owned subsidiaries including ComEd and Exelon Business Services, accurately reflected transactions engaged in by the company. The controls were also designed to detect unlawful payments, and included requiring multiple employees to be involved in the approval of contracts that exceeded specified amounts and auditing to help ensure accurate reporting of payments. Exelon maintained a corporate anti-bribery policy and implemented a Code of Business Conduct, which governed the conduct of Exelon, ComEd, and Exelon Business Services employees and agents, including third-party consultants.

h. From in or around 2006 through in or around 2015, the Code of Business Conduct provided that "[m]anagement is accountable for establishing and maintaining a system of internal controls within an organization," that management was

required to "ensure that there is clear, complete, fair, and accurate reporting of financial and non-financial information pertaining to business transactions," and that management was accountable to the Exelon board of directors for compliance. The Code of Business Conduct further specified that employees were accountable for "recording all business transactions, events and conditions accurately and completely," and were prohibited from "falsifying data, information or records with respect to the Company's finances or operations, including those related to, among other things: assets, liabilities, revenues, expenses and earnings . . . ." and from "creating off-book accounts or funds or making any other entry in any other record that intentionally misrepresents, conceals or disguises the true nature of any transaction, event or condition . . . ." Senior officers of Exelon were also required to ensure that internal controls around financial reporting were properly designed and effective, and were further required to promptly report any violations of these requirements. The Code of Business Conduct further provided that the "FCPA also requires that publicly held companies, like Exelon, maintain accurate books, records and accounts and devise a system of internal accounting controls sufficient to provide reasonable assurance that, among other things, the Company's books and records fairly and accurately reflect business activities and transactions."

      i.     In or around 2015, the Code of Business Conduct was revised, and from in or around 2015 to in or around 2019 provided that "[b]usiness and financial records are essential to our business operations. Exelon relies on the integrity and accuracy of these records to make strategic decisions and has designed and implemented a series of

internal controls—organizational structures, processes, procedures, systems, etc.—to effectively manage financial reporting." The Code of Business Conduct further instructed employees to: "[n]ever keep off-the-book accounts or false or incomplete records"; "[n]ever make an entry in any record that intentionally misrepresents, conceals or disguises the true nature of any transaction, event or condition"; "[r]ecord all business transactions, events and conditions accurately, completely and in a timely fashion"; "[e]nsure that there is clear, complete fair and accurate reporting and supporting records of financial information pertaining to business transactions"; "[n]ever mislead or misinform anyone about our business operations or finances"; "[i]mmediately report any requests received to manipulate accounts, books and records, or financial reports, and any suspected misconduct regarding accounting, internal controls, or auditing matters to the Ethics and Compliance Office, Audit and Controls, or the Legal Department." The Code of Business Conduct further emphasized under the heading "Fighting Bribery and Corruption" that bribes and kickbacks of any kind violated the Code of Business Conduct and were illegal, and that the FCPA "[r]equires that publicly held companies, like Exelon, have accounting controls to assure that all transactions are recorded fairly and accurately in our financial books and records." The Code of Business Conduct provided the following examples of what was expected of employees and agents: (a) "[k]eep accurate and complete records so all payments are honestly detailed and company funds are not used for unlawful purposes"; (b) "[c]onduct due diligence on all potential agents, consultants or other business partners"; and (c) "[n]ever use a third party to make

payments or offers that could be improper."    Exelon's Code of Business Conduct also prohibited bribery and listed as an example of a prohibited bribe: "Providing something of value for the benefit of a public official in a position to make a decision that could benefit the company."

   j.  Exelon, together with ComEd and Exelon Business Services, provided training on the Code of Business Conduct to employees in the form of training guides.

   k.  Employees of Exelon and its subsidiaries, including ComEd and Exelon Business Services, were required to annually certify adherence to Exelon's Code of Business Conduct.    Employees were also required to promptly report potential violations of the Code of Business Conduct, including but not limited to "[a]ccounting improprieties, internal accounting controls or auditing matters."

**The Illinois General Assembly and**
**Legislation Affecting ComEd's Business**

   l.  The State of Illinois annually received in excess of $10,000 in federal benefits in each calendar year from 2011 through 2019.

   m.  The legislative branch of government for the State of Illinois was commonly known as the Illinois General Assembly.    The Illinois General Assembly was composed of two houses: The House of Representatives and the Senate.

   n.  The Illinois General Assembly routinely considered bills and passed legislation that had an impact on ComEd's operations and profitability, including

legislation that affected the regulatory process used to determine the rates ComEd could charge customers for the delivery of electricity.

        o.     In 2011, the General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA"). EIMA provided for a regulatory process through which ComEd was able to more reliably determine rates it could charge customers and, in turn, determine how much money it was able to generate from its operations to cover, among other things, costs for grid-infrastructure improvements. The passage of EIMA therefore helped improve ComEd's financial stability.

        p.     Following the passage of EIMA, the Illinois Commerce Commission ("ICC") interpreted the language of EIMA in a manner adverse to ComEd. In 2013, the General Assembly passed legislation, known as Senate Bill 9, that effectively overruled the ICC's adverse interpretation of EIMA.

        q.     On or about December 1, 2016, the General Assembly passed the Future Energy Jobs Act ("FEJA"), which provided for a renewal of the regulatory process that was beneficial to ComEd. After the passage of FEJA, ComEd maintained a continuing interest in advancing legislation in the General Assembly favorable to its interests, and opposing legislation that was not consistent with its operational and financial success.

## The Thirteenth Ward Democratic Organization

r.     The City of Chicago was divided into fifty wards.     Each ward publicly elected an individual, known as an Alderman, to represent the ward on the Chicago City Council.

s.     Each ward also publicly elected individuals for each respective political party that were each known as a "Committeeman" or "Committeeperson."     A Committeeman had varying roles in each ward, that could include such tasks and duties as addressing day-to-day grievances presented by ward residents; having a role in endorsing candidates for office and deciding the composition of the "slate" of candidates for their political party for office within Cook County; and having a role in deciding who would be appointed to fill any vacancies that arose with respect to certain public offices.

t.     The Thirteenth Ward Democratic Organization was a political party committee that maintained an office within Chicago's Thirteenth Ward at 6500 South Pulaski Road, Chicago, Illinois (the "Thirteenth Ward Office").     The purpose of the Thirteenth Ward Democratic Organization was to, among other things, cultivate support for political candidates and public officials who ran for and held public office through a variety of means, which included door-to-door campaigning by political workers, including those known as "precinct captains," who were associated with the Thirteenth Ward Democratic Organization.

### Defendants and Relevant Individuals

u.     Public Official A was the Speaker of the House of Representatives and an elected member of that body.   As Speaker of the House of Representatives, Public Official A was able to exercise control over what measures were called for a vote in the House of Representatives.   Public Official A also exercised substantial influence over fellow lawmakers concerning legislation, including legislation affecting ComEd. Public Official A was elected from a House district that was largely made up of two Chicago wards: the Thirteenth Ward and the Twenty-Third Ward.   Public Official A was also Democratic Committeeman for the Thirteenth Ward and Chairman of the Thirteenth Ward Democratic Organization.

v.     Defendant MICHAEL McCLAIN served with Public Official A in the House of Representatives for approximately ten years beginning in 1972.   After McCLAIN's service in the House of Representatives, McCLAIN served as a lobbyist and/or consultant for ComEd until in or around 2019.   McCLAIN was an attorney who was registered to practice law from between in or around 1977 to in or around 2016.

w.     Defendant ANNE PRAMAGGIORE was the chief executive officer of ComEd between in or around March 2012 and May 2018.   From on or about June 1, 2018 to on or about October 15, 2019, PRAMAGGIORE served as a senior executive at an affiliate of Exelon, and had oversight authority over ComEd's operations. PRAMAGGIORE was an attorney who was registered to practice law from between in or around 1989 to in or around 2019.   Each year between in or around 2012 and in or

around 2016, PRAMAGGIORE received annual ethics training, including training on the duty to maintain accurate books and records. Each year between in or around 2010 and in or around 2018, PRAMAGGIORE certified her understanding of the Code of Business Conduct.

          x.      Defendant JOHN HOOKER served as ComEd's executive vice president of legislative and external affairs from in or around 2009 until his retirement in or around 2012. From in or around 2012 to in or around 2019, HOOKER served as an external lobbyist for ComEd. Exelon required HOOKER to certify his understanding of the Code of Business Conduct. Between in or around 2010 and in or around 2011, HOOKER certified his understanding of the Code of Business Conduct.

          y.      Fidel Marquez served as ComEd's senior vice president of external and governmental affairs from in or around March 2012 until in or around September 2019. Each year between in or around 2012 and in or around 2016, Marquez received annual ethics training, including training on the duty to maintain accurate books and records. Each year between in or around 2010 to in or around 2018, Marquez certified his understanding of the Code of Business Conduct.

          z.      Defendant JAY DOHERTY was the owner of Jay D. Doherty & Associates ("JDDA"), which performed consulting services for ComEd beginning prior to in or around 2011 and continuing until in or around 2019.

aa.    Individual 13W-1 was the Alderman for the Thirteenth Ward from in or around 1994 until on or about April 30, 2011, and was the Treasurer of the Thirteenth Ward Democratic Organization.

bb.    Individual 13W-2 was associated with the Thirteenth Ward Democratic Organization and was a precinct captain within the Thirteenth Ward.

cc.    Individual 13W-3 was associated with the Thirteenth Ward Democratic Organization and was a precinct captain within the Thirteenth Ward.

dd.    Individual 23W-1 was the Alderman for the Twenty-Third Ward until on or about May 31, 2018.

ee.    Individual BM-1 was a resident of Elmwood Park, Illinois, who sought a position on ComEd's board of directors.

2.    Beginning no later than in or around 2011, and continuing through in or around 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN,<br>
ANNE PRAMAGGIORE,<br>
JOHN HOOKER, and<br>
JAY DOHERTY,

defendants herein, did conspire with each other, Fidel Marquez, and others known and unknown to the Grand Jury:

a.    to corruptly solicit and demand, and to accept and agree to accept from another person things of value, namely, jobs, contracts, and monetary payments associated with those jobs and contracts, for the benefit of Public Official A and his associates, intending that Public Official A, an agent of the State of Illinois, be influenced

11

and rewarded in connection with any business, transaction, and series of transactions of the State of Illinois involving things of value of $5,000 or more, namely, legislation affecting ComEd and its business, in violation of Title 18, United States Code, Section 666(a)(1)(B);

b.  to corruptly give, offer, and agree to give things of value, namely, jobs, contracts, and monetary payments associated with those jobs and contracts, for the benefit of Public Official A and his associates, with intent to influence and reward Public Official A, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving things of value of $5,000 or more, namely, legislation affecting ComEd and its business, in violation of Title 18, United States Code, Section 666(a)(2); and

c.  knowingly and willfully to circumvent a system of internal accounting controls and to falsify any book, record, and account of Exelon and ComEd, in violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff(a).

3.  It was part of the conspiracy that, for the purpose of influencing and rewarding Public Official A in connection with his official duties as Speaker of the Illinois House of Representatives, and to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business, the conspirators (i) arranged for various associates of Public Official A, including Public Official A's political allies and individuals who performed political work for Public Official A, to obtain jobs, contracts, and monetary payments associated with

12

those jobs and contracts from ComEd and its affiliates, even in instances where such associates performed little or no work that they were purportedly hired to perform for ComEd; and (ii) created and caused the creation of false contracts, invoices and other books and records to disguise the true nature of certain of the payments and to circumvent internal controls.

### Hiring of Public Official A's Associates as Vendor "Subcontractors" Who Performed Little or No Work for ComEd

4.    It was further part of the conspiracy that Public Official A and McCLAIN sought to obtain from ComEd jobs, vendor contracts and subcontracts, as well as monetary payments for various associates of Public Official A, including Public Official A's political allies and individuals who performed political work for Public Official A, such as ward precinct captains who worked within Public Official A's district.

5.    It was further part of the conspiracy that ComEd, together with senior executives and agents of the company, including but not limited to McCLAIN, PRAMAGGIORE, HOOKER, and Fidel Marquez, corruptly arranged for jobs, vendor contracts and subcontracts, as well as monetary payments to be provided to various associates of Public Official A.

6.    It was further part of the conspiracy that, at certain times, in order to conceal the nature and source of the payments and to prevent detection of the illegal activity, these jobs, vendor subcontracts, and monetary payments were indirectly provided to Public Official A's associates through third-party intermediaries.

7.     It was further part of the conspiracy that certain recipients of these jobs, vendor contracts and subcontracts, as well as monetary payments, often did little or no work in return for such benefits.

8.     It was further part of the conspiracy that the conspirators caused third-party intermediaries to enter into false contracts, to submit false invoices for payment, and further caused the creation and retention of other false documents and records within Exelon, ComEd and Exelon Business Services that made it falsely appear that payments intended for third-party intermediaries were solely for legitimate services to be rendered or actually rendered by the third-party intermediaries, when in fact, the contracts, invoices and internal documentation were intended to disguise the fact that a substantial amount of the payments to the third-party intermediaries was intended for Public Official A's associates, who performed little or no work for ComEd.

9.     It was further part of the conspiracy that, at times, Public Official A's associates who were recipients of vendor subcontracts and monetary payments submitted invoices to third-party intermediaries, purporting to document services for the benefit of ComEd, concealing the fact that little or no work was performed by them for the benefit of ComEd, in order to ensure the continuation of such payments.

### Retention of Law Firm A

10.     It was further part of the conspiracy that the conspirators caused ComEd to retain Law Firm A, for the purpose of influencing and rewarding Public Official A in connection with Public Official A's official duties.

14

11. It was further part of the conspiracy that, in or around 2011, McCLAIN and HOOKER, who were not members of ComEd's legal department, advised a member of ComEd's legal department that it was important to retain Law Firm A. Thereafter, Law Firm A was retained by ComEd pursuant to a contract that provided Law Firm A would be provided with approximately 850 hours of work a year.

12. It was further part of the conspiracy that, in or around 2014, PRAMMAGGIORE instructed a member of ComEd's legal department that Law Firm A's contract had to be renewed and that McCLAIN had to be dealt with in connection with the renewal of the contract.

13. It was further part of the conspiracy that, in or around 2016, after personnel within ComEd sought to reduce the number of hours of legal work provided to Law Firm A because there was not enough appropriate legal work to provide to Law Firm A, McCLAIN interceded with PRAMAGGIORE, in order to cause Law Firm A's contract to be renewed on terms acceptable to Law Firm A.

14. It was further part of the conspiracy that, in or around 2016, a ComEd employee, who was assigned as a project manager by PRAMAGGIORE to assist with the project of obtaining legislative approval of FEJA—and who had no oversight authority over ComEd's legal department—began to monitor the renewal of Law Firm A's contract in order to help ensure that Law Firm A's contract was renewed.

15. It was further part of the conspiracy that, in or around 2016, the conspirators caused ComEd to enter into a new contract with Law Firm A, with the

intent to influence and reward Public Official A in connection with Public Official A's official duties, including the promotion and passage of legislation that affected ComEd.

### Thirteenth Ward Interns

16.     It was further part of the conspiracy that, for the purpose of influencing and rewarding Public Official A, the conspirators caused positions in the ComEd Internship Program to be set aside for individuals associated with the Thirteenth Ward who were identified by McCLAIN.

17.     It was further part of the conspiracy that potential Thirteenth Ward interns identified by McCLAIN did not need to compete against the general intern applicant pool, and instead, received more favorable treatment when it came to assessing their qualifications for a position within the ComEd Internship Program.

18.     It was further part of the conspiracy that Marquez would contact other employees within ComEd for the purpose of stressing the need to hire interns who were referred by McCLAIN, and ensuring that Thirteenth Ward interns received favorable treatment during the hiring process.

19.     It was further part of the conspiracy that ComEd's minimum academic requirements for intern candidates, such as a minimum required grade point average, were waived at times for certain Thirteenth Ward intern candidates who did not meet those requirements.

### Appointment to ComEd Board

20.     It was further part of the conspiracy that, by no later than in or around November 2017, Public Official A and McCLAIN sought the appointment of Individual BM-1 to the ComEd board of directors, and PRAMAGGIORE agreed to seek the appointment of Individual BM-1 with the intent to influence and reward Public Official A in connection with Public Official A's official duties.

21.     It was further part of the conspiracy that between in or around 2017 and in or around 2019, PRAMAGGIORE took steps to cause ComEd to appoint Individual BM-1 to the board of directors, including urging other ComEd executives to agree to and arrange for Individual BM-1's appointment.

22.     It was further part of the conspiracy that, in or around April 2019, Individual BM-1 was appointed to the ComEd board of directors.

### Hiring of Other Individuals

23.     It was further part of the conspiracy that McCLAIN regularly made requests on Public Official A's behalf to PRAMAGGIORE, Marquez, and other personnel within ComEd to hire individuals associated with Public Official A as full-time employees, consultants, and contractors.

24.     It was further part of the conspiracy that, for the purpose of influencing and rewarding Public Official A, the conspirators secured and attempted to secure jobs and contracts for these individuals as requested by McCLAIN.

<u>Concealment</u>

25.    It was further part of the conspiracy that, in order to conceal the unlawful benefits tendered for the purpose of influencing and rewarding Public Official A, the conspirators concealed multiple violations of Exelon's Code of Business Conduct, including violations of: (i) the requirement to keep accurate and complete records of all payments made by ComEd, Exelon and Exelon Business Services; (ii) the prohibition on never using a third party to make payments or offers that could be improper; and (iii) the prohibition on "providing something of value for the benefit of a public official in a position to make a decision that could benefit the company."

26.    It was further part of the conspiracy that, in order to conceal the nature and purpose of their conduct, conspirators often referred to Public Official A as "our Friend," or "a Friend of ours," rather than using Public Official A's true name.

27.    It was further part of the conspiracy that the defendants and their co-conspirators misrepresented, concealed and hid, and caused to be misrepresented, concealed and hidden, and attempted to misrepresent, conceal and hide acts done in furtherance of the conspiracy and the purpose of those acts.

<u>Overt Acts</u>

28.    In furtherance of the conspiracy and to effect its objects and purposes, the defendants and their co-conspirators committed and caused to be committed the following overt acts, among others, within the Northern District of Illinois and elsewhere:

a.      On or about each date set forth below, defendants caused payments to be made to JDDA in the approximate amount set forth below, with a substantial portion of each payment intended for associates of Public Official A:

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| a-1 | 01/27/2014 | $31,000 |
| a-2 | 03/03/2014 | $31,000 |
| a-3 | 03/31/2014 | $43,000 |
| a-4 | 04/28/2014 | $37,000 |
| a-5 | 05/30/2014 | $37,000 |
| a-6 | 07/03/2014 | $37,000 |
| a-7 | 07/28/2014 | $37,000 |
| a-8 | 08/29/2014 | $37,000 |
| a-9 | 09/29/2014 | $37,000 |
| a-10 | 10/30/2014 | $37,000 |
| a-11 | 12/01/2014 | $37,000 |
| a-12 | 12/29/2014 | $37,000 |
| a-13 | 01/29/2015 | $37,000 |

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| a-14 | 03/02/2015 | $37,000 |
| a-15 | 03/30/2015 | $37,000 |
| a-16 | 04/27/2015 | $37,000 |
| a-17 | 06/01/2015 | $37,000 |
| a-18 | 06/29/2015 | $37,000 |
| a-19 | 08/11/2015 | $37,000 |
| a-20 | 08/31/2015 | $37,000 |
| a-21 | 09/28/2015 | $37,000 |
| a-22 | 10/29/2015 | $37,000 |
| a-23 | 11/30/2015 | $37,000 |
| a-24 | 12/28/2015 | $37,000 |
| a-25 | 01/29/2016 | $37,000 |
| a-26 | 02/29/2016 | $37,000 |
| a-27 | 03/31/2016 | $37,000 |
| a-28 | 04/28/2016 | $37,000 |

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| a-29 | 05/31/2016 | $37,000 |
| a-30 | 06/27/2016 | $37,000 |
| a-31 | 08/01/2016 | $37,000 |
| a-32 | 08/29/2016 | $37,000 |
| a-33 | 09/29/2016 | $37,000 |
| a-34 | 10/31/2016 | $37,000 |
| a-35 | 11/28/2016 | $37,000 |
| a-36 | 03/02/2017 | $69,500 |
| a-37 | 04/03/2017 | $65,000 |
| a-38 | 05/30/2017 | $32,500 |
| a-39 | 06/01/2017 | $32,500 |
| a-40 | 06/29/2017 | $32,500 |
| a-41 | 07/31/2017 | $32,500 |
| a-42 | 09/11/2017 | $32,500 |
| a-43 | 09/29/2017 | $32,500 |

| Overt Act | Date | Amount |
|---|---|---|
| a-44 | 10/30/2017 | $32,500 |
| a-45 | 11/27/2017 | $32,500 |
| a-46 | 01/16/2018 | $32,500 |
| a-47 | 04/03/2018 | $65,000 |
| a-48 | 04/16/2018 | $32,500 |
| a-49 | 04/30/2018 | $32,500 |
| a-50 | 05/29/2018 | $32,500 |
| a-51 | 06/29/2018 | $32,500 |
| a-52 | 07/30/2018 | $37,500 |
| a-53 | 08/27/2018 | $37,500 |
| a-54 | 10/01/2018 | $42,500 |
| a-55 | 10/29/2018 | $37,500 |
| a-56 | 11/30/2018 | $37,500 |
| a-57 | 12/31/2018 | $3,750 |
| a-58 | 01/04/2019 | $33,750 |

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| a-59 | 04/01/2019 | $112,500 |
| a-60 | 04/09/2019 | $37,500 |
| a-61 | 05/03/2019 | $37,500 |

b.    On or about each date set forth below, defendant DOHERTY caused a check to be made to Individual 13W-1 in the approximate amount set forth below, for payments totaling approximately $256,000:

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| b-1 | 12/30/2013 | $4,000 |
| b-2 | 01/31/2014 | $4,000 |
| b-3 | 02/28/2014 | $4,000 |
| b-4 | 03/31/2014 | $4,000 |
| b-5 | 04/30/2014 | $4,000 |
| b-6 | 05/30/2014 | $4,000 |
| b-7 | 06/30/2014 | $4,000 |
| b-8 | 07/31/2014 | $4,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| b-9 | 08/31/2014 | $4,000 |
| b-10 | 09/30/2014 | $4,000 |
| b-11 | 10/31/2014 | $4,000 |
| b-12 | 11/30/2014 | $4,000 |
| b-13 | 12/31/2014 | $4,000 |
| b-14 | 01/31/2015 | $4,000 |
| b-15 | 02/28/2015 | $4,000 |
| b-16 | 03/31/2015 | $4,000 |
| b-17 | 04/30/2015 | $4,000 |
| b-18 | 05/31/2015 | $4,000 |
| b-19 | 06/30/2015 | $4,000 |
| b-20 | 07/31/2015 | $4,000 |
| b-21 | 08/31/2015 | $4,000 |
| b-22 | 09/30/2015 | $4,000 |
| b-23 | 10/31/2015 | $4,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| b-24 | 11/30/2015 | $4,000 |
| b-25 | 12/31/2015 | $4,000 |
| b-26 | 01/31/2016 | $4,000 |
| b-27 | 02/29/2016 | $4,000 |
| b-28 | 03/31/2016 | $4,000 |
| b-29 | 04/30/2016 | $4,000 |
| b-30 | 05/31/2016 | $4,000 |
| b-31 | 06/30/2016 | $4,000 |
| b-32 | 07/31/2016 | $4,000 |
| b-33 | 08/31/2016 | $4,000 |
| b-34 | 09/30/2016 | $4,000 |
| b-35 | 10/31/2016 | $4,000 |
| b-36 | 11/30/2016 | $4,000 |
| b-37 | 03/03/2017 | $4,000 |
| b-38 | 03/03/2017 | $4,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| b-39 | 03/31/2017 | $4,000 |
| b-40 | 04/05/2017 | $4,000 |
| b-41 | 06/05/2017 | $4,000 |
| b-42 | 06/08/2017 | $4,000 |
| b-43 | 07/06/2017 | $4,000 |
| b-44 | 07/31/2017 | $4,000 |
| b-45 | 09/15/2017 | $4,000 |
| b-46 | 10/06/2017 | $4,000 |
| b-47 | 11/06/2017 | $4,000 |
| b-48 | 12/07/2017 | $4,000 |
| b-49 | 01/23/2018 | $4,000 |
| b-50 | 04/10/2018 | $4,000 |
| b-51 | 04/10/2018 | $4,000 |
| b-52 | 04/24/2018 | $4,000 |
| b-53 | 05/07/2018 | $4,000 |

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| b-54 | 06/05/2018 | $4,000 |
| b-55 | 07/09/2018 | $4,000 |
| b-56 | 07/31/2018 | $4,000 |
| b-57 | 09/05/2018 | $4,000 |
| b-58 | 10/05/2018 | $4,000 |
| b-59 | 11/06/2018 | $4,000 |
| b-60 | 12/10/2018 | $4,000 |
| b-61 | 01/10/2019 | $4,000 |
| b-62 | 04/08/2019 | $4,000 |
| b-63 | 04/18/2019 | $4,000 |
| b-64 | 04/26/2019 | $4,000 |

      c.     On or about each date set forth below, defendant DOHERTY caused a check to be made to Individual 13W-2's company in the approximate amount set forth below, for payments totaling approximately $325,000:

| Overt Act | Date | Amount |
|-----------|------|--------|
| c-1 | 12/30/2013 | $5,000 |
| c-2 | 01/31/2014 | $5,000 |
| c-3 | 02/28/2014 | $5,000 |
| c-4 | 03/31/2014 | $5,000 |
| c-5 | 04/30/2014 | $5,000 |
| c-6 | 05/30/2014 | $5,000 |
| c-7 | 06/30/2014 | $5,000 |
| c-8 | 07/31/2014 | $5,000 |
| c-9 | 08/31/2014 | $5,000 |
| c-10 | 09/30/2014 | $5,000 |
| c-11 | 10/31/2014 | $5,000 |
| c-12 | 11/30/2014 | $5,000 |
| c-13 | 12/31/2014 | $5,000 |
| c-14 | 01/31/2015 | $5,000 |
| c-15 | 02/27/2015 | $5,000 |

| Overt Act | Date | Amount |
|---|---|---|
| c-16 | 03/31/2015 | $5,000 |
| c-17 | 04/30/2015 | $5,000 |
| c-18 | 05/31/2015 | $5,000 |
| c-19 | 06/30/2015 | $5,000 |
| c-20 | 07/31/2015 | $5,000 |
| c-21 | 08/31/2015 | $5,000 |
| c-22 | 09/30/2015 | $5,000 |
| c-23 | 10/31/2015 | $5,000 |
| c-24 | 11/30/2015 | $5,000 |
| c-25 | 12/31/2015 | $5,000 |
| c-26 | 01/31/2016 | $5,000 |
| c-27 | 02/29/2016 | $5,000 |
| c-28 | 03/31/2016 | $5,000 |
| c-29 | 04/30/2016 | $5,000 |
| c-30 | 05/31/2016 | $5,000 |

| Overt Act | Date | Amount |
|---|---|---|
| c-31 | 06/30/2016 | $5,000 |
| c-32 | 07/31/2016 | $5,000 |
| c-33 | 08/31/2016 | $5,000 |
| c-34 | 09/30/2016 | $5,000 |
| c-35 | 10/31/2016 | $5,000 |
| c-36 | 11/30/2016 | $5,000 |
| c-37 | 03/03/2017 | $5,000 |
| c-38 | 03/03/2017 | $5,000 |
| c-39 | 03/31/2017 | $5,000 |
| c-40 | 04/05/2017 | $5,000 |
| c-41 | 06/05/2017 | $5,000 |
| c-42 | 06/08/2017 | $5,000 |
| c-43 | 07/06/2017 | $5,000 |
| c-44 | 07/31/2017 | $5,000 |
| c-45 | 09/15/2017 | $5,000 |

| Overt Act | Date | Amount |
|---|---|---|
| c-46 | 10/06/2017 | $5,000 |
| c-47 | 11/06/2017 | $5,000 |
| c-48 | 12/07/2017 | $5,000 |
| c-49 | 01/23/2018 | $5,000 |
| c-50 | 04/10/2018 | $5,000 |
| c-51 | 04/10/2018 | $5,000 |
| c-52 | 04/24/2018 | $5,000 |
| c-53 | 05/07/2018 | $5,000 |
| c-54 | 06/05/2018 | $5,000 |
| c-55 | 07/09/2018 | $5,000 |
| c-56 | 07/31/2018 | $5,000 |
| c-57 | 09/05/2018 | $5,000 |
| c-58 | 10/05/2018 | $5,000 |
| c-59 | 11/06/2018 | $5,000 |
| c-60 | 12/10/2018 | $5,000 |

| Overt Act | Date | Amount |
|-----------|------|--------|
| c-61 | 01/10/2019 | $5,000 |
| c-62 | 04/08/2019 | $5,000 |
| c-63 | 04/18/2019 | $5,000 |
| c-64 | 04/26/2019 | $5,000 |
| c-65 | 05/06/2019 | $5,000 |

      d.    On or about each date set forth below, defendant DOHERTY caused a check to be made to Individual 13W-3 in the approximate amount set forth below, for payments totaling approximately $144,000:

| Overt Act | Date | Amount |
|-----------|------|--------|
| d-1 | 03/31/2014 | $4,500 |
| d-2 | 04/30/2014 | $4,500 |
| d-3 | 05/30/2014 | $4,500 |
| d-4 | 06/30/2014 | $4,500 |
| d-5 | 07/30/2014 | $4,500 |
| d-6 | 08/31/2014 | $4,500 |

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| d-7 | 09/30/2014 | $4,500 |
| d-8 | 10/31/2014 | $4,500 |
| d-9 | 11/30/2014 | $4,500 |
| d-10 | 12/31/2014 | $4,500 |
| d-11 | 01/31/2015 | $4,500 |
| d-12 | 02/27/2015 | $4,500 |
| d-13 | 03/31/2015 | $4,500 |
| d-14 | 04/30/2015 | $4,500 |
| d-15 | 05/31/2015 | $4,500 |
| d-16 | 06/30/2015 | $4,500 |
| d-17 | 07/31/2015 | $4,500 |
| d-18 | 08/31/2015 | $4,500 |
| d-19 | 09/30/2015 | $4,500 |
| d-20 | 10/31/2015 | $4,500 |
| d-21 | 11/30/2015 | $4,500 |

| Overt Act | Date | Amount |
|:---:|:---:|:---:|
| d-22 | 12/31/2015 | $4,500 |
| d-23 | 01/31/2016 | $4,500 |
| d-24 | 02/29/2016 | $4,500 |
| d-25 | 03/31/2016 | $4,500 |
| d-26 | 04/30/2016 | $4,500 |
| d-27 | 05/31/2016 | $4,500 |
| d-28 | 06/30/2016 | $4,500 |
| d-29 | 07/31/2016 | $4,500 |
| d-30 | 08/31/2016 | $4,500 |
| d-31 | 09/30/2016 | $4,500 |
| d-32 | 10/31/2016 | $4,500 |

e.      On or about February 25, 2015, McCLAIN sent an email to Marquez, in which he wrote, "Our Friend's ward? Summer interns? 10 jobs or 12 or what is the ceiling? Best, Mike."

f.      On or about April 2, 2015, in response to an email asking whether there was pressure to hire a prospective intern associated with the Thirteenth Ward, or

whether the intern could simply be "fairly considered" for the ComEd Internship Program, Marquez wrote an email that said, "There is pressure to hire Hope she interviews well."

        g.    On or about April 29, 2015, Marquez forwarded an email to McCLAIN, advising that a candidate McCLAIN had referred to ComEd for the ComEd Internship Program had been hired.

        h.    On or about January 20, 2016, McCLAIN wrote an email to PRAMAGGIORE and HOOKER that said the following: "I am sure you know how valuable [Lawyer A] is to our Friend," and then went on to write, "I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you. Is this a drill we must go through? For me, Hook and I am sure you I just do not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend."

        i.    On or about January 20, 2016, PRAMAGGIORE wrote an email to McCLAIN, in response to the email referenced in paragraph 28(h) and responded, "Sorry. No one informed me. I am on this."

        j.    On or about January 20, 2016, PRAMAGGIORE forwarded the email referenced in paragraph 28(h) to Marquez.

        k.    On or about January 20, 2016, PRAMAGGIORE forwarded the email referenced in paragraph 28(h) to an employee in ComEd's legal department.

l.&#x20;&#x20;&#x20;&#x20;&#x20;On or about February 25, 2016, McCLAIN wrote an email to Marquez, in which McCLAIN advised that "the 13th Ward may not want these people in their column," in reference to ComEd counting interns that returned to the ComEd Internship Program against the number of spaces allotted to individuals from the Thirteenth Ward.

m.&#x20;&#x20;&#x20;&#x20;&#x20;On or about April 15, 2016, McCLAIN wrote an email to ComEd's project manager for FEJA with the subject heading, "[Lawyer A] law firm?!"

n.&#x20;&#x20;&#x20;&#x20;&#x20;On or about May 22, 2016, the project manager for FEJA wrote an email to a member of ComEd's legal department that asked, in reference to Law Firm A, "Are we closed out on this topic?"

o.&#x20;&#x20;&#x20;&#x20;&#x20;On or about May 24, 2016, McCLAIN wrote an email to a member of ComEd's legal department, HOOKER, and the project manager for FEJA, in which McCLAIN proposed terms for the renewal of Law Firm A's contract with ComEd.

p.&#x20;&#x20;&#x20;&#x20;&#x20;On or about December 2, 2016, McCLAIN wrote an email to a member of ComEd's legal department, in which McCLAIN followed up on a prior email concerning Law Firm A, and asked "After you catch a couple of good nights [sic] sleep can we put this item to bed?"

q.&#x20;&#x20;&#x20;&#x20;&#x20;On or about December 3, 2016, PRAMAGGIORE sent an email to McCLAIN in which she assured McCLAIN that she would resolve outstanding issues relating to Law Firm A's contract, by noting, "Fidel and I are meeting on Monday to make our list. This will be on it."

36

r.      In or around January 2017, in connection with the renewal of JDDA's contract, PRAMAGGIORE signed a false and misleading document, known as a "Single Source Justification," in support of the renewal of JDDA's contract and caused it to be submitted to Exelon Business Services.   This Single Source Justification form made it falsely appear that the large amount of money to be paid to JDDA under the contract was on account of, among other things, JDDA's "unique insight & perspective to promote ComEd and its business matters to further develop, execute and manage its Government Relations presence" and did not indicate that a substantial amount of the fees that would be paid to JDDA was intended for third parties in an effort to influence and reward Public Official A.

s.      On or about April 2, 2017, McCLAIN sent an email to Marquez, PRAMAGGIORE, and HOOKER, inquiring about the participation of individuals associated with the Thirteenth Ward in the ComEd Internship Program, and noted, "I strongly recommend this item as we go through this transition period.   My goal is that both parties are happy and not frustrated a second.   I hope you agree."

t.      On or about November 17, 2017, PRAMAGGIORE sent an email to a member of ComEd's legal department, forwarding an email that had been sent at the request of Public Official A, containing a copy of the resume for Individual BM-1.

u.      On or about January 5, 2018, Marquez sent an email approving the renewal of JDDA's contract for 2018.

v.    On or about January 8, 2018, in connection with the renewal of JDDA's contract, PRAMAGGIORE signed a false and misleading document, known as a "Single Source Justification," in support of the renewal of JDDA's contract and caused it to be submitted to Exelon Business Services.   This Single Source Justification form made it falsely appear that the large amount of money to be paid to JDDA under the contract was on account of, among other things, "Consultant has specific knowledge that cannot be sourced from another consultant/supplier."   The form did not indicate that a substantial amount of the fees that would be paid to JDDA was intended for third parties in an effort to influence and reward Public Official A.

w.    On or about February 9, 2018, McCLAIN sent an email to Marquez's assistant, in which McCLAIN wrote that it was his understanding that the Thirteenth Ward would be provided ten positions in the ComEd Internship Program: "[F]or as long as I can remember it has been ten interns??"

x.    On or about February 12, 2018, Marquez caused an email to be sent by his assistant to McCLAIN, in which the assistant wrote, "Confirmed with Fidel we will work to provide you 10 slots."

y.    On or about May 2, 2018, McCLAIN placed a call to Public Official A, and advised Public Official A that PRAMAGGIORE was experiencing push-back to the appointment of Individual BM-1 to the ComEd board of directors, and had proposed finding a job that would pay Individual BM-1 the same amount of money as a board member.

38

z.     On or about May 16, 2018, McCLAIN placed a telephone call to PRAMAGGIORE, during which call PRAMAGGIORE advised McCLAIN that (i) she had instructed Marquez to "hire" Individual 23W-1 after checking with DOHERTY; and (ii) she would, at Public Official A's request, "keep pressing" to appoint Individual BM-1 to the ComEd board of directors.

aa.     On or about May 16, 2018, McCLAIN placed a telephone call to Marquez, during which McCLAIN explained why certain individuals were being paid indirectly through JDDA, by making reference to their utility to Public Official A's political operation, and advised Marquez that Individual 23W-1 should be paid $5,000 a month.

bb.     On or about June 29, 2018, DOHERTY caused an email to be sent to a ComEd employee, which made it falsely appear that the justification for an additional $5,000 a month sought under JDDA's revised contract was because JDDA would assume an "expanded role with Cook County Board President's office and Cook County Commissioners and Department Heads," when in fact the additional $5,000 a month in compensation sought was intended for payment to Individual 23W-1, who performed little or no work for JDDA or ComEd.

cc.     On or about September 7, 2018, McCLAIN and PRAMAGGIORE participated in a telephone call, during which PRAMAGGIORE assured McCLAIN that PRAMAGGIORE was continuing to advocate for the appointment of Individual BM-1 to

ComEd's board of directors and explained "You take good care of me and so does our friend and I will do the best that I can to, to take care of you."

dd. On or about December 6, 2018, McCLAIN sent an email to Marquez and others at ComEd, in which McCLAIN advised, in reference to the ComEd Internship Program, "I am pretty sure the 'ask' will be to 'put aside' or 'save' ten summer jobs for the 13th Ward."

ee. On or about January 29, 2019, HOOKER traveled to the Union League Club, in Chicago, Illinois for the purpose of meeting with Marquez to discuss the renewal of the JDDA contract.

ff. On or about February 7, 2019, McCLAIN traveled to a restaurant in Springfield, Illinois, for the purpose of meeting with Marquez to discuss the renewal of the JDDA contract.

gg. On or about February 13, 2019, DOHERTY met with Marquez in Chicago, Illinois, and discussed how to present information to ComEd's chief executive officer concerning the renewal of the JDDA contract.

hh. On or about February 18, 2019, PRAMAGGIORE participated in a telephone call with Marquez, during which call, after she was told that the subcontractors associated with DOHERTY just "collect a check" and that Marquez needed to brief the chief executive officer of ComEd concerning the JDDA contract, PRAMAGGIORE advised Marquez not to make any changes to the contract, because "we do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their

nose out of joint and we're trying to move somebody off, and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield."

   ii.  In or around March 2019, in connection with the renewal of JDDA's contract, the defendants caused the preparation of a false and misleading document, known as a "Single Source Justification," in support of the renewal of JDDA's contract, and the submission of this form to Exelon Business Services. This Single Source Justification form made it falsely appear that the large amount of money to be paid to JDDA was because, among other things, "Consultant has specific knowledge that cannot be sources [sic] from another supplier/contractor," and did not indicate that a substantial amount of the fees that would be paid to JDDA was intended for third parties in an effort to influence and reward Public Official A.

   jj.  On or about March 5, 2019, McCLAIN met with a ComEd executive and Marquez for the purpose of explaining why the JDDA contract and the payments to Individual 13W-1, Individual 13W-2, and Individual 23W-1 should be continued for another year.

   kk.  On or about March 11, 2019, DOHERTY caused a representative from Exelon Business Services to execute a contract containing false representations and promises that the compensation paid to JDDA was in return for providing ComEd with advice on legislative issues, when in fact a significant portion of the compensation to be

paid to JDDA was intended for Individual 13W-1, Individual 13W-2, and Individual 23W-1, who in fact did little or no legitimate work for ComEd.

       ll.    On or about April 25, 2019, PRAMAGGIORE advised McCLAIN by text message, "Just sent out Board approval to appoint [Individual BM-1] to ComEd Board."

       mm.   On or about April 26, 2019, ComEd filed a notice with the U.S. Securities and Exchange Commission stating that Individual BM-1 had served as a director of ComEd since April 2019.

All in violation of Title 18, United States Code, Sections 371 and 2.

### COUNT TWO

THE SPECIAL JANUARY 2019 GRAND JURY further charges:

1.      Paragraphs 1(a), 1(b), 1(l) through 1(q), and 1(u) through 1(w) of Count One of this indictment are hereby realleged and incorporated here.

2.      In or around December 2016, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN, and
ANNE PRAMAGGIORE,

defendants herein, corruptly offered and agreed to give a thing of value, and caused ComEd to offer and agree to give a thing of value, namely, a contract for Law Firm A and monetary payments associated with that contract, for the benefit of Public Official A and his associate, Lawyer A, with intent to influence and reward Public Official A, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, legislation affecting ComEd and its business;

In violation of Title 18, United States Code, Sections 666(a)(2) and 2.

43

## COUNT THREE

THE SPECIAL JANUARY 2019 GRAND JURY further charges:

1.      Paragraphs 1(a), 1(b), 1(d) through 1(k), and 1(m) through 1(cc) of Count One of this indictment are hereby realleged and incorporated here.

2.      Between in or around January 2017 and in or around February 2017, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN,
ANNE PRAMAGGIORE,
JOHN HOOKER, and
JAY DOHERTY,

defendants herein, knowingly and willfully falsified and caused to be falsified certain ComEd and Exelon books, records, and accounts, so that those books, records, and accounts did not in reasonable detail, accurately and fairly reflect the transactions and dispositions of ComEd's and Exelon's assets, namely, in connection with the renewal of JDDA's contract for 2017;

In violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff(a), and Title 18, United States Code, Section 2.

## COUNT FOUR

THE SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), 1(d) through 1(k), and 1(m) through 1(cc) of Count One of this indictment are hereby realleged and incorporated here.

2.     Between in or around January 2018 and in or around March 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN,
ANNE PRAMAGGIORE,
JOHN HOOKER, and
JAY DOHERTY,

defendants herein, knowingly and willfully falsified and caused to be falsified certain ComEd and Exelon books, records, and accounts, so that those books, records, and accounts did not in reasonable detail, accurately and fairly reflect the transactions and dispositions of ComEd's and Exelon's assets, namely, in connection with the renewal of JDDA's contract for 2018;

In violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff(a), and Title 18, United States Code, Section 2.

<u>**COUNT FIVE**</u>

THE SPECIAL JANUARY 2019 GRAND JURY further charges:

1.      Paragraphs 1(a), 1(b), 1(l) through 1(q), 1(u), 1(w) and 1(ee) of Count One of this indictment are hereby realleged and incorporated here.

2.      Between in or around 2018 and in or around April 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN, and
ANNE PRAMAGGIORE,

defendants herein, corruptly offered and agreed to give a thing of value, and caused ComEd and Exelon to offer and agree to give a thing of value, namely, a position on the ComEd board of directors and monetary payments associated with that position, for the benefit of Public Official A and his associate, Individual BM-1, with intent to influence and reward Public Official A, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, legislation affecting ComEd and its business;

In violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT SIX

THE SPECIAL JANUARY 2019 GRAND JURY further charges:

1.      Paragraphs 1(a), 1(b), and 1(l) through 1(dd) of Count One of this indictment are hereby realleged and incorporated here.

2.      In or around May 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN, and
ANNE PRAMAGGIORE,

defendants herein, corruptly offered and agreed to give a thing of value, and caused ComEd to offer and agree to give a thing of value, namely, payments of $5,000 a month, for the benefit of Public Official A and his associate, Individual 23W-1, with intent to influence and reward Public Official A, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, legislation affecting ComEd and its business;

In violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT SEVEN

THE SPECIAL JANUARY 2019 GRAND JURY further charges:

1.     Paragraphs 1(a), 1(b), 1(d) through 1(k), and 1(m) through 1(dd) of Count One of this indictment are hereby realleged and incorporated here.

2.     Between in or around May 2018 and in or around July 2018, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN,
ANNE PRAMAGGIORE,
JOHN HOOKER, and
JAY DOHERTY,

defendants herein, knowingly and willfully falsified and caused to be falsified certain ComEd and Exelon books, records, and accounts, so that those books, records, and accounts did not in reasonable detail, accurately and fairly reflect the transactions and dispositions of ComEd's and Exelon's assets, namely, in connection with the amendment of JDDA's contract for 2018;

In violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff(a), and Title 18, United States Code, Section 2.

48

## COUNT EIGHT

THE SPECIAL JANUARY 2019 GRAND JURY further charges:

1.    Paragraphs 1(a), 1(b), 1(l) through 1(dd) of Count One of this indictment are hereby realleged and incorporated here.

2.    Between in or around January 2019 and on or about March 11, 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN,
ANNE PRAMAGGIORE,
JOHN HOOKER, and
JAY DOHERTY,

defendants herein, corruptly offered and agreed to give a thing of value, and caused ComEd to offer and agree to give a thing of value, namely, a new annual contract for JDDA and monetary payments associated with that contract, for the benefit of Public Official A and his associates, Individual 13W-1, Individual 13W-2, and Individual 23W-1, with intent to influence and reward Public Official A, as an agent of the State of Illinois, in connection with any business, transaction, and series of transactions of the State of Illinois involving a thing of value of $5,000 or more, namely, legislation affecting ComEd and its business;

In violation of Title 18, United States Code, Sections 666(a)(2) and 2.

## COUNT NINE

THE SPECIAL JANUARY 2019 GRAND JURY further charges:

1.      Paragraphs 1(a), 1(b), 1(d) through 1(k), and 1(m) through 1(dd) of Count One of this indictment are hereby realleged and incorporated here.

2.      Between in or around February 2019 and in or around March 2019, in the Northern District of Illinois, Eastern Division, and elsewhere,

MICHAEL McCLAIN,
ANNE PRAMAGGIORE,
JOHN HOOKER, and
JAY DOHERTY,

defendants herein, knowingly and willfully falsified and caused to be falsified certain ComEd and Exelon books, records, and accounts, so that those books, records, and accounts did not in reasonable detail, accurately and fairly reflect the transactions and dispositions of ComEd's and Exelon's assets, namely, in connection with the renewal of JDDA's contract for 2019;

In violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff(a), and Title 18, United States Code, Section 2.

A TRUE BILL:

_____
FOREPERSON


_____
UNITED STATES ATTORNEY