UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MICHAEL McCLAIN,
ANNE PRAMAGGIORE,
JOHN HOOKER, and
JAY DOHERTY

No. 20 CR 812

Judge Harry D. Leinenweber

## GOVERNMENT'S CONSOLIDATED RESPONSE TO DEFENDANTS' PRETRIAL MOTIONS

JOHN R. LAUSCH, JR.
United States Attorney

AMARJEET S. BHACHU
DIANE MacARTHUR
TIMOTHY CHAPMAN
SARAH STREICKER
MICHELLE KRAMER
JULIA K. SCHWARTZ
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ...................................................................................................... 3

LEGAL STANDARD ............................................................................................... 13

ARGUMENT ......................................................................................................... 15

    I.     The Indictment Properly Alleges Violations of 18 U.S.C. § 666. ............... 15

        A.    The Indictment Tracks the Statutory Language and Places Defendants on Fair Notice of the Charges. ........................................... 15

        B.    The § 666 Counts Are Not Defective for Failing to Allege A Bribe or Gratuity Involving a *Quid Pro Quo*. .................................................. 18

        C.    The § 666 Counts Are Not Defective for Failing to Allege A Connection to an "Official Act." ............................................................. 39

    II.    The § 666 Counts Are Not Duplicitous. ...................................................... 43

    III.   Defendants' Constitutional Arguments Are Without Merit. ..................... 45

    IV.   Counts One, Two, Five, and Eight Are Not Defective For Failing to Allege § 666(c)'s Inapplicability. .................................................................. 49

        A.    Whether A Job, Contract, or Payment Is Bona Fide Is A Trial Defense. .................................................................................................. 50

        B.    The Indictment Amply Alleges That The Benefits Conferred on Public Official A's Associates Were Not "Bona Fide" Compensation Under § 666. .......................................................................................... 58

CONCLUSION ....................................................................................................... 66

i

# TABLE OF AUTHORITIES

## CASES

*BedRoc Ltd., LLC v. United States*, 541 U.S. 176 (2004) ........................................... 19

*Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465 (1997) ....................... 33

*Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815 (7th Cir. 2016) ................................................................................................. 34

*Hamling v. United States*, 418 U.S. 87 (1974) ........................................................... 13

*Johnson v. United States*, 576 U.S. 591 (2015) ......................................................... 46

*Kolender v. Lawson*, 461 U.S. 352 (1983) .................................................................. 46

*Marshall*, 75 F.3d (7th Cir. 1996) .............................................................................. 45

*Mathis v. United States*, 136 S. Ct. 2243 (2016) ....................................................... 44

*McDonnell v. United States,* -- U.S. --, 136 S. Ct. 2355 (2016) ................. 39, 40, 41, 47

*McKelvey v. United States*, 260 U.S. 353 (1922) ..................................... 50, 51, 54, 55

*Ocasio v. United States*, -- U.S. --, 136 S. Ct. 1423 (2016) .................................. 20, 34

*Ryan v. United States*, 688 F.3d 845 (7th Cir. 2012) .................................................. 39

*Sabri v. United States*, 541 U.S. 600 (2004) .............................................................. 46

*Salinas v. United States*, 522 U.S. 52 (1997) ................................................. 19, 20, 31

*United States v. Abbey*, 560 F.3d 513 (6th Cir. 2009) ................................................ 21

*United States v. Agostino*, 132 F.3d 1183 (7th Cir. 1997) ................................ passim

*United States v. Anderson*, 280 F.3d 1121 (7th Cir. 2002) ........................................ 13

*United States v. Anderson*, 517 F.3d 953 (7th Cir. 2008) .......................................... 44

*United States v. Avenatti*, 432 F. Supp. 3d 354 (S.D.N.Y. 2020) .............................. 35

*United States v. Bates*, 96 F.3d 964 (7th Cir. 1996) .................................................. 14

*United States v. Berardi*, 675 F.2d 894 (7th Cir. 1982) ............................................. 44

*United States v. Blagojevich*, 794 F.3d 729 (7th Cir. 2015) ........................... 34, 62, 63

ii

*United States v. Boender*, 649 F.3d 650 (7th Cir. 2011) ..................................... passim

*United States v. Boyland*, 862 F.3d 279 (2d Cir. 2017) ............................................... 41

*United States v. Bruno*, 661 F.3d 733 (2d Cir. 2011).................................................... 36

*United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008).................................... 61

*United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011) ................................................. 62

*United States v. Carey*, 929 F.3d 1092 (9th Cir. 2019)................................................ 57

*United States v. Commonwealth Edison Co., No.*, 20 CR 368 (N.D. Ill.).................. 60

*United States v. Cornier-Ortiz*, 361 F.3d 29 (1st Cir. 2004)....................................... 63

*United States v. Cox*, 536 F.3d 723 (7th Cir. 2008) ..................................................... 14

*United States v. Crozier*, 987 F.2d 893 (2d Cir. 1993) ................................................. 46

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016) .......................................... 44

*United States v. Donagher*, No. 19 CR 240, 2021 WL 663181 (N.D. Ill. Feb. 19, 2021)
........................................................................................................................... passim

*United States v. Dwyer*, 238 Fed. App'x 631 (1st Cir. 2007) ....................................... 52

*United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013)......................................... 31, 33

*United States v. Fidel Marquez*, 20 CR 602 (N.D. Ill.) .................................................. 4

*United States v. Firtash*, 392 F. Supp. 3d 872 (N.D. Ill. 2019) ........................... 15, 53

*United States v. Ganim*, 510 F.3d 134 (2d Cir. 2007)..................................... 29, 30, 32

*United States v. Garrido*, 713 F.3d 985 (9th Cir. 2013) .............................................. 21

*United States v. Gee*, 432 F.3d 713 (7th Cir. 2005) ............................................... passim

*United States v. Hardin*, 874 F.3d 672 (10th Cir. 2017) ............................................ 46

*United States v. Hawkins*, 777 F.3d 880 (7th Cir. 2015)............................... 27, 31, 32

*United States v. Jackson*, 688 F. App'x 685 (11th Cir. 2017)............................... 32, 33

*United States v. Jackson*, 926 F.2d 691 (E.D.N.C. 2013) ........................................... 54

*United States v. Jennings*, 160 F.3d 1006 (4th Cir. 1998). ................................... 33, 34

iii

*United States v. Johnson*, 874 F.3d 990 (7th Cir. 2017)........................................ 32, 33

*United States v. Kloess*, 251 F.3d 941 (11th Cir. 2001) ............................................... 57

*United States v. Laroque*, No. 12 CR 88, 2015 WL 306977 (E.D.N.C. Jan. 21, 2015) ...................................................................................................................... 53, 54

*United States v. Lupton*, 620 F.3d 790 (7th Cir. 2010)............................ 51, 52, 59, 63

*United States v. Lupton*, No. 07-CR-219, 2007 WL 4303714 (E.D. Wis. Dec. 10, 2007) ........................................................................................................................... 53

*United States v. Maggio*, 862 F.3d 642 (8th Cir. 2017) ............................................ 41

*United States v. Mann*, 172 F.3d 50 (6th Cir. 1999).................................................. 62

*United States v. Mariano*, 983 F.2d 1150 (1st Cir. 1993).......................................... 30

*United States v. McNair*, 605 F.3d 1152 (11th Cir. 2010)........................................ 21

*United States v. Medley*, 913 F.2d 1248 (7th Cir. 1990)..................................... 25, 26

*United States v. Mills*, 140 F.3d 630 (6th Cir. 1998).................................................. 62

*United States v. Moore*, 563 F.3d 585 (7th Cir. 2009) .............................................. 14

*United States v. Mullins*, 800 F.3d 866 (7th Cir. 2015) ................................ 20, 22, 23

*United States v. Nelson*, 712 F.3d 498 (11th Cir. 2013) ............................................ 46

*United States v. Ng Lap Seng*, 934 F.3d 110 (2d Cir. 2019)........................... 41, 46, 48

*United States v. Novak*, 13 CR 312, 2014 WL 2937062 (N.D. Ill. June 30, 2014)..... 55

*United States v. Pansier*, 576 F.3d 726 (7th Cir. 2009)............................................ 43

*United States v. Porter*, 886 F.3d 562 (6th Cir. 2018) ........................................ 21, 41

*United States v. Resendiz-Ponce*, 549 U.S. 102 (2007) ....................................... 16, 17

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013)............................................... 35

*United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988).......................................... 63, 64

*United States v. Roberson*, 998 F.3d 1237 (11th Cir. 2021) ................................ 39, 41

*United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994) ................................................ 58

*United States v. Rose*, 590 F.2d 232 (7th Cir. 1978)................................................ 21, 34

*United States v. Rosen*, 716 F.3d 691 (2d Cir. 2013) .................................................... 36

*United States v. Rowlette*, 397 F.2d 475 (7th Cir. 1968) ...................................... 54, 55

*United States v. Roya*, 574 F.2d 386 (7th Cir. 1978) ............................................. 55, 57

*United States v. Royal*, 731 F.3d 333 (4th Cir. 2013) ................................................. 54

*United States v. Ryans*, 709 F. App'x 611 (11th Cir. 2017) ....................................... 46

*United States v. Shabani*, 513 U.S. 10 (1994) ........................................................... 20

*United States v. Silver*, 948 F.3d 538 (2d Cir. 2020) .................................................. 42

*United States v. Sisson*, 399 U.S. 267 (1970)............................................................. 55

*United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021) ........................................... 42, 43

*United States v. Solomon*, 892 F.3d 273 (7th Cir. 2018) ............................................ 39

*United States v. Starks*, 472 F.3d 466 (7th Cir. 2006)................................................ 45

*United States v. Stout*, No. 89-317, 1990 WL 136341 (E.D. Pa. Sept. 18, 1990) . 51, 54

*United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999)........... 21, 22, 25

*United States v. Tadios*, 650 F. App'x 394 (9th Cir. 2016) ........................................ 52

*United States v. Tamras-Martin*, Case No. 18 CR 267 ............................................. 28

*United States v. Thomas*, 150 F.3d 743 (7th Cir. 1998) ....................................... 14, 53

*United States v. Vaughn*, 722 F.3d 918 (7th Cir. 2013) ................................. 13, 14, 18

*United States v. Vuitch*, 402 U.S. 62 (1971)............................................................... 56

*United States v. Westmoreland*, 240 F.3d 618 (7th Cir. 2001) ................................... 14

*United States v. White*, 610 F.3d 956 (7th Cir. 2010) ........................................... 13, 14

*United States v. Whiteagle*, 759 F.3d 734 (7th Cir. 2014) ......................................... 45

*United States v. Williams*, 507 F.3d 905 (5th Cir. 2007)............................................ 52

*United States v. Yashar*, 166 F.3d 873 (7th Cir. 1999).............................................. 14

*United States v. Zimmermann*, 509 F.3d 920 (8th Cir. 2007)...................................32

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ... 46, 47

*Wisconsin Central Ltd. v. United States*, -- U.S. --, 138 S. Ct. 2067 (2018)..............19

## STATUTES

15 U.S.C. § 78m(b)(5).................................................................................................12

18 U.S.C. § 2............................................................................................................12

18 U.S.C. § 201(b) ....................................................................................................24

18 U.S.C. § 201(b)(1) ................................................................................................41

18 U.S.C. § 666 .................................................................................................. passim

18 U.S.C. § 666(a)(1)(b)...................................................................................... passim

18 U.S.C. § 666(a)(2) ........................................................................... 12, 15, 19, 28

18 U.S.C. § 666(b) ....................................................................................................47

18 U.S.C. § 666(c) .....................................................................................................49

18 U.S.C. § 921(a)(3) ................................................................................................54

18 U.S.C. § 1346....................................................................................... 29, 39, 42

18 U.S.C. § 1512.......................................................................................................57

18 U.S.C. § 1515(c) ...................................................................................................54

18 U.S.C. § 1951....................................................................................... 29, 39, 42

18 U.S.C. § 371 ........................................................................................... 12, 34

21 U.S.C. § 360a(b) ...................................................................................................54

31 U.S.C. § 5313 .......................................................................................................64

42 U.S.C. § 1320a-7(b)(1)..........................................................................................55

**RULES**

Federal Rule of Criminal Procedure 7(c)(1) ........................................................ 13, 17

Federal Rule of Criminal Procedure 12(b)(2) ..................................................... 52, 53

## INTRODUCTION

Between 2011 and 2019, defendants Michael McClain, Anne Pramaggiore, John Hooker, and Jay Doherty conferred a stream of benefits on Public Official A, the Speaker of the Illinois House of Representatives, intending to corruptly influence and reward Public Official A's efforts to assist ComEd with respect to legislation affecting ComEd's business. The benefits conferred on Public Official A included jobs, vendor contracts and subcontracts, and monetary payments for Public Official A's associates and political allies. Notably, defendants arranged for Public Official A's associates to be hired as ComEd "subcontractors," when those individuals did little or no work for ComEd, and concealed the nature of the related payments, including by falsifying internal records and using intermediaries such as Doherty's company to make payments. Defendants retained Law Firm A, a firm valuable to Public Official A's political operation, after being told that reducing the firm's hours would provoke an adverse reaction from Public Official A. Defendants appointed Individual BM-1 to ComEd's board of directors at Public Official A's request, despite objections from other ComEd officials. And defendants set aside summer internship positions for, and gave preferential treatment to, individuals identified by McClain and associated with Public Official A's ward in Chicago.

Counts One (in part), Two, Five, Six and Eight of the indictment track the plain language of § 666, and detail the above-described scheme to trade, with corrupt intent, valuable benefits for favorable action by Public Official A on ComEd's legislative agenda in Springfield. Contrary to defendants' argument (R. 44, 45), these

counts are not defective for failure to allege a *quid pro quo*. The Seventh Circuit repeatedly has held that no *quid pro quo* agreement or understanding is required to establish a violation of § 666, consistent with the plain language of the statute. Moreover, even if a *quid pro quo* were required, the indictment includes ample factual details from which a *quid pro quo* can be inferred.

Defendants also ask this Court to ignore Seventh Circuit precedent and conclude that the government may not pursue a gratuity theory under § 666. The Court should decline this invitation, and rule that § 666 criminalizes gratuities, with or without a *quid pro quo*. The Court should also decline to invalidate § 666 on constitutional grounds, consistent with the overwhelming weight of precedent upholding the statute.

Finally, the Court should reject defendants' argument that the indictment must be dismissed in light of the "bona fide" exception in § 666(c). Although § 666 does not apply to bona fide salary or other compensation paid in the usual course of business; the question whether payments constitute such compensation is a jury question—that fact need not be specifically alleged in the indictment. Moreover, even if such an allegation were necessary, the detailed allegations in the indictment more than adequately establish that the jobs, contracts, and payments at issue were bribes, rather than "bona fide" arrangements made in the usual course of business and exempted from the reach of § 666.

# BACKGROUND

## *Factual Background*

### *Defendants and Relevant Individuals and Entities*

Commonwealth Edison Company ("ComEd") was a company headquartered in Chicago that delivered electricity to customers across northern Illinois. R. 1 ¶ 1(a). ComEd was a subsidiary of Exelon Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states. *Id.* ¶¶ 1(c)-(e).

As Speaker of the Illinois House of Representatives, Public Official A controlled which measures were called for a vote in the House of Representatives and exercised substantial influence over fellow lawmakers concerning legislation, including legislation affecting ComEd. R. 1 ¶1(u). Public Official A was elected from a House district that was largely made up of two Chicago wards: the 13th Ward (for which he was Democratic Committeeman and Chairman) and the 23rd Ward. *Id.*

Defendant McClain served with Public Official A in the House of Representatives for approximately 10 years beginning in 1972. McClain subsequently served as a lobbyist and/or consultant for ComEd, until in or around 2019. R. 1 ¶ 1(v).

Defendant Pramaggiore was the chief executive officer of ComEd between March 2012 and May 2018. From June 1, 2018, to October 15, 2019, Pramaggiore was a senior executive at an affiliate of Exelon, and had oversight authority over ComEd's operations. R. 1 ¶ 1(w).

Defendant Hooker served as ComEd's executive vice president of legislative and external affairs from 2009 until his retirement in 2012. From in or around 2012 to 2019, Hooker served as an external lobbyist for ComEd. R. 1 ¶ 1(x).

Defendant Doherty was the owner of Jay D. Doherty & Associates ("JDDA"), which performed consulting services for ComEd. R. 1 ¶ 1(z).

Fidel Marquez served as ComEd's senior vice president of external and governmental affairs from in or around March 2012 until in or around September 2019. R. 1 ¶ 1(y). Marquez was a co-conspirator of the charged defendants and pleaded guilty to conspiracy to commit bribery in a separate case. *See United States v. Fidel Marquez*, 20 CR 602 (Rowland, J.).

### *Consultant Hiring*

The indictment alleges that defendants engaged in bribery and conspired to do so by hiring consultants at ComEd for the corrupt purpose of influencing Public Official A. As alleged in the indictment, McClain regularly made requests on Public Official A's behalf to Pramaggiore, Marquez, and other ComEd personnel to hire individuals associated with Public Official A as full-time employees, consultants, and contractors. R. 1 ¶ 23. The other defendants, in turn, secured and attempted to secure jobs and contracts for these individuals, many of whom did little or no work for ComEd, for the purpose of corruptly influencing and rewarding Public Official A. *Id.* ¶ 24, 28(bb), 28(hh), 28(kk).

For example, the indictment alleges that, in 2018, defendants arranged for Individual 23W-1, who was then the Alderman for the 23rd Ward, to be hired as a

4

ComEd consultant and paid indirectly through Doherty's firm, JDDA. R. 1 ¶¶ 1(dd), 28(z). From 2013 to 2019, defendants similarly arranged for payments to be made by ComEd to other political allies of Public Official A, including the former Alderman for the 13th Ward and Treasurer of the 13th Ward Democratic Organization (Individual 13W-1) and two precinct captains for the 13th Ward (Individual 13W-2 and Individual 13W-3). R. 1 ¶ 1(aa), 1(bb), 1(cc), 28(a), 28(b), 28(c), 28(d). Instead of paying these "subcontractors" directly, ComEd made regular payments to JDDA, intending that a substantial portion of the payments would be passed on to Public Official A's associates. *Id.* ¶ 28. These "subcontractors" performed little or no work; in fact, Pramaggiore was told that they just "collect[ed] a check." *Id.* ¶ 28(hh).

Defendants understood these appointments to be directly linked to Public Official A's ability to help ComEd with its legislative agenda in Springfield. For example, the indictment details that, on May 16, 2018, McClain called Marquez, and explained that certain individuals were being paid indirectly through JDDA due to their utility to Public Official A's political operation. R. 1 ¶ 28(aa). McClain further advised Marquez that Individual 23W-1 should be paid $5,000 a month. *Id.* And on February 18, 2019, Pramaggiore told Marquez not to make any changes to the JDDA contract because it could affect their success in obtaining favorable legislation:

> [W]e do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their nose out of joint and we're trying to move somebody off, and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield.

*Id.* ¶ 28(hh). Likewise, on March 5, 2019, McClain met with a ComEd executive and Marquez for the purpose of explaining why the JDDA contract and the payments to Individual 13W-1, Individual 13W-2, and Individual 23W-1 should be continued for another year. *Id.* ¶ 28(kk).

### Concealment Efforts

The indictment also details the steps defendants took to conceal benefits they conferred on Public Official A. In addition to using code words to refer to Public Official A, such as "our Friend," rather than using Public Official A's true name (R. 1 ¶¶25-27), defendants caused false records to be created conceal the payments.

As alleged in Count One, in 2017, 2018, and 2019, Pramaggiore signed and submitted false and misleading documents, known as a "Single Source Justifications," to cover up subcontractor payments to JDDA. R. 1 ¶¶ 28(r), 28(v), 28(ii). Those documents made it falsely appear that the substantial payments to JDDA were for Doherty's "unique insight & perspective" (in 2017), and "specific knowledge that cannot be sourced from another" consultant (in 2018 and 2019)—while failing to disclose that a substantial portion of the payments were in fact intended for third parties in an effort to corruptly influence and reward Public Official A. *Id.* ¶¶ 28(r), 28(v), 28(ii).

The indictment alleges that Doherty, too, acted to conceal the purpose of the payments from ComEd. For example, on June 29, 2018, Doherty caused an email to be sent to a ComEd employee that falsely justified the additional $5,000 a month JDDA would be passing on to Individual 23W-1. R. 1 ¶ 28(bb). Doherty falsely claimed

6

the $5,000 was for the company's "expanded role with Cook County Board President's office and Cook County Commissioners and Department Heads," when in fact the additional $5,000 a month would be paid to Individual 23W-1, who performed little or no work for JDDA or ComEd. *Id.* Similarly, on March 11, 2019, Doherty caused a contract to be executed that contained false representations that JDDA was being compensated for giving advice on legislative issues, when in fact a significant portion of that compensation was intended for Individuals 13W-1, 13W-2, and 23W-1, each of whom did little or no legitimate work for ComEd. *Id.* ¶ 28(kk).

### *Law Firm A*

The indictment further alleges that ComEd's retention of Law Firm A was intended to corruptly influence Public Official A. Specifically, in 2011, McClain and Hooker advised a member of ComEd's legal department that it was important to retain Law Firm A, a law firm "valuable" to Public Official A. R. 1 ¶¶ 11, 28(h). After that, ComEd retained Law Firm A and guaranteed the firm approximately 850 hours of work each year. *Id.* ¶ 11. In 2014, Pramaggiore instructed a member of ComEd's legal department that Law Firm A's contract had to be renewed, working through McClain to do so. *Id.* ¶ 12.

In 2016, after ComEd personnel sought to reduce the number of hours of legal work provided to Law Firm A, McClain interceded with Pramaggiore to cause Law Firm A's contract to be renewed on terms acceptable to Law Firm A. R. 1 ¶ 13. On January 20, 2016, McClain wrote to Pramaggiore and Hooker, "I am sure you know how valuable [Lawyer A] is to our Friend," and continued:

7

> I know the drill and so do you. If you do not get involve [sic] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you. Is this a drill we must go through? For me, Hook and I am sure you I just do not understand why we have to spend valuable minutes on items like this when we know it will provoke a reaction from our Friend.

*Id.* ¶ 28(h). That same day, Pramaggiore responded: "Sorry. No one informed me. I am on this." *Id.* ¶ 28(i). She then forwarded McClain's email to Marquez and an employee in ComEd's legal department. *Id.* ¶¶ 28(j)-(k).

The retention of Law Firm A was linked to ComEd's legislative agenda: In 2016, a ComEd project manager, tasked with helping to obtain legislative approval of the Future Energy Jobs Act ("FEJA")[1]— legislation that provided for a renewal of a regulatory process beneficial to ComEd—but who had no oversight over ComEd's legal department, began to monitor the renewal of Law Firm A's contract. R. 1 ¶¶ 14, 28(m)-(o). On April 15, 2016, McClain sent the project manager an email with the subject heading, "[Lawyer A] law firm?!" *Id.* ¶ 28(m). On May 22, 2016, the project manager emailed a member of ComEd's legal department asking, "Are we closed out on this topic [of Law Firm A's contract renewal]?" *Id.* ¶ 28(n). On May 24, 2016, McClain again pressed ComEd's legal department, Hooker, and the project manager about Law Firm A's contract, and proposed terms for the contract renewal. *Id.* ¶ 28(o).

On December 2, 2016, McClain emailed a member of ComEd's legal department in regard to Law Firm A, and asked, "After you catch a couple of good nights [sic] sleep can we put this item to bed?" R. 1 ¶ 28(p). In response, Pramaggiore

---

[1] On December 1, 2016, the General Assembly passed FEJA. R. 1 ¶ 1(q).

assured McClain that she would resolve outstanding issues relating to Law Firm A's contract, writing, "Fidel [Marquez] and I are meeting on Monday to make our list. This will be on it." *Id.* ¶ 28(q). ComEd ultimately renewed its contract with Law Firm A in 2016. *Id.* ¶ 15.

### *Board Appointment for Individual BM-1*

As alleged in the indictment, defendants also conspired to appoint Individual BM-1—an associate of Public Official A—to ComEd's Board of Directors with the corrupt intent of influencing and rewarding Public Official A.

Specifically, starting in November 2017, Public Official A and McClain sought to have Individual BM-1 appointed to ComEd's Board of Directors. R. 1 ¶¶ 20-21. On May 2, 2018, McClain advised Public Official A that Pramaggiore was experiencing push-back on Individual BM-1's appointment and had proposed finding a job that would pay Individual BM-1 the same amount of money as a Board position. *Id.* ¶ 28(y). On May 16, 2018, Pramaggiore told McClain that she would, at Public Official A's request, "keep pressing" for Individual BM-1's Board appointment (*id.* ¶ 28(z)), a sentiment she repeated on a September 7, 2018 phone call with McClain: "You take good care of me and so does our friend and I will do the best that I can to, to take care of you." *Id.* ¶ 29(cc). Pramaggiore's efforts culminated in Individual BM-1's appointment to ComEd's Board in April 2019. *Id.* ¶¶ 22, 28(ll), 28(mm).

### *Thirteenth Ward Interns*

Defendants also caused positions in ComEd's summer internship program to be set aside for individuals associated with the 13th Ward who were identified by

McClain. R. 1 ¶¶ 16. The 13th Ward interns were given favorable treatment in the intern selection and the full-time hiring process. *Id*. ¶¶ 16-19.

McClain expressly linked the hiring of these interns to Public Official A. As alleged in the indictment, on February 25, 2015, McClain emailed Marquez, "Our Friend's ward? Summer interns? 10 jobs or 12 or what is the ceiling?" R. 1 ¶ 28(e). In an April 2015 email, Marquez acknowledged the "pressure" to hire one of the 13th Ward intern applicants. *Id*. ¶28(f).

On April 2, 2017, McClain sent an email to Marquez, Pramaggiore, and Hooker, again stressing the importance of hiring 13th Ward interns: "I strongly recommend this item as we go through this transition period. My goal is that both parties are happy and not frustrated a second. I hope you agree." R. 1 ¶ 28(s).

On February 9, 2018, McClain sent an email to Marquez's assistant, saying he understood that the 13th Ward would be provided 10 positions in the ComEd Internship Program, as had been done "for as long as I can remember." R. 1 ¶ 28(w). Three days later, Marquez caused an email to be sent by his assistant to McClain, confirming that ComEd would provide the 10 internship positions. *Id*. ¶ 28(x).

On December 6, 2018, McClain emailed Marquez and others at ComEd: "I am pretty sure the 'ask' will be to 'put aside' or 'save' ten summer jobs for the 13th Ward." R. 1 ¶ 28(dd).

### *Legislation Affecting ComEd*

While defendants were conferring this stream of benefits on Public Official A, the Illinois General Assembly routinely considered and passed legislation that

10

impacted ComEd's operations and profitability, including legislation that affected the regulatory process used to determine the rates ComEd could charge customers for electricity. R. 1 ¶ 1(n). Throughout the relevant timeframe, ComEd maintained a continuing interest in advancing legislation in the General Assembly favorable to its interests and opposing legislation adverse to its interests. *Id.* ¶ 1(q).

For example, in addition to the 2016 passage of FEJA, discussed above, the Illinois General Assembly in 2011 passed the Energy Infrastructure and Modernization Act ("EIMA"), which benefitted ComEd by allowing ComEd to more reliably determine consumer rates, thereby improving ComEd's financial stability. R. 1 ¶ 1(o). Following EIMA's passage, the Illinois Commerce Commission ("ICC") interpreted the law in a manner adverse to ComEd. In 2013, the Illinois General Assembly passed legislation, known as Senate Bill 9, that effectively overruled the ICC's adverse interpretation of EIMA. *Id.* ¶ 1(p).

### *The Indictment*

On November 18, 2020, a grand jury returned a nine-count indictment against McClain, Pramaggiore, Hooker, and Doherty, premised on the above-described conduct. The following chart summarizes the counts and charges in the indictment:

| Count | Defendant(s) | Violation(s) | Description |
|-------|--------------|--------------|-------------|
| 1 | McClain Pramaggiore Hooker Doherty | 18 U.S.C. §§ 371, 2 | Conspiracy to commit an offense against the United States <br> • Object 1: Violation of 18 U.S.C. § 666(a)(1)(b) <br> • Object 2: Violation of 18 U.S.C. § 666(a)(2) <br> • Object 3: Violation of 15 U.S.C. §§ 78m(b)(5), 78ff(a) |
| 2 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Offering/agreeing to give a bribe, related to the ComEd contract with Law Firm A |
| 3 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2017 JDDA contract |
| 4 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the January to March 2018 JDDA contract |
| 5 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Offering/agreeing to give a bribe, related to ComEd's Board position for Individual BM-1 |
| 6 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Offering/agreeing to give a bribe, related to hiring Individual 23W-1 as a ComEd consultant |
| 7 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the May to July 2018 JDDA contract |
| 8 | McClain Pramaggiore Hooker Doherty | 18 U.S.C. §§ 666(a)(2), 2 | Offering/agreeing to give a bribe, related to ComEd's hiring of Individual 13W-1, Individual 13W-2, and Individual 23W-1 |
| 9 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2019 JDDA contract |

12

***The Pretrial Motions***

Defendants have moved to partially dismiss the Count One conspiracy and to dismiss the § 666 counts (Counts Two, Five, Six and Eight). R. 45. They argue, among other arguments, that the indictment must allege a specific *quid pro quo*, that § 666 is unconstitutionally vague, and that the alleged bribes were bona fide salaries paid in the usual course of business subject to the exception set forth in § 666(c). R. 45. Doherty has separately moved to dismiss the § 666 counts against him (the Count One conspiracy in part, which is predicated on a violation of § 666, and Count Eight), arguing that the counts are deficient for failing to allege that the § 666(c) exemption for bona fide payment is inapplicable. R. 44.

## LEGAL STANDARD

An indictment must "be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment complies with Rule 7 and the Constitution if it (1) states the elements of the crimes charged; (2) adequately informs a defendant of the nature of the charges brought against him; and (3) enables the defendant to assert the judgment as a bar to future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Vaughn*, 722 F.3d 918, 925 (7th Cir. 2013); *United States v. White*, 610 F.3d 956, 958-59 (7th Cir. 2010); *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002). To successfully challenge the sufficiency of an indictment based on the failure to allege a required element, a defendant must

establish both that an element was omitted and that he suffered prejudice as a result. *Vaughn*, 722 F.3d at 925.

"Facial sufficiency is not a high hurdle"; there is no need for an indictment to "exhaustively describe the facts surrounding a crime's commission." *United States v. Bates*, 96 F.3d 964, 970 (7th Cir. 1996), *aff'd*, 522 U.S. 23 (1997); *United States v. Westmoreland*, 240 F.3d 618, 633 (7th Cir. 2001) (an indictment need not spell out each element so long as each element is present in context). An indictment that tracks the words of a statute to state the elements of the crime generally is acceptable, so long as the indictment states sufficient facts to place a defendant on notice of the specific conduct at issue. *Vaughn*, 722 F.3d at 925.

When considering a motion to dismiss under Rule 12(b), a court assumes all facts in the indictment to be true and "view[s] all facts in the light most favorable to the government." *United States v. Yashar*, 166 F.3d 873, 880 (7th Cir. 1999); *see also United States v. Moore*, 563 F.3d 585, 586 (7th Cir. 2009). The court evaluates the allegations "on a practical basis and in their entirety, rather than in a hypertechnical manner." *United States v. Cox*, 536 F.3d 723, 726 (7th Cir. 2008) (quotation omitted). A motion to dismiss an indictment is not a summary-judgment motion and should not be used to "test[ ] the strength or weakness of the government's case, or the sufficiency of the government's evidence." *Moore*, 563 F.3d at 586 (citation omitted); *see also White*, 610 F.3d at 959 (courts "do not consider whether any of the [indictment's] charges have been established by evidence, or whether the Government can ultimately prove its case"); *United States v. Thomas*, 150 F.3d 743, 747 (7th Cir. 1998)

14

(Easterbrook, J., concurring) ("Summary judgment does not exist in criminal cases.") (citation omitted); *United States v. Firtash*, 392 F. Supp. 3d 872, 885 (N.D. Ill. 2019) (Pallmeyer, J.) ("To the extent Defendants dispute the government's ability to prove their case, that is a matter for trial, not a basis for dismissal.").

## ARGUMENT

**I.     The Indictment Properly Alleges Violations of 18 U.S.C. § 666.**

**A.     The Indictment Tracks the Statutory Language and Places Defendants on Fair Notice of the Charges.**

Section 666 of Title 18 criminalizes theft and bribery concerning government entities that receive federal benefits of $10,000 or more. 18 U.S.C. § 666. Congress passed § 666 in 1983 to "augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." Comprehensive Crime Control Act of 1989, S. Rep. No. 98-225, 98th Cong., 1st Sess. 369-70 (1983), reprinted in 1984 USCCAN 351.

As pertinent here, § 666(a)(2) makes it a crime for an individual to corruptly give, offer, or agree to give anything of value to any person, intending to influence or reward an agent of state government "in connection with any business, transaction, or series of transactions" of such government involving anything of value over $5,000. 18 U.S.C. § 666(a)(2). Based on the statute's plain language, the following elements must be proven to establish an offense under of § 666(a)(2):

(1) That the defendant gave, offered, or agreed to give a thing of value to another person;

(2) That the defendant did so corruptly with the intent to influence or reward an agent of a state government, in connection with some business, transaction, or series of transactions of the government, with corruptly defined as acting with the understanding that something of value is to be offered or given to reward or influence him in connection with his official duties;

(3) That this business, transaction, or series of transactions involved a thing with a value of $5,000 or more;

(4) That the State of Illinois received benefits of more than $10,000 under a federal program in a one-year period.

Pattern Criminal Jury Instructions of the Seventh Circuit (2020 ed.) at 279 ("Pattern Instructions").

In addition, § 666(a)(1)(B) of Title 18 makes it a crime for an agent of state government to corruptly solicit or demand, for the benefit of any person, or to accept or agree to accept, anything of value, intending to be influenced or rewarded "in connection with any business, transaction, or series of transactions" of that government involving anything of value over $5,000. 18 U.S.C. § 666(a)(1)(B); *see also* Pattern Instructions, at p. 274-75.[2]

As defendants concede (R. 46 at 15-16[3]), the indictment tracks the plain

---

[2] Section 666(a)(1)(B) is cited as an object of the Count One conspiracy.

[3] Defendants rely on *United States v. Resendiz-Ponce*, 549 U.S. 102 (2007), to argue that a § 666 indictment must allege more than the elements in § 666. R. 46 at 5-6. Although the Court in *Resendiz-Ponce* observed that "there are crimes that must be charged with greater specificity," the Court nevertheless held that the attempted illegal reentry statute at issue did *not* need to be pleaded with greater specificity because guilt did not depend on such specific factual allegations. 549 U.S. at 110. In so holding, the Court emphasized that the promulgation of Rule 7(c)(1) was designed to eliminate such technicalities in criminal pleadings, by allowing an indictment to simply provide a "'plain, concise, and definite written

language of § 666: Counts Two, Five, Six and Eight, which allege substantive violations of § 666, charge defendants with corruptly offering, agreeing to give, and causing ComEd to offer and agree to give things of value to associates of Public Official A for the benefit of Public Official A, with intent to influence and reward Public Official A in connection with legislation intended to benefit ComEd. R. 1 at Counts 2, 5, 6 & 8. Likewise, the portion of the Count One conspiracy that is premised on an agreement to violate § 666 alleges that defendants knowingly conspired to corruptly solicit and demand, and to accept and agree to accept, things of value for the benefit of Public A and his associates, intending that Public Official A would be influenced and rewarded in connection with legislation affecting ComEd and its business. R. 1 ¶ 2(a).

The indictment also contains detailed factual allegations that put defendants on notice of the specific nature of the charges—that the defendants engaged in a calculated plan to corruptly influence and reward Public Official A in connection with State business. R. 1 ¶¶ 2-3. The benefits defendants conferred on Public Official A included: (1) hiring Public Official A's associates as ComEd "subcontractors," who in fact did little or no work for ComEd (*id.* ¶¶ 3-7, 28(a)-(d), (hh), (r), (z)-(aa), (ee)-(jj) &

---

statement of the essential facts constituting the offense charged.'" *Id.* (quoting Fed. R. Cr. P. 7(c)(1)). *Resendiz-Ponce* made no mention of § 666, and there is no basis for concluding that § 666 requires greater specificity. In any event, the allegations in the indictment, in addition to alleging the essential elements of the offenses charged, place defendants on fair notice of the crimes they committed, including by detailing at length their corrupt arrangements, the precise benefits offered and received, and communications that reflect their corrupt intent.

Count 6 & Count 8); (2) hiring Law Firm A and renewing Law Firm A's contract (*id.* ¶¶ 20-22, 28(h)-(k), (m)-(q) & Count 2); (3) appointing Individual BM-1 to ComEd's board of directors at Public Official A's request (*id.* ¶¶ 10-15, 28(t), (y)-(z), (cc), (ll) & Count 5); and (4) setting aside summer internship positions and giving preferential treatment for those internships to individuals associated with the 13th Ward identified by McClain (*id.* ¶¶ 16-19, 28(h)-(g), (l), (s), (w)-(x), (dd)). These benefits are alleged to have been provided to Public Official A with the intent to influence and reward his efforts to assist ComEd with respect to legislation affecting ComEd.

In view of the indictment's detailed allegations, the § 666 counts satisfy all legal and constitutional requirements. They are more than sufficient to notify defendants of the charged offenses, protect them from double jeopardy, and enable them to prepare a defense; thus, they are facially valid. *See*, *e.g.*, *Vaughn*, 722 F.3d at 927 (indictment is adequate if it sets forth the elements of the offense, identifies the date and time of the alleged criminal conduct, and provides citations to applicable statutes).

## B. The § 666 Counts Are Not Defective for Failing to Allege A Bribe or Gratuity Involving a *Quid Pro Quo*.

Notwithstanding their concession that the indictment tracks the plain language of § 666, defendants argue that the § 666 charges are deficient for failing to specifically allege a *quid pro quo*. R. 46 at 15-16. However, the plain text of § 666, and the Seventh Circuit's case law, reflects no such requirement, whether the case is charged under the intent to influence (bribery) or the intent to reward (gratuity)

18

provision of § 666.[4]

### 1. A *Quid Pro Quo* Is Not an Element of § 666.

A statute must be interpreted consistent with its plain meaning. *See*, *e.g.*, *Salinas v. United States*, 522 U.S. 52, 56 (1997) (interpreting § 666 based on its plain text, and recognizing "[t]he enactment's expansive, unqualified language, both as to the bribes forbidden and the entities covered"); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (noting that the "preeminent canon of statutory interpretation" is that Congress "says . . . what it means and means . . . what it says" (citation omitted)); *Wisconsin Central Ltd. v. United States*, -- U.S. --, 138 S. Ct. 2067, 2070 (2018) (court is obliged to interpret "words consistent with their 'ordinary meaning at the time Congress enacted the statute'" (quotation marks omitted)).

By its plain text, § 666(a)(2) makes it a crime to offer, give, and agree to give, things of value to another person, where the giver acts "corruptly, with the intent to influence or reward" an agent of a State or local government agency in connection with some business, transaction, or series of transactions of the government agency. 18 U.S.C. § 666(a)(2). Section 666(a)(1)(B) makes it a crime for an agent of state government to demand, solicit, accept, or agree to accept a thing of value from another person, where the official acts "corruptly," "intending to be influenced or rewarded in

---

[4] The distinction between a bribe and a gratuity has been described as follows: "If the payer's intent is to influence or affect future actions, then the payment is a bribe. If, on the other hand, the payer intends the money as a reward for actions the payee has already taken, or is already committed to take, then the payment is a gratuity." *United States v. Agostino*, 132 F.3d 1183, 1195 (7th Cir. 1997).

connection with any business, transaction, or series of transactions" of the government agency by which he is employed. 18 U.S.C. § 666(a)(1)(B). Neither provision makes the guilt of a defendant contingent upon an agreement or understanding between payor and payee to exchange benefits for business. Instead, with respect to § 666(a)(2), the plain text focuses exclusively on the conduct and state of mind of the offeror or giver of the bribe or reward, without regard to the conduct or state of mind of the government agent to whom the offer was made.[5]

Indeed, the structure of § 666—which defines as separate crimes the offering and giving of a bribe or reward, *see* § 666(a)(2), and the solicitation and acceptance of a bribe or reward, *see* § 666(a)(1)(B)—confirms that no *quid pro quo* agreement or understanding is required to establish a § 666(a) offense. A defendant is guilty if he or she corruptly offers a bribe, without regard to whether the public official solicits the bribe or intends to take any action in return.

Relying on the statute's plain language and structure, the Seventh Circuit repeatedly and unequivocally has held that no *quid pro quo* agreement or understanding is required to establish a violation of § 666.[6] *See, e.g.*, *United States v.*

---

[5] Because the plain text of the statute, and the case law interpreting the statute, is clear, the rule of lenity has no place here. *See Salinas*, 522 U.S. at 66 ("The rule [of lenity] does not apply when a statute is unambiguous . . . ."); *United States v. Shabani*, 513 U.S. 10, 17 (1994) ("The rule of lenity [ ] applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute.").

[6] Because Count 1 alleges a conspiracy to violate § 666 (among other objects), the government need not allege or prove a completed § 666 violation for that count—and certainly need not allege or prove that any defendant engaged in a *quid pro quo. See Ocasio v. United States*, -- U.S. --, 136 S. Ct. 1423, 1430 (2016) ("Not only is it unnecessary for each member of a conspiracy to agree to commit each element of the substantive offense, but also a conspirator

*Mullins*, 800 F.3d 866, 871 (7th Cir. 2015) (holding that evidence of *quid pro quo* is not necessary to establish a violation of § 666(a)(1)(B)); *United States v. Boender*, 649 F.3d 650, 654 (7th Cir. 2011) (noting that "it is clear that our circuit, like most others, does not require a specific *quid pro quo*" in cases involving charged violations of § 666(a)(2)); *United States v. Gee*, 432 F.3d 713, 714 (7th Cir. 2005) (holding that a *quid pro quo* is sufficient but not necessary to violate § 666(a)(1)(B)); *United States v. Agostino*, 132 F.3d 1183, 1190-91 (7th Cir. 1997) (§ 666(a)(2), "by its statutory language, requires that the defendant act '*corruptly . . . with intent to influence or reward*,'" and on that basis "declin[ing] to import an additional, specific *quid pro quo* requirement into the elements of § 666(a)(2)").[7]

Defendants argue that the Supreme Court's statement in *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398 (1999), identifying a *quid pro quo* as an element of bribery under 18 U.S.C. § 201(b), indicates that § 666, which also includes the phrase "intent to influence," must also include that element. *Sun-Diamond* in no

---

may be convicted 'even though he was incapable of committing the substantive offense' himself." (citation omitted)); *United States v. Rose*, 590 F.2d 232, 235 (7th Cir. 1978) ("Whether the substantive crime itself is, or is likely to be, committed is irrelevant [for a § 371 conspiracy].").

[7] Other circuits have similarly held that § 666 does not require a *quid pro quo. See, e.g.*, *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018) ("[T]he text of § 666(a)(1)(B) says nothing of a *quid pro quo* requirement to sustain a conviction, express or otherwise." (quotation marks and citation omitted)); *United States v. Garrido*, 713 F.3d 985, 996 (9th Cir. 2013) ("§ 666 does not require a jury to find a specific *quid pro quo*."); *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010) ("[T]here is no requirement in § 666(a)(1)(B) or (a)(2) that the government allege or prove an intent that a specific payment was solicited, received, or given in exchange for a specific official act, termed a *quid pro quo*."); *United States v. Abbey*, 560 F.3d 513, 521 (6th Cir. 2009) ("*Sun-Diamond*'s heightened *quid pro quo* standard is inapplicable to . . . 18 U.S.C. § 666.").

way suggests that a bribery offense charged under § 201(b)—or a bribery offense under § 666—requires proof of a completed exchange or corrupt intent on the part of both parties. Instead, the Court distinguished between the scienter requirements of § 201(b) (bribery) and § 201(c) (illegal gratuities) to illustrate the distinct scienter requirement applicable to illegal gratuity offenses under § 201(c) at issue in that case: proof of "a link between a thing of value conferred upon a public official and a specific 'official act' for or because of which it was given." 526 U.S. at 404-06, 413.[8]

In the years since *Sun-Diamond*, the Seventh Circuit repeatedly has reaffirmed its conclusion that a specific *quid pro quo* is not required to establish a violation of § 666. *See Gee*, 432 F.3d at 714; *Boender*, 649 F.3d at 654; *Mullins*, 800 F.3d at 871. More specifically, in *Gee*, the Seventh Circuit held that a "*quid pro quo* of money for a specific legislative act" was sufficient, but not necessary, to establish a violation of § 666(a)(1)(B). 432 F.3d at 714. At issue in *Gee* was a conspiracy to exchange payments to a Wisconsin senator to influence the awarding of contracts to Opportunities Industrialization Center of Greater Milwaukee. In addressing the defendant's challenge to the sufficiency of the evidence, the court rejected the argument that the charged conspiracy had not been proven because the evidence failed to establish any specific act taken by the senator in response to any specific payment, and held that "[a] *quid pro quo* of money for a specific legislative act is *sufficient* to violate the statute, but it is not *necessary*." *Id.* (emphasis in original). The

---

[8] As discussed below in Part I(C), § 666 also differs from § 201 in that neither the bribery nor the gratuity provisions of § 666 includes an "official act" requirement.

22

court explained:

> It is enough if someone "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B).

432 F.3d at 714-15. The court held that a jury could reasonably conclude that the senator had the requisite corrupt intent, and therefore conspired to violate § 666. *Id.* Thus, the court made clear its rejection of the proposition that a *quid pro quo* is required to establish a bribery offense under § 666; the decision also indicates that an "exchange" of money for influence may be inferred from the acceptance of a bribe with corrupt intent.

In *Mullins*, the defendant was charged with violating § 666(a)(1)(B) based on his solicitation and acceptance of kickbacks from vendors whom he assisted in obtaining service contracts with Cook County. 800 F.3d at 867-68. The defendant challenged his conviction, arguing that the government had produced no evidence of a *quid pro quo*. *Id.* at 871. The court held that evidence of a *quid pro quo* was not required to establish a violation of § 666(a)(1)(B), but, even if it were, jurors could infer that the cash defendant received from the vendors "was a reward—a bribe—for buying his influence in obtaining their contracts" given that the vendors received contracts in return for their kickback payments. *Id.*

In *Boender*, the Seventh Circuit addressed whether a specific *quid pro quo* was required to establish a violation § 666(a)(2), in the context of a challenge to the

instructions presented to the jury. 649 F.3d 650. Boender was convicted based on evidence showing that, intending to influence a Chicago alderman in connection with the rezoning of certain industrial property, he paid $38,000 for repairs to the alderman's home and convinced business associates to contribute, at his expense, to the Congressional campaign of the alderman's aunt.

On direct review, Boender challenged the court's failure to instruct the jury that a specific *quid pro quo* was necessary to sustain a conviction, and the government's failure to prove such a *quid pro quo*. The Seventh Circuit held, consistent with its precedent, that proof of a *quid pro quo* was not necessary to establish a violation of § 666(a)(2) and, therefore, a jury instruction requiring one would have been incorrect as a matter of law. 649 F.3d at 654. In reaching this conclusion, the court specifically rejected Boender's argument (repeated by defendants here, R. 46 at 6-8) that, pursuant to *Sun-Diamond*, § 666 should be construed consistently with 18 U.S.C. § 201(b) (proscribing bribery of federal officials), noting the differences in the structure and language of the two statutes:

> Boender's premise is false: while parallel in some respects, the two statutes differ in the provisions central to Boender's argument. Whereas § 201(b) makes it a crime to "corruptly give[ ], offer [ ] or promise[ ] anything of value to any public official . . . with intent to influence any official act," § 666(a)(2) criminalizes corrupt giving "with intent to influence *or reward*" a state or local official. Further, § 201(b) is complemented by § 201(c), which trades a broader reach—criminalizing *any* gift given "for or because of any official act performed or to be performed," § 201(c)(1)(A)—for a less severe statutory maximum of two, rather than fifteen, years' imprisonment. Section 666(a)(2) has and needs no such parallel: by its plain text, it already covers both bribes and rewards.

24

Moreover, Boender's parallel is undermined by *Sun-Diamond* itself. There, the Supreme Court distinguished between bribes, rewards, and other gratuities. The bribery provision, § 201(b), covers only bribery and requires a specific *quid pro quo*. *Sun-Diamond*, 526 U.S. at 404, 119 S.Ct. 1402. The "illegal gratuity" provision, § 201(c), on the other hand, requires only the identification of a specific official act "for or because of which" a gift was given. *Id.* at 406, 119 S.Ct. 1402. Tellingly, the example of an illegal gratuity that the Court cited was "a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken." *Id.* at 405, 119 S.Ct. 1402. Section § 666(a)(2), however, criminalizes both bribes and rewards in the same section. If the Supreme Court's construction of § 201 in *Sun-Diamond* tells us anything about § 666(a)(2), it is what we said in *Gee*: "A *quid pro quo* of money for a specific legislative act is sufficient to violate [§ 666], but it is not necessary."432 F.3d at 714.

Absent any reasons to reconsider our precedent—and indeed in light of the clear statutory text—we conclude that the government was not required to establish a specific *quid pro quo* of money in exchange for a legislative act.

649 F.3d at 655 (emphasis in original). As the *Boender* court recognized, the significant differences in the language and structure of § 666 and § 201 mean that no *quid pro quo* is required for § 666 offenses.

Defendants' reliance on the Seventh Circuit's statement in *United States v. Medley*, 913 F.2d 1248 (7th Cir. 1990), that "[t]he essential element of a section 666 violation is '*quid pro quo*'; that is, whether the payment was accepted to influence and reward an official for an improper act" (R. 46 at 14-15; 913 F.2d at 1260), is misplaced. The court in *Medley* made that statement in the context of a challenge to the omission of an instruction defining the term "corruptly." The court held that, where a defendant is charged with accepting or agreeing to accept payment intending to be influenced or rewarded in the performance of his official duties, the term

25

"corruptly" was "self-defining" and the failure to separately address it in the jury instructions was not plain error. 913 F.2d at 1261. Thus, the focus of the court's statement was the statute's requirement of corrupt intent; it was not presented with the question of whether a *quid pro quo* must be specifically identified in the indictment, and did not opine on that issue.

The Seventh Circuit later made the limitations of its decision in *Medley* clear in *Agostino*, explaining that the question of "whether an indictment must contain specific allegations of a *quid pro quo* was not before the *Medley* court and it did not rule on this issue." *Agostino*, 132 F.3d at 1190 (further explaining that "the *Medley* court was not positing an additional element to the statutory definition of the crime, but instead was explaining the *sine qua non* of a violation of § 666," that is, the corrupt intent of the defendant in question). That question *was*, however, directly before the court in *Agostino*, and the Seventh Circuit held that the indictment before it—which tracked the words of the statute—was not facially deficient for failing to include allegations of a specific *quid pro quo*. *Id.* The court explained that an indictment must allege only the intent elements "set forth in the statutory language," "and not any specific *quid pro quo*." *Id.*

Indeed, *Agostino*'s discussion of the *Medley* court's analysis in the context of distinguishing § 666(a)(2) and § 666(a)(1)(B) makes clear that guilt under § 666(a)(1)(B) depends solely on the corrupt intent of the public official, and guilt under § 666(a)(2) depends solely on the corrupt intent of the person who offers or pays the bribe or reward. That is, a payer violates § 666(a)(2) even if the intended recipient

26

declines to accept the bribe or gratuity. Neither provision requires proof of a meeting of the minds or agreement between the two parties or a completed transaction.

Defendants rely on *United States v. Hawkins*, 777 F.3d 880, 881 (7th Cir. 2015), to support their contention that a *quid pro quo* is required under the "intent-to-influence prong of Section 666." R. 46 at 21. Far from requiring a *quid pro quo*, *Hawkins* held that a public official need not agree or even intend to perform an official act to be convicted under § 666.

In *Hawkins*, the defendants, Cook County employees who had accepted money from a police officer trying to reduce the penalties for his own crimes, challenged their convictions for violating § 666(a)(1)(B), and argued that the government had to show that they took the money intending to perform an official act. 777 F.3d at 881. The *Hawkins* court disagreed. It held that the defendants could properly be convicted under a reward theory, even if they did not intend to be influenced. The court also affirmed the jury instruction that defined "corruptly" to require that the defendants took money "with the understanding" that the money was "offered or given to reward or influence [them] in connection with [their] official duties." *Id.* at 882. The court explained that this definition properly placed the focus of the corrupt-intent inquiry on the defendants, who act "corruptly if they *know* that the payor is trying to get them to do the acts forbidden by the statute, and they take the money anyway." *Id.* In other words, a government employee need not actually perform any acts after receiving a payment, or even intend to do so, as long as he knew the payor wanted to influence or reward him.

27

Defendants also rely on District Judge Edmond Chang's unpublished memorandum opinion in *United States v. Tamras-Martin*, Case No. 18 CR 267-2, Dkt. 63 (N.D. Ill. Feb. 17, 2019) (attached to defendant's memorandum as Exhibit B). R. 46 at 10-11. In *Tamras-Martin*, the government pursued a bribery theory only (unlike in this case), and Judge Chang instructed the jury that a *quid pro quo*—or "the intent that the agent perform an official act in exchange for something of value"—was required. R. 46-1, Exh. B at 6. In examining the Seventh Circuit's decisions in *Boender*, *Gee*, and *Mullins*, Judge Chang focused on the distinctions made in those cases between the way bribery and illegal gratuities are treated in the federal bribery statute (§ 201) and the federal program bribery statute (§ 666)—particularly, the fact that § 666, unlike § 201, addresses both bribery and illegal gratuities in the same statutory provision—and concluded that, where a "reward" or gratuity theory is not presented, the jury should be provided with instructions that mirror those applicable to § 201(b) bribery cases, which include a *quid pro quo* requirement. *Id.* at 4-6.

The government respectfully disagrees with Judge Chang's analysis, which was written in connection to jury instructions rather than a motion to dismiss. In a more recent opinion, Judge Lee rejected Judge Chang's analysis and held that an indictment need not allege a *quid pro quo* where the government charges an intent to influence violation of § 666(a)(2). *See United States v. Donagher*, No. 19 CR 240, 2021 WL 663181, at *7 (N.D. Ill. Feb. 19, 2021) (Lee, J.). The Seventh Circuit has, on numerous occasions, cited the textual differences between § 666 and § 201 in concluding that § 666 requires no proof of a *quid pro quo*. It reached that conclusion

28

before *Sun-Diamond*, and it has reaffirmed the conclusion numerous times since *Sun-Diamond*. Had the court wanted to limit its holdings in the manner suggested by Judge Chang, it would have done so in plain terms. Moreover, Judge Chang's analysis is not applicable here. The indictment alleges that defendants acted with intent to both influence *and* reward.

Also contrary to defendants' argument, the Second Circuit did not hold in *United States v. Ganim,* 510 F.3d 134 (2d Cir. 2007), that a *quid pro quo* is required under § 666. The court focused primarily on the *quid pro quo* requirement applicable to honest services fraud, in violation of 18 U.S.C. § 1346, and a violation of the Hobbs Act, 18 U.S.C. § 1951, holding in those contexts that a *quid pro quo* requires a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as opportunities arise. 510 F.3d at 148-49.

With respect to § 666, the *Ganim* court noted that the statute encompasses both payments made to "influence," connoting bribery, and payments made to "reward," connoting an illegal gratuity, but that the government had charged bribery only. 510 F.3d at 150. The court rejected the defendant's claim that the instructions erroneously allowed the jury to convict him on a gratuity theory, given that the jury, per the instructions, was required to find a "specific quid pro." *Id*. The court did not opine on whether the statute contained a *quid pro quo* requirement—an issue that was not, in that case, disputed by the parties. Instead, for purposes of the appeal, the court "presume[d] that the same standard for proving a *quid pro quo* exists under both 18 U.S.C. § 666 and § 201(b)(1), as neither party has argued that there is, or

should be, any difference of which we should be cognizant." 510 F.3d at 148 n.7 (although expressing skepticism that the standards should be the same for § 666 and § 201, noting "salient" differences between the two provisions, and also observing that there was "good reason to limit *Sun–Diamond*'s holding to the statute at issue in that case"). Assuming the applicable standard was provided by *Sun-Diamond*—that bribery requires a "specific intent to give or receive something of value *in exchange* for an official act"—the court found the requirement met by the jury instructions provided. *Id*. at 151-52 (quoting *Sun-Diamond*; internal marks omitted; emphasis in original).

*United States v. Mariano*, 983 F.2d 1150, 1159 (1st Cir. 1993), is similarly inapposite, as the court did not consider the elements of a § 666 offense, but whether the gratuity or bribery Sentencing Guideline applied. Because the conduct there did involve a *quid pro quo,* the court did not address whether a *quid pro quo* was a required element of § 666.

While the Fourth and Eighth Circuits have held that a *quid pro quo* is required for bribery in violation of § 666 (R. 46 at 15 n. 8), those decisions are incorrect for the reasons articulated by the Sixth, Seventh, Ninth and Eleventh Circuits, discussed in note 5 above, and inconsistent with the law in this circuit.

Defendants contend that a *quid pro quo* is required, because otherwise large swathes of legal conduct would be criminalized. R. 46 at 17-18. Defendants ignore the "corrupt" intent requirement of § 666, which distinguishes criminal conduct (like the defendants') from lawful exercise of First Amendment rights. The government will

30

have to show that defendants acted "with the intent that something of value" be "given or offered to reward or influence [Public Official A] in connection with [Public Official A's] official duties." Pattern Instructions, at p. 279. That instruction, which parallels the instruction approved by the Seventh Circuit in *Hawkins*, suffices to "safeguard against criminalizing innocent acts." *Hawkins*, 777 F.3d at 882. A *quid pro quo* agreement or understanding is not necessary to avoid impinging on First Amendment freedoms. As described below, the indictment amply alleges that the regular, substantial, and surreptitious stream of benefits defendants provided to Public Official A over the course of more than eight years were made with corrupt intent, and were not mundane political goodwill gestures.[9]

## 2. Section 666 Criminalizes the Payment of Gratuities

Defendants acknowledge that the "Seventh Circuit has held that a conviction is possible under an intent-to-reward theory without proof of a *quid pro quo*," but nevertheless ask the Court to follow the First Circuit's decision in *United States v. Fernandez*, 722 F.3d 1 (1st Cir. 2013), and conclude that gratuities are not criminalized under § 666. R. 46 at 20. The Court should decline defendants' invitation

---

[9] Defendants' references to the legislative history of § 666 are similarly unavailing. Legislative intent has no relevance where, as here, the plain text of the statute is unambiguous. *See Salinas*, 522 U.S. at 57-58 (stating, in the context of § 666, that "[c]ourts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language. '[O]nly the most extraordinary showing of contrary intentions' in the legislative history will justify a departure from that language" (quotations and citations omitted)). Moreover, defendants' cabined interpretation of § 666 would contravene Congress's intent, which was to "augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies that are disbursed to private organizations or State and local governments pursuant to a Federal program." S. Rep. No. 98-225 at 369-70.

to disregard circuit precedent.

The Seventh Circuit has long recognized that the government may pursue a gratuity theory under § 666, without proving a *quid pro quo. See Hawkins*, 777 F.3d at 881; *Agostino*, 132 F.3d at 1190.[10] Most recently, in *United States v. Johnson*, 874 F.3d 990, 1002 (7th Cir. 2017), the Seventh Circuit rejected the defendant's argument that the instructions impermissibly allowed him to be convicted of a gratuity under § 666. *Id.* at 1001-02. The court reaffirmed the circuit precedent that holds that § 666 criminalizes the receipt of both bribes *and* gratuities. 874 F.3d at 1001. The court then held, in the alternative, that mere use of the word "reward" does not necessarily signal a gratuity instead of a bribe, and that the challenged instruction—despite the inclusion of the word "reward"—made the defendant's conviction contingent upon his acceptance of a bribe, because it told the jury that he needed to have corrupt intent at the time he "*accepted*" the bribe. *Id.* The court rejected the argument that the instruction "hypothetically" could be understood as permitting a conviction based on the defendant's acceptance of "gratuities," particularly since the evidence showed that the defendant received kickbacks (or bribes), rather than gratuities, in that the defendant intended to be paid for official acts before he received payment and before he took action. *Id.* at 1002. Importantly, the court in *Johnson* held that the jury

---

[10] The majority of circuits to address the issue similarly permit § 666 prosecutions under a gratuity theory. *See Ganim*, 510 F.3d at 150 ("[A] payment made to 'influence' connotes bribery, whereas a payment made to 'reward' connotes an illegal gratuity."); *United States v. Zimmermann*, 509 F.3d 920, 927 (8th Cir. 2007) ("Section 666(a)(1)(B) prohibits both the acceptance of bribes and the acceptance of gratuities intended to be a bonus for taking official action"); *accord United States v. Jackson*, 688 F. App'x 685, 695 (11th Cir. 2017).

instructions—which did *not* contain a *quid pro quo* requirement but, rather, tracked the statutory language (as the indictment does in this case)—accurately stated the elements of bribery under § 666. 874 F.3d at 1001.

In addition to being inconsistent with precedent in the Seventh Circuit, the First Circuit's decision in *Fernandez*, 722 F.3d 1, is wrong. There, the court held that § 666 criminalizes only bribes, not gratuities. *Id.* at 26. Under the First Circuit's interpretation, "the word 'reward' . . . merely clarifies 'that a bribe can be promised before, but paid after, the official's action on the payor's behalf.'" *Id.* (quoting *United States v. Jennings*, 160 F.3d 1006, 1015 n. 3 (4th Cir. 1998)).

Contrary to the First Circuit's analysis, the word "reward" contemplates an alternative means of violating § 666. Section 666 was drafted to generally track § 201, which proscribes both bribery and illegal gratuities. Although there are notable differences between the statutes (as described above), it is clear that Congress intended to prohibit both gratuities and bribes in both statutes. As the Eleventh Circuit recognized, "[a] reward would implicitly come after the act—a transaction of the organization—has been completed." *United States v. Jackson*, 688 F. App'x at 695 (declining to follow *Fernandez*). Defendants' interpretation would improperly erase the word "reward" from § 666. *See Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 472 (1997) ("[L]egislative enactments should not be construed to render their provisions mere surplusage."). In short, this court should follow circuit precedent and allow the government to proceed under both a bribery and a gratuity theory.

### 3. Even if a *Quid Pro Quo* Were Required, the Indictment Is Sufficient.

Even if this Court were to find that § 666 requires that the indictment allege an intended or consummated *quid pro quo* (which it does not), the indictment sets forth ample allegations from which a *quid pro quo* could be inferred. *See United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) (*quid pro quo* does not require an explicit agreement between the parties); *accord Empress Casino Joliet Corp. v. Balmoral Racing Club*, Inc., 831 F.3d 815, 826 (7th Cir. 2016).

Even in circuits that require a *quid pro quo* under § 666(a)(2), it is only the intent of the defendant (in this case, the payors) that matters; the intent or agreement of the recipient, or public official, is irrelevant.[11] *Jennings*, 160 F.3d at 1017 ("Under § 666(a)(2) the intent of the payor, not the intent of the payee, is determinative of whether a crime occurred."). Here, the indictment specifically alleges that defendants "corruptly offered and agreed to give" things of value from ComEd to Public Official A's associates with "intent to influence and reward Public Official A" in connection with legislation affecting ComEd. *E.g.*, R. 1 at 43. This satisfies even defendant's

---

[11] In addition, even if a *quid pro quo* were an element of a § 666 offense, the government would not be required to allege or prove a *quid pro quo* with respect to Count 1, which alleges a conspiracy in violation of 18 U.S.C. § 371, as the government need not allege or prove that the conspiracy's object was completed. *See Ocasio*, 136 S. Ct. at 1430; *Rose*, 590 F.2d at 235.

definition of a *quid pro quo*.[12] According to defendants, § 666's "corrupt" and "intent to influence" requirements should be read to impose a *quid pro quo* requirement. If defendants' interpretation of the statute were correct (it is not), then the allegation that defendants "corruptly" gave benefits to Public Official A with "intent to influence" him should suffice to allege a *quid pro quo*. Under defendants' own interpretation, these words together imply intent to engage in a *quid pro quo*, placing defendants on fair notice of the allegations they say are required.

The indictment also contains detailed factual allegations concerning defendants' corrupt intent, from which the court can infer that they intended Public Official A to perform an official act in exchange for the things of value.

According to the indictment, over more than eight years, ComEd provided Public Official A's political associates—including those who worked for Public Official A as precinct captains or as part of his political machine—with more than $700,000 and other valuable benefits, intending that in return Public Official A would take favorable action with regard to ComEd legislation. R. 1 ¶ 28(a)-(d). The court can infer defendants' intent to exchange benefits for Public Official A's official support

---

[12] Defendants recognize that no completed exchange or agreement is necessary to prove a *quid pro quo*, as they define a *quid pro quo* as "an intent that the public official perform an official act in exchange for something of value." R. 46 at 6. Even in the context of honest services fraud, where (unlike § 666) a *quid pro quo* is required, no meeting of the minds between both parties or completed exchange is necessary; an intention by one party to engage in a *quid pro quo* suffices for that party to be held criminally responsible. *See, e.g., United States v. Ring*, 706 F.3d 460, 467-68 (D.C. Cir. 2013) (no completed corrupt exchange or agreement needed for honest services fraud; the statute punishes the scheme, not its success); *United States v. Avenatti*, 432 F. Supp. 3d 354, 365 (S.D.N.Y. 2020).

from the benefits themselves—the allegation that the benefits were regular, spanned a lengthy period of time, and were of high value. *See United States v. Rosen*, 716 F.3d 691, 703 (2d Cir. 2013) (*quid pro quo* existed where payments far exceeded token gift amounts and were structured as monthly consulting payments). The court also can infer defendants' intent to engage in a *quid pro quo* from the allegation that defendants knew that certain benefits were provided in return for little or no legitimate work, R. 1 ¶¶ 3, 7-9, 28(bb), 28(kk); *see United States v. Bruno*, 661 F.3d 733, 744 (2d Cir. 2011) (finding *quid pro quo* based in part on fact that defendant "performed virtually non-existent consulting work for substantial payments"); and from the acts taken to conceal the true nature of the benefits, including use of Doherty as an intermediary and falsifying records, R. 1 ¶¶ 28(r), 28(v), 28(bb), 28(kk), 28(ii); *Bruno*, 661 F.3d at 744 (attempt to cover up payments is proof of *quid pro quo*). The stream of benefits defendants conferred on Public Official A are alleged to have had the desired result—ComEd's substantial legislative success in Springfield (R. 1 ¶ 1(o)-(q), (u))—which likewise supports an inference of a *quid pro quo* and places defendants on notice of the charges against them. *See Bruno*, 661 F.3d at 744 (timing can evidence a *quid pro quo*).

Defendants argue that the "indictment fails to allege any connection between these hiring decisions and any agreement or understanding with Public Official A that he would take (or refrain from) any action on ComEd's behalf in exchange for the things of value." R. 46 at 16. As an initial matter, according to defendants' own definition of a *quid pro quo*, a connection to an agreement or understanding with

36

Public Official A is not needed—only "intent" on the part of defendants that the public official perform an official act in exchange for something of value. R. 46 at 6. In any event, the indictment does allege such a connection.

For example, according to the indictment, Pramaggiore told McClain that she would see to Individual BM-1's Board appointment because McClain and Public Official A ("our friend") had taken "good care" of her and she would take good care of them. R. 1 ¶ 28(cc). In other words, Pramaggiore's efforts to secure lucrative employment for Public Official A's associates were linked to Public Official A's ability to "take care of" ComEd in his official capacity. Similarly, the indictment alleges that, on January 20, 2016, McClain told Pramaggiore and Hooker that if they did not "resolve this issue of 850 hours for [Law Firm A] per year then he will go to our Friend [Public Official A]. . . . *we know it will provoke a reaction from our Friend*"—that is, action adverse to ComEd's interests in Public Official A's official capacity. R. 1 ¶ 28(h) (emphasis added). Pramaggiore's response, as alleged, shows that she knew exactly what the deal was: she responded that she was "on this" and would discuss with Marquez. *Id.* ¶¶ 28(i), 28(q). Pramaggiore then tasked a project manager, whose role was to obtain legislative approval for FEJA and who had no authority to oversee ComEd's legal department, with helping to ensure that Law Firm A's contract was renewed. *Id.* ¶ 14.

The indictment also alleges that defendants understood that the "consulting" contracts awarded to Public Official A's associates were intended in exchange for favorable treatment in Springfield. In February 2019—after years of paying Public

Official A's associates through Doherty as an intermediary—Pramaggiore and Doherty cautioned Marquez not to terminate payments before ComEd's 2019 legislative success in Springfield: "[W]e do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their nose out of joint and we're trying to move somebody off, and then we get forced to give 'em a five-year contract *because we're in the middle of needing to get something done in Springfield*." R. 1 ¶ 28(gg)-(hh) (emphasis added). Pramaggiore thus is alleged to have directly connected the JDDA contract to Public Official A's treatment of ComEd legislation in Springfield.

Defendants' efforts to liken their conduct to commonplace legislative lobbying or campaign contributions ignore the indictment's allegation that they acted with corrupt intent in giving and offering to give a stream of benefits for favorable legislative action by Public Official A. The illegal conduct alleged in the indictment did not consist merely of lobbying, and it did not include campaign contributions made by ComEd.

In short, the indictment, which tracks the language of § 666, includes ample factual allegations from which a *quid pro quo* may be inferred—specifically that defendants arranged for various benefits for Public Official A, intending that in return Public Official A would give favorable treatment to ComEd legislation.

### C.    The § 666 Counts Are Not Defective for Failing to Allege A Connection to an "Official Act."

Defendants also are incorrect that the § 666 counts are defective because they fail to allege that the charged benefits were promised or given in exchange for a specific "official act," as that term is defined in *McDonnell v. United States*, -- U.S. --, 136 S. Ct. 2355 (2016). R. 46 at 6-7, 18, 22-23.

The indictment sufficiently alleges that defendants provided a stream of benefits to Public Official A intending to get favorable treatment for ComEd legislation. The Seventh Circuit endorsed this theory in connection with the prosecution of former Illinois Governor George Ryan:

> [T]his is not a case in which a public official had a specific price for each official act that he did, like a menu in a restaurant where you pick an item and it has a particular price. . . . The corruption here was more like a meal plan in which you don't pay for each item on the menu. Rather, there is a cost that you pay, an ongoing cost, and you get your meals.

*Ryan v. United States*, 688 F.3d 845, 852 (7th Cir. 2012); *see also United States v. Solomon*, 892 F.3d 273, 276 (7th Cir. 2018) (honest services fraud statute "reaches schemes that involve a stream of benefits over time, not just singly negotiated deals"); *United States v. Roberson*, 998 F.3d 1237, 1251-52 (11th Cir. 2021) (approving of "'retainer' theory of liability" in a § 666 case).

*McDonnell,* 136 S. Ct. 2355, is not applicable here. In *McDonnell*, the governor of Virginia and his wife were charged with honest services fraud, in violation of 18 U.S.C. § 1346, and Hobbs Act extortion, in violation of 18 U.S.C. § 1951, based on their acceptance of luxury goods, vacations, and personal loans from a Virginia

businessman seeking to influence the funding decisions of state medical schools. *Id.* at 2362, 2364. McDonnell was convicted after trial, and his conviction was affirmed by the court of appeals. *Id.* at 2366-67. The Supreme Court reversed, holding that the jury instructions' definition of "official act," as pertinent to the charged statutes, was flawed. The Court held that the district court instead should have instructed the jury that (1) an official act is limited to a "question, matter, cause, suit, proceeding or controversy involving the formal exercise of government power," *id.* at 2374; (2) the pertinent "'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official,' such as the question whether to initiate the research studies," *id.*; and (3) "merely arranging a meeting or hosting an event to discuss a matter does not count as a decision or action on that matter." *Id.* at 2375.

Whereas *McDonnell* involved a prosecution for honest services fraud and extortion under color of official right, which both require proof that charged bribes were paid in exchange for an "official act" of the bribed official (for § 1346) or that the bribed official was acting under "color of official right" (for § 1951), § 666 does not use the term "official act" or "official right." Instead, § 666(a)(2) proscribes corruptly giving, offering, or agreeing to give "anything of value to any person, with intent to influence or reward" an agent of the relevant governmental entity. Section 666 requires that the thing of value being given or offered be in connection with "any business [or] transaction" of the government entity, rather than an official act, and it does not include a list of concrete items, such as "cause, suit, proceeding or

40

controversy," which the Supreme Court found implicitly limited the terms "question [or] matter." In other words, § 666 does not require that the defendants contemplate an exchange for a discrete official act, so long as they intended to influence in connection with governmental business more generally. (This is one of many textual and structural differences between § 666 and § 201. Section 201—unlike § 666(a)— uses the term "official act," expressly requiring a defendant act with intent to influence or be influenced in the performance of "any official act." 18 U.S.C. § 201(b)(1), (b)(2)(A); *see also id.* § (c)(1)(A), (c)(1)(B) (gratuity provisions).)

While the Seventh Circuit has not addressed the issue, every circuit court that has done so has declined to import *McDonnell*'s holding into prosecutions under § 666 for the above reasons. *See Roberson,* 998 F.3d at 1247, 1251 (holding, "[c]onsistent with the views of our sister Circuits," that *McDonnell*'s "official act" requirement does not apply to § 666 and that a bribery conviction also does not require a "specific act"); *United States v. Ng Lap Seng*, 934 F.3d 110, 131-33 (2d Cir. 2019), *cert. denied*, 141 S. Ct. 161 (2020) (holding that § 666 is "more expansive" than § 201, so "the *McDonnell* standard" does not apply); *United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018) (finding defendant's "reliance on *McDonnell* is misplaced," because "[i]n *McDonnell*, the Supreme Court limited the interpretation of the term "official act" as it appears in § 201, an entirely different statute than [§ 666]"); *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (same); *United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) ("*McDonnell* had nothing to do with § 666."). Thus,

*McDonnell* provides no basis for finding that the indictment in this case is deficient for failure to allege an "official act" to be performed by Public Official A.

Defendants rely on *United States v. Silver*, 948 F.3d 538 (2d Cir. 2020), *cert. denied*, 141 S. Ct. 656 (2021), a case that, like *McDonnell*, involved honest services fraud (§ 1346) and extortion under color of official right (§ 1951) charges. In the context of jury instructions, the *Silver* court held that neither statute required "advance identification of the particular *act* to be undertaken"; the government may bring prosecutions based on an "as the opportunities arise" theory after *McDonnell*. *Id.* at 558. However, per *McDonnell*, the government needed to prove that the official "underst[ood]—at the time he accepted the payment—the particular *question or matter* to be influenced" and that the question or matter involved a "formal exercise of government power." 948 F.3d at 545, 557-58. *Silver* does not apply to cases involving allegations of a stream of improper benefits. *Id.* at 578 (Lohier, J., concurring) ("other schemes—sometimes referred to as the 'stream of benefits' or 'retainer' theories of bribery—are not even implicated in this case"). In addition, *Silver*, like *McDonnell*, has no application to § 666 charges.

Furthermore, both *McDonnell* and *Silver* were decided in the context of challenges to jury instructions. As the Second Circuit explained in *United States v. Skelos*, 988 F.3d 645 (2d Cir. 2021), rejecting a former public official's challenge to his indictment based on *McDonnell*:

> [I]ndictments are not required to do anything more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime. This one did. The language in

> an indictment is not required to be as precise as the attendant jury charge, nor is it required to delineate how the government will prove the elements set forth in the indictment.

*Id.* at 659 (quotations and citations omitted). Here, there can be no dispute that the indictment tracks the language of § 666 and adequately informs defendants of the charges against them.

Even if *Silver* required some form of heightened pleading (and it does not), the indictment adequately defines the particular question or matter defendants sought to influence: legislation affecting ComEd. R. 1 ¶¶ 2, 3, 15, Counts 2, 5, 6, 8. The indictment also alleges the types of power Public Official A wielded over ComEd legislation, including EIMA and FEJA. Public Official A not only controlled what measures were called for a vote in the House, he also influenced the votes of his fellow lawmakers on ComEd legislation, which resulted in significant legislative wins for ComEd in Springfield. R. 1 ¶ 1(o)-(q), (u).

## II. The § 666 Counts Are Not Duplicitous.

Defendants argue that the substantive bribery counts must be dismissed as duplicitous in the event the government pursues both bribery and gratuity theories. R. 46 at 30. Defendants' argument assumes that bribery under § 666 requires a *quid pro quo* and gratuity under § 666 does not, which, as discussed above is incorrect and inconsistent with circuit precedent. In any event, the counts are not duplicitous.

An indictment is duplicitous if it charges two or more offenses in a single count. *United States v. Pansier*, 576 F.3d 726, 734 (7th Cir. 2009). "A count is not duplicitous, however, if it simply charges the commission of a single offense by different means."

*United States v. Berardi*, 675 F.2d 894, 897-98 (7th Cir. 1982). Rule 7(c)(1) of the Federal Rules of Criminal Procedure expressly provides that "[a] count may allege that . . . the defendant committed [the offense] by one or more specified means."

Contrary to defendants' contention, neither the language nor the structure of § 666, nor any case authority, supports treating the statute's bribery and reward theories of criminal liability as separate elements of proof or separate offenses. The two theories of liability constitute alternative means by which a § 666 offense may be committed. The statute "sets forth just one offense, with two means (in the form of two intents) of violating it." *Donagher*, 2021 WL 663181, at *14 (citing *Boender*, 649 F.3d at 654-55, & *Gee*, 432 F.3d 714); *see also United States v. Daugerdas*, 837 F.3d 212, 226 (2d Cir. 2016) ("The fact that the various methods of committing a single offense can be divided into two separate categories . . . does not create duplicity."). The statute criminalizes illegal bribes and gratuities together in the same provision, and the same punishment applies to both. *Cf.*, *Mathis v. United States*, 136 S. Ct. 2243 (2016). Accordingly, the § 666 counts properly charge defendants with giving and agreeing to give things of value, intending to influence or reward Public Official A.

Defendants contend that the differing base offense levels for gratuities and bribes somehow render the § 666 counts duplicitous. R. 46 at 38-39. Indictments routinely charge both § 666 bribery and gratuity theories in a single count, requiring courts to determine at sentencing whether a defendant's "conduct was 'more akin' to a gratuity or to a bribe." *United States v. Anderson*, 517 F.3d 953, 961 (7th Cir. 2008);

44

*see also United States v. Whiteagle*, 759 F.3d 734, 758 (7th Cir. 2014); *Agostino*, 132 F.3d at 1195. As Judge Lee recently explained in denying a motion to dismiss § 666 counts on duplicity grounds:

> [T]he Sentencing Commission often recommends different punishments for defendants who commit the same offense in different ways. For example, § 2C1.1(b)(2) states that defendants who pay more than $ 6,500 in bribes merit lengthier sentences than those who pay less. No one would argue that those circumstances involve distinct offenses that must be charged in separate counts. As a result, the Guidelines do not indicate that [§666 counts alleging payment of both bribes and gratuities] are duplicitous.

*Donagher*, 2021 WL 663181, at *14.

Finally, even if the § 666 counts were duplicitous, the remedy would not be dismissal. Any potential duplicity concern could easily be addressed in a special verdict form or appropriate jury instruction. *See Marshall*, 75 F.3d at 1112 (7th Cir. 1996) (reasoning that "even if the offenses are arguably separate and distinct," the trial court's jury instruction ensured the jury's conviction relied unanimously upon one of the theories); *United States v. Starks*, 472 F.3d 466, 471 (7th Cir. 2006) (concerns about duplicity cured by unanimity instruction).

## III. Defendants' Constitutional Arguments Are Without Merit.

No court has ever held that § 666—a lynchpin of federal law enforcement for upwards of 38 years—is unconstitutionally vague or overbroad, or otherwise constitutionally deficient, and this Court should decline defendants' invitation to be the first to do so. R. 46 at 24-29.

The void-for-vagueness doctrine, derived from the Due Process Clause, *see* U.S. Const., amend. V, provides that a penal statute must "define the criminal offense with

sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). A criminal statute violates the Fifth Amendment's guarantee of due process of law if it is "so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). To be facially vague, a statute must be vague in all its applications. *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982).

Section 666 is not vague. Intended to "protect the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery," *Sabri v. United States*, 541 U.S. 600, 606 (2004) (quotation marks and citation omitted), § 666(a)(2) prohibits an individual from corruptly giving, offering, or agreeing to give anything of value of $5,000 or more to any person, intending to influence or reward an agent of state government "in connection with any business, transaction, or series of transactions." As multiple courts have held, the language of this statute is adequate to alert a reasonable person of ordinary intelligence to the conduct it prohibits and presents no risk of arbitrary enforcement. *See Ng Lap Seng*, 934 F.3d at 135 (denying defendant's vagueness challenge, noting "that courts have uniformly rejected vagueness challenges both to § 666 and to the FCPA"); *accord United States v. Hardin*, 874 F.3d 672, 677 (10th Cir. 2017); *United States v. Nelson*, 712 F.3d 498, 510 (11th Cir. 2013); *United States v. Crozier*, 987 F.2d 893, 900 (2d Cir. 1993); *United States v. Ryans*, 709 F. App'x 611, 619 (11th Cir. 2017); *Donagher*,

2021 WL 663181, at *13 ("Every circuit court to have addressed this issue has held that § 666 is not void for vagueness.").

This is because, while the scope of § 666 is broad, its reach is limited in important respects. First, it applies only in the context of bribes and gratuities paid to agents of government agencies and organizations that receive more than $10,000 of federal benefits in a one-year period. *See* 18 U.S.C. § 666(b). Second, it applies only to things of value provided to influence or reward such agents "in connection with business, transaction, or series of transactions" having a value of more than §5,000. *See id.* § 666(a). Third, it applies only to defendants who act with corrupt intent. *Id.* This scienter requirement mitigates any possible ambiguity in the statute. *See Vill. of Hoffman Estates*, 455 U.S. at 499 (explaining that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed").

Defendants have made no showing that, in the approximately 38 years § 666 has been on the books, the statute has been applied in manner that is arbitrary or discriminatory. Notably, no court has found § 666 to be overbroad, facially or as applied.

Relatedly, defendants argue that the Supreme Court's narrowed construction of the term "official act" in *McDonnell*, 136 S. Ct. 2355, was motivated by constitutional concerns that implicitly require all federal bribery statutes to contain an "official act" element; and that, absent such a requirement, the statute is unconstitutionally vague and overbroad and violates principles of federalism. R. 46

47

at 28. As discussed above, *McDonnell* has no application to § 666, and it does not suggest a constitutional infirmity in that statute. The fact that § 666 does not use the term "official act" does not make the statute so vague as to make it incomprehensible to people of ordinary intelligence or create a risk of arbitrary enforcement. *See Ng Lap Seng*, 934 F.3d at 137 ("[W]e conclude that *McDonnell*'s constitutional concerns simply do not arise in the context of [§ 666].").

Moreover, the conduct at issue in *McDonnell* is easily distinguished from the conduct of defendants in this case. In *McDonnell*, the alleged criminal conduct essentially consisted of facilitating meetings: McDonnell was alleged to have arranged meetings with government officials; hosted events designed to encourage researchers to study a private company's product; contacted other government officials; allowed others to invite individuals to events at his mansion; and recommended to other government officials that they meet with the private company's executives. In other words, McDonnell was not alleged to have accepted bribes with corrupt intent to be influenced in connection with government business or transactions; all he did was facilitate meetings. The issue was whether these meetings arranged, events hosted, and contacts made properly counted as "official act[s]" under § 201(a)(3); the Court held that they did not.

This case involves fundamentally different conduct. There is no question that the "*quo*" here constituted more than access or meetings: Public Official A played a critical role in the passage of legislation in the Illinois House of Representatives that affected ComEd's interests. R. 1 ¶¶ 1(n)-(q), (u), 2(b), 3. And as discussed in Part

48

I(B)(3), the indictment alleges a connection between defendants' efforts to provide benefits to Public Official A and his associates (such as Individual BM-1's Board appointment) and Public Official A's official role in influencing and voting on legislation (which Pramaggiore described as Public Official A taking "good care" of her), along with the defendants' efforts to conceal their conduct. R. 1 ¶ 28(cc); *see also id*. ¶ 28(h), 28(i), 28(q) (McClain threatening a bad "reaction" by Public Official A if the law firm's contract was not maintained); *id*. ¶ 28 (hh) (Pramaggiore cautioning Marquez not to terminate payments before ComEd's 2019 legislative success in Springfield). This is precisely the type of corruption the federal bribery statutes are meant to criminalize.

## IV.   Counts One, Two, Five, and Eight Are Not Defective For Failing to Allege § 666(c)'s Inapplicability.

Defendants move to dismiss Count One in part and Counts Two and Five in their entirety, and Doherty separately moves to dismiss Count Eight,[13] alleging that those counts are insufficiently pled because the indictment does not explicitly mention 18 U.S.C. § 666(c). R. 44; R. 46 at 32. Section 666(c) states:

> This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

18 U.S.C. § 666(c). Defendants' argument lacks merit. Whether the payment alleged as a benefit was "bona fide" compensation is a jury question; it need not be alleged in

---

[13] McClain, Pramaggiore, and Hooker do not join Doherty in seeking dismissal of the allegations in Counts One and Eight relating to the subcontractors hired through JDDA who are alleged to have done little to no work. R. 46 at 35 n.19.

49

the indictment. In any event, the indictment alleges that the jobs, contracts, and payments at issue were corruptly intended to influence and reward Public Official A in connection with his official duties—if true, as the allegations are assumed to be, these benefits would not be "bona fide" arrangements exempted from the reach of § 666. Accordingly, defendants' motions to dismiss based on § 666(c) should be denied.

### A. Whether A Job, Contract, or Payment Is Bona Fide Is A Trial Defense.

Section 666(c) provides an exception to criminal liability under § 666(a) and (b), where the alleged benefits given, solicited, or received took the form of "bona fide" salary, wages, or compensation paid in the "usual course of business." Although the statute does not define "bone fide," its dictionary definition suggests a transaction in good faith, without deception or fraud. *See* Merriam-Webster Dictionary (2021). In other words, per the statute, a "bona fide" salary or wages received in the usual course of business would not qualify as—in fact, it would be the opposite of—a benefit conferred with corrupt intent to influence the actions of a public official.

Section 666(c)'s plain language, and the statutory structure, make clear that it functions as an exception—that is, a defense to charges under § 666(a). In *McKelvey v. United States*, 260 U.S. 353, 357 (1922), the Supreme Court established the now long-standing principle that:

> an indictment or other pleading founded on a general provision defining the elements of an offense, or of a right conferred, need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere, and that it is incumbent on one who relies on such an exception to set it up and establish it.

50

*Id.* (indictment alleging that defendant obstructed free passage over public lands was not required to negate the statutory good-faith exception). As another court summarized, per *McKelvey*, "[g]enerally, the government need not charge statutory exceptions in the negative and prove them as such at trial unless the exception is so incorporated into the language of the statute defining the crime that the elements of the offense cannot be accurately described if the exception is omitted." *United States v. Stout*, No. 89-317, 1990 WL 136341, at *26 (E.D. Pa. Sept. 18, 1990), *aff'd* 932 F.2d 962 (3d Cir. 1991) (holding that § 666(c) is not an element of § 666 and need not be alleged in the indictment).

Here, § 666(c) is a distinct exception to the offenses enumerated in § 666(a), and the omission of the exception from the indictment in no way compromises the accuracy of the description of the crimes committed.

The indictment alleges that benefits facilitated by defendants—jobs, contracts, and payments to and for Public Official A's associates—were provided with corrupt intent as part of a corrupt conspiracy to influence and reward Public Official A, the opposite of a bona fide payment in the usual course of business. Defendants claim otherwise. Defendants are free to argue at trial (if the argument can be made in good faith) that the benefits in question fall within the scope of § 666(c). But this is a factual dispute for trial, not appropriate for resolution on a motion to dismiss.

Treating § 666(c) as a trial defense is consistent with the case law that holds that whether a payment was "bona fide" and made in the "usual course of business" is a question of fact for the jury. *See United States v. Lupton*, 620 F.3d 790, 802 (7th

51

Cir. 2010)[14] (citing *United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide.")); *see also United States v. Dwyer*, 238 Fed. App'x 631, 647 (1st Cir. 2007) ("Whether wages were bona fide is a question of fact for the jury."); *United States v. Tadios*, 650 F. App'x 394, 397 (9th Cir. 2016) (affirming denial of motion to dismiss § 666 counts because whether the compensation was "bona fide," as defendant claimed, was "a question of fact for the jury to decide").

Federal Rule of Criminal Procedure 12(b)(2) constrains pretrial summary relief in this context: "[a] party may raise by pretrial motion any defense, objection, or

---

[14] In *Lupton*, for example, an agent of the State of Wisconsin was charged with soliciting a kickback in connection with his job soliciting proposals from parties interested in purchasing state property. 620 F.3d at 794-95. In conversations with a real estate broker, Lupton sought a kickback of one-quarter of the fee that the broker would receive if the transaction went through. At a bench trial, Lupton argued that he had simply proposed a legitimate "commission split" with the broker, which was permitted under Wisconsin law, and that this commission split was discussed only hypothetically. *Id.* at 802. Thus, Lupton argued, his discussions with the broker amounted to nothing more than a bona fide business transaction under § 666(c). In rejecting Lupton's argument and convicting him of the § 666 charge, the district court found that Lupton's "'unusual maneuvering' with [the broker] 'reveals that this was not to be a payment in the ordinary course of business.'" *Id.* at 820 (quoting *Lupton*, No. 07-CR-219, 2009 WL 679649, at *5 (E.D. Wis. Mar. 16, 2009)). The Seventh Circuit agreed and made clear that whether a payment is in the ordinary course of business is an issue of fact:

> The evidence was sufficient to support the factfinder's conclusion. *See United States v. Williams*, 507 F.3d 905, 909 (5th Cir. 2007) ("Whether wages are bona fide and earned in the usual course of business is a question of fact for the jury to decide.").

> Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete with evidence supporting the finding that this particular "split" was neither bona fide nor sought in the ordinary course of business.

*Id.* at 802.

request that the court can determine *without a trial of the general issue*." Fed. R. Crim. P. 12(b)(2); *see also Thomas*, 150 F.3d at 747 (Easterbrook, J., concurring) ("Summary judgment does not exist in criminal cases." (citation omitted)); *Firtash*, 392 F. Supp. 3d at 885 ("To the extent Defendants dispute the government's ability to prove their case, that is a matter for trial, not a basis for dismissal."). Here, the dispute as to the applicability of § 666(c) will require a trial on the general issue of whether defendants acted in good faith, and without deception or fraud or corrupt intent, in providing benefits to Public Official A and his associates.

Nevertheless, defendants argue that the exception in § 666(c) is an element of the offense that must be alleged in the indictment. Doherty correctly acknowledges that there is no published authority—from a circuit or district court—supporting this position. R. 44 at 9. And as Doherty acknowledges, multiple district courts have concluded that § 666(c)'s inapplicability need not be specifically alleged in the indictment. *Id.* For example, in *United States v. Lupton*, No. 07-CR-219, 2007 WL 4303714, at *8 (E.D. Wis. Dec. 10, 2007), the district court denied the defendant's motion to dismiss, noting that the "defendant provide[d] no authority for the proposition that the government must, in the indictment, specifically allege the inapplicability of the exception to liability under § 666(c)," and, in any event, the indictment alleged a "kickback" scheme clearly incompatible with "bona fide income." *Id.* Likewise, in *United States v. Laroque*, No. 12 CR 88, 2015 WL 306977, *1-3 (E.D.N.C. Jan. 21, 2015), the district court held that § 666(c)'s inapplicability need not be specifically alleged in the indictment, and in any event, the government

53

adequately alleged that the stolen funds were not bona fide payments made in the usual course of business. *Id.* (relying on *McKelvey*, 260 U.S. at 357, and *United States v. Royal*, 731 F.3d 333 (4th Cir. 2013), in which the Fourth Circuit held that the antique firearm exception in 18 U.S.C. § 921(a)(3) was not an essential element of § 922(g) that had to be alleged in the indictment).[15] *See also Stout*, 1990 WL 136341, at *26 ("Generally, the government need not charge statutory exceptions in the be accurately described if the exception is omitted." (citing C. Wright, 1 *Federal Practice and Procedure* § 125 at 371-72, & *McKelvey,* 260 U.S. 353)).

The Seventh Circuit's decisions interpreting exceptions similar to § 666(c) are consistent with these holdings. In *United States v. Rowlette*, 397 F.2d 475 (7th Cir. 1968), for example, defendants were charged with unlawful sale of a stimulant drug under 21 U.S.C. § 360a(b), which exempts from its reach sales made in the ordinary course of the business or occupation of the defendant. Defendants argued that the government had to allege and prove that defendants' conduct did not fall within that exemption. The Seventh Circuit disagreed, holding that the defendant must establish

---

[15] In so holding, the court explicitly distinguished *United States v. Jackson*, 926 F.2d 691 (E.D.N.C. 2013), relied upon by defendants, which held that 18 U.S.C. § 1515(c) was an essential element of § 1512 when the defendant is an attorney. R. 46 at 34; *see Laroque*, 2015 WL 306977 at *3 ("The exception codified in § 666(c), unlike the exception[] in *Jackson* . . . is not tailored to a specific category of potential defendants. Rather, like the exception in *Royal,* it is potentially applicable to every defendant charged with theft or bribery under § 666(a). Thus, § 666(c) has no limitation comparable to § 1515(c) and § 822(c), and the court declines to broaden *Jackson* and put the burden on the government to allege in every prosecution under § 666(a) that funds at issue do not amount to bona fide salary or compensation of the defendant."). Subsection 1515(c) is discussed further below in connection with *United States v. Kloess*, in which the Eleventh Circuit held that § 1515(c) was *not* an essential element.

that his conduct fell within a statutory exception or exemption. *Id.* at 479. Relying on *McKelvey* and its progeny, the court equated the exemption in § 360 to an affirmative defense, and held that the burden of establishing such a defense is upon the defendant, not upon the government to disprove it. *Id.*; *see also United States v. Roya*, 574 F.2d 386, 391 (7th Cir. 1978) ("An indictment founded on a general provision of a statute need not negative an exception made by a proviso or other distinct clause, whether in the same section or elsewhere." (citing *McKelvey*, 260 U.S. at 357)).

On the same basis, in *United States v. Novak*, 13 CR 312, 2014 WL 2937062 (N.D. Ill. June 30, 2014), the district court rejected an argument very similar to defendants'. The defendants in *Novak* were medical doctors charged with accepting kickbacks in violation of 42 U.S.C. § 1320a-7(b)(1) & (2). Like § 666, § 1320a-7b contains an exception—namely, the statute includes a "safe harbor" that exempts from criminal liability "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services . . . ." 18 U.S.C. § 1320a-7b(b)(3)(B). Defendants argued that the indictment made the safe harbor provision relevant but failed to negate the application of the safe harbor provision or affirmatively concede its application. *Id.* at *2. The court rejected this argument, because "[a]n indictment [ ] is not required to anticipate affirmative defenses or negate statutory exemptions." *Id.* (citing *United States v. Sisson*, 399 U.S. 267, 287 (1970); *McKelvey*, 260 U.S. at 357). The court concluded that the indictment was sufficiently pled in that it tracked the language of the anti-kickback statute. *Id.* The court noted that the application of the

55

bona fide employee exemption should not be decided in a pretrial motion, but could be contested at trial. *Id.* at *3.

Doherty attempts to distinguish these decisions as inapplicable where the object of the bribes is a job (and particularly a job absent a *quid pro quo* exchange), as it was here. R. 44 at 9-10. The case law does not support this distinction. In fact, the "bona fide" exception in § 666(c) is most obviously applicable to employment arrangements; yet the courts discussed above nonetheless treat the exception as a factual issue for the jury, rather than a defect that warrants dismissal of an indictment.

Doherty's reliance on *United States v. Vuitch,* 402 U.S. 62, 70 (1971), is similarly misplaced. *Vuitch* involved a Washington, D.C. statutory provision that outlawed abortions unless performed by an authorized licensed physician to preserve the mother's life or health. The Court stated, "[i]t is a general guide to the interpretation of criminal statutes that when an exception is incorporated in the enacting clause of a statute, the burden is on the prosecution to plead and prove that the defendant is not within the exception." *Id.* at 70. Because Congress "expressly authorized physicians to perform such abortions as are necessary to preserve the mother's 'life or health,'" and because of the constitutional concerns with a statute that presumed the guilt of a physician who performed an abortion, the court concluded that "the burden is on the prosecution to plead and prove that an abortion was not 'necessary for the preservation of the mother's life or health." *Id.* at 70-71.

56

*Vuitch* did not overrule *McKelvey*'s holding that a statutory exception need not be specifically pleaded in the indictment; indeed, since *Vuitch*, the Seventh Circuit relied upon *McKelvey* in *Roya* (*supra*) to hold that an indictment "need not negative an exception" under the statute. *See also United States v. Carey*, 929 F.3d 1092, 1099 (9th Cir. 2019) ("We find no cases holding that *Vuitch* abrogated *McKelvey*, partially or otherwise). As the Ninth Circuit recently summarized, "[t]he *McKelvey* rule applies when a statutory exception is an exception *to* the elements of an offense; the *Vuitch* rule applies when the exception *is* an element of the offense." *Id.* (emphasis in original). Here, as discussed above, § 666(c) is an exception to the statutory elements, not an element itself.

Finally, Doherty argues that the burden of production demonstrates that § 666(c) is an element of the offense, relying on *United States v. Kloess*, 251 F.3d 941, 946 (11th Cir. 2001). The defendant in *Kloess* was charged with obstruction of justice in violation of 18 U.S.C. § 1512, and moved to dismiss the indictment pursuant to § 1515(c), which exempts from criminal liability "the providing of lawful, bona fide, legal representation services in connection with or anticipation of an official proceeding." *Id.* at 944. The court held that § 1515(c) was an exception to § 1512, not an element of a § 1512 offense. It explained that § 1512 "defines a perfectly cogent offense" on its own, and that § 1515(c) "is a narrow exception to [§ 1512's] general proscription" intended to be litigated at trial by the defendant, who was in the better position to raise that he provided bona fide legal representation in connection with the charged conduct. 251 F.3d at 945.

57

The same logic applies here. Section 666(a) defines a "perfectly cogent" offense without reference to § 666(c). Section 666(c) is a separate clause clearly written as a limited exception and not an integral part of the offense of bribery. And Doherty, as the owner of JDDA, is free to present at trial evidence regarding the subcontracts he issued and payments he made and received.

In sum, what defendants really seek by their motions is an evaluation of the evidence that will be presented at trial regarding the jobs, contracts, and payments at issue, which is clearly improper at this stage of the proceedings.[16] Defendants may raise § 666(c) as a defense at trial, but particularly in light of the allegations of the indictment, § 666(c) is not a basis to dismiss adequately pled counts of the indictment.

## B. The Indictment Amply Alleges That The Benefits Conferred on Public Official A's Associates Were Not "Bona Fide" Compensation Under § 666.

The indictment's allegations are more than sufficient to establish that the jobs, contracts, and payments defendants arranged for Public Official A's associates were not "bona fide" compensation paid in the "usual course of business," even if such an

---

[16] Indeed, Doherty's motion broadly claims that courts have shown concern for a jobs-theory of bribery, and cites to a string of cases, none of which opine on the issue of whether § 666(c) is an essential element. R. 44 at 6-9. For example, *United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994), did not relate to or even involve the applicability of § 666(c). The Second Circuit instead reversed the defendant's conviction on grounds that the government had not proved that he acted corruptly, defined as accepting or demanding a personal benefit intending to be improperly influenced in his official duties. *Id.* at 853. Here, the procedural posture is a motion to dismiss, not a motion for acquittal, and Doherty *is* alleged to have acted corruptly in facilitating private contracts and payments that Doherty knew were intended to benefit Public Official A and Public Official A's associates and to influence and reward Public Official A in connection with his official duties as a state legislator. That Doherty was a private businessman does not somehow render him immune from prosecution under § 666.

allegation were required. For example, paragraph 3 of the indictment alleges that, as part of the conspiracy:

> for the purpose of influencing and rewarding Public Official A in connection with his official duties as Speaker . . . and to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and the defeat of legislation unfavorable to ComEd and its business, the conspirators (i) arranged for various associates of Public Official A, including Public Official A's political allies and individuals who performed political work for Public Official A, to obtain jobs, contracts, and monetary payments associated with those jobs and contracts from ComEd and its affiliates, even in instances where such associates performed little or no work that they were purportedly hired to perform for ComEd; and (ii) created and caused the creation of false contracts, invoices and other books and records to disguise the true nature of certain of the payments and to circumvent internal controls.

R. 1 at ¶ 3. As other examples, the indictment alleges that Doherty, through JDDA, agreed to act as a third-party intermediary to further and to conceal the offense by receiving payments from ComEd and subsequently making payments to Public Official A's associates, including Individuals 13W-1, 13W-2, and 13W-3, and Individual 23W-1. *See*, *e.g.*, *id.* at ¶¶ 28(a)-(d). The indictment alleges that Doherty's subcontractors received payments even though they did little or no work, and that false information was submitted to Exelon and ComEd to disguise the true nature of the subcontracts and payments, including justification forms signed by Pramaggiore. *See*, *e.g.*, *id.* at ¶¶ 1(z), 6-8, 28(v), 28(aa)-(bb), 28(gg), 28(hh), 28(jj)-(kk). Furthermore, the indictment is rife with descriptions of the "unusual maneuvering," *see Lupton*, 620 F.3d at 820, that defendants undertook to obtain the jobs and contracts, not only for Individuals 13W-1, 13W-2, 13W-3, and Individual 23W-1, but also as for Law Firm

A,[17] the 13th Ward Interns,[18] and the ComEd Board position for Individual BM-1.[19] The allegations make clear that these jobs, contracts, and payments were bribes that were corruptly solicited, accepted, and offered in order to benefit Public Official A and his associates and to influence and reward Public Official A in his official capacity.

Nevertheless, defendants argue that because the facts alleged in the indictment reflect that certain individuals hired by ComEd actually performed work for ComEd (Law Firm A, Individual BM-1, and the 13th Ward interns), the wages and fees paid to them cannot be a thing of value for purposes of § 666(a)(2), and that § 666(c) therefore requires dismissal in part of Count One and of Counts Two and Five in their entirety. R. 46 at 36-37. Contrary to defendants' argument, a job or

---

[17] *See, e.g.*, R. 1 ¶¶ 1(q), 10-15, 28(h)-(k), 28(m)-(q) (describing how McClain, Pramaggiore, and Hooker worked with the ComEd project manager for FEJA—major legislation that ComEd wanted passed in the Illinois General Assembly in 2016—in order to renew Law Firm A's contract because Lawyer A was "valuable" to Public Official A and if the contract was not renewed, it "will provoke a reaction" from Public Official A). Defendants cite portions of the Deferred Prosecution Agreement in *United States v. Commonwealth Edison Co.*, No. 20 CR 368 (N.D. Ill.), which state that ComEd paid Law Firm A for the hours the firm worked, and renewed Law Firm A's contract in 2016 with reduced hours. R. 46 at 36. Those selective quotations—from a document that is not even incorporated in the indictment in this case—are not a complete account of the evidence concerning Law Firm A's contract renewal. An informed jury, with the benefit of all relevant evidence concerning Law Firm A, will decide whether Law Firm A's contract renewal was for bona fide services and entered into in the ordinary course of business.

[18] *See, e.g.*, *id.* at ¶¶ 16-18, 28(e)-(g), 28(s), 28(w), 28(dd) (describing how McClain worked with co-conspirator Marquez to ensure that ComEd, pursuant to McClain and Public Official A's request, reserved 10 internship positions per year for individuals from Public Official A's ward and that there was "pressure to hire" certain of these interns).

[19] *See, e.g.*, *id.* at ¶¶ 20-22, 28(t), 28(y)-(z), 28(cc) (describing that Pramaggiore advised McClain that she would, at Public Official A's request, "keep pressing" to appoint Individual BM-1 to the Board even after experiencing push-back because "you take good care of me and so does our friend [Public Official A] and I will do the best that I can to, to take care of you").

payment is not necessarily "bona fide" and made in the "usual course of business" solely because work is performed, particularly where the job or contract *is the bribe* as it was here.

In *United States v. Bryant*, 556 F. Supp. 2d 378 (D.N.J. 2008), a federal court in New Jersey addressed similar facts and found that a salary paid to an individual who did legitimate work was a bribe. In *Bryant*, the dean of a medical school created a paid position for state legislator Wayne Bryant as a "program support coordinator." *Id.* at 385. The indictment alleged that the dean caused Bryant to receive a salary in that role in exchange for Bryant using his position as a state legislator to benefit the medical school. *Id.* at 385-86. The defendants moved to dismiss § 666 charges, relying on § 666(c). The court rejected this argument, holding that Bryant's "salary was not paid 'in the usual course of business' because it was allegedly the *quid* in a *quid pro quo* bribery arrangement." *Id.* at 428. The court explained that, even though it may have been paid for legitimate work, because the "salary itself constitutes the bribe . . . it was not 'bona fide' or paid 'in the regular course of business.'" *Id.* at 428-29 ("If a public official sells his office for wages, even if some legitimate work is performed in exchange for those wages, it is sufficiently clear that such wages are not "bona fide."). The court concluded:

> [T]he reason why Bryant's . . . salary was not "bona fide" has nothing to do with the value of the legitimate work he did. Even if Bryant did provide value . . . in the form of legitimate work, his salary cannot be "bona fide" if it was part of a *quid pro quo* bribery deal.

*Id.*[20] (distinguishing *United States v. Mills*, 140 F.3d 630, 633 (6th Cir. 1998), and *United States v. Mann*, 172 F.3d 50 (6th Cir. 1999), because they "do not hold that a bribe paid in the form of a salary falls within § 666(c)").

Similar to the salary arrangement in *Bryant*, the defendants' offers to secure jobs, contracts, and payments to Public Official A's associates were a critical part of the bribery scheme and were not made in the usual course of business.[21]

---

[20] Bryant's subsequent conviction for violating 18 U.S.C. § 666 and other statutes was affirmed on other grounds. *United States v. Bryant*, 655 F.3d 232 (3d Cir. 2011).

[21] Defendants may argue that the cases cited by the government treat § 666(c) as surplusage. They do not. Sections 666(a) and (c) work in tandem, with § 666(a) defining the crime(s) and § 666(c) stating a defense. Section 666(a)(2), for example, makes it unlawful to corruptly give money to an individual with intent to influence or reward a state agent, in connection with government business; § 666(c) carves out an exception that specifies that this is permissible if it was compensation or salary (typically received in the course of employment), was bona fide (which requires, at the least, that it was not received as part of a corrupt arrangement), and was received in the usual course of business. A person paying a salary for legitimate employment in the usual course of business could still be guilty of a § 666(a)(2) offense if the arrangement was not bona fide.

In any event, "[t]he canon against surplusage is not an absolute rule," *Marx v. Gen. Revenue Corp.,* 568 U.S. 371, 385 (2013), and "rigorous application of the canon" is not always a "useful guide to a fair construction of the statute," *King v. Burwell,* 576 U.S. 473, 491 (2015). Here, as with respect to any statute that contains an exception that operates as or similarly to an affirmative defense, there is bound to be some overlap in the function of the statutory provision defining the crime and the scope of the exception. And the interpretation advanced by the cases cited by the government makes far more sense than defendant's construction: If § 666(c) were to exempt from the reach of § 666 any defendant who offered or gave compensation regardless of whether the compensation was obtained through fraudulent means, "then Congress would have no need to specify that the statute did not cover '*bona fide* salary,' which as noted above, implies that an employee's salary was obtained without fraud or deceit." *United States v. Walsh*, 156 F. Supp. 3d 374, 385-87 (E.D.N.Y. 2016) (denying defendant's motion to dismiss on the basis of § 666(c) and rejecting defendant's contention that the canon of surplusage required the Court find that § 666(c) provided him safe-harbor). Here, the government has alleged that defendants offered and gave the jobs, contracts, and payments at issue with fraud and deceit—namely, with the corrupt purpose of influencing and rewarding Public Official A in connection with his official position in regard to legislation affecting ComEd. It would be absurd to construe the safe harbor

Defendants' citation to dicta from *United States v. Blagojevich*, 794 F.3d 729, 736 (7th Cir. 2015), does not require a different conclusion. R. 46 at 32-33; R.44 at 7-8. In that case, the Seventh Circuit vacated Blagojevich's conviction under § 666(a)(1)(B), among other statutes, in connection with his attempt to negotiate a cabinet secretary position for himself from then-President Obama in exchange for appointing President Obama's associate to a Senate seat. The court held that Blagojevich's actions were political logrolling—meaning, the trading of one political act for another political act—rather than an exchange for a private benefit and therefore not a bribe under § 666(a)(1)(B). *Id.* at 735. In explaining its decision, the Court referenced § 666(c):

> Section 666 . . . forbids theft or bribery in publicly funded programs (of which the State of Illinois is one). Count 23 relies on § 666(a)(1)(B), which makes it a crime for an agent of a covered organization to solicit "corruptly . . . anything of value" in connection with a transaction worth $5,000 or more. "Corruptly" refers to the recipient's state of mind and indicates that he understands the payment as a bribe or gratuity. . . . It would not be plausible to describe a political trade of favors as an offer or attempt to bribe the other side. What is more, § 666(c) provides that the section as a whole does not apply "to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Compensation for a job by someone other than a ghost worker is a "bona fide salary"—and, as we've pointed out, the "usual course of business" in politics includes logrolling.

*Id.* at 736. The court's statement that compensation for a job by "someone other than a ghost worker" is bona fide compensation was made in the context of its conclusion that political logrolling was done in the "usual course of business," and not under

---

provided by § 666(c) to apply to jobs, contracts, and payments which were neither bona fide nor sought in the usual course of business.

circumstances remotely similar to those presented in this case. Here, the charges are not based on political logrolling, but rather, on private benefits in the form of jobs, contracts, and payments offered to be paid by a private company in order to influence and reward a legislator in carrying out his official duties. Defendants' scheme to bribe Public Official A through private jobs, contracts, and payments was not done in the "usual course of business" and was not the sort of "acceptable business practice" that § 666(c) was intended to protect. *See United States v. Cornier-Ortiz*, 361 F.3d 29, 36 (1st Cir. 2004) (rejecting a defense under § 666(c) and holding that "[a] scheme designed to evade conflict of interest rules is hardly legitimate or acceptable"); *Lupton*, 620 F.3d at 802 ("Regardless of whether commission splitting is permissible under Wisconsin law, the record here is replete with evidence supporting the finding that this particular 'split' was neither bona fide nor sought in the ordinary course of business."). In sum, the payments alleged in the indictment were neither "bona fide" nor made in the "usual course of business."

Finally, in seeking to dismiss the § 666 counts, despite the fact that they track the language of the statute, defendants rely on *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988), which did not involve a bribery charge. Rather, the defendant was accused of failing to file Currency Transaction Reports under 31 U.S.C. §§ 5313 and 5322. *Id.* at 1060. In discovery, the government disclosed documents (which the government conceded were accurate) demonstrating that none of the relevant transactions totaled more than $10,000, a necessary factual predicate for the charges. *Id.* at 1060-61. Under these unique facts, the Seventh Circuit affirmed the district

64

court's dismissal of the indictment because the undisputed evidence showed that none of the transactions at issue exceeded $10,000. *Id.* Critically, the court dismissed the indictment "not because the government could not prove its case, but because there was no case to prove." *Id.*

Nothing remotely similar occurred here. The indictment alleges, and the evidence will prove, that defendants hired and caused the hiring of Individuals 13W-1, 13W-2, 13W-3, 23W-1, as well as BM-1, Law Firm A, and the 13th Ward Interns in order to influence and reward Public Official A in his capacity as Speaker of the House of Representatives with significant power over legislation affecting ComEd's interests. These were not bona fide arrangements made in the usual course of business, and there is no legal basis to dismiss these charges from the indictment.

## CONCLUSION

For foregoing reasons, the government respectfully requests that the Court deny defendants' pretrial motions.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

/s/ *Amarjeet S. Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
TIMOTHY CHAPMAN
SARAH STREICKER
MICHELLE KRAMER
JULIA K. SCHWARTZ

Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

66