UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No.  20 CR 812 |
| v. | Hon. Harry D. Leinenweber |
| MICHAEL McCLAIN, ANNE PRAMAGGIORE, JOHN HOOKER, and JAY DOHERTY | |

## GOVERNMENT'S SANTIAGO PROFFER AND MOTION TO ADMIT EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 801(D)(2)(E)

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

By:     /s/ *Amarjeet S. Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
SARAH STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300

# TABLE OF CONTENTS

I.      Introduction………………………………………………………………....1

II.     Applicable Law……………………………………………………….....…..2

     A.     Existence of and Membership in the Conspiracy……………………….2

     B.     "In Furtherance of" the Conspiracy………………………………....…6

     C.     Alternative Bases for Admissibility of Statements…………………….9

          1.     A Defendant's Own Statements………………………………...…9

          2.     Non-Hearsay Statements…………………………………………10

          3.     Statements Against Penal Interest……………………………....11

          4.     Coconspirator Statements after *Crawford*…………………………12

III.    Evidence Demonstrating the Existence of the Charged Conspiracy
and the Defendants' Participation in the Conspiracy…………………….…..13

     A.     General Overview of the Conspiracy……………………………………14

     B.     Evidence of the Conspiracy…………………………………….......…17

          1.     Anticipated Witness Testimony………………………………….17

               a.     Individual LD-1…………………………....…17

                    (1)     ComEd's Legislative Initiatives and
Madigan's Support of Them…………………….18

                    (2)     Retention of Law Firm A……………………….22

                    (3)     Board Appointment……………………………….24

                    (4)     Other Benefits…………………………………….25

b.     Fidel Marquez………………………………..…..26

     (1)     Hiring of Subcontractors…………………………28

     (2)     Retention of Law Firm A……………………...…35

     (3)     Board Appointment……………………………36

     (4)     Internship Program……………………………36

     (5)     Other Benefits…………………………………37

c.     Individual 13W-3……………………………………39

d.     Relative of Individual 13W-1………………………44

e.     Professor Dick Simpson……………………………44

f.     Various Federal Law Enforcement Agents……………47

g.     Individual BM-1……………………………...…48

h.     Legislators and Other Witnesses……………………..51

2.     Documentary and Other Physical Evidence…………………52

a.     Hiring of Subcontractors…………………………52

     (1)     Financial Records Evidencing Payments
to Subcontractors………………………...……52

     (2)     Absence of Records Reflecting Actual Work
Performed by Subcontractors……………...…….53

     (3)     False Records Concerning Payments Made
to Subcontractors……………………………....…54

     (4)     Records Otherwise Demonstrating the
Relationship of the Conspirators and their Roles
with Respect to Subcontractors…………………62

b.     Retention of Law Firm A………………….....…66

c.     Board Appointment……………………………70

d.     Internship Program……………………………71

e.     Other Benefits…………………………………73

3.    Wiretap Communications and Consensual Recordings…….........75

a.    Recordings Concerning Efforts to Confer Benefits on Madigan and His Associates, as well as the Corrupt Intent of the Conspirators………………………..……75

(1)    Hiring of Subcontractors…………………………………75

(a)    Recordings concerning Payments to Individual 23W-1 and Other Subcontractors…………………………………76

(b)    Recordings concerning 2019 Renewal of JDDA Contract………………....80

(c)    Additional Recordings Demonstrating Corrupt Intent of Conspirators with Respect to Subcontractor Relationships….....97

(2)    Retention of Law Firm A……………………………104

(3)    Board Appointment……………………………….....106

(4)    Other Benefits………………………………….......111

b.    Recordings Establishing Relationship of the Conspirators and their Respective Roles in the Conspiracy….......……………………………..……113

IV.    Coconspirator Statements………………………………………......119

V.    Conclusion…………………………………………………….......122

The United States of America, by its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendants Michael McClain, Anne Pramaggiore, John Hooker, and Jay Doherty, and moves for the admission of such statements pursuant to Federal Rules of Evidence 104(a) and 801(d)(2)(E), and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I.    Introduction

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the charged conspiracy, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris*, 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the conspiracy or all of the coconspirator statements that were made in furtherance of the charged conspiracy. Rather, this submission highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracy described in Count One and the participation of the coconspirators. As a result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses. Finally,

1

by presenting statements attributed to particular witnesses, the government is not committing to call each of the witnesses for each of the statements attributed.

## II.    Applicable Law

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against an opposing party" and "was made by the party's coconspirator during and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[1]

### A.    Existence of and Membership in the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendants' coconspirator will be admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were

---

[1]    No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy . . . ." *Id.* at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendants and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid. 801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy, evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (*en banc*).

3

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *Bourjaily*, 483 U.S. at 178, 180; *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson*, 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[2]

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for

---

[2] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant out of cocaine not hearsay because showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

4

an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet*, 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is

5

irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

### B. "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea*, 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator

6

exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also Johnson*, 200 F.3d at 533;[3]

- to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), *abrogated on other grounds by United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar*, 573 F.3d at 545;

---

[3] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

7

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *Johnson*, 200 F.3d at 533; *United States v. Molinaro*, 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- to "describe[e] the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992);

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85 F.3d 1232,

1238 (7th Cir. 1996); *see also United States v. Rivera*, 136 F. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

### C.     Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own statements, for example, are admissible against him or her pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule.

### 1.     A Defendant's Own Statements

A defendant's own admissions are relevant to establish the factual predicates for the admission of coconspirator statements against him or her. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997). A defendant's own admissions are admissible against him or her pursuant to Rule 801(d)(2)(A), without reliance on the coconspirator-statement rule. *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). *See also* Fed. R. Evid. 801(d)(2)(A) (providing that a "statement" is not hearsay if "[t]he statement is offered against a party and . . . was made by the party in an individual or representative capacity"). Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him or her. *See Godinez*, 110 F.3d at 455; *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

Moreover, statements during a conversation with a defendant that are offered by the government to provide context for a defendant's statements are, as a general matter, admissible as non-hearsay. For example, in *United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011), the Seventh Circuit addressed the district court's introduction of a confidential informant's recorded statements to the defendant. The Court held that the challenged statements were non-hearsay because they were offered not for their truth but to put the defendant's "own words in context and to help the jury make sense out of his reaction to what [the informant] said and did." *Id.* at 580 (defendant's responses "would have been unintelligible without the context provided by [the informant's] statements"). Likewise, a statement that is incapable of verification—such as a suggestion, question, offer, demand, or order—does not constitute hearsay because it "do[es] not make any truth claims." *United States v. Montana*, 199 F.3d 947, 950 (7th Cir. 1999).

### 2. Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. An example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral [or] written assertion" or "nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is

10

incapable of verification, such as an order or a mere suggestion, is not hearsay and does not require Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868.

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[4] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

### 3.  Statements Against Penal Interest

Under Federal Rule of Evidence 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the

---

[4]     Federal Rule of Evidence 801(c) defines hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement."

11

declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was also inculpatory of the first two co-defendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming the district court's decision to admit a co-defendant's inculpatory statement which also incriminated the defendant because it was not made in an attempt to curry favor with law enforcement, but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir. 2014); *United States v. Watson*, 525 F.3d 583, 587-88 (7th Cir. 2008); *Hamilton*, 19 F.3d at 356. *See also United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).

### 4. Coconspirator Statements after *Crawford*

Only "testimonial" statements implicate the Confrontation Clause, *Crawford v. Washington*, 541 U.S. 36 (2004), and a statement made in furtherance of a conspiracy is not a testimonial statement. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (rejecting confrontation clause claim as to introduction of coconspirator statements

because such statements are not testimonial); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial). Further, even if a hearsay statement does not qualify for admission under Rule 801(d)(2)(E), or any other hearsay exception, that fact alone would not create a Confrontation Clause issue because only testimonial statements implicate the right to confront a witness. *Crawford*, 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as . . . would an approach that exempted such statements from Confrontation Clause scrutiny altogether."); *see also Volpendesto*, 746 F.3d at 289 ("[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

## III. Evidence Demonstrating the Existence of the Charged Conspiracy and the Defendants' Participation in the Conspiracy

At trial, the government's evidence will establish that each defendant joined a conspiracy that had among its objects corruptly influencing and rewarding Michael Madigan in connection with his official duties as the Speaker of the Illinois House of Representatives, in order to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and to defeat of legislation unfavorable to ComEd and its business, as well as the creation of false contracts, invoices, and other books and records to disguise the true nature of benefits paid to Madigan's associates and to circumvent internal controls. As set forth below, the evidence that establishes the

existence of this conspiracy meets the preponderance of the evidence standard applicable at this stage of the proceedings. Below, the government has summarized some but not all of the evidence that it will present at trial regarding the existence of the charged conspiracy.

## A.    General Overview of the Conspiracy

Commonwealth Edison Company ("ComEd") was a company headquartered in Chicago that delivered electricity to customers across northern Illinois. ComEd was a subsidiary of Exelon Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states.

As Speaker of the Illinois House of Representatives, Michael Madigan (identified as Public Official A in the indictment)[5] controlled which measures were called for a vote in the House of Representatives and exercised substantial influence over fellow lawmakers concerning legislation, including legislation affecting ComEd. Madigan was elected from a House district that was largely made up of two Chicago wards: the 13th Ward (for which he was Democratic Committeeman and Chairman) and the 23rd Ward.

---

[5]     Madigan, an unindicted coconspirator at the time this case was brought, was separately charged in a superseding indictment several months ago with the conspiracy offense set forth in Count One of the indictment, as well as a host of other offenses that did not center around ComEd.  *See United States v. Madigan, et al.*, 22 CR 115 (N.D. Ill.).

Defendant McClain served with Madigan in the House of Representatives for approximately 10 years beginning in 1970s. McClain subsequently served as a lobbyist and/or consultant for ComEd, until in or around 2019.

Defendant Pramaggiore was the chief executive officer of ComEd between March 2012 and May 2018; prior to that, she served as President. From June 1, 2018, to October 15, 2019, Pramaggiore was a senior executive at an affiliate of Exelon, and had oversight authority over ComEd's operations.

Defendant Hooker served as ComEd's executive vice president of legislative and external affairs from 2009 until his retirement in 2012. From in or around 2012 to 2019, Hooker served as an external lobbyist for ComEd.

Defendant Doherty was the owner of Jay D. Doherty & Associates ("JDDA"), which performed consulting services for ComEd.

The conspiracy charged in Count One of the indictment alleges that between in and around 2011 and 2019, the defendants participated in a conspiracy to commit an offense against the United States. Specifically, the coconspirators agreed to confer a stream of benefits on Madigan, intending to corruptly influence and reward Madigan's efforts to assist ComEd with respect to legislation affecting ComEd's business. Moreover, the indictment alleges that the conspirators sought to conceal this illegal activity by falsifying books and records to disguise the true nature of benefits provided to Madigan.

These benefits conferred on Madigan included jobs, vendor contracts and subcontracts, and monetary payments for Madigan's associates and political allies. Notably, defendants arranged for Madigan's associates—including a former 13th Ward Alderman and political associate of Madigan ("Individual 13W-1"), 13th Ward precinct captains ("Individual 13W-2" and "Individual 13W-3"), and a former 23rd Ward Alderman and political ally of Madigan ("Individual 23W-1")—to be hired as ComEd "subcontractors," to reap over one million dollars in payments even though these individuals did little or no work for ComEd. Defendants concealed the nature of the payments to the Madigan subcontractors, including by falsifying internal records and using intermediaries such as Doherty's company and others (such as Intermediary 2 and Intermediary 3) to make payments. In addition, defendants retained Law Firm A, a firm who had a partner ("Law Firm Partner A") particularly valuable to Madigan's political operation, and continued to do so after being told that reducing the firm's hours would provoke an adverse reaction from Madigan. Defendants also appointed Individual BM-1 to ComEd's board of directors at Madigan's request, despite reservations expressed by other ComEd officials. And defendants set aside summer internship positions for, and gave preferential treatment to, individuals identified by McClain and associated with Madigan and the 13th Ward—all for the purpose of corruptly ensuring ComEd's legislative goals were met.

16

**B.      Evidence of the Conspiracy**

The existence of the conspiracy, and the participation of the defendants and the other coconspirators in the conspiracy, will be established by, among other things: (i) the testimony of numerous witnesses; (ii) documentary evidence, including evidence seized pursuant to search warrants and obtained by subpoena; and (iii) court-authorized wire interceptions and lawfully recorded conversations.

**1.      Anticipated Witness Testimony**

The government anticipates that the witnesses called at trial will include the testimony of the individuals referenced below, among others. The testimony of these witnesses will demonstrate the existence of the conspiracy, the methods used to engage in the illegal activity, identify the defendants' roles within the conspiracy, and explain the conspirators' motive and opportunity to engage in the illegal conduct.

**a.      Individual LD-1**

The government expects to call an individual who was a member of ComEd's legal department ("Individual LD-1") at times relevant to the indictment. [6]

---

[6]      The government has redacted names of certain uncharged individuals for purposes of this public filing.

17

### (1)    ComEd's Legislative Initiatives and Madigan's Support of Them

The government expects Individual LD-1 will testify about several major legislative initiatives ComEd supported beginning in or around 2011, and Madigan's involvement with and support of them—context and evidence that demonstrates the purpose behind illicit benefits conferred on Madigan and his associates by the conspirators.

Individual LD-1 is expected to testify that in or around 2005, ComEd faced the prospect of filing for bankruptcy, and several years later, its operational capabilities were poor. At the request of Pramaggiore, Individual LD-1 participated in the negotiation of legislation that would ultimately be passed as the Energy Infrastructure Modernization Act (known as "EIMA").

Individual LD-1 is expected to testify about the regulatory environment ComEd faced before EIMA was enacted. Among other things, Individual LD-1 is expected to testify that prior to 2011, the rates ComEd could charge customers were set through a process regulated by the Illinois Commerce Commission, commonly known as a "rate case." The rate case process prior to 2011 had become very contentious, cumbersome, and unpredictable. ComEd could not effectively make future plans for investment because it could not be assured of what returns it would receive on its investments.

EIMA overcame this dilemma by providing for what was known as a "formula rate," which provided a simpler and more predictable formula for devising what ComEd

was permitted to charge customers—and thereby providing ComEd with greater economic stability and the ability to more accurately forecast its return on investment.

Individual LD-1 will explain that ComEd's lead outside lobbyist in connection with the passage of EIMA was Michael McClain. Individual LD-1 will explain that s/he understood McClain was very close with Madigan, and that Madigan and McClain had previously worked together in the General Assembly. McClain brought messages and information from Madigan to the company, and relayed messages to Madigan from the company. Because of his close relationship with Madigan, and his role as a lobbyist for ComEd, McClain was sometimes referred to as a "double agent" by Individual LD-1 and others at ComEd. Individual LD-1 will explain that McClain often referred to Madigan as "our friend" rather than by his name.

Individual LD-1 will also identify Hooker as a former Executive Vice President of Legislative and External Affairs at ComEd, and subsequently a contract lobbyist who was very close to McClain.

Individual LD-1 is also expected to testify that Pramaggiore often relied on an inner circle to make decisions; when those decisions concerned political strategy, the decision-makers would be Pramaggiore, McClain, and Hooker, not the ComEd management committee.

Individual LD-1 will explain that initial negotiations concerning EIMA took place in a small conference room within Madigan's suite of offices within the State Capitol, and that McClain and Hooker arranged for Individual LD-1's presence at these meetings.

19

Both McClain and Hooker moved freely within Madigan's office space within the State Capitol.

Individual LD-1 learned during the negotiations that Madigan's support and involvement was critical to the passage of EIMA. For example, Individual LD-1 is expected to testify that during the negotiations, a member of Madigan's staff told him/her that Madigan held staff meetings on Sundays and discussed pending matters including EIMA; Individual LD-1 understood it was critical that Madigan support the legislation because he was the one who would call it for a vote in the House. EIMA passed the General Assembly in May 2011, and the Governor's veto was overridden in the fall of that year. Individual LD-1 was told by McClain and Hooker that Madigan had supported overriding the Governor's veto.

Individual LD-1 is expected to further testify that s/he was involved in the negotiation of a subsequent piece of legislation championed by ComEd, the Future Energy Jobs Act ("FEJA"), which passed in 2016. Individual LD-1 will explain that the purpose of FEJA included an extension of the otherwise applicable deadline set for the "formula rate" that provided greater predictability and stability to ComEd's operations—it had been subject to a "sunset" provision in EIMA, and therefore new legislation was needed to keep it in place. Individual LD-1 is expected to testify that s/he represented ComEd in Springfield during the negotiations related to FEJA. In the fall of 2016, Madigan's staff brought the stakeholders (which included another utility company and other groups, such as environmental groups) together for final negotiations

on the bill. Individual LD-1 will testify that McClain informed him that Madigan had approved a particular legislator to be the sponsor of the bill. Individual LD-1 will explain that this legislator did not have expertise on energy matters. [7]

Individual LD-1 will explain that McClain and Hooker were present throughout the negotiations on FEJA, and that it was Individual LD-1's impression that they spoke to Madigan throughout the process because they had access to non-public information about the status of the legislation. In addition, McClain and Hooker answered Individual LD-1's questions about the legislation in a manner that suggested that they were in communication with Madigan.

Individual LD-1 is expected to testify that Pramaggiore was credited with the passage of EIMA and FEJA. In Individual LD-1's experience, Pramaggiore viewed all aspects of ComEd's business through a political lens. Pramaggiore's general strategy was to support ComEd's success in the legislature, instead of through the Illinois Commerce Commission. Madigan was an important part of Pramaggiore's strategy, and Individual LD-1 is expected to testify that Pramaggiore would say things like, "What's important to the Speaker is important to us." This message would be repeated at meetings concerning legislative, regulatory, and management issues. According to Pramaggiore, Madigan was

---

[7]      In addition to Individual LD-1, the government expects that another ComEd employee will testify about the company's financial condition in the mid-2000s and the financial benefits of the formula rate legislation enacted in EIMA and extended in FEJA. The government disclosed the substance of this witness's anticipated testimony in a written notice to defense counsel on January 9, 2023.

very important to ComEd because, in her view, ComEd's business depended on political relationships, and it was important to maintain a good relationship with the Speaker. Indeed, Pramaggiore gave prominence to the company's relationship with Madigan above other legislators; Individual LD-1 understood this to be as a consequence of Madigan's importance in directing the business of the General Assembly. Pramaggiore maintained a close relationship with Madigan, and even traveled to Turkey with Madigan as part of an official State of Illinois trip.

### (2)      Retention of Law Firm A

Individual LD-1 is expected to testify that ComEd first signed a contract with Law Firm A in approximately October 2011, which was approved by Individual LD-1. Although Individual LD-1 had been initially introduced to Law Firm Partner A in the summer of 2011, Individual LD-1 did not take any immediate action to retain Law Firm A. However, Individual LD-1 will explain that McClain began asking in the late summer and fall of 2011 whether ComEd had found work for Law Firm A. McClain told Individual LD-1 that hiring Law Firm A was important—though he did not explain why it was important. Individual LD-1 did not heed McClain's initial comments; however, as the fall veto session approached in 2011 (the session at which the Governor's veto of EIMA was overridden), McClain asked more frequently about Law Firm Partner A and work for Law Firm A. Individual LD-1 will testify that one day while Individual LD-1 was in Springfield for negotiations on EIMA legislation, Hooker came into his office and closed the door. Hooker asked Individual LD-1 about Law Firm A, and explained that it was

important that Individual LD-1 act on the contract for Law Firm A—but Hooker mentioned nothing about any legal expertise that Law Firm A could provide to ComEd. Individual LD-1 understood by McClain and Hooker's comments to mean that the contract was important because it was important to Madigan.

Thereafter, Individual LD-1 decided to approve a contract for Law Firm A, based on several considerations. One of them was because McClain and Hooker had told him/her that the contract was important to Madigan; the others included the fact that ComEd was trying to increase its work with diverse firms such as Law Firm A, and because there was legal work for Law Firm A to do. The contract was unusual, however, in that it provided for Law Firm A to be guaranteed a minimum of 850 billable hours of work per year—a provision that was presented by Law Firm Partner A. The government expects Individual LD-1 will testify that, at the time, it was unusual for ComEd to enter into a law firm contract that provided for a set number of billable hours.

In or about 2014, Individual LD-1 asked Pramaggiore if s/he had to renew the contract for Law Firm A and deal with McClain on it, and Pramaggiore told Individual LD-1 that Individual LD-1 had to renew the contract.

In or about 2016, Individual LD-1 wanted to reduce the number of hours of legal work that the company was obligated to provide Law Firm A, because there was not enough appropriate legal work to give the firm. When McClain learned that Individual LD-1 had proposed decreasing the firm's hours, McClain contacted Individual LD-1 to express his unhappiness and also forwarded email correspondence about this to

Pramaggiore. McClain pushed Individual LD-1 to renew Law Firm A's contract on terms favorable to Law Firm A. McClain told Individual LD-1 that Madigan was interested in ComEd renewing the contract and that McClain was advocating for Law Firm A on behalf of Madigan. Individual LD-1 is expected to testify that McClain, who had no responsibility within ComEd's legal department, even proposed terms for the contract, and eventually wore down Individual LD-1's resistance to some of those terms—though Individual LD-1 reduced the guaranteed number of hours Law Firm A would receive under the new contract. Individual LD-1 renewed the contract in approximately mid-2016. Individual LD-1 will testify that the renewal of the contract was politically motivated, and that Individual LD-1 should have done more to push back against Pramaggiore.

### (3)    Board Appointment

Individual LD-1 is expected to testify about Pramaggiore's efforts to have Individual BM-1 appointed to ComEd's board of directors. Specifically, Individual LD-1 is expected to testify that ComEd had an "advisory" board that had less oversight responsibility, and more of a focus on community involvement and representation. Individual LD-1 learned in or around the fall of 2017 that Individual BM-1 was being considered to fill an open seat on the ComEd board. Pramaggiore was the person who offered Individual BM-1's name as a candidate; she indicated that Individual BM-1 had been recommended by Madigan, and provided Individual LD-1 with Individual BM-1's resume, which had come from Madigan. Individual LD-1 raised with Pramaggiore

whether the company ought to place a person recommended by Madigan on the board, because Individual LD-1 felt it created an optics issue and could make it appear that Madigan had access to confidential, non-public information. Pramaggiore did not appear to agree with Individual LD-1, and she pushed for Individual BM-1 to be appointed to the board. Indeed, in a subsequent meeting with the President of Exelon, Pramaggiore advocated for Individual BM-1's appointment by stating that Individual BM-1's appointment was important to Madigan. Individual BM-1 was ultimately appointed to the board in 2019.

### (4)     Other Benefits

Individual LD-1 is expected to testify that McClain made other requests for employment for a variety of different individuals; Individual LD-1 noted that McClain was unique in the sense that he was a contract lobbyist, was relentless, and often indicated that the requests came from Madigan. Individual LD-1 responded to McClain's requests because s/he realized if they did not respond, McClain would go to Pramaggiore. As an example, McClain made requests that included wanting to know whether the legal department was finding legal work for the father of Madigan's son-in-law. As another example, McClain asked to be advised of what bond counsels, bond companies, and litigation attorneys ComEd used; Individual LD-1 understood that McClain wanted the information so he could brief Madigan.

### b.    Fidel Marquez

The government anticipates Fidel Marquez will testify at trial. Marquez served as ComEd's senior vice president of external and governmental affairs from in or around March 2012 until in or around September 2019. Marquez was charged with conspiring to corruptly influence and reward Madigan in a separate case. *See United States v. Fidel Marquez*, 20 CR 602 (Rowland, J.). Marquez pleaded guilty pursuant to a written plea agreement and agreed to cooperate with the government.

Marquez is expected to testify in detail about his role in the conspiracy to corruptly influence and reward Madigan. Marquez is expected to testify that he participated in a conspiracy to provide benefits to Madigan's associates with the intent to induce Madigan to take action as Speaker that was favorable to ComEd, including support of ComEd's efforts to pass legislation beneficial to ComEd. The benefits ComEd provided to Madigan included: (a) paying money to Madigan associates through third-party lobbying and consulting firms, even though the Madigan associates did very little or no work for ComEd; (b) contracting with Law Firm A, a firm operated by a Madigan political ally associate; (c) the appointment of Individual BM-1 to the ComEd board of directors; and (d) hiring Madigan associates as interns or ComEd employees.

Like Individual LD-1, Marquez is expected to testify that Pramaggiore placed great importance on legislative matters. Marquez is expected to testify that ComEd's relationship with the General Assembly and Madigan was poor in the early to mid-2000s, and that Pramaggiore and her predecessor took steps to improve ComEd's standing with

Madigan. Pramaggiore made it clear to Marquez that she did not want anyone from ComEd to anger Madigan; Pramaggiore viewed Madigan as immensely powerful in the General Assembly and wanted him to be favorably disposed towards ComEd, and it was not uncommon for her to ask what Madigan's position was on an issue. Marquez is expected to testify that his understanding was that pleasing Madigan was a continuation of, and perhaps a magnification of, the culture created by her predecessor prior to the passage of EIMA, namely, a culture of making sure Madigan was favorably disposed to ComEd, and not negatively disposed to the company.

Moreover, like Individual LD-1, Marquez is expected to testify about the close relationship Pramaggiore had with her fellow coconspirators, McClain and Hooker. After assuming his role in governmental affairs, it was apparent to Marquez that Pramaggiore and Hooker were both close to Madigan. Moreover, Pramaggiore worked very closely with McClain, who was someone who communicated on behalf of Madigan; she trusted McClain completely and often sought his advice. McClain sometimes participated in conference calls and meetings as the only person who was not a ComEd employee. Moreover, even though both McClain and Hooker were technically under Marquez's authority as lobbyists and consultants, McClain and Hooker often communicated directly with Pramaggiore without including Marquez. Indeed, at times, Pramaggiore would strategize with McClain and Hooker outside of Marquez's presence—something Marquez would learn of later. McClain would refer to Madigan as "our friend," and only rarely referred to him by his actual name.

27

### (1)    Hiring of Subcontractors

Marquez is expected to testify that ComEd hired and paid a series of subcontractors who did little or no work for the purpose of corruptly influencing and rewarding Madigan. Specifically, Marquez is expected to testify that Jay Doherty's firm, Jay D. Doherty & Associates, Inc. ("JDDA") served as a consultant for ComEd, and primarily focused on helping ComEd obtain access to officials associated with the City of Chicago and Cook County. When Marquez became the Senior Vice President of Governmental and External Affairs in 2012, the JDDA contract was paid out of the budget of ComEd's CEO, instead of the lobbying budget, which was unusual for individuals who provided services like Doherty.

Marquez learned after he assumed this position that two Madigan associates—Individual 13W-1 and Individual 13W-2—were being paid by ComEd as "subcontractors" through JDDA, and soon after, a third Madigan associate, Individual 13W-3, was added as a subcontractor. Marquez will explain that the payments to Individual 13W-1 and Individual 13W-2 continued through the entirety of his service as Senior Vice President of Governmental and External Affairs,[8] and the payments continued to Individual 13W-3 until and including 2018 (though Individual 13W-3 was paid through multiple third parties, including JDDA, Intermediary 2, and Intermediary 3 as discussed further

---

[8]    Marquez was terminated in 2019, after the government's investigation went overt.

below). Marquez will testify that (i) he never asked any of these individuals to perform any work for ComEd, and did not expect them to perform any work for ComEd; (ii) Marquez was never informed they were performing work for anyone at ComEd; and (iii) none of them had any unique skills that ComEd needed or wanted. The method of paying them—that is, as subcontractors—was unusual. The intermediaries, like JDDA, served as "pass through" entities in order to pay the subcontractors. Marquez is expected to further testify that while paying individuals as requested by Madigan and McClain did not guarantee legislative success, the purpose of the payments was to influence Madigan and to ensure Madigan did not act against ComEd and its legislative requests and agenda due to a failure to fulfill his hiring requests.

With respect to Individual 13W-1, Marquez is expected to testify that he learned Individual 13W-1 was being paid under the JDDA contract, when he spoke to McClain in 2013 about adding Individual 13W-3 as an additional subcontractor under JDDA. Marquez knew Individual 13W-1 served as the Alderman for Chicago's 13th Ward, and that it was widely known that the 13th Ward was "Madigan's ward," where he had long served as the Committeeman. During his conversation with McClain, McClain described Individual 13W-1 as a close Madigan associate. Prior to his cooperation with the government, Marquez did not give Doherty any direction about what work Individual 13W-1 should perform in return for payment, because Marquez did not expect Individual 13W-1 to perform any work for ComEd. Moreover, Marquez is expected to testify that

29

he does not believe that he ever discussed with Doherty what work Individual 13W-1 was doing.

Similarly, Marquez is expected to testify that when he learned from McClain that Individual 13W-2 was a JDDA subcontractor, McClain advised him that Individual 13W-2 was close to Madigan. As with Individual 13W-1, Marquez never gave Doherty any direction about what work Individual 13W-2 should perform because he did not expect Individual 13W-2 to perform any work. Moreover, Marquez is expected to testify that he does not recall either McClain or Doherty discussing any work performed by Individual 13W-2.

With respect to Individual 13W-3, Marquez is expected to testify that he learned about Individual 13W-3 in 2013. At that time, Pramaggiore forwarded Marquez an email she had received from McClain. At the time, Individual 13W-3 was being paid as a ComEd subcontractor through McClain's lobbying firm, Awerkamp & McClain. In the email, McClain asked that Individual 13W-3 be moved from McClain's firm to the JDDA contract. After Pramaggiore sent Marquez the email, Marquez discussed the matter with McClain. McClain told Marquez that Individual 13W-3 was associated with Chicago's 13th Ward and was important to Madigan. Marquez does not recall discussing what, if anything, Individual 13W-3 was doing for ComEd. Marquez contacted Doherty to tell him that Individual 13W-3 would be placed under the JDDA contract; when he did so, Doherty did not express surprise or ask why this was happening. Doherty did not ask what work Individual 13W-3 was to perform; Marquez did not discuss with Doherty any work that

Individual 13W-3 would perform; and Marquez did not tell Doherty that Individual 13W-3 would be doing any work for Marquez or ComEd.

Payments to Individual 13W-3 were again shifted in approximately November 2016, so that he was paid under a contract with Intermediary 2 instead of JDDA. Intermediary 2 was owned by a former Madigan staffer who began acting as an external lobbyist for ComEd in approximately 2013 or 2014. Individual 13W-3 was moved to Intermediary 2 because Individual 13W-3 became a Cook County Commissioner and Doherty sometimes lobbied Cook County Commissioners, thereby creating what could appear to be a conflict—in that Doherty might need to lobby Individual 13W-3, who he was paying thousands of dollars a month. Marquez remembers discussing the move with McClain, who Marquez believes consulted with Madigan about the move. As with Individual 13W-1 and Individual 13W-2, Marquez did not give the owner of Intermediary 2 any direction about what work Individual 13W-3 should be performing, because Marquez did not expect Individual 13W-3 to perform any work.

Marquez is expected to testify that Individual 13W-3 was moved again, so that he was paid as a subcontractor of another intermediary, a law firm referred to herein as Intermediary 3. The owner of Intermediary 3 was a former representative who was close to Madigan. Individual 13W-3 was moved because the owner of Intermediary 2 had been accused of sexual harassment, which caused ComEd to terminate his lobbying contract. Marquez did not discuss the move with the owner of Intermediary 3; nor did he give the owner any direction about what work Individual 13W-3 should perform for ComEd.

31

Marquez did not expect Individual 13W-3 to perform any work. Marquez is expected to testify that the payments to Individual 13W-3 ended in December 2018, because Individual 13W-3 became the Cook County Recorder of Deeds.

Marquez is further expected to testify that Pramaggiore was aware that Individual 13W-1, Individual 13W-2, and Individual 13W-3 were paid under the JDDA contract; she never discussed any work these individuals were supposed to be performing for ComEd, nor did she ever discuss any work they actually performed for ComEd's benefit. Based on these facts, as well as the fact that (i) the payments were made under her budget; and (ii) Pramaggiore never questioned why the individuals were being paid through JDDA, Marquez concluded that Pramaggiore did not expect these individuals to perform any work and that they were hired and paid to influence Madigan and to ensure that Madigan did not do anything unfavorable to ComEd's legislative interests.

Marquez is expected to testify that a fourth individual, Individual 23W-1, a former 23rd Ward Alderman who was known to be a political ally of Madigan, was added as a JDDA subcontractor in 2018. McClain asked, on behalf of Madigan, for Individual 23W-1 to be added; the request was made by McClain to Pramaggiore, who in turn directed Marquez to make arrangements for payments to begin to Individual 23W-1. At the time Individual 23W-1 was added as a subcontractor, Marquez suggested asking McClain whether it would be acceptable to Madigan for ComEd to drop any of the other subcontractors. Marquez made this suggestion because he knew the other individuals that were paid as subcontractors through Doherty and Intermediary 3 were not doing

any work. Marquez would testify that, due to Pramaggiore's promotion to a new role at Exelon, which entailed her departure from ComEd and the appointment of a new ComEd CEO (the "New CEO"), both he and Pramaggiore were concerned that the New CEO might question the JDDA contract, because the contract was $450,000 a year and was paid out of the New CEO's budget. Much of that amount was for payment of Madigan's associates who did nothing. Marquez was concerned that the New CEO might elect to eliminate some of the subcontractors, thereby angering Madigan, which could affect ComEd's prospects with respect to pending or future legislation.

Marquez is expected to further testify that Doherty had to provide a written justification for why his firm would be paid more money with the addition of Individual 23W-1. Doherty provided a justification that stated that the increased payment was due to JDDA's "expanded role with Cook County Board President's office and Cook County Commissioners and Department Heads." Marquez will testify that Doherty's statement was false, because it did not explain that the anticipated payments to Individual 23W-1 were the reason for the need to amend the contract. While Marquez contemplated using Individual 23W-1 for work with the City, he took no steps to have Individual 23W-1 perform any work, and never discussed Individual 23W-1 doing work with McClain, Pramaggiore, Doherty, or Individual 23W-1 himself. To Marquez's knowledge, no one at ComEd asked Individual 23W-1 to perform any work; and since Marquez had arranged for him to be added as a subcontractor, Marquez will explain he would expect to know if Individual 23W-1 had performed any work for ComEd.

Marquez is further expected to testify that a fifth individual, a former State Representative ("Individual FR-1"), was also hired as a subcontractor at Madigan's request. Individual FR-1 had initially approached Marquez directly about getting a job as a lobbyist before he retired from the General Assembly; however, given his concerns about Individual FR-1—among other things, Marquez believed him to have a difficult personality and as sloppy in his conversation and approach to issues—Marquez did not want to hire Individual FR-1, though he did not tell Individual FR-1 that, because the FEJA bill was set for a vote before the General Assembly at the end of 2016. However, in December 2016, McClain asked ComEd to hire Individual FR-1, after Individual FR-1 left the General Assembly. Marquez understood this request came from Madigan. Marquez hired Individual FR-1; but for the request coming from McClain and Madigan, Marquez would not have hired him. Individual FR-1 was also paid indirectly—through a third-party entity. Marquez advised Pramaggiore about these events, as it was Marquez's general practice to tell her about any conversations with McClain, especially those involving requests from Madigan. Marquez met with Individual FR-1 periodically to get information about the mood of the General Assembly, but never tasked Individual FR-1 with a particular project. Individual FR-1 was subsequently moved, so that he was paid under Intermediary 2, and then by Intermediary 3. Marquez never had any discussions with the owner of Intermediary 3 about Individual FR-1, because Marquez did not anticipate Individual FR-1 performing any real work.

### (2)    Retention of Law Firm A

Marquez is expected to testify concerning the retention of Law Firm A. Marquez will explain that Law Firm Partner A, along with his partner, ran Law Firm A. Marquez knew Law Firm Partner A to be a former chief of staff of the mayor of Chicago, and a leader of a Hispanic organization in Chicago. Marquez also understood Law Firm Partner A to be politically important to Madigan.

Marquez will testify that in early 2016, he learned that Law Firm A had a contract with ComEd that guaranteed it a minimum number of billable hours of work each year. Marquez will explain that he had never heard of a third-party contract that made such a guarantee to a firm. Marquez will testify that around that time, McClain complained that the company was not providing enough work to meet its contractual requirement to Law Firm A. Marquez believes he was copied on the email because McClain hoped Marquez would understand that if Law Firm Partner A was not happy with how this matter was addressed, then Law Firm Partner A would go to Madigan for assistance. Marquez also understood that both he and Pramaggiore were contacted by McClain because McClain was hoping Marquez and Pramaggiore would intercede and assist Law Firm A. Marquez let the attorneys in ComEd's legal department know that Madigan would be unhappy if Law Firm Partner A was not pleased with how the matter was handled—it was therefore made clear to members of the legal department that failing to give adequate work to Law Firm Partner A could negatively affect the company's legislative goals.

### (3)    Board Appointment

Marquez is expected to testify that Pramaggiore told him in approximately 2018 that she had received a request from McClain that ComEd appoint Individual BM-1 to ComEd's board of directors. Marquez understood this to be a request made for the benefit of Madigan, and it was also his understanding from his conversations with Pramaggiore that Pramaggiore had pushed for Individual BM-1's appointment to the ComEd board of directors based on Madigan's request that Individual BM-1 be appointed to the board, and that Pramaggiore had done this in order to please Madigan and ensure there was no adverse impact on future legislation the company sought.

### (4)    Internship Program

Marquez will explain that ComEd had a large summer internship program for students. Each summer, ComEd hired approximately 100 to 150 interns company-wide. In order to be eligible for the program, a candidate needed to be enrolled full-time in college or university, except for a few select high school students. ComEd would recruit prospective interns on college campuses, and would also receive referrals from public officials and others. However, even those referred had to compete with the general pool of interns.

This was not the case with interns from Madigan's 13th Ward. Well before Marquez became Senior Vice President of Governmental and External Affairs, ComEd allocated a number of intern spots for the 13th Ward. This meant 13th Ward candidates did not need to compete with the general pool of candidates. By the time Marquez took

his position, the number of allocated spots was six to eight, but by 2015 or 2016, had risen to ten spots. These spots were Madigan's to fill because of his position as Speaker and his legislative importance to ComEd—the company was attempting to influence Madigan in his role as a public official.

McClain referred 13th Ward interns to ComEd, and Marquez worked hard to ensure they were placed because Marquez did not want to risk Madigan forming a negative view of the company, which would impact the legislative goals of ComEd. At times, Marquez was able to waive the minimum GPA requirement for applicants from the 13th Ward, and often Marquez emphasized to other employees the sensitivity and need to hire 13th Ward interns. Marquez will testify that he did this to avoid any negative reaction from Madigan, which could impact future legislation the company sought.

### (5) Other Benefits

Marquez will testify that the company received other requests from Madigan and McClain to hire individuals for positions at ComEd. Generally, when a request was received from McClain, Marquez would advise the human resources department that a resume had been received, and the candidate would be invited for an interview or to sit for requisite testing. In addition, in certain cases, Marquez would contact the manager of the department to highlight that a particular candidate's hiring was important. This was done in part for the purpose of making sure that those making the decision to hire a

candidate were aware that rejecting the candidate could damage the relationship between ComEd and a public official.

For example, Marquez will describe the extraordinary treatment afforded one candidate recommended by McClain, Individual CR-1. Marquez will explain that in early 2016, McClain asked ComEd to hire Individual CR-1. McClain made it clear to Marquez that the request to hire Individual CR-1 came from Madigan. Individual CR-1 proved difficult to place in a job, because s/he was particular about what type of job s/he was willing to perform. As a result, Marquez will explain the company took unusual steps to find a position for him/her by, among other things, providing advice for how s/he could revise his/her resume, looking for additional positions for Individual CR-1 more to his/her liking, and offering to coach Individual CR-1 so that s/he could present better in job interviews with ComEd. Marquez will explain that he did all these things because it was his understanding that hiring Individual CR-1 was very important to Madigan, and Marquez believed it was important to cater to Madigan's request to hire Individual CR-1 so that there was no adverse effect on ComEd's legislative agenda. In late July 2016, Individual CR-1 was hired by ComEd; Marquez understood from communications that Madigan would be informed of the hire.

As another example, Marquez will testify that the company received a request to hire a specific external lobbyist. Marquez will testify that he believes the request came from McClain, and that the lobbyist was a friend of Michael Madigan's son. Marquez met with the lobbyist, but did not wish to hire him, so he dragged his feet on hiring the

lobbyist. McClain complained to Pramaggiore, who then suggested to Marquez that he reconsider hiring the lobbyist. The lobbyist was thereafter hired.

Furthermore, as noted below, Marquez is also expected to explain the contents of recorded conversations made both before and after he began cooperating with the government, in which the conspirators discussed, among other things, the provision of benefits to Madigan and the intent the conspirators had in providing those benefits.

### c.    Individual 13W-3

The government expects to call Individual 13W-3 as a witness at trial. Individual 13W-3 is one of the subcontractors who was paid through intermediaries such as Doherty, Intermediary 2, and Intermediary 3. The government anticipates that Individual 13W-3 will confirm that Individual 13W-3 performed little or no work in return for payments received indirectly from ComEd, and that the payments were made simply because Individual 13W-3 was a valuable political operative for Madigan.

The government expects that Individual 13W-3 will testify that s/he worked as a precinct captain for Madigan, and that Madigan considered Individual 13W-3 to be among his most valuable political operatives due to his/her skill as a precinct captain.

Individual 13W-3 will testify that s/he received a series of patronage jobs—other jobs that Madigan secured for Individual 13W-3 as compensation for Individual 13W-3's work as a precinct captain and for other political campaign work Individual 13W-3 performed for Madigan. These patronage positions included jobs in local government.

Individual 13W-3 continued to work very hard for Madigan on political campaigns, in part because Individual 13W-3 enjoyed the work, and in part out of fear that Madigan would threaten Individual 13W-3's government job. Indeed, Individual 13W-3's understanding was that if Individual 13W-3 did not perform well during political campaigns, Madigan could cause him/her to be removed from their government job.

Individual 13W-3 is expected to testify that, in addition to the government positions that Madigan obtained for Individual 13W-3, Madigan also arranged for Individual 13W-3 to receive additional money. Specifically, Individual 13W-3 asked Madigan for a job as a consultant or lobbyist where Individual 13W-3 could make an additional $45,000 per year, so that Individual 13W-3 had sufficient funds for his/her retirement. Ultimately, Madigan informed Individual 13W-3 that s/he would be "working for McClain." Individual 13W-3 knew McClain to be a part of Madigan's "kitchen cabinet," that is, s/he knew McClain to be one of the Madigan's closest confidants and advisors. However, Madigan told Individual 13W-3 that he (Madigan) controlled the contract, and that if Individual 13W-3 left the organization (meaning Madigan's political organization), Individual 13W-3 would no longer work for McClain.

Individual 13W-3 is expected to testify that s/he began receiving $45,000 per year beginning in approximately May 2012. During the first few months of payment, at McClain's instruction, Individual 13W-3 called a list of legislators McClain had provided to determine if they had any issues relevant to ComEd. Individual 13W-3 is expected to testify that this work was a "joke," because there was no substance to it. Individual 13W-

40

3 understood that the payments from McClain were in reality made for Individual 13W-3's work on political campaigns.

Individual 13W-3 is expected to further testify that in approximately January or February 2014, McClain told Individual 13W-3 that, going forward, s/he would be working for Jay Doherty. Individual 13W-3 met with Doherty, who, among other things, told Individual 13W-3 that s/he would be "on call" and that if Doherty needed anything, he would let Individual 13W-3 know. Doherty also told Individual 13W-3 to keep knocking on doors, which Individual 13W-3 understood to mean campaigning for Madigan. Doherty never told Individual 13W-3 to contact anyone else for assignments. Individual 13W-3 is expected to testify that after that initial meeting with Doherty, Individual 13W-3 had no further contact with Doherty. Individual 13W-3 was not asked to do any work for Doherty, and s/he did no work for Doherty. Individual 13W-3 never did any work for ComEd at the direction of Doherty, and did not believe that his/her payments from Doherty had any connection to ComEd. Individual 13W-3 received $4,500 from Doherty a month; Individual 13W-3 understood that payments from Doherty were, like payments from McClain, compensation for his/her political work for Madigan.

Individual 13W-3 will testify that after being appointed as a Cook County Commissioner with Madigan's assistance, Doherty contacted him/her and told Individual 13W-3 that since Individual 13W-3 was now a Cook County Commissioner, Doherty had to let him/her go due to a conflict, in that Doherty lobbied the County. Either the same day or the next day, Individual 13W-3 received a call from Madigan, who told Individual

41

13W-3 to take the Commissioner position and that Madigan would find something else for Individual 13W-3 (to replace the payments Individual 13W-3 had received from Doherty). Thereafter, McClain called Individual 13W-3 and informed him/her that Individual 13W-3 would now work for Intermediary 2, who Individual 13W-3 knew had previously held a position within Madigan's office. As with Doherty, Individual 13W-3 received $4,500 a month from Intermediary 2. Individual 13W-3 received no assignments from Intermediary 2, and did no work for Intermediary 2. Individual 13W-3 understood these payments continued to be compensation for Individual 13W-3's campaign work for Madigan.

Individual 13W-3 will testify that payments from Intermediary 2 ended, and he began receiving payments from Intermediary 3, who was a lobbyist and former Illinois State Representative who was close to Madigan. Intermediary 3 received a consulting contract from Intermediary 3 that referenced providing services to ComEd. Individual 13W-3 signed the contract that suggested that Individual 13W-3 would provide services to ComEd, but it was apparent quite quickly that Individual 13W-3 was not going to do any work for ComEd.

Specifically, Individual 13W-3 will testify that approximately two to three weeks after receiving the contract from Intermediary 3, Individual 13W-3 had a conversation with Madigan while Individual 13W-3 was out doing campaign work in the 13th Ward. During that conversation, Individual 13W-3 expressed his/her concern to Madigan that Individual 13W-3 had not been doing any work for ComEd as the contract suggested.

42

Madigan responded that Individual 13W-3 did not have to worry about that, because what Individual 13W-3 was doing right then—meaning campaign work—was what was important to Madigan. Madigan further told Individual 13W-3 that Individual 13W-3 was doing what Intermediary 3 and ComEd wanted Individual 13W-3 to be doing. Individual 13W-3 understood Madigan to be referring to political campaign work for Madigan, and further understood s/he did not have to worry about doing any work for ComEd.

Individual 13W-3 is expected to testify that Individual 13W-3 never did any work for Intermediary 3 or for ComEd. Intermediary 3 never asked Individual 13W-3 to do any work and neither did anyone at ComEd. Individual 13W-3 received payments like s/he had with Doherty and Intermediary 2, and did no work for those payments.

Individual 13W-3 is expected to testify that the payments from Intermediary 3 were terminated when s/he became the Cook County Recorder of Deeds. McClain called to inform Individual 13W-3 that the payments had to end because Individual 13W-3 was "too close" to ComEd, and that he would find Individual 13W-3 something else, which Individual 13W-3 understood to mean a new source of payments.

Individual 13W-3 will testify that a series of invoices that were sent to Doherty and others, purporting to claim that Individual 13W-3 had performed services—including services rendered to ComEd—were false, because Individual 13W-3 never performed any such services.

43

### d.    Relative of Individual 13W-1

A relative of Individual 13W-1 is expected to testify, and confirm that Individual 13W-1 was a former Alderman for the 13th Ward. Further, the relative is expected to testify that Individual 13W-1 asked the relative to email invoices to JDDA. While the relative never asked about the invoices, Individual 13W-1 never said he worked for ComEd; by January 2018, Individual 13W-1 and his/her spouse cared for the relative's children full time. The relative was not aware of Individual 13W-1 having any other employment. Like the testimony of Marquez and Individual 13W-3 (as well as the recorded conversations discussed below), this testimony will confirm that the coconspirators caused ComEd to pay money to the Madigan subcontractors even though they performed no work in return.

### e.    Professor Dick Simpson

The government expects to call Professor Dick Simpson as an expert witness. Professor Simpson, a professor emeritus who worked at the University of Illinois for over fifty years, is an expert in the field of political science and government, and has been qualified as an expert in multiple prior proceedings.

Professor Simpson is expected to testify about the structure, method, and operation of the Chicago political machine. Among other things, Professor Simpson is expected to testify that a political machine is defined as a permanent political organization or political party that is characterized by patronage, favoritism, government contracts, loyalty, and precinct work. He will explain that machine politics is a defined academic

44

term used in the study of government, particularly local government. Professor Simpson will testify that a political machine is a hierarchical political organization or political party that seeks to control the government through patronage jobs, favors to voters, and contracts to businesses. Professor Simpson will explain that political machines are typically organized through a political party and are capable of delivering the vote with mechanical regularity for that party.

Professor Simpson is expected to further testify about the operation of machine politics at the Ward level within Chicago. Specifically, Professor Simpson will testify that Wards are divided into precincts. A precinct is an official governmental unit for purposes of elections. A precinct captain is a political position, not a governmental position. Precinct captains are appointed by the party, and more specifically, by the Ward Committeeman. Precinct captains are selected based largely on their loyalty to the party, as well as their ability to gather votes for the party. Many precinct captains volunteer their time in hopes of receiving, maintaining, or enhancing patronage positions. Some precinct captains volunteer their time also in the hopes of being slated as a party candidate in a future election or some other material benefit.

The job of a precinct captain is to deliver the votes at election time for the party's chosen candidates (also referred to as the party's slate of candidates, as noted above), no matter who the candidate is in terms of ideology or character. In between elections, precinct captains deliver city services for the residents in their precinct. For example, if

a street needs repair, the precinct captain will report it to the Alderman or Ward Committeeman in order to get it repaired.

Precinct captains typically have assistant precinct captains working for them, and these are typically individuals who are performing this work without payment in the hopes of receiving a patronage job. Precinct captains and assistant precinct captains work to gather support for the party's slate of candidates, by going door-to-door to talk to voters within the precinct and seeking their support for the party's candidates.

Professor Simpson's testimony will thus serve to corroborate and inform the jury's assessment of the testimony of Individual 13W-3 (one of several Madigan subcontractors provided with a no-show job funded by ComEd that, in reality, was designed to compensate him/her for political work for Madigan within the 13th Ward), as well as help the jury understand and put in context the nature of McClain's comments during wiretap and recorded conversations (discussed further below), in which McClain mentions the importance of various subcontractors to Madigan's political operation, such as their status as precinct captains within the 13th Ward organization (*see* Session 2686 described below), and in which McClain describes ComEd's payments to the subcontractors as part of the "old fashioned patronage system" (*see* March 5, 2019 recording described below). Professor Simpson's testimony will provide a framework to help the jury understand the evidence regarding Madigan's and McClain's efforts to have the subcontractors paid by ComEd and to determine the intent or purpose behind these efforts —these were no

simple arms' length job recommendations; they often were efforts to obtain payments for key political workers of Madigan, who were integral to the political machine.

### f. Various Federal Law Enforcement Agents

The government anticipates introducing testimony from multiple federal law enforcement officers concerning searches of various locations pursuant to court-authorized warrants, as well as the results of subpoenas for documents served on multiple parties. Their testimony is expected to establish the absence of work performed for ComEd by the Madigan subcontractors—thereby demonstrating that their employment was not *bona fide* and in the ordinary course, and was instead part of a conspiracy to corruptly influence and reward Madigan. Specifically, the targets of these searches and subpoenas include the residences of certain Madigan subcontractors, as well as entities that acted as conduits for payment to the subcontractors (such as the offices and spaces used by JDDA). The government anticipates that this testimony will reflect, consistent with the testimony of Marquez, Individual 13W-3, and the relative of Individual 13W-1 (as well as wire interceptions discussed in greater detail below) that there were few, if any, documents found or produced that reflected any actual work product prepared by Madigan subcontractors or that reflected specific work actually performed by the subcontractors—even though they were paid under ComEd CEO's budget for approximately eight years.

47

### g.    Individual BM-1

The government expects to call Individual BM-1 as a witness. Individual BM-1 is expected to confirm that Madigan assisted in Individual BM-1's appointment to the ComEd board, and the circumstances under which Madigan decided to do so—testimony that again demonstrates the position was sought by Madigan and McClain to assist Madigan politically.

Specifically, Individual BM-1 is expected to testify that s/he previously worked as the chief executive officer of a municipal corporation. In September 2007, during Individual BM-1's tenure, Individual BM-1 terminated an employee that worked for the municipal corporation. Individual BM-1 knew that terminating this individual might upset Madigan because the employee was associated with Madigan and had previously served as a legislative assistant in the General Assembly.

After the termination of this employee, Individual BM-1 sought to restructure the corporation's debt through legislation that would expand the municipal corporation's ability to issue debt. Individual BM-1 unsuccessfully attempted to arrange a meeting with Madigan to discuss the legislation, and Individual BM-1's assistant received a message in response to these requests, namely, that the employee Individual BM-1 terminated should schedule the meeting with Madigan. Individual BM-1 therefore understood that Madigan would not meet with Individual BM-1. Individual BM-1 resigned as CEO of the municipal corporation in order to ensure the debt restructuring legislation passed,

48

because Individual BM-1 felt it would not pass if Individual BM-1 remained chief executive officer.

Individual BM-1 is expected to further testify that Individual BM-1 felt his/her relationship with Madigan was toxic (as a consequence of the events described above), and therefore in 2016 asked a member of Congress who had endorsed Madigan for re-election to help repair Individual BM-1's relationship with Madigan. Shortly thereafter, Individual BM-1 received a telephone call from Madigan and met with him at his office.

In 2017, Individual BM-1 asked the same member of Congress to set up meetings with Madigan and another public official to request that they both recommend Individual BM-1 for an open position on ComEd's board. Individual BM-1 asked the member of Congress to make the request because the member of Congress had endorsed Madigan in the prior election cycle, and Individual BM-1 felt Madigan owed the member of Congress a political favor. Individual BM-1 and the member of Congress met with Madigan at Madigan's office; Madigan agreed to recommend Individual BM-1 for the ComEd board seat. After the meeting, someone from Madigan's office requested a copy of Individual BM-1's resume.

Individual BM-1 is expected to testify that sometime in January 2018, Madigan called Individual BM-1 and told him/her that someone at ComEd would be notifying Individual BM-1 that Individual BM-1 would need to fill out various forms to undergo a background check. A few months later, in approximately April 2018, Madigan called Individual BM-1 and advised that Individual BM-1 would possibly be seated on the

49

ComEd board for the August 2018 board meeting. After Individual BM-1 spoke to Madigan, Pramaggiore called Individual BM-1 and invited Individual BM-1 to join the board. Pramaggiore indicated that she would set up a dinner for Individual BM-1 with her and her incoming replacement as CEO. That dinner happened on September 10, 2018, though only Marquez and the New CEO attended. At that dinner, Individual BM-1 was advised that the ComEd board was being restructured, and that Individual BM-1's appointment would not occur until after the next general election.

Individual BM-1 spoke to the New CEO on the telephone on February 13, 2019, and discussed the progress of Individual BM-1's appointment to the board. Individual BM-1 was told that the process was moving along. Several days later, Individual BM-1 received a telephone call from McClain—prior to receiving this call, Individual BM-1 had left a message to set up a meeting between Madigan, Individual BM-1, and a member of Congress on an unrelated matter. During the call with McClain, McClain assured Individual BM-1 that he would be appointed to the board and that McClain had told Madigan that McClain would call Individual BM-1 to alleviate any anxiety Individual BM-1 had. Individual BM-1 was surprised to learn that McClain knew of his/her efforts to join the board.

Individual BM-1 is expected to further testify that after Individual BM-1 attended his/her first ComEd board meeting in May 2019, Individual BM-1 spoke to McClain and thanked McClain for his support and asked McClain to thank Madigan as well. McClain advised Individual BM-1 to "whisper" into Pramaggiore's ear to thank her because she

had played a big role in Individual BM-1's appointment to the board. McClain told Individual BM-1 that it was a bigger team, or words to that effect, which Individual BM-1 understood to mean that there were a number of people that had helped get Individual BM-1 appointed to the board.

### h.    Legislators and Other Witnesses

The government anticipates calling various current and former members of the General Assembly and other witnesses familiar with the operation of both the General Assembly and Madigan's office during times relevant to the indictment. These witnesses are expected to establish that Madigan was understood to be the most powerful legislator in Springfield, and had effective power to control the flow and passage of legislation through the House by, among other things, (i) deciding what bills would stay within committee; (ii) deciding what bills would be called for a vote; (iii) controlling committee assignments; and (iv) controlling financial and campaign assistance to lawmakers, and running candidates against those that did not accede to his wishes, thus making it difficult for them to take positions in opposition to his wishes.

This testimony will be relevant and provide important context for the jury in understanding why the charged defendants were so eager to satisfy Madigan's requests for payments and other benefits, and why Madigan and McClain were in a position to make requests for such largess. The testimony of legislators will also serve to corroborate the testimony of other cooperating witnesses who will explain the motivation for

complying with Madigan's requests—his outsized power in the General Assembly meant his approval was necessary for legislation relevant to ComEd.

Legislators and other witnesses are also expected to corroborate the testimony of Marquez, by confirming that McClain was very close to Madigan; that McClain was known to act as Madigan's agent; and that McClain often positioned himself on visits to the Capitol in close proximity to Madigan's office—thus demonstrating his close relationship with the Speaker. This testimony will corroborate that Madigan and McClain were closely associated and that McClain acted on Madigan's behalf in soliciting and facilitating the provision of benefits from ComEd.

### 2. Documentary and Other Physical Evidence

#### a. Hiring of Subcontractors

##### (1) Financial Records Evidencing Payments to Subcontractors

The government anticipates introducing records, including financial institution records, as well as records of payments made by ComEd and intermediaries such as JDDA to demonstrate that the Madigan subcontractors received payments over the course of approximately eight years. These payments originated from ComEd's affiliate, were directed to an intermediary such as JDDA, Intermediary 2, and Intermediary 3. Thereafter, the payments were disbursed to the subcontractors, such as Individual 13W-3, who was paid by JDDA, Intermediary 2, and Intermediary 3, with funds obtained from ComEd. All told, these records will reflect that the subcontractors, who did little to no

work, received well in excess of $1.2 million during the period from in or around 2011 to in or around 2019. The fact that these Madigan associates received over $1.2 million over the course of many years even though they did little to no work is clear and convincing proof of the existence of the conspiracy and illicit nature of the activity the conspirators joined in.

### (2) Absence of Records Reflecting Actual Work Performed by Subcontractors

As noted above, the government anticipates introducing testimony concerning the absence of documents as proof of the illegal activity. Specifically, the government intends to introduce testimony concerning searches executed at multiple locations (as well as the results of subpoenas served on multiple parties). The targets of these requests include the residences of certain Madigan subcontractors, as well as entities that acted as conduits for payment to the subcontractors. The government will introduce certain documents that were found within various search locations, and these documents will similarly reflect that they did not concern actual work product prepared by Madigan subcontractors, nor did they reflect specific work actually performed by the subcontractors. Indeed, with respect to invoices, the jury will learn that many of the

invoices were pre-printed in advance, so that they could be sent each month, and that nothing else was found suggesting actual work performed for ComEd.

### (3) False Records Concerning Payments Made to Subcontractors

The government's evidence will demonstrate that, during the course of the conspiracy, numerous false documents were generated over an eight-year period to conceal the fact that the subcontractors were being paid despite the fact that they did little or no work and were being paid to corruptly influence Madigan. The extensive efforts undertaken to hide and falsify the nature of the payments and to circumvent internal controls within the company constitutes evidence of the corrupt intent of the conspirators. Some examples are as follows.

<u>False Invoices</u>

From September 2011 through 2019, Doherty caused invoices to be submitted to ComEd for payment. Each of those invoices falsely stated that the invoiced amount was for Doherty's firm, and more specifically, was compensation for "Public Affairs and Government Affairs Counsel in connection with the Mayor's Office, City of Chicago Elected Representatives and the Department of Environment." Each invoice was false in that it falsely described the intended ultimate recipients of the payments, falsely described the reason for the payments to the ultimate recipients, and omitted that Doherty would make payments to Individuals 13W-1, 13W-2, 13W-3, and 23W-1, who did

little or no work for Doherty's firm during each period covered by each invoice. An example of one of these invoices appears below:[9]

**JAY D. DOHERTY**

**I N V O I C E**

> CONTRACT ORDER #00129557
> INVOICE # 41515
> INVOICE DATE: 4/15/15
> INVOICE AMOUNT: $37,000

Exelon Business Services Co.
An Exelon Company
P.O. Box 87656
Chicago, IL 60680-0656

**PROFESSIONAL SERVICES:** Public Affairs and Government Affairs Counsel in connection with the Mayor's Office, City of Chicago Elected Representatives and the Department of Environment.

As specified in our contract of January 1, 2000
(for services rendered 5/01/15 – 6/01/15):                    $37,000

                                        TOTAL:    $37,000
                                                  ======

Payable upon receipt.

Please make check payable to:

Jay D. Doherty & Associates

In addition, Doherty invoiced amounts in excess of his monthly contractual rate for certain months. The invoices associated with those months falsely stated that the

---

[9]     Pertinent portions of several documents are reproduced herein. In some cases, owing to this being a public pre-trial filing, the true names and identifiers of certain individuals have been redacted.

55

additional amounts invoiced related to additional "services rendered" or "additional scope of services." For example, Doherty submitted an invoice for $30,000 to Exelon Business Services Co. dated September 15, 2011, which falsely claimed that $5,000 was for "Services rendered 8/1/11 – 9/1/11." Doherty submitted an invoice for $42,500 to Exelon Business Services Co. dated September 1, 2018, which falsely claimed that $5,000 was for "additional scope of services." These invoices did not state that the payments would actually be passed on to subcontractors who were hired to corruptly influence and reward Madigan and who did little or no work for Doherty's firm.

The conspirators caused other intermediaries used to pay the Madigan subcontractors to submit false invoices as well. For example, from November 2016 through February 2018, Intermediary 2 caused invoices to be submitted to ComEd for payment, which ComEd processed internally. Each of those invoices falsely stated that the invoiced amount was for Intermediary 2's firm, and more specifically, for "Lobbying services." None of the invoices stated that Intermediary 2 would be paying any subcontractors, even though Intermediary 2 made payments to Individual 13W-3 and Individual FR-1 during that time period, and those subcontractors did little or no work for Intermediary 2. Moreover, each of the invoices that were made part of the company's books and records falsely described the reason for each payment as being solely for "lobbying services," when in truth the payments were intended in part to corruptly influence and reward Madigan.

<u>False Asset Suite Records</u>

Payments to consultants were tracked in Exelon's and ComEd's Asset Suite management system, and information from that system was automatically incorporated into the company's general ledger on a daily basis.

From August 2011 to 2019, Pramaggiore and others approved or caused the approval of payments to JDDA in the company's Asset Suite management system, which entries contained false and misleading information. Specifically, entries into the Asset Suite management system falsely indicated that the payments (1) were intended for "Jay Doherty & Associates" (in the "Description" entry), (2) were connected to the associated invoice submitted by Doherty (in the "Invoice Number" entry), which falsely described the nature of the payment, and (3) pertained to a legitimate commercial transaction (for example, the "SubAcct" entry listed "515060" and the "Detail Cost Element" entry listed "3T," which made it appear that the payment was for professional work, namely, a consultant voucher). These records were false in that they did not reflect that a portion of the payments were in truth intended for subcontractors, who did little or no work for Doherty's firm, and they falsely stated the reason for these payments.

Similar false records were generated with respect to payments made through other intermediaries to Madigan subcontractors. For example, from November 2016 through February 2018, ComEd approved payments to Intermediary 2 in ComEd's Asset Suite management system. The corresponding entries contained false and misleading information, which was in turn automatically incorporated into the company's general

ledger. Specifically, the vouchers included entries falsely indicating that the payments (1) were intended for "[Intermediary 2's firm]" (in the "Vendor" entry), (2) were connected to the associated invoice submitted by Intermediary 2 (in the "Invoice Number" entry), (3) pertained to a legitimate commercial transaction (for example, the "SubAcct" entry listed "535100" for federal and state lobbying, the "SIC" entry listed "V17" for political services, and the "Project" entry listed "LL8258" for legislative services). These entries made it appear that the payment was for professional work, but did not reflect that a portion of the payments were actually intended for the subcontractors, who did little or no work for Intermediary 2, and that the payments to the subcontractors were made for the purpose of corruptly influencing and rewarding Madigan.[10]

<u>False Contracts</u>

JDDA entered into a number of contracts with ComEd which falsely described why money was being paid to JDDA. For example, Jay Doherty signed a contract dated January 3, 2017, which falsely stated that JDDA was retained "to promote Commonwealth Edison and its business matters," and to "develop execute and manage

---

[10]    The government expects to call a witness from ComEd or an affiliate who will explain, among other things, how false entries in Asset Suite would then be incorporated within the company's general ledger, thus generating false accounting records for the company. In conjunction with this evidence, the government will also offer the testimony of witnesses to establish that ComEd and its parent company Exelon were issuers under the Exchange Act; were required to maintain a system of internal controls in order to assure the accuracy of books and records; and had a system of internal controls (including an ethical code of conduct) that prohibited bribe payments as well as the creation of false entries within the company's books and records.

its Government Relations Presence. Government Relations will be provided in connection with the City of Chicago, including the Mayor's Office, Department Agency heads and Aldermanic offices; Cook County, including Board President's Office and Department Agency heads; and State of Illinois, including the Governor's Office and State Agency heads." This was false and misleading because, in fact, a substantial portion of each month's payment from ComEd was destined for the subcontractors, and the contract falsely stated the reason for these payments.

As another example, Doherty signed a contract amendment increasing monthly payments to JDDA by $5,000 per month, to $37,500 per month. That contract amendment falsely stated that JDDA was retained for June 1, 2018 to January 13, 2019 to provide "Government and Public Affairs Professional Services for the following: City Council, Department heads and Mayor's Office, plus expanded role with Cook County Board President's office and Cook County Commissioners Department Heads." This amendment was false and misleading because the amendment was signed in order to provide for the monthly payment of $5,000 to Individual 23W-1, who did no work for Doherty as to the matters described in the amendment. The amendment thus falsely stated the reason for this payment.

As another example, the conspirators caused Intermediary 2 to sign a contract dated January 1, 2018, which falsely suggested that all the money paid under that contract was to "assist ComEd by providing Illinois political and legislative analysis on all bills and resolutions in which ComEd has any interest, direct or indirect, present or

prospective; and represent ComEd in legislative and regulatory matters before the Illinois General Assembly and other Illinois governmental bodies," among other services, when in fact a substantial portion was destined for the subcontractors for the illicit purposes described above.

As another example, as described above, Individual 13W-3 was provided a contract by Intermediary 3 that falsely represented that Individual 13W-3 would provide consulting services to ComEd—even though Individual 13W-3 performed no such services for ComEd whatsoever. A portion of this phony contract read as follows:



<u>False Single Source Justifications</u>

Pramaggiore caused a number of internal documents to be prepared that provided false justifications as to why payments to the Madigan subcontractors needed to be made. For example, on January 23, 2017, Pramaggiore signed a single source justification related to JDDA's contract, stating that Doherty's firm would be paid $429,400 in 2017 because of his "unique insight & perspective to promote ComEd and its business matters to further develop, execute and manage its Government Relations presence." This single source justification further falsely stated that JDDA's "scope of work" included: "to promote Commonwealth Edison and its business matters" and "to further develop, execute and manage its Government Relations presence," and that "Government relations will be provided in connection with the City of Chicago, including the Mayor's Office, Department Agency heads and Aldermanic offices; Cook County, including Board President's office & Department Agency heads and: State of Illinois, including the Governor's Office and State Agency heads." This single source justification was false in that it did not state that a substantial portion of the funds paid to JDDA would be going to the subcontractors, who did little or no work for Doherty's firm and falsely stated the reason for such payments.

<u>Other False Communications</u>

Defendants caused other false statements to be made regarding JDDA's contracts and payments. For example, on July 29, 2018, Doherty's assistant wrote to ComEd

accounting personnel with an explanation of why the JDDA contract needed to be increased by $5,000 a month:

> I just spoke to Jay regarding his increased and expanded responsibilities for ComEd effective June 1, 2018.
>
> Here are the scope of services:
>
> City Council, Department Heads and Mayor's Office, plus expanded role with Cook County Board President's office and Cook County Commissioners and Department Heads.
>
> Can you please confirm if this is acceptable.
>
> Thank you,
>
> Have a great weekend,

The information Doherty provided in this email was false, because Doherty's legitimate responsibilities related to lobbying Cook County governmental bodies were not, in fact, expanding; instead, the additional payments would be going to a new subcontractor, Individual 23W-1, who was being paid not for the reasons described, but for the purpose of corruptly influencing and rewarding Madigan.

### (4)    Records Otherwise Demonstrating the Relationship of the Conspirators and their Roles with Respect to Subcontractors

The government anticipates introducing additional documents that demonstrate the relationship of the conspirators and their role in the conspiracy with respect to the subcontractor payments. For example, the government expects to offer documents seized from McClain pursuant to a court-authorized search warrant of his vehicle. Among the

62

documents seized is a handwritten list of assignments and work McClain performed for Madigan. Not only does the list reflect that McClain was available 24/7 at the beck and call of Madigan—thereby establishing that McClain acted at the direction of and for the benefit of Madigan—but it also included an entry reflecting that McClain "currently manage[d]" the subcontractors on Madigan's behalf—who did little or no work, as well as Madigan's allotment of interns:



As another example, an email communication between Pramaggiore and Doherty is instructive. Pramaggiore credited Doherty—the man who acted as a nominee to receive hundreds of thousands of dollars of payments intended for the Madigan subcontractors—with helping her in "creating an understanding" with Madigan:



**From:** Pramaggiore, Anne R:(ComEd)
**Sent:** Saturday, October 11, 2014 10:55 AM
**To:** 'jay███████████
**Subject:** Re: Mike Madigan and ████████

Thanks Jay -- I really appreciate your note. It has been a long path with each of them and relationships always require care. Thanks for your help in creating an understanding with both of those gentlemen. You are always there for us!

We are starting to plan our next round of action. Ameren is starting to stir up activity on the formula rate and that is pushing us out there a little faster than we would have liked, but we are ready. We will bring you into the dialogue in the next week or so.

Always something!

Anne

**From:** Jay Doherty [mailto:████████████]
**Sent:** Saturday, October 11, 2014 05:04 AM
**To:** Pramaggiore, Anne R:(ComEd)
**Subject:** Mike Madigan and ████████

I was thrilled to:

1. observe the nice relationship which you and Mike have with **Speaker Mike Madigan** at last evening's Field Museum reception; and
   ████████████████████████████████████

Thank you for all you do.

Jay Doherty

Other documents the government intends to offer will demonstrate the close relationship between Madigan and McClain—and illustrate that requests made to ComEd by McClain originated from Madigan, who McClain considered his "real" client. For example, upon his formal retirement as a lobbyist in 2016, McClain sent the following

letter to Madigan illustrating his loyalty and continued willingness to carry out "assignments" for Madigan upon request:[11]



December 3, 2016

Dear Shirley and Mike,

I am writing this letter just in case I do not express all of my items to you "face to face". Or, if I do not see you before you go West.

Cinda is typing this note because my "Catholic nun penmanship" is not up to par.

I am retiring as a lobbyist. It is time. I want to go out at my professional peak. I wanted to let my "real" client know that I am retiring as a lobbyist.

On December 2, 2014, on our 29th wedding anniversary I gave Cinda a gift. I told her I would retire December 2, 2015. We decided I could not leave my "real" client at that time for obvious reasons, and so we decided to stay and help. I did.

I am willing, with Cinda's blessing to do "assignments". Michael, you will have to decide if you want me to do it, legally and ethically. I offer it. I am willing to be part of strategic and tactical discussions also.

At the end of the day I am at the bridge with my musket standing with and for the Madigan family. I will never leave your side, Shirley and Mike.

So, I am happy for the new life. I hope you are happy for us. Cinda is accustomed to me being gone for 100 to 150 nights a year. Sixty or more hours a week. Paying clients who want conference calls on Saturday night at 10 p.m. or at 8 p.m. on Sunday night. Interesting life. It will be a change.

The most difficult and the most anxious part of this process is to tell you I am retiring. I hope I do not cry. Mike, I have known you since 1975. Shirley is not far behind. I will, no, we will work hard to keep the wonderful love and friendship.

Thank you. God bless.

I could have written many words but the fewer the better. Illinois is a great State because of your hand on the rudder and you know instinctively now, just like Richard J. Daley, when to start, slow or turn off the engine. Our love, John and Cinda

---

[11]   The government's evidence will demonstrate this letter was written on the heels of the passage of FEJA, and around the very same time McClain was making additional demands to ComEd concerning Law Firm A's contract.

In addition, numerous emails corroborate the testimony of Marquez and others. For example, with respect to the transfer of payment for Individual 13W-3 from the JDDA contract to Intermediary 2, McClain sent an email to Marquez, which confirmed both McClain's role and Madigan's ("Our friend") role in the transfer of Individual 13W-3 from JDDA to Intermediary 2, as well as the owner of Intermediary 2 being read into the plan.

Finally, numerous records will be introduced to demonstrate the importance of the subcontractors to Madigan and the nature of their relationship. For example, emails from Madigan's assistant dated January 4, 2019 and January 6, 2019, indicate that Madigan agreed to let Individual 13W-3 and Individual 23W-1 sit in his box during the inauguration. In addition, Pramaggiore texted Marquez on April 29, 2019 to tell him that "[Individual 23W-1's family] are very close to the Speaker."

### b. Retention of Law Firm A

Documents make it clear that the retention of Law Firm A was linked to ComEd's legislative agenda and the need to corruptly influence and reward Madigan. Specifically, in 2016, after ComEd personnel sought to reduce the number of hours of legal work provided to Law Firm A, McClain interceded and wrote a series of emails making it clear that Law Firm A was on the payroll at Madigan's request and there would be repercussions if Law Firm A's work was significantly curtailed. First, McClain wrote

Marquez on January 19, 2016, advising him that Law Firm A was hired at Madigan's request (identified in the email as "a friend"):



Then, the next day, McClain bluntly informed Pramaggiore that there would be consequences if the company meddled with Law Firm A's contract:



That same day, Pramaggiore—consistent with the anticipated testimony of Marquez concerning her policy of keeping Madigan happy—prostrated herself and her company in response to McClain's demand: "Sorry. No one informed me. I am on this." She then forwarded McClain's email to Marquez and Individual LD-1.[12]

---

[12]     Individual LD-1 is expected to testify that when s/he received this email from Pramaggiore (without any additional written comment from Pramaggiore), Individual LD-1 understood Pramaggiore to be communicating that Individual LD-1 needed to get the contract for Law Firm A renewed, and that Pramaggiore was telling Individual LD-1 to do what McClain asked to keep McClain and ostensibly Madigan happy.

Thereafter, the ComEd project manager who was tasked with helping to obtain legislative approval of FEJA—legislation that provided for a renewal of the "formula rate" beneficial to ComEd among other beneficial changes—but who had no oversight authority whatsoever over ComEd's legal department, began to monitor the renewal of Law Firm A's contract. On April 15, 2016, McClain sent the project manager an email with the subject heading, "[Law Firm Partner A] law firm?!"  On May 22, 2016, the project manager emailed Individual LD-1, asking, "Are we closed out on this topic [of Law Firm A's contract renewal]?"[13]  On May 24, 2016, McClain again pressed ComEd's legal department, Hooker, and the project manager about Law Firm A's contract, and proposed terms for the contract renewal. As explained earlier, Law Firm A's contract was renewed.

Other evidence will help explain why McClain and Madigan were so keen to obtain work for Law Firm A; Law Firm A and Law Firm Partner A were "valuable" to Madigan because they took a prominent role in political activity and fundraising for the Speaker. The government anticipates introducing documents at trial demonstrating that Law Firm A was a key contributor of money to Madigan. For example, the government intends to introduce memos addressed to Madigan, detailing the amount of campaign

---

[13]     Because the project manager was not part of the legal department, but was Pramaggiore's trusted assistant and the project manager for the passage of EIMA and FEJA, Individual LD-1 is expected to testify that Individual LD-1 understood Pramaggiore was paying attention to the renewal of the contract to make sure that it got done.

contributions Law Firm A had raised for Madigan, as well as fliers reflecting that Law Firm Partner A took a prominent role in fundraising events benefitting Madigan.[14]

### c.    Board Appointment

The government anticipates offering several documents concerning the appointment of Individual BM-1 to the ComEd board of directors. For example, the government intends to offer an email sent by Pramaggiore to Individual LD-1 on or about November 17, 2017, forwarding an email sent on Madigan's behalf, containing a copy of Individual BM-1's resume. As another example, which again demonstrates the role Pramaggiore took in pushing forward hiring requests made at Madigan's request,

---

[14]    The government anticipates calling another witness who will explain that Madigan had asked Law Firm Partner A to assist with the legislative remapping process (a matter discussed further below) because of his connections to the Hispanic community, and that Law Firm Partner A had also acted as a fundraiser for Madigan.  Law Firm Partner A's political assistance to Madigan further demonstrates why Madigan and McClain were so intent upon Law Firm Partner A receiving business from ComEd.

Pramaggiore prompted Marquez to arrange a dinner with Individual BM-1 as a prelude to his appointment on the board:



As a further example, the government intends to introduce the notice ComEd filed with the United States Securities and Exchange Commission on or about April 26, 2019, noting that Individual BM-1 had served as a director of ComEd since April 2019.

d.    Internship Program

As noted earlier, Marquez associated the requests for hiring interns from the 13th Ward with Madigan, the Committeeman of the 13th Ward. In emails, McClain expressly

linked the hiring of these interns to Madigan. For example, in an email dated February 25, 2015, McClain asked Marquez, "Our Friend's ward? Summer interns? 10 jobs or 12 or what is the ceiling?"  Several weeks later, Marquez responded as follows to a question from another ComEd employee whether an intern referral from the 13th Ward could simply be "fairly consider[ed]" or whether there was "pressure to hire":

On April 2, 2017, McClain sent an email to Marquez, Pramaggiore, and Hooker, again stressing the importance of hiring 13th Ward interns: "I strongly recommend this item as we go through this transition period. My goal is that both parties are happy and not frustrated a second. I hope you agree."

On February 9, 2018, McClain sent an email to Marquez's assistant, saying he understood that the 13th Ward would be provided ten positions in the ComEd Internship Program, as had been done "for as long as I can remember." Three days later, Marquez caused an email to be sent by his assistant to McClain, confirming that ComEd would provide the ten internship positions.

On December 6, 2018, McClain emailed Marquez and others at ComEd: "I am pretty sure the 'ask' will be to 'put aside' or 'save' ten summer jobs for the 13th Ward."

### e. Other Benefits

There are numerous emails concerning other benefits sought by Madigan and McClain from ComEd. For example, as noted earlier, Marquez is expected to testify about the lengths that he went to in order to have an individual recommended by Madigan, Individual CR-1, hired by the company. Marquez understood the request to originate from Madigan. Contemporaneous emails corroborate Marquez's expected testimony. As reflected below, Marquez made it apparent to other personnel within ComEd that there was a "very strong need" to bring Individual CR-1 in—despite the fact that she had refused to interview for five different openings—because of the fact that she was connected to Madigan, and that this situation was on Pramaggiore's radar (even

though Individual CR-1 was being considered for relatively low-level positions within ComEd):



On Jul 8, 2016, at 8:44 AM, Marquez Jr, Fidel:(ComEd) <Fidel.Marquez@ComEd.com> wrote:

On ████████ Anne called me last night
Told her I've been working with ██████ She's been terrific! ████ is looking for a job that doesn't seem to fit our culture
████ came to us from Speaker

Fidel Marquez

From: █████████████████████@exeloncorp.com>
Sent: Friday, July 8, 2016 8:33 AM
Subject: Re: Referral
To: Marquez Jr, Fidel:(ComEd) <fidel.marquez@comed.com>

████████████████████████████████

Regarding the other issue, I need to know who ████ is connected to. Recruiting has offered her five opportunities to interview and "she" has refused. I talked to Anne about this a week ago. ████ doesn't want to work storm duty?? Really? I need to know who the referral is

Sent from my iPhone

> On Jul 7, 2016, at 5:45 PM, Marquez Jr, Fidel:(ComEd) <Fidel.Marquez@ComEd.com> wrote:
>
> Hello ███████
████████  ███████             ████████
████████████████████████████
>
> Second, ██████ and I are working on a high level referral, ███████ She seems to be very limited in location and hours
> However there is still a very strong need to bring in
> This is on Anne's radar
████████████████████████████

74

### 3. Wiretap Communications and Consensual Recordings

The government anticipates introducing numerous wiretapped and consensual recordings as proof of the existence of the conspiracy. Collectively, these recordings provide powerful corroborating evidence of the existence of the conspiracy and the participation of each defendant in the conspiracy, contain coconspirator statements in furtherance of the conspiracy, and corroborate the anticipated testimony of government witnesses and documentary evidence, including those witnesses and documents discussed above. These recordings are divided into the following categories for purposes of discussion: (a) recordings concerning efforts to confer benefits on Madigan and his associates, as well as the corrupt intent of the conspirators; and (b) the relationship of the various conspirators and their roles within the conspiracy.[15]

### a. Recordings Concerning Efforts to Confer Benefits on Madigan and His Associates, as well as the Corrupt Intent of the Conspirators

#### (1) Hiring of Subcontractors

The government will introduce multiple calls and meetings demonstrating that the conspirators coordinated to arrange for payments to be made to Madigan's associates, who were paid as purported subcontractors by Jay Doherty and others, even though they did little or no work in return. Indeed, the recordings reflect that the conspirators were

---

[15] The transcripts quoted below are in draft form only and are subject to revision before trial.

aware that these subcontractors did no real work in return for payment, that the purpose of payments was to influence and reward Madigan, and despite this, they caused, directed, and facilitated the payments to be made. These communications reflect the personal participation of each and every one of the defendants in efforts to direct these illicit payments to the Madigan subcontractors.

### (a) Recordings concerning Payments to Individual 23W-1 and Other Subcontractors

As discussed above, Marquez is expected to testify concerning the addition of Individual 23W-1 as a subcontractor who was paid through Doherty at Madigan's and McClain's request—though he did no work for ComEd. Contemporaneous wire interceptions confirm these events.

For example, on or about May 16, 2018, at approximately 10:20 a.m. (McClain Phone, Session #2657), McClain was asked by Madigan, "And ah, when you're with Anne, you're talking about [Individual 23W-1]?" McClain said, "[Individual 23W-1] and [Individual BM-1, the board member appointed at Madigan's request]."

Within the hour, McClain was on the telephone with Pramaggiore. Specifically, on or about May 16, 2018, at approximately 11:06 a.m (McClain Phone, Session #2664), McClain made an outgoing call to Pramaggiore. During the call, Pramaggiore and McClain discussed individuals who were being indirectly paid by ComEd at the request of Madigan and McClain. Specifically, McClain asked, "Secondly, have you thought any more about [Individual 23W-1]?" Pramaggiore said, "Yeah, I told Fidel [Marquez] to hire

him. To get it done, so I'll follow up on that. Oh yeah." McClain said, "Okay. I'll tell a friend of ours so he can call him." Pramaggiore said, "Yeah, let me, let me make sure, let me just double check with Fidel. The only question Fidel had was, you know, when [the New CEO] comes in, he's gonna look at all this stuff and, you know—" McClain said, "Oh yeah." Pramaggiore continued, "—we got a lotta people hanging out there and so one question Fidel and I had was, is there anybody who, you know, we could sort of take off the roster. And I think he was going to ask you about that."

These interceptions establish a number of different points: (i) the request to hire Individual 23W-1 as a subcontractor was made by McClain, based on Madigan's direction; (ii) Pramaggiore, the CEO of ComEd, was directly responsible for agreeing to the request to put Individual 23W-1 on the payroll and directing Marquez to arrange for payments to Individual 23W-1 ("I told Fidel to hire him"); (iii) McClain wanted Madigan to inform Individual 23W-1 that he had been hired, not an individual from ComEd—thus further demonstrating this was not a *bona fide*, arms' length employment decision made in the ordinary course of business; and (iv) Pramaggiore (the CEO) asked McClain (the nominally subordinate contract consultant) for permission to reduce the number of Madigan subcontractors, out of concern that the payments would be scrutinized by her successor. As to the latter point, based on Marquez's expected testimony referenced above, as well as subsequent interceptions, the jury will be provided with evidence that reflects that certain of the conspirators were concerned that the New CEO (who was scheduled to replace Pramaggiore as CEO of ComEd, and who was known to be a former

77

federal prosecutor), would question the payments made to Madigan's associates. This is unsurprising, because there were a "lotta people" being paid who were just "hanging out," to use defendant Pramaggoire's own words.

As another example, on or about May 16, 2018, at approximately 2:31 p.m. (McClain Phone, Session #2686), McClain made an outgoing call to Marquez. During the call, the men reviewed payments that were being made by ComEd at the request of Madigan and McClain to the Madigan subcontractors, and discussed adding Individual 23W-1 to the roster of subcontractors. Notably, during this call, McClain (i) set the price to be paid to Madigan's associate, Individual 23W-1, as opposed to ComEd official making that determination—once again demonstrating that the payments were not *bona fide* and not made in the ordinary course of business; (ii) explained the reason why each of the various subcontractors was being paid by ComEd—with reference to their political association or utility to Madigan—as opposed to any legitimate, actual work they performed for ComEd; and (iii) reiterated that Madigan, not a ComEd official, would be the one to tell Individual 23W-1 that he would begin receiving payments. Specifically, Marquez said, "Did you get my message?" McClain said, "You wanted to talk about [Individual 23W-1]?" Marquez said, "Yeah, so Anne mentioned your conversation with her about [Individual 23W-1]. What were you thinking numbers wise?" McClain said, "Five, five." Marquez said, "Okay, so we still have [Individual 13W-2], right?" [Marquez confirmed that ComEd was currently providing payments to Individual 13W-2 at Madigan and

McClain's request.][16] McClain said, "Right. Let me just tell you about each guy as you go through them. So [Individual 13W-2], he's one of the top three precinct captains and he also trains people how to go door to door, so just to give you an idea of how important the guy is." Marquez said, "[Individual 13W-1]." McClain said, "[Individual 13W-1], former alderman." Marquez said, "Yup, I remember, actually when I first started doing this external stuff he was Alderman down there. Uhm, then we've got [Individual 23W-1]. Uhm, and —" McClain said, "[Individual 13W-3]." Marquez said, "Pardon me?" McClain said, "There's [Individual 13W-3]." Marquez said, "Yup, [Individual 13W-3]. Now he's no longer a Commissioner but is he going to be Recorder of Deeds?" McClain laughed, and said, "I don't think, it's possible." Marquez said, "Okay. Alright, someone thought that might be the case." McClain said, "It's a funny business up here." Marquez said, "And, [Individual FR-1]." McClain said, "[Individual FR-1], I gotta talk to M—somebody about that, let me talk about that." Marquez said, "We are going to go ahead and add [name redacted]—[Individual 23W-1]. What I'm gonna do is have Jay Doherty reach out to him and work it that way." [Marquez advised McClain that ComEd would begin paying Individual 23W-1, but that the payments would flow through lobbyist Jay Doherty's lobbying firm, JDDA.] McClain said, "Give me a few hours so I can call somebody else to

---

[16]     Where bracketed interpretations in recorded conversations appear, the government anticipates that a participant to the conversation (such as Marquez in this case), will explain what was meant or understood by either what the witness said or heard.

make a call to him would you?" [McClain asked for time to call Madigan, so that Madigan could, in turn, call Individual 23W-1 to tell him that he would begin receiving payments from Doherty's lobbying firm.] Marquez said, "You let me know."

(b)      **Recordings concerning 2019 Renewal of JDDA Contract**

The government anticipates the evidence at trial (including the testimony of Marquez) will reflect that Doherty's consulting contract was subject to renewal in 2019—after the New CEO had taken over as CEO from Pramaggiore. In early 2019, Marquez began cooperating with the government and began recording conversations concerning the renewal of Doherty's contract. Each defendant was captured on a recording discussing the renewal of the contract, either in direct conversation with Marquez or with each other. Marquez sought advice from the defendants in explaining to the New CEO *why* the Doherty subcontractors were being paid so much money by ComEd.

Notably, not a single defendant suggested any subcontractor was being paid to perform valuable, legitimate work for ComEd; despite this, they all attempted to ensure Doherty's contract (and payments to the Madigan subcontractors) were authorized to continue for another year. The recorded conversations reflect that the payments were both corruptly solicited and offered, that all the defendants were involved in them being made, and that each defendant was aware of the true purpose of the payments.

For example, on or about February 7, 2019, at approximately 12:04 p.m., McClain and Marquez met at a restaurant in Springfield, Illinois. During the meeting, McClain

80

and Marquez discussed the renewal of ComEd's contract with JDDA, which included money to pay Madigan's associates through JDDA. This conversation is notable because it establishes, among other things, (i) McClain's effort to conceal why the subcontractors under Doherty were being paid, demonstrated by his advice to Marquez not to put anything in writing about what the subcontractors did for payment; (ii) that McClain did not believe they did any legitimate work for the company, in that McClain never suggested they performed any legitimate work for the company when asked for advice on how to explain what the subcontractors did, nor did he suggest the obvious step of simply asking Doherty what they did; (iii) that McClain was aware that paying the subcontractors indirectly through Doherty could be used as an artifice by the company and those associated with the company to deny knowledge that the subcontractors were not performing any work; and (iv) that the subcontractors were hired at Madigan's request, and that this alone justified their payment, regardless of whether they actually did anything. Specifically, Marquez said, "I met with Hooker not that long ago, and we'll get back to that, but the contract with Jay Doherty is under the CEO's budget. I never had to touch it. Now, someone needs to talk to [the New CEO] about it. I don't know how, you know [the New CEO]'s, I don't know how he's going to react." McClain said, "I don't either." Marquez said, "And here's what, did John [Hooker] tell you he and I talked about it? Okay. So John, he suggested that I have a write-up for each of Jay's subcontractors, [Individual 13W-2], [Individual 23W-1], and [Individual 13W-1]. And have him write up what they do, like, I don't know what they do. I don't know if I can tell [the New CEO]

what they do. And, you know, [the New CEO]'s gotta approve it." Thereafter, McClain said, "Right. I don't either and he could just as easily require something in writing, but I would say to you don't put anything in writing." Marquez said, "Okay, because that was John's suggestion, right, but my dilemma is I gotta go in to [the New CEO] and say, 'Here's, this is under your budget, here's Jay's contract.' He's gonna say, 'How much is this for? What's all included? . . . What's, what are we paying Jay for?'" McClain said, "So, um, they're all former ward committeemen and aldermen. [Individual 23W-1], former alderman. [Individual 13W-1], and this either was number one, two, or three depending on the year, his [Madigan's] best precinct worker. He actually trains other precinct workers, so—" Marquez asked, "Meaning, mean [Individual 13W-2]?" McClain said, "[Individual 13W-2]." Marquez said, "Okay." McClain said, "So he's uh, it's a favor and it's uh, Doherty's contract, Doherty's the one that has to prove that if the IRS ever comes in and says, 'Who are these guys, what do they do?'" Marquez said, "Right." McClain said, "Doherty's gotta prove it." Marquez said, "Right." McClain said, "The company [ComEd] doesn't have to."[17] Marquez said, "Right, right, but, I understand that, but [the New CEO] is going to, and legitimately so. I think it's a legitimate question." McClain said, "It is, yeah." Marquez said, "It's a legitimate question. [the New CEO]'s gonna ask, 'What are we paying Doherty for?'" McClain said, "Well, on Doherty, for Doherty's sake, he does

---

[17]     Marquez is expected to testify that he understood McClain's reference to the payments being a "favor" as meaning that the payments were a political favor to Madigan.

work for us." Marquez said, "Right, but I'm just talking, 'cause—" McClain said, "But you're talking about the three subcontracts?"[18] Marquez said, "Well, if you look at the contract, it's Jay Doherty and Associates." McClain said, "Right." Marquez said, "And I forget the amount, Mike, but it's a monthly amount." McClain said, "Right." Marquez said, "Equal to a yearly amount, and it's a pretty hefty amount." McClain said, "168 grand [$168,000] just for the subs [Madigan associates]." Marquez said, "Okay, and then and then what Jay's is—" McClain said, "I don't know what Jay's is." Marquez said, "Yeah, I can't remember, I don't know the numbers off-hand." McClain said, "I've never asked him but probably 10 grand a month at least." Marquez said, "Yeah, I don't remember off-hand." McClain said, "That's 288 [$288,000] if it's 10 grand a month." Marquez said, "And he [the New CEO] goes, 'What?'"

Later during the conversation, McClain said, "If that hour he's [the New CEO] got his ex-prosecutor hat on, he's gonna say we can't do this." Marquez said, "That's right, that's a possibility. And in his conversations with his staff, he brings that up often. Former prosecutor, former prosecutor, former prosecutor." McClain said, "I thought about this . . . It's very possible that that's what his reaction is going to be, and then I think you have to have, at least I'd ask you to recommend that, 'Before you do anything,

---

[18]     Marquez is expected to testify that he understood McClain to be contrasting Doherty, who actually did legitimate work ("he does work for us"), from the Madigan subcontractors—who did not.

can McClain and you have a sit-down?'" Marquez said, "Okay." McClain said, "As a back up." Marquez said, "Okay." McClain said, "And you could say, 'Look I didn't think it was appropriate for McClain to—" Marquez interjected, "I don't even wanna—" McClain said, "—talk to you about this.'" Marquez said, "I don't even wanna bring that up." McClain said, "You're welcome to." Marquez said, "Eh. Well, [the New CEO] is funny about conversations you and I might have that he's not aware of. And [the New CEO] will probably believe that somehow we're plotting against him." McClain said, "Or he probably thinks that all the time any—" Marquez said, "Well, that's what I mean. I mean this will give him another nail in the coffin. So that's why, that's why I don't wanna do that. So, recommend nothing in writing." McClain said, "I think all that can do is hurt ya. There's no way you could, except for giving him your biography . . . except for maybe giving him a biography of each of the three [Madigan subcontractors]. But I certainly wouldn't do the work product because you don't supervise that."[19] Marquez said, "I don't." McClain said, "Or monitor that, that's Jay's." Marquez said, "Right." McClain said, "Jay's. And you know what I would say to [the New CEO] is 'Jay's been really good to us at City Hall, and he does that'—" Marquez said, "City Club?" McClain said, "City Club. So it's, I'd say that almost every speech I've been around he plugs ComEd, sooner or later he

---

[19]     Marquez is expected to testify that he understood McClain was advising him against putting anything in writing because a truthful explanation would disclose the Madigan subcontractors did no work, or alternatively, he would submit a false document.

84

sneaks it in." Marquez said, "Right. Shamelessly." McClain said, "Yeah, shamelessly. So there's a lot of benefit with this guy." Marquez said, "Yeah." McClain said, "In my opinion." Marquez said, "So then what do you think about, alright I'll try that with [the New CEO], here's this, here's what's going on." McClain said, "You don't know what [the New CEO] will show up that day, that's the problem." Marquez said, "I know." McClain said, "Now you know better than I do." Marquez said, "I know, I never know. And I don't have a litmus test to find out. It's like, mm, I better come back tomorrow." McClain said, "So I can see him saying we can't do this. . . . Okay, I mean, 'Fidel we can't do this. Anne [Pramaggiore] may have done that, but I don't feel good about this. It looks raw to me.' I could see him, I can hear him saying, 'That's fine.'"

A telephone call between Michael McClain and John Hooker occurred on or about February 11, 2019, at approximately 10:36 p.m. (McClain Phone, Session #19533). During the call, McClain and Hooker discussed McClain's meeting with Marquez on February 7, 2019 (described above), and the payments to Madigan's associates through Doherty. In the call, the men agree that ComEd "had" to hire the subcontractors because Madigan had asked them to be hired, that McClain and Hooker devised the plan of placing the Madigan subcontractors under Doherty to conceal the arrangement, and that it was immaterial whether the subcontractors performed work or not. Specifically, Hooker said, "How did you make out with Fidel [Marquez] when he came to talking about Doherty? Jay Doherty? I was gonna wait 'til I saw you." McClain said, "Well, I just told him to be transparent with uh . . . with uh . . ." Hooker said, "[the New CEO]." McClain said, "[The

New CEO]. I mean just like [the New CEO] you told, I mean I, I said to Fidel, 'You may

not be able to say this, you may be able to say that.' Just like you ended up telling Fidel

he had to hire [a named individual] because [a named labor leader] came to you. 'We had

to hire these guys because Mike Madigan came to us.' It's just that simple." Hooker said,

"That's as simple as it is." McClain said, "That's how simple it is. So if you want to make

it a Federal court suit, okay, but that's how simple it is." Hooker said, "Right. And this

was the best way to do it, that this avenue is one of the best avenues . . ." McClain said,

"Right." Hooker said, "It's, it's clean for all of us." McClain said, "Right." Hooker said,

"You know?" McClain said, "Right. We don't have to worry about whether or not, I'm

just making this up, whether or not [Individual 23W-1], is doing any work or not. That's

up to Jay Doherty to prove that." Hooker said, "That's right." McClain said, "We're not,

we're not, uh, monitoring his work load; whether or not [Individual 23W-1]'s earning his

five grand a month. That's up to Jay Doherty." Hooker said, "That's right." McClain said,

"That's why we set it up like this, John." Hooker said, "We came up with this plan and

between him, our friend [Madigan],[20] and, and . . . [name redacted] and the alderman; they

thought it was great." McClain said, "Yep. Well, yeah, we, you and I came up with it."

Hooker said, "I know." McClain said, "They didn't come up with the idea. You and I came

---

[20]     The government's evidence, including the testimony of multiple witnesses as noted above,
such as Marquez, will demonstrate that Madigan was often referred to as "our friend" in
conversation to camouflage his identity from others.

up with it." Hooker said, "No, we came up with it, but they thought it was great once they heard it." McClain said, "Oh yeah, oh yeah, oh yeah, yep, yep."

Doherty also discussed the subcontractors with Marquez two days later. On or about February 13, 2019, at approximately 1:30 p.m., Marquez and Doherty met in Marquez's office at ComEd. During the meeting, Marquez and Doherty discussed ComEd's payments to the Madigan associates through JDDA. This conversation demonstrates (i) Doherty's knowledge that the subcontractors he paid for approximately eight years performed no work; (ii) Doherty's understanding that the subcontractors were paid for the purpose of corruptly influencing and rewarding Madigan; (iii) that Doherty was conscious of the illegality of his own conduct as reflected by his own guarded behavior during this conversation; and (iv) that Doherty continued to act as a nominee after explicitly confirming that the subcontractors he paid did no work as well as confirming his understanding that they were being paid to corruptly influence and reward Madigan. Specifically, Marquez said, "First, thanks for meeting. First of all, don't, I don't want you feeling like your contract with us is at any kind of peril. I don't want you thinking that. Here's the change, Jay, and here's why I needed to talk to you. So, [the New CEO] is new, he's new to ComEd. . . . And you may or may not know this. Probably a lot of detail that you don't know. There's a lot of detail I don't know. But your contract is under [the New CEO]'s budget." Doherty said, "Right." Marquez said, "It's always been under the CEO's budget." Doherty said, "Right." Marquez said, "Okay." Doherty said, "Back to [name redacted]." Marquez said, "Does it go all the way back to [name

redacted]? How long ago?" Doherty said, "Oh, I started working for Commonwealth Edison Company, thank you lord, in 1985." Later in the conversation, Doherty said, "And then came along, again, this is just you and me talking, I don't even know who else knows this. John Hooker calls and says, 'Jay, I've got a sub for you. You know, a sub—" Marquez said, "A subcontractor." Doherty said, "'Subcontractor, [Individual 13W-1], [Individual 13W-1].' . . . He says, 'we're gonna pay him [Doherty holds up 4 fingers] every month and you just—' I think John [Hooker] said, 'I'll talk to Fidel.' I don't know who he talks to. I don't know." [Hooker instructed Doherty to pay $4,000 per month to Individual 13W-1.][21] Marquez said, "That was, that was, that predated me, because when I was working with you, we were just working on city stuff and it was just me and you and [name redacted]." Doherty said, "Okay." Marquez said, "And when I first got here from Ops, [Individual 13W-1] wasn't even an alderman anymore." Doherty said, "Oh yeah, that's right. You came over from Ops." Marquez said, "It seemed like I've been here forever, but—" Doherty said, "I've known you and we've become great friends. And then came on, I think, [Individual 13W-2]." Marquez said, "Okay." Doherty said, "Who ran recorder of deeds office." Marquez said, "Okay." Doherty said, "And then came on, for a while, [Individual 13W-3]." Marquez said, "Okay." Doherty said, "Who's now Recorder of Deeds.

---

[21]     Doherty's refusal to audibly note how much money he was paying this Madigan subcontractor smacks of his consciousness of guilt—as does his statement "this is just you and me talking."

Before he was Cook County Assessor. And then, and then now, [Individual 23W-1]."
Marquez said, "Yeah." Doherty said, "So, I don't know if, I just can't remember if Mike
McClain was part, I think it was really John Hooker who always just called me." Marquez
said, "Yeah." Doherty said, "And said, 'Hey, I'm gonna slug this guy on.' And then it went
up to whatever it is today, $37,000, so it looks like I'm making a gillion dollars."

Continuing during the same conversation, Marquez said, "Yeah, so that, and that's,
you know, this is something [the New CEO]'s gotta approve, right?" Doherty said,
"Yeah." Marquez said, "And I've got to go to [the New CEO] and say, 'I know you're new
here. You know Jay. Here's that.'" Doherty said, "Right." Marquez said, "So he's gonna
ask questions." Doherty said, "Sure, he should." Marquez said, "And, 'How did it get this
way?' and stuff like that." Doherty said, "Right." Marquez said, "So, as far as I know, and
maybe you can tell me different, all these guys do is, they're a sub under you and you cut
them a check. Do they do anything? What do they do? What do you have them doing?"
Doherty said, "Well, not much, to answer the question." Marquez said, "Okay." Doherty
said, "Not much. What, let me just answer this. If I ever ask them anything in general, I
would ask them. But this is really all, this is, you know, just you and me talking." Marquez
said, "Yeah." Doherty said, "This all came from Hooker, McClain, [name redacted]."
Marquez said, "Okay." Doherty said, "And I don't, I don't talk to [Individual 13W-1]. I
mean . . . when my dad died and he was, all this stuff and—" Marquez said, "Right, right."
Doherty said, "But I don't say go do this in Springfield." Marquez said, "Right." Doherty
said, "Go do this at the [Chicago] City Council. Go do that. [Individual 13W-2], I met with

a couple times. [Individual 13W-3], I mean, I see him, but I don't, you know, but I don't do anything specific." Doherty continued, "But I do know that every six or eight or nine months, every once in a while, Hooker will call and say, 'Is everything okay with the guys?' . . . 'Cause I know John [Hooker] sees the Chairman, strike that, the Speaker [Madigan]. . . . John [Hooker] is a head of that committee or commission, or whatever, on the fair maps."[22] Doherty continued, "So, I don't think I'd tinker with that. . . . I really, I really don't."[23]

Continuing during the same conversation, Marquez said, "You know, I've just got to go to [the New CEO] and explain it to him the best I could. . . . I'm just not sure what kind of questions he's got. So I'm just trying to prepare myself, Jay, for what questions

---

[22] The government anticipates calling a witness who will explain that the legislative districts in Illinois are redrawn, or remapped, every ten years, and that this remapping process, which decides the boundaries of each district, was critical towards ensuring the greatest number of Democrats could be elected. Further, this witness is expected to testify that in 2014, a group called the "Fair Maps Initiative," known as the "Initiative," challenged the remapping process. The Initiative wanted an independent commission, and not the majority party in the Illinois House, to be in charge of the remapping process. Madigan wanted the Initiative defeated. An independent commission would mean that Madigan would lose the ability to affect district boundaries in his favor and in favor of the Democratic Party. The witness is expected to testify that Hooker was a plaintiff in a lawsuit filed to challenge the Initiative. Hooker was a ComEd lobbyist at the time and ComEd had legislation before the Illinois House. Hooker was represented by an attorney close to Madigan. Like Law Firm Partner A, Hooker acted as a political ally to Madigan.

[23] Marquez is expected to testify that he understood Doherty to be telling him that the Madigan subcontractors did not perform any work for JDDA or ComEd, that Hooker continued to monitor the situation on behalf of Madigan, and that there would be negative consequences from terminating the contract that sent payments to the Madigan's subcontractors, even though they did no work.

he might have." Doherty said, "Here's how I might. Number one, your money comes from Springfield [where the State legislature is located]. ComEd money, right? For the most part." Marquez said, "You mean, that's how we make our money?" Doherty said, "Yeah." Marquez said, "Yeah, yeah. Through our rates, yes, regulated."[24] Doherty said, "And, you know, I would, if it were me, and again, Mike Madigan's not my best friend, but if I called him right now, he'd call or he's say, Jay, if I want to go see him, I'd go see him. But, my bottom line advice would be, 'if it ain't broke, don't fix it' with those guys." Marquez said, "Okay." Doherty said, "I don't think, you know, you've been around the game and again, Madigan doesn't ask, I never ever once had a conversation with Mike [Madigan] about these people . . . But I know, I have every reason to believe, that McClain has." Marquez said, "Okay." Doherty said, "I know Hooker has." Marquez said, "Okay." Doherty said, "Because Hooker would call me about these guys. I mean, I never met these guys. I met [Individual 13W-1] because what you guys do with the City Council." Marquez said, "He used to be an alderman." Doherty said, "And [Individual 23W-1] I know well." Marquez said, "When he was the alderman." Doherty said, "They keep their mouth shut, and you know. But, do they do anything for me on a day to day basis? No."[25]

---

[24]   Marquez's reference here is to the formula rate legislation embodied in EIMA and FEJA. As noted earlier, multiple witnesses will establish that Madigan supported these legislative initiatives, and indeed, ensured the passage of FEJA by causing others to vote for the legislation.

[25]   Marquez is expected to testify that he understood Doherty to be telling him that the Madigan subcontractors kept quiet about the fact they received payments in return for

Later in the conversation, Doherty said, "But okay, so [the New CEO], or Fidel, why would we pay a guy, like Doherty and these other three people, all this money? I don't know about the other three people. That's, that, I guess, can be answered in Springfield with Madigan. And to keep Madigan happy, I think it's worth it, because you'd hear otherwise."[26] Marquez said, "Okay." Doherty said, "In my opinion. I never talked to him about it, but I didn't have to. But Hooker has. Do you talk with John much?" Marquez said, "Yeah, I talk to John. I talk to John." Doherty said, "He'll know the story . . . ." This recording makes clear that Doherty understood the payments to the Madigan subcontractors to be part of a pay-to-play arrangement made to corruptly influence and reward Madigan.

Marquez subsequently discussed the renewal of the Doherty contract with Pramaggiore during a telephone call on or about February 18, 2019 (Marquez Phone, Session #6182). During that call, Pramaggiore explicitly instructed Marquez that he should convince the New CEO to renew the contract in order to avoid any negative impact on legislative initiatives in Springfield that were then pending, including a

---

doing nothing, and the same applied to Individual 13W-3 when he received payments in the past.

[26]     Marquez is expected to testify that he understood Doherty to mean that the payments made to Madigan's associates were made in order to favorably influence Madigan with respect to legislation sought by ComEd and to prevent Madigan from being angry with the company and not supporting its legislative agenda.

beneficial extension of the formula rate legislation that was pending at the time.[27] Specifically, Marquez explained to Pramaggiore that, "I met with Jay, uh, Jay pretty much, well he did say, 'Well, you know all these guys [the Doherty subcontractors] do is pretty much collect a check, um, and you should just leave it alone. Don't mess with it, just leave it alone, um, otherwise things can go, you know, bad for us in Springfield.'" After Marquez explained to Pramaggiore that he needed to talk to his new boss, the New CEO, about the contract, Pramaggiore interrupted him and said the following:

> Yeah here's the—you do—but here's the problem: Is if you go in and say, you know, "We need to clean this stuff up, it's been that way since [name redacted]," He's gonna do a victory lap that he's got another thing on me and, you know, everything is how much better he can handle things than me. My suggestion is, and you potentially, I mean he can do what he wants, but my suggestion is you go in and say, "Hey [the New CEO], you know we've got some contracts, some subcontracts, it's probably a good time to make a switch. We got a new governor in place, you know, um you got, you know, 30% change over in the, in the um, in the s-, in the, uh, legislature, but let's not do it until after the session's over. Let's look at this in terms of going forward to next year because we do not want to get caught up in a, you know, disruptive battle where, you know, somebody gets their nose out of joint and we're trying to move somebody off and then we get forced to give 'em a five-year contract because we're in the middle of needing to get something done in Springfield.

---

[27] The government's evidence will show that at the time of this conversation, ComEd was seeking an extension of the effective date of the formula rate legislation previously passed by the Illinois General Assembly that had been extremely favorable to the company. Marquez is expected to testify that Doherty's work was focused within Chicago and the Cook County area.

Pramaggiore, a high-level company executive who oversaw the hiring and payment of the Madigan subcontractors for roughly eight years even though they did no work, advised Marquez to continue paying individuals hired at Madigan's request thousands of dollars a month to ensure (i) that her successor did not have derrogatory information that could be used against her; (ii) that ComEd's legislative efforts were not thwarted; and (iii) that a larger corrupt payment was not necessary to ensure favorable legislation was passed.

McClain subsequently met with the New CEO on March 5, 2019, in order to discuss the renewal of the Doherty contract. During the conversation, McClain made it clear that the Doherty subcontractors were patronage workers hired at Madigan's request, and that hiring them was for the purpose of influencing and rewarding Madigan. Specifically, the New CEO began that portion of the discussion by stating, "But anyway, with Jay [Doherty's contract], so, uh . . ." McClain stated, "Let's go back, I think we gotta go backwards. So, um, the history with Madigan is, um, even in the, um, when, when Lee Daniels was, was, um, Speaker . . ." The New CEO stated, "Mm-hmm." McClain continued, ". . . we had a bill that we wanted, uh, heard, and Lee [Daniels] wanted no part of it. And even then Madigan grabbed the bill and had the meetings in his office, and, uh, and the same thing when we [ComEd] de-regged [sought deregulation legislation], um, it, it, it's just, um, um, I don't know if it's his [Madigan's], um, um, view of ComEd, uh, from even the seventies [1970s] when, when, you know, he [Madigan] had to name people be meter readers, right. I mean, it's, uh, the old fashioned patronage system and . . ." The New CEO interjected, "Mm-hmm." McClain continued, ". . . uh, ComEd played it like,

um, uh, he . . ." The New CEO stated, "Like a chip." McClain stated, "You're a ward committeeman and, uh, and we have seven meter readers in your, in your ward and you can name four of them, [McClain laughs] you know." The New CEO responded "Mm-hmm." McClain continued, "And that's just the way ComEd was for, uh, years, and then, as, as we've kind of morphed into, um, not being able to do that. No meter readers, and, uh, your, your, um, uh, frankly, your employees are more skilled. And a lot of people in his ward, um, we [ComEd] morphed into, 'How else can we help you?'" The New CEO stated, "Right." McClain said, "Right." McClain then gave an example of an individual who ComEd hired as a staff attorney, which was, in turn, based upon a request that came from the individual's father. McClain also indicated that the individual's father, "had a special love for ComEd before that and after that—" The New CEO said, "Yeah." McClain continued, "—because of that commitment." McClain continued, "So, that's just what we've, we've always done for, Good Lord, over 20 years now. Because we can't really do meter readers, we don't have 'em any more. We don't—" The New CEO said, "Yeah." McClain continued, "—linemen, there's, there's no one from the 13th Ward that'd linemen. So, what we have is, um, uh, [name redacted], uh, I meant to say, sorry, [Individual 23W-1]. Used to be an Alderman, um, next to, and his son is chairman of the revenue committee. Um, and, uh, [Individual 13W-2], who's a top three precinct committeeman. Uh, and, uh, they're all, they're all good solid people." The New CEO responded, "And available when, when we need, uh, when we need some help, right?" McClain responded, "Mm-hmm." McClain then analogized the payment of individuals by

ComEd through JDDA to the hiring of a person by the New CEO at the request of a union leader, and the New CEO responded by denying that the union leader had requested that the hire be made, although the New CEO thought the hiring would be appreciated by the union leader, who, according to the New CEO, "might be on the ICC." McClain also mentioned that it was similar to ComEd's previous hiring of another individual (Individual C) at the request of another elected member of the Illinois House of Representatives (not Madigan). Thereafter, the New CEO indicated the contract would be renewed.

McClain and Hooker also repeatedly made clear in other recorded conversations their understanding that ComEd hired individuals at Madigan's direction, and that these hires were made in exchange for ensuring favorable action on legislation by Madigan. For example, prior to McClain's meeting with the New CEO, McClain met with Hooker and Marquez on or about February 27, 2019. During this meeting, Marquez indicated that the New CEO might not approve the renewal of Doherty's contract, and asked McClain and Hooker how "our friend," that is, Madigan, would react if the Doherty contract was not renewed. Hooker expressed his understanding that Madigan would adversely affect ComEd's legislative agenda: " 'Oh. Okay. You're not going to do it? You're not going to do something for me, I don't have to do anything for you.' He [Madigan] won't say it [out loud]." Hooker added that Madigan might reach out to the CEO of Exelon to discuss the renewal of the Doherty contract "before he hurt us."

As another example, after meeting with the New CEO, on or about March 6, 2019, at approximately 3:05 p.m. (McClain Phone, Session #21893), McClain called Hooker. During the call, McClain and Hooker discussed McClain's meeting with Marquez and the New CEO on or about March 5, 2019. Specifically, McClain said, "They [ComEd] asked me to come into town yesterday and um, because, uh, they wanted me to explain the Jay Doherty situation, you know the contracts? And—" Hooker said, "To [the New CEO]?" McClain said, "Yeah. And so the, why that's important, and uh, I did it in about two minutes and he [the New CEO] said, 'Well, that's not the way Fidel told me about it, this is fine with me.' I said, 'Okay.'" Hooker said, "Michael, you gotta, what did you just say, 'This is why this is important to us.'" McClain said, "Right. And you know, and I think maybe they just, they're scared of him so they don't talk bluntly to him, you know what I mean?" Hooker said, "Right, right. With the Jay Doherty stuff, you got a little leg up." McClain said, "Right. Exactly." Hooker said, "I mean it's uh, unmentioned, but you know, that which is understood need not be mentioned." McClain said, "Right. Exactly. Exactly."

        (c)    **Additional Recordings Demonstrating Corrupt Intent of Conspirators with Respect to Subcontractor Relationships**

The government anticipates introducing a number of recordings that further demonstrate the intent of the conspirators with respect to the retention of subcontractors hired by ComEd at Madigan's request. For example, certain recordings demonstrate that Madigan was in control of which subcontractors would continue to be paid, thus

demonstrating the illicit nature of the hiring arrangements made by the conspirators to benefit Madigan. The recordings the government will offer will show that Intermediary 3 (owned by a Madigan associate as discussed above) acted as an intermediary for payments much in the same way Doherty did, and received directions on whether to pay a subcontractor based on Madigan's decision-making. Specifically, on or about December 8, 2018, McClain told the owner of Intermediary 3, "I did talk to himself [Madigan],[28] um, about Individual 13W-3." The owner of Intermediary 3 responded, "Yeah." McClain said, "Himself thinks that maybe we oughta stop it [the payments to Individual 13W-3 from ComEd via Intermediary 3]." The owner of Intermediary 3 said, "Okay." McClain said, "And I called, I called Individual 13W-3 to congratulate him [for becoming Cook County Recorder of Deeds]. And then next week I'll call him to say we're going to cut off the contract." The owner of Intermediary 3 responded, "Okay." McClain indicated that terminating the payments to Individual 13W-3 were "prudent." The owner of Intermediary 3 asked, "So what do I do with that thing? Reduce the amount that comes to me?" McClain asked, "Umm, why don't you do the, um, pay the November one. And December just pay for, like, you know, a half a month or something." The owner of Intermediary 3 responded, "Okay." McClain said, "Just say, you know, you know, 'Merry,

---

[28] The government also intends to present the telephone conversation between McClain and Madigan, wherein Madigan advises McClain that payments to Individual 13W-3 should be discontinued. These payments were discontinued because Individual 13W-3 had been appointed as the Cook County Recorder of Deeds with Madigan's backing.

Merry Christmas, [Individual 13W-1], uh, from the [named redacted]' Something like that." The owner of Intermediary 3 asked, "Okay. Like a bonus?" As noted above, Individual 13W-3 will testify that he never performed any work for Intermediary 3, its owner, or ComEd; therefore, representing a final payment to Individual 13W-3 as a "bonus" was yet another bogus explanation to cover an illicit payment made pursuant to a phony contract.

As another example demonstrating McClain's intent in causing ComEd to hire individuals at Madigan's direction—as well as the close relationship Madigan had with ComEd as a result—McClain explained the Madigan/ComEd relationship to a ComEd employee ("Individual CE-1"). On or about February 21, 2019, at approximately 6:16 p.m. (Session #20664), McClain placed a call to Individual CE-1. During the call, McClain and Individual CE-1 discussed Madigan's need for someone at ComEd to be immediately responsive to Madigan's requests. Specifically, McClain said, "So, uh, the reason why I called you [Individual CE-1] was, uh, the Speaker [Madigan] called me. He said, 'Mike, on all these bills before, whether it was what the green people wanted, or, Exelon Generation wanted, or ComEd wanted, I just always used you [McClain] as the point person.'" Individual CE-1 said, "Yeah." McClain said, "'And, and uh, you're not here, so who could be the point person? Uh, because, I don't wanna be going to uh, five different people, ten different people.' And so, what I was calling you about was, I think, you and Fidel, you guys just gotta get your heads together, because it's not just that you're the point person. It also is, if there is a problem with the legislator, like they're having a

problem with ComEd, well then you gotta get it fixed." Individual CE-1 said, "Yeah."

McClain said, "And you gotta get it fixed, like, yesterday. Um, and if uh, if the Speaker

[Madigan] has somebody come to him and say, 'uh, you know they don't have a Latino PR

company,' and he comes to me and he says, 'Can you, can you hire a Latino PR company

for the rest of the session?' I mean—" Individual CE-1 said, "Yeah." McClain said, "It's

that, it's that kind of stuff. Whoever it is, gotta have the confidence of the Speaker, to uh,

you're gonna act on it right away, but more importantly, principals back in Chicago gotta

know, that if a request comes from that person, like, let's say me . . . uh, then, it's uh, it's

gotta, drop everything and get it done. It can't be, 'I'll get it done next week.'" Individual

CE-1 said, "Right, right." McClain said, "So, it's uh—" Individual CE-1 said, "So for

FEJA, this was you before you retired? Right?" McClain said, "Right." Individual CE-1

said, "[S]o, that obviously has to be, someone he trusts as well, right? Or does it?" McClain

said, "Oh, I think so. 'Cause, some of that, some of that stuff is kind of delicate, right?"

Individual CE-1 said, "Yeah, yeah." McClain said, "Uh, and, uh, you know, and there has

been times, [Individual CE-1] where, like, like, uh, he [Madigan] comes to me and says,

'Have them take a look at this resume and see if they can find uh, space for this person.'"

Individual CE-1 said, "Right." McClain said, "Uh, so, it's not that, it's a delicate thing,

right?" Individual CE-1 said, "Oh no, I understand. I understand. So it's gotta be someone

that he's trusting outside of our company, right?" McClain said, "Well I think so. I, I, I

don't, I think it can't be an employed person, I think that's, some of the things that are,

may be talked about—" Individual CE-1 said, "Yeah." McClain said, "—should be only

shared with, one person or two people inside the company." Individual CE-1 said, "So when you think about those characteristics then, Mike, 'cause then, you know his circle, you know who he trusts, so can you think of who comes to mind for you?" McClain said, "Well, . . . look it, I, I recommended both [names redacted] to the company." Individual CE-1 said, "Right." McClain said, "Because I thought, I believe some day, they could, one of them or both of them could take my place? . . . I don't know if they're ready yet, [Individual CE-1]." Individual CE-1 said, "Yeah, yeah." McClain said, "You know what I mean?" Individual CE-1 said, "Yeah. Just, I get what you're saying, I get it. I've only been around but my instinct, I understand where they're different at—" McClain said, "Put your street hat on, not your ComEd hat on." Individual CE-1 said, "Exactly, that's what, that's why I said I understand what you're saying." McClain said, "Yeah, and uh, other thing is uh, uh, you, you, you can't be corporate. Like, for instance, uh, like, he'll say, he'll say to me at dinner, he'll say, he would say, 'Mike, just, what do you guys really want. I mean, tell me what the bottom line is and we'll, we'll start working towards that end.'" Individual CE-1 said, "Uh huh, exactly." McClain said, "Well, you know, it's, let's say, you're my contact person, well you know, I would tell you, or let's say back when Hooker was Executive Vice President, I'd say, 'Okay, I disclose where we're [ComEd] going.'" And so, now he's in sync with us on where the final bill is gonna look like, but uh, you know, I, I don't think you can tell [the New CEO] that."

McClain reiterated his message that hiring requests from Madigan were relayed through code, and that it was expected they would be acted on promptly. For example,

on or about February 22, 2019, at approximately 2:59 p.m. (McClain Phone, Session #20732), McClain participated in a conference call with Pramaggiore and Marquez. During this call, McClain, Pramaggiore and Marquez discussed the selection of a person outside of ComEd who would serve as Madigan's central point of contact with ComEd. Specifically, McClain said, "So, we're in a conundrum." Pramaggiore said, "Yep. Yeah, so Fidel, we wanted to put the three of us together. We've got a challenge with the Springfield dynamics and Michael [McClain] is really— I think he's got to share that because he understands it better than I, I mean I understand it but in any event, I wanted to talk before it got to a broader audience just so you could, I think it may need to come from you, but I want to make sure you can control the message. You or I, but probably you. Michael, do you want to?" McClain said, "Sure. So Fidel, last Wednesday the Speaker [Madigan] called me up and said, 'You know, Mike, we have this green set of bills that they want to do, we have uh, Exelon Generation wants to do something, and ComEd wants to do something. And no matter what happened in the past, I've just always gone to you. Even though you maybe didn't represent different people, I always use you as the point person. But you're not here anymore so who's the point person?' And this is like at 4-4:30 at night and he said, 'If you can still get back to me before I go to dinner I'd appreciate it.' I went, 'Holy schtick!' I still haven't gotten back to him. And as you know, Fidel, the point person has to have his trust and also have the company's trust. And that person's got to be very discrete. And whoever that person is talking to, for the company, like let's say it's you, there's a code, right? So like, when all of a sudden I come to you and

102

say, 'Will you take a look at this resume?' I mean, that's like, 'Will you drop and do try to get this done as fast as possible, right?'" It is notable that McClain again and again brought up the fact that any future point of contact with Madigan had to be conditioned to comply with Madigan's hiring requests, which were delivered through "code," and also notable that Pramaggiore expressed no reservations about this practice.

Indeed, another wire interception confirms that both McClain and Madigan understood that individuals employed by ComEd at Madigan's request often did little to no work—further demonstrating their joint knowledge of the lack of a *bona fide* reason for payments to individuals employed at Madigan's request. Specifically, on or about August 4, 2018 (McClain Phone, Session #10276), McClain discussed the execution of a labor agreement with Madigan that involved ComEd. During the conversation, McClain noted that a named individual was going to drive the agreement around to various parties so that it could be executed—in effect, acting as a courier. Madigan then asked, "B-but Mike he's [the named individual] involved with ComEd?" McClain responded, "Yeah, remember we got him that contract, um, maybe five years ago now whenever it was? For a buck fifty a year." Madigan said, "Mhm (laughs)." McClain said, "Well if, if you remember uh-" Madigan interjected, "Some of these guys have made out like bandits Mike." McClain said, "Oh my God, (coughs) for very little work too." Madigan said, "Yeah." McClain then reiterated, "Very little work." Indeed, many of the Madigan subcontractors made out like thieves, just as Madigan observed.

103

As a final example, a conversation between McClain and a former Madigan staffer ("Individual FS-1"), demonstrates that McClain was involved in a long-running practice of making payments to Madigan associates on the pretense that they were performing legitimate work. Specifically, on or about August 28, 2018 (McClain Phone, Session #12138), McClain had a call with Individual FS-1. During the call, McClain recommended to Individual FS-1 that Individual FS-1 "start another company," and that the company would be used "to do more than just political contributions." In explaining the something "more," McClain explained that "at one point in time I had uh, maybe five consultants working for me," and "all they ever really did is give me pieces of paper."[29] McClain added that Individual FS-1 having another company would come in handy if "he"—meaning Madigan—ever asked Individual FS-1 to hire someone for several months.

### (2)    Retention of Law Firm A

The government anticipates offering recordings concerning the purpose behind providing benefits to Law Firm A. These interceptions reflect that the requests made on

---

[29]    McClain's comments came in the context of McClain's request that Individual FS-1 make payments of $1,000 a month to a former 13th Ward employee, who had left service with the 13th Ward after sexual harassment allegations were lodged against him. In connection with the requested payments, McClain had suggested that the former 13th Ward employee be tasked with preparing a short report—clearly as a pretext for the payment, which Individual FS-1 referred to as a "bullshit report," recognizing it for what it was—a proposed sham to cover a payment to a Madigan associate. McClain's admission in this call mirrors the "joke" assignment he gave to Individual 13W-3 when Individual 13W-3 began receiving payments through McClain; Individual 13W-3 is expected to discuss this during his testimony as described earlier.

Madigan's behalf to provide business to Law Firm A were motivated by Law Firm A's valuable contributions to Madigan's political activities—consistent with the anticipated testimony of Individual LD-1, the ultimatum McClain posed to Pramaggiore by email as discussed above (where McClain noted how "valuable" Law Firm A was to Madigan), and the documents reflecting Law Firm A's involvement in fundraising for Madigan. For example, on or about October 22, 2018 (Session #29848), McClain and Marquez discussed giving additional legal work to Law Firm A. McClain complained that he still hadn't heard about "how much money they're gonna end up . . . doing for" Law Firm A. Marquez explained that he had spoken to an individual within ComEd's legal department, and that they had been able to find more work to provide to Law Firm A. Marquez further indicated that he would "stay on it," because his "pushing and inquiring" might cause an individual within the legal department to try "harder" to find business for Law Firm A. Marquez noted that "sometimes you gotta do that," and McClain noted that "everything else is . . . meaningless until reapportionment. Then it's, then it's punctuated." The interception therefore reflects McClain's association of work and money provided to Law Firm A by ComEd with political initiatives involving Madigan, such as legislative remapping.

Indeed, on or about October 26, 2018, (McClain Phone, Session #13947), McClain spoke with Law Firm Partner A, one of the principals of Law Firm A. During the call, McClain directed Law Firm Partner A to drop $90,000 in political donations at Madigan's law office; Law Firm Partner A promptly informed McClain that a fellow partner was

105

trying to obtain additional business from ComEd, and noted that "hopefully . . . it will proceed," but that if "something slows down . . . I will give you a call." McClain acknowledged this, and asked to be blind copied on further correspondence concerning efforts to obtain work from ComEd. This interception starkly reveals the transactional relationship Madigan and McClain possessed with Law Firm A and Law Firm Partner A, and explains why the men were focused on ComEd providing benefits to Law Firm A.

### (3)    Board Appointment

The government also anticipates offering recordings that demonstrate the efforts taken to appoint Individual BM-1 to the ComEd board by the conspirators at Madigan's request—even in the face of internal opposition within the company. For example, on or about May 2, 2018 (McClain Phone, Session #1648), Madigan and McClain discussed the appointment of Individual BM-1 to ComEd's board of directors. Madigan said, "Okay, uh, you left some notes for me last night and one of them was concerned with [Individual BM-1]." McClain said, "Yes, so they've got just a little bit of push back, I guess [Individual BM-1] has had some financial problems in the past and stuff like that and then there's some guys that are doing the due diligence wanting to know if [a former ComEd board member] would like to come back on the board, and so Anne asked me to talk to you about, a board member gets paid seventy-eight grand a year, is it important to you for [Individual BM-1] to be on the board? And if it is, she'll keep pushing, and if it's not, you're just trying to help him out, then she'll try to find something that would compensate him equally with that." Madigan asked, "What would that mean, Mike?" McClain answered,

"I don't know and she didn't know, but she said she'd find something. Not a full-time job, it would not be a full-time job." Madigan said, "And Mike, a board member gets paid how much?" McClain said, "Seventy-eight thousand." [30] Madigan laughed, and said, "Maybe I'll take the appointment." Later in the conversation, Madigan said, "Yeah. Mike, I would suggest that we continue to support [Individual BM-1]." McClain said, "Okay." Madigan said, "Um, but keep me advised as to how much push back there is." McClain said, "Right, I will. She says it's none from her and none from [a senior Exelon executive], it's just, uh you know, the second and third tier people, right."

Madigan revisited the subject of Individual BM-1's appointment to the ComEd board days later. Specifically, on or about May 16, 2018 (McClain Phone, Session #2657), Madigan told McClain, "There's a request from [a member of Congress] to see me." McClain said, "Uh huh." Madigan said, "And I suspect that may relate to [Individual BM-1]." McClain said, "Okay." Madigan asked, "Do you know anything further on that?" McClain said, "I'm seeing Anne [Pramaggiore] tomorrow morning." Madigan said, "Okay." McClain said, "So I'll know better tomorrow." Madigan said, "Alright and Mike, my recommendation is, go forward with [Individual BM-1], so if the only complaint about

---

[30]    Pramaggiore's willingness to find something—anything—that would serve as a vehicle to pay a Madigan associate $78,000 a year is yet another vivid demonstration of her corrupt relationship with Madigan and McClain.

[Individual BM-1] is that he suffers from bankruptcy twice, so did Harry Truman."
McClain said, "Right."

McClain promptly acted on Madigan's instruction. Specifically, on or about May 16, 2018, at approximately 11:06 a.m. (McClain Phone, Session #2664), McClain called Pramaggiore, and during the call, Pramaggiore and McClain discussed the appointment of Individual BM-1 to the ComEd board. McClain said, "And uh, I talked to him about [Individual BM-1]." Pramaggiore said, "Yes." McClain said, "And he would appreciate it if you would keep pressing." Pramaggiore said, "Okay. Got it. I will keep pressing." McClain said, "Okay."

On or about July 17, 2018, at approximately 8:52 a.m. (McClain Phone, Session #8429), McClain and Pramaggiore discussed Pramaggiore's efforts to have Individual BM-1 appointed to the ComEd board, as requested by Madigan. Specifically, Pramaggiore said: "Hey, the reason I called was, I, um, so I talked to [a senior Exelon executive] yesterday and, um, we're moving forward with [Individual BM-1]. So, that's a positive, um what he asked me to do, and I talked to [Individual LD-1] yesterday, late afternoon. But, I think what we're going to do is, um, I'm just gonna confirm that you know that this can be communicated to [Individual BM-1]. [A senior Exelon executive] wanted me to set up a dinner for [the New CEO] and [Individual BM-1]. So, I'm gonna put that in motion, um, but I'm gonna check with [Individual LD-1] today and just get the protocol for, you know, who oughta be calling [Individual BM-1] to let him know. Then I'll set up the dinner with [the New CEO] and we'll sort of put the program together, the

process together, that how, timing wise, when he comes on and that sort of thing. So, we have a board meeting Thursday so it's probably next quarter when, you know, would be his first meeting. Which gives us plenty of time to get him, you know sittin' down with [the New CEO]." McClain said: "So, is this um, formal enough that I can tell our friend or do you want me to hold off?"  Pramaggiore said: "Yes." McClain said: "Oh, okay." Pramaggiore said, "Yep, you can tell him, yep." McClain said: "Thank you, I will." Pramaggiore said, "Yeah, yep. So . . . Yeah, that one was a little, you know, took a little bit, but um, yeah. We're all good." McClain said: "It's interesting, how long some things take. Isn't it Anne?" Pramaggiore said: "Yeah. Well and you know it's interesting, you know I'm getting a little more of a read on the culture and psyche of the Exelon corporate world, which is very different than ComEd. But you kind of have to cut through it." Pramaggiore's willingness to "cut through" internal resistance to the appointment of Individual BM-1 to the board at Madigan's request is further proof of her corrupt relationship with Madigan and McClain.

McClain promptly advised Madigan that Individual BM-1 would be appointed to the ComEd board as Madigan had requested. Specifically, on or about July 17, 2018, at approximately 10:31 a.m. (McClain Phone, Session #8447), McClain called Madigan and said, "Speaker, [Individual BM-1]." Madigan responded, "Yeah." McClain said: "You may call him." Madigan said, "So that's gonna happen?" McClain said, "Yep, so [a senior Exelon executive] told Anne [Pramaggiore] yesterday and Anne called me this morning." Madigan said, "Very good." McClain said, "And I made it clear that, 'So our friend should

now call [Individual BM-1]?' She said, 'Yes.'" Madigan said, "Okay, I'll probably call [the member of Congress]." McClain said, "Okay." Madigan said, "Tell him first." McClain said, "Sure." Madigan said, "I mean, he's the reason I would talk to [Individual BM-1]." McClain said, "Sure."

Madigan continued to press for information on Individual BM-1's appointment after it was delayed. Specifically, on or about September 7, 2018, at approximately 3:17 p.m. (McClain Phone, Session #13095), Madigan asked McClain, "Mike, are we for certain that [Individual BM-1] is on the board?" McClain said, "Ah, I can call Anne [Pramaggiore] but I mean that's what she said. Why? Have, have you heard some information that that's . . ." Madigan said, "No, I haven't, I haven't heard anything different. I just kept a note here." McClain said, "Yeah. Well, let me call Anne's secretary, 'cause I think she's traveling today, and make sure that that happened." Madigan said, "Okay, yeah."

McClain followed up on Madigan's request for information by calling Pramaggiore, who confirmed that Individual BM-1 would be appointed to the board—and had done her best to "take care" of Madigan by seeing to the appointment of Individual BM-1 to the board because Madigan took care of her. Specifically, on or about September 7, 2018, at approximately 5:01 p.m. (McClain Phone, Session #13111), Pramaggiore told McClain, "Um, so, I wanted to respond to your text on [Individual BM-1] and kinda tell you where it was and I didn't want to put it in writing." McClain said, "Sure." Pramaggiore said, "Um, so, he is not officially on the board, but he, you know, should be. I mean, barring anything like bizarre. Um, basically, you know, what's been happening is, you know, um,

110

you know [a senior Exelon executive] been a little bit of an issue and I finally just went directly to [another senior Exelon executive] and I'm like, 'We need to do this."

Later in the conversation, Pramaggiore explained there were still reservations within the company about appointing Individual BM-1 to the board, which she had to overcome: "So it's in the works, but [the Exelon CEO], like I said, [a senior Exelon executive] is signed on." Pramaggiore later added, "You know 'cause [Individual LD-1] and [a senior Exelon executive] were like, 'Well,' you know, so I told [named individual] that they were, 'You know, well, he had a, you know.' I don't know, he had a foreclosure or something. I'm like, 'Get over it, you know, just get over it.' So, they have, but I had to push a little . . . ." Pramaggiore later added, "Okay. . . . But it's, ah yeah, it's, it's moving and like I said, I talked to [Individual BM-1] myself and the dinner is Monday night I believe and yeah, so." McClain said, "Perfect." Pramaggiore said, "Yeah, so." McClain said, "Appreciate it." Pramaggiore said, "Anyway, yeah you bet, of course, of course. You take good care of me and so does our friend [Madigan] and I will do the best that I can to, to take care of you. You're a good man." Pramaggiore herself made it crystal clear that she sought to influence and reward Madigan—by placing an individual on the ComEd board in the face of internal reservations in return for Madigan "taking care of" her in Springfield.

### (4)    Other Benefits

The government anticipates introducing recordings of other benefits the defendants sought to solicit and confer on Madigan. For example, on or about December

11, 2018 (McClain Phone, Session #18290), Madigan asked McClain if he had received a resume for a named individual who was related to a local public official, and told McClain that his "thought was there might be a place for her at ComEd." McClain advised Madigan he would bring the resume with him when he had breakfast with Marquez.[31]

As another example, on or about April 9, 2019 (McClain Phone, Session #17513), John Hooker had a telephone call with Marquez. During the call, Hooker reported to Marquez that Pramaggiore was exploring hiring Madigan's former chief of staff, who had left his position in the wake of allegations of harassment made by other State employees. Hooker explained that Pramaggiore wanted to have the former chief of staff work for her, but Pramaggiore wanted to "pay him but hide his contract in someone else's," and Hooker had suggested "put him in as a consultant with McClain." McClain similarly suggested to Marquez that ComEd could "hide things" by employing Madigan's former chief of staff as a consultant through a third party in an intercepted phone call. McClain Phone, Session #3870. Of course, Pramaggiore's and McClain's proposed method of concealment of payments to Madigan's former chief of staff had been employed by the coconspirators with the Madigan subcontractors for years to great effect.[32]

---

[31]    The government also anticipates introducing documentary evidence concerning this referral.

[32]    The government anticipates introducing the testimony of a witness who will explain that Pramaggiore abandoned her plan to hire Madigan's former chief of staff after she discovered the existence of the federal criminal investigation.

As another example, on February 16, 2019, McClain spoke to another ComEd lobbyist, in follow-up to that lobbyist's request that Madigan help him secure more lobbying work. McClain acknowledged that the lobbyist had come to see the Speaker; McClain told him that "we're on it" and "this is [Madigan's] return call." The lobbyist told McClain that he was hoping to get more work and acknowledged that he enjoyed his work for ComEd. McClain Phone, Session #20021. This call demonstrates that McClain acted as Madigan's agent ("this is his return call"), and Madigan arranged for McClain to help to secure consulting work at ComEd and other companies for individuals connected to Madigan.

### b. Recordings Establishing Relationship of the Conspirators and their Respective Roles in the Conspiracy

The government anticipates introducing a number of recordings that establish the close relationships between the conspirators and their respective roles in the conspiracy—for the purposes of, among others, demonstrating (i) the conspirators acted jointly; (ii) nullifying any defense that the defendants acted independently of each other in asking for and providing benefits to Madigan; and (iii) demonstrating the mutually beneficial relationship the defendants had cultivated with Madigan.[33]

For example, the government will introduce recordings that demonstrate that defendant McClain was Madigan's right-hand man, acted pursuant to Madigan's

---

[33]    As to this last point, certain other interceptions already discussed demonstrate the symbiotic relationship between Madigan and ComEd—ComEd would deliver payments

directions, and served as a conduit of messages and information from Madigan to others, including ComEd. These interceptions will constitute proof that McClain's requests to ComEd were made in his capacity as an agent and trusted confidant of Madigan—thus also corroborating the testimony of Marquez and Individual LD-1 about McClain's allegiance to Madigan. For example, during a call on February 20, 2019, (McClain Phone, Session #20526), McClain advised a named individual (who expressed concern that at times he did not pursue the best interests of Madigan in his affairs), that McClain had convinced himself "twenty years ago" that "my client is the Speaker. My client is not ComEd."

Consistent with this belief, the government will introduce a series of calls that vividly demonstrate that McClain was a trusted confidant and was regularly given assignments and instructions to pass to others directly by Madigan. For example:

- On or about May 24, 2018 (McClain Phone, Session #3340), Madigan told McClain that he got a message from a named individual, and asked McClain "Are you in a position to advise [that named individual] just to stay away from me?" McClain responded "Yes." Minutes later, McClain called the named individual and told him that Madigan could not meet with him due to optics. McClain Phone, Session #3342. McClain then told Madigan's assistant that he had taken care of the request. McClain Phone, Session #3343.

- On or about June 6, 2018 (McClain Phone, Session #5092), McClain and a former staff member of Madigan discussed hiring a public relations firm to "sav[e] the

_____

to Madigan associates, and Madigan would take favorable action for ComEd—by, for example, arranging for votes on critical legislation, or sitting with McClain to better understand what the company's goals were legislatively.

Speaker" in the wake of well-publicized allegations of misconduct by a member of Madigan's staff.

- On or about July 2, 2018 (McClain Phone, Session #7508), Madigan asked McClain to make an inquiry to find out who within the Governor's administration could assist to have appropriated money released for use.

- On or about July 29, 2018 (McClain Phone, Session #9550), McClain and Madigan discussed a list of assignments McClain performed for Madigan. During the conversation, among other things, (i) McClain related information he had received from Madigan's chief of staff to Madigan, concerning what answers the chief of staff would give if questioned concerning a specific matter;[34] and (ii) McClain indicated he would bring Madigan's staff up to speed on the status of certain legislation unrelated to ComEd concerning hospital funding.

- On or about September 5, 2018 (McClain Phone, Session #12860) during a telephone call between Madigan and McClain, Madigan asked for McClain's advice on how to respond to the Senate President, who was understood to have authorized political advertisements to be broadcast that cast Madigan in a negative light. McClain advised Madigan to "let your agents do it for . . . now," "I'd let us handle this for twenty-four, forty-eight hours and if [the Senate President] by that time hasn't called you, then I guess you, you're gonna have to call him . . ."

- On or about November 16, 2018 (McClain Phone, Session# 14849), Madigan reviewed his efforts to gather votes to be re-elected Speaker with McClain, discussed McClain arranging to have a message passed to Illinois' Joint Committee on Administrative Rules concerning a prior directive issued by Governor Rauner. In addition, McClain asked Madigan when McClain should call a named State Representative that Madigan wished to retire and "lower the boom" on the State Representative; Madigan instructed McClain to do so "sooner rather than later." Thereafter, on or about August 11, 2018 (McClain Phone, Session #15167), McClain called the named State Representative to tell them that "this is no longer me talking, I'm an agent," on behalf of someone

---

[34] It appears obvious that McClain acted as an intermediary between Madigan and his chief of staff so both men could deny talking to each other about a sensitive subject where questions might be raised about whether they had "coordinated" their stories. This vignette demonstrates how implicitly Madigan trusted McClain.

[Madigan] who thought the Representative ought to "move on" and was not interested in moving the State Representative "up in leadership." (McClain made a number of other calls in which he discussed his communications with that State Representative on Madigan's behalf. *See, e.g.*, McClain Phone, Session #14739, 15068, 15768, 16563.)

- On or about March 15, 2019 (McClain Phone, Session #22879) and March 19, 2019 (McClain Phone, Session #23293), Madigan directed McClain to call a third party and advise them that Madigan would not sign a letter, and in a following call with the third party, McClain complained that his "assignments" took longer and longer time, and thereafter advised that third party that Madigan would not sign a draft letter to the Secretary of Transportation.

The government will introduce other recordings that demonstrate that McClain attended regular meetings in which Madigan and his inner circle discussed pending legislation and other sensitive political matters. *See, e.g.*, McClain Phone, Session #17995. For example, McClain was involved in calls involving discussions of the Speaker's Office's response to sexual harassment issues that engulfed Madigan and his office in 2018 (*see, e.g.*, McClain Phone, Session #5092, 5121, 5665, 7192), and the replacement of Madigan's chief of staff after his resignation in 2018 (*see, e.g.*, McClain Phone, Session #5646). And another category of tasks McClain performed for Madigan related to fundraising efforts for democratic candidates in Illinois, including McClain's soliciting campaign contributions from lobbyists and their clients. *See, e.g.*, McClain Phone, Session #7268, 17761.

The government will also introduce recordings that demonstrate that Pramaggiore was closely associated with Madigan and McClain and that she attributed her success at ComEd to both of these men. For example, on May 8, 2018, Pramaggiore

116

(who was then the CEO of ComEd) informed McClain that she had been promoted and would become the chief executive officer of Exelon Utilities. During the call, Pramaggiore told McClain that the information was not yet public, but that she had called Michael Madigan earlier that morning (indeed, Madigan was, according to Pramaggiore, her "first call,")[35] and therefore was "one of the few people that is in the know." Pramaggiore thanked McClain for her promotion by adding, "It never would have happened without you, and John, and the Speaker, and I mean, hon—really, 'cause the only reason I am in this position is because ComEd has done so well, and you guys have been my, my spirit guides and more on that. . . . I love you guys." Pramaggiore continued on to tell McClain that she would continue to need McClain's "help in a lot of different ways," including for purposes of "strategizing nationally."[36]

The government will also introduce recordings consistent with the testimony of witnesses that demonstrate that, in addition to the company providing benefits to Madigan, the company received favorable assistance from Madigan with respect to legislation affecting ComEd—and that the conspirators were aware of Madigan's critical

---

[35]    Pramaggiore explained that she had not yet spoken to the Governor before speaking to McClain.

[36]    In the same vein, McClain discussed with Madigan in a separate call that he believed Madigan had "developed a real nice relationship" with Pramaggiore during a joint trip the two went on to Turkey.  In addition, as noted earlier, Pramaggiore noted in causing Individual BM-1 to be appointed to the ComEd board that she aimed to take care of Madigan and McClain because the two men took care of her.

assistance to the company in the past with respect to legislative matters. For example, during a recorded call between McClain and Hooker on or about May 16, 2018 (McClain Phone, Session #2628), the pair discussed their concerns about how a new legislative proposal was against ComEd's interests. In discussing the legislative outlook, McClain reminded Hooker that, with respect to the passage of FEJA, "If you remember at the, that last day, um, when we had to go to Madigan. Madigan put 47 votes on and then, um, I-I was negotiating the bill with . . . [name redacted]."[37] That same day, McClain and Pramaggiore spoke over the phone about House Bill 5626, a legislative proposal that was adverse to ComEd's interests advocated by Attorney General Lisa Madigan. In a phone call that day, McClain told Pramaggiore, "On this Lisa Madigan bill. . . we've gotta kill it. Period." Pramaggiore agreed: "Yes, yes." McClain Phone, Session #2634. In a May 18, 2018, email from McClain to Pramaggiore and others at ComEd, McClain stated, "approximately a month ago, a friend of ours alerted me and thereby us to this initiative [HB5626] and the concept of an amendment. As we all know, that was code for we can go ahead and kill it." McClain similarly reported to Hooker that Madigan recognized that the bill "doesn't have any legs," in a call recorded on May 22, 2018. McClain Phone, Session #3108. And on June 20, 2018, McClain told Hooker that Madigan told him that he would

---

[37] This interception will confirm the anticipated testimony of another government witness, who will testify that, as a member of Madigan's staff, shortly before the passage of FEJA, s/he was asked by Madigan to obtain additional votes for FEJA once it became apparent that FEJA did not have the votes to pass.

"kill" the bill if they (meaning ComEd) wanted him to. McClain Phone, Session #6764. House Bill 5626 did not pass.

## IV.   Coconspirator Statements

The statements between the coconspirators in furtherance of the conspiracy fall into numerous categories, all concerning subjects integral to the conspiracy and its success. These statements—which will establish the information flow between coconspirators and was intended to help each perform his role—will be introduced through the testimony of cooperating defendants and witnesses, including but not limited to those noted above, lawfully recorded in-person meetings and telephone calls, including the recordings referenced throughout this submission, and written communications made by coconspirators, such as emails (some of which are described herein) and business documents, including invoices and internal corporate documents. As outlined in the opening section of this proffer, a larger number of these statements will be admissible without regard to the coconspirator hearsay rule, because they are statements of the defendants, statements not offered to prove the truth of the matter asserted, verbal acts, or for other reasons.

Given the extent and number of such statements in this case, the government does not, and cannot, detail each and every proposed coconspirator statement of each witness or document. Nor does *Santiago* or the Seventh Circuit's precedent require the government to set forth the specific, verbatim coconspirator statement. Instead, the Seventh Circuit has specifically stated that categories of statements, such as those set

119

forth below, suffices. *See United States v. McClellan*, 165 F.3d 535, 554 (7th Cir. 1999) (rejecting the argument that the "government is bound to give notice in advance of trial of co-conspirator statements it intends to introduce at trial"); *United States v. Johnson*, No. 08 CR 466, 2011 WL 809194, at *8 (N.D. Ill. Mar. 2, 2011) (rejecting defendant's argument that the government failed to "specifically identif[y] the statements it intends to introduce" and rejecting defendant's request "that the Government be required to specifically identify each statement by a co-conspirator it intends to introduce"). Nevertheless, the government has provided numerous specific examples of coconspirator statements here. The coconspirator statements offered at trial will concern the subjects listed below, and include, but are not limited to, the coconspirator statements discussed above:

1. Statements regarding other members of the conspiracy, including the following:

    a. Identifying other members of the conspiracy and their roles;

    b. Identifying the structure and origin of the conspiracy;

    c. Reviewing a coconspirator's exploits and criminal acts previously committed in order to, among other things, update a fellow coconspirator on actions taken by the enterprise;

    d. Recruiting potential coconspirators;

    e. Statements that reveal the roles of participants in the conspiracy's illegal activities or specific criminal conduct;

    f. To report coconspirators' status and in turn receive assurances of assistance from coconspirators;

2. Statements to conduct or help conduct the conspiracy's activities, including the following:

   a. The purpose behind prior criminal acts carried out by the conspiracy;

   b. To plan criminal acts by the conspiracy;

   c. To instill and maintain the trust and cohesiveness of the conspiracy;

   d. To advise of the progress and accomplishments of the conspiracy;

   e. To inform or reassure the listener regarding the conspiracy's activities;

   f. To control damage to an ongoing conspiracy;

   g. Statements to outsiders to enhance the conspiracy's position in the eyes of outsiders and express confidence about the ability of the conspiracy; and

   h. To inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), and to reassure or calm the listener regarding the progress or stability of the conspiracy;

3. Statements concerning the means used to conceal the conspiracy's illegal activities; and

4. Statements to others outside the conspiracy to reassure those individuals, to seek their cooperation, and to encourage them to not reveal incriminating information.

As is evident from the categories' description, all such statements made by coconspirators furthered the conspiracy. Thus, under the case law summarized above, all such statements are properly admitted at trial as coconspirator statements under Fed. R. Evid. 801(d)(2)(E).

## V.    Conclusion

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed. Based upon this proffer, the government respectfully requests that this Court find that categories of coconspirator statements listed above, as well as coconspirator statements like them, are admissible pending the introduction of evidence to support this proffer.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

By:    s/ *Amarjeet S. Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
SARAH STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300