UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 20 CR 812 |
| v. | |
| | Judge Harry D. Leinenweber |
| MICHAEL McCLAIN, ANNE PRAMAGGIORE, JOHN HOOKER, and JAY DOHERTY | |

**GOVERNMENT'S CONSOLIDATED RESPONSE TO
DEFENDANTS' MOTIONS *IN LIMINE* AND REPLY IN SUPPORT OF *SANTIAGO*
MOTION**

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

By:        /s/ *Amarjeet S. Bhachu*
        AMARJEET S. BHACHU
        DIANE MacARTHUR
        SARAH STREICKER
        JULIA K. SCHWARTZ
        Assistant United States Attorneys
        219 South Dearborn Street
        Fifth Floor
        Chicago, Illinois 60604
        (312) 353-5300

# TABLE OF CONTENTS

TABLE OF AUTHORIOTIES ......................................................................................... iii

ARGUMENT .................................................................................................................... 1

I.    The Court Should Grant the Government's Motion to Conditionally Admit Coconspirator Statements (Dkt. 112)........................................................... 1

    A.    The Government Adequately Identified the Conspiracy and the Categories of Statements that Should Be Admitted. .................................... 1

    B.    The Government's *Santiago* Proffer Amply Establishes a Conspiracy to Falsify Books and Records. ....................................................................... 5

II.    The Statements Made by Marquez After He Began Cooperating Are Admissible (Dkt. 131). ...................................................................................... 8

    A.    Applicable Law ....................................................................................... 8

        1.    Out-of-Court Statements Offered for "Context" Are Admissible. ................... 8

        2.    Adoptive Admissions Are Properly Admissible for their Truth. ...................... 9

        3.    Relevant Evidence Is Excluded Where Its Probative Value Is "Substantially Outweighed by the Danger of Unfair Prejudice.".......................................... 10

    B.    Marquez's Statements to Hooker, Doherty, McClain, and the New CEO Are Admissible for Context and as Adoptive Admissions. ......................................... 11

        1.    The January 29, 2019 Recording Should Not Be Redacted........................... 11

        2.    The February 13, 2019 Recording Should Not Be Redacted......................... 14

        3.    The March 5, 2019 Recording Should Not Be Redacted............................... 16

        4.    Redaction of These Recordings Is Unwarranted. ........................................... 18

III.    Defendant Hooker's Motion to Exclude "Speculative" Testimony by Fidel Marquez And Evidence Concerning the Fair Maps Initiative Should Be Denied (Dkt. 128). .. 19

IV.    Doherty's Consolidated Motions *In Limine* Should Be Denied (Dkt 133)................. 21

    A.    Marquez and Individual 13W-3 Can Testify About Their Understandings Consistent with Rule 701. .................................................................... 21

    B.    Marquez's Recorded Statement about Rates Is Non-Hearsay. ............................. 25

    C.    Doherty's Motion to Bar Argument that His Use of Four Fingers Is Evidence of a Guilty Conscience Should Be Denied.................................................. 27

    D.    The Government Is Permitted to Argue that the Jury Can Use Its Common Sense. .................................................................................................................. 28

    E.    The Government Will Not Make Argument Comparing the Defendants to Organized Crime or Gang Members.................................................... 29

    F.    The Government Should Be Permitted To Argue that Payments Were More Easily Concealed because They Were Paid Out of Defendant Pramaggiore's Budget. .. 29

V.      The Court Should Permit Evidence of Compensation Received from ComEd by McClain, Pramaggiore, and Hooker (Dkts. 125, 128, 131). ...................................... 30

VI.     The Court Should Permit Evidence Concerning the Cancellation of Consulting Contracts and Termination of Pramaggiore's Employment After ComEd Learned About the Criminal Investigation. (Dkts. 127, 128). .................................................... 33

VII.    The Court Should Permit Evidence Regarding Madigan's Efforts to Secure Public Board and other Governmental Employment for the Subcontractors (Dkt. 125). ...... 35

VIII.   The Court Should Permit Argument That McClain Referred to Madigan as "Our Friend" In Order to Conceal Their Criminal Conduct (Dkt. 127). ............................ 36

IX.     The Court Should Deny McClain's Untimely Fishing Expedition for Grand Jury Materials (Dkt. 141). ............................................................................................... 39

    A.  McClain's Request for Grand Jury Materials Is Untimely. .................................. 40

    B.  McClain Has Not Shown any Likelihood of Error in the Grand Jury Proceedings. ...................................................................................................... 41

X.      McClain's Motion to Exclude Evidence Regarding Payments to a Thirteenth Ward Employee Should Be Denied (Dkt. 127). .................................................................... 42

XI.     The Court Should Deny Hooker and McClain's Motions to Exclude So-Called Rule 404(b) Evidence (Dkt. 128, 142). ............................................................................... 44

    A.  Background ....................................................................................................... 44

    B.  Rule 404(b) Does Not Apply. ........................................................................... 46

    C.  Even If Rule 404(b) Applies, These Events Are Admissible. ............................. 48

    D.  The Challenged Evidence Is Not Unfairly Prejudicial. .................................... 49

XII.    Keisha Parker's Prepared Remarks Are Probative of ComEd Leaders' Relationship With and Motivations About Speaker Madigan (Dkt. 131). ......................................... 50

XIII.   The Court Should Deny McClain, Pramaggiore, and Hooker's Motion to Exclude Evidence Regarding Campaign Contributions (Dkt. 131). .......................................... 55

XIV.    The Government Will Not Elicit Evidence of the ComEd DPA Unless A Defendant Opens the Door (Dkt. 131). ...................................................................................... 56

XV.     The Government Will Not Elicit Evidence of the Indictment Against Madigan Unless A Defendant Opens the Door (Dkt. 127). ................................................................... 56

XVI.    Other Motions Should Be Denied As Moot. .............................................................. 57

CONCLUSION ..................................................................................................................... 58

# TABLE OF AUTHORIOTIES

## CASES

*Anderson v. United States*, 417 U.S. 211 .................................................................................... 9

*Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ............................................................................. 38

*Bruce v. Levy Premium Foodservice Ltd. P'ship*, No. 3:16 C 2734, 2019 WL 11704226 (M.D. Tenn. Apr. 2, 2019) .................................................................................................................... 43

*E.E.O.C. v. Indiana Bell Telephone Co.*, 256 F.3d 516 (7th Cir. 2001) ........................................ 53

*Evans v. Jones*, 996 F.2d 766 (7th Cir. 2021) ........................................................................... 28

*Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638 (2002) ........................................................... 55

*In re Allstate Corp. Sec. Litig.*, 966 F.3d 595 (7th Cir. 2020) ..................................................... 38

*Jenkins v. Anderson*, 447 U.S. 231 (1980) ................................................................................. 14

*Lutwak v. United States*, 344 U.S. 604 (1953) ........................................................................... 18

*Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, No. 16-cv-01702-BLF, 2018 WL 6439133 (N.D. Cal. Dec. 7, 2018) ............................................................................................................. 43

*Old Chief v. United States*, 519 U.S. 172 (1997) ........................................................................ 54

*Thompson v. City of Chicago*, 472 F.3d 444 (7th Cir. 2006) ...................................................... 54

*United States v. Akinrinade*, 61 F.3d 1279 (7th Cir. 1995) .......................................................... 8

*United States v. Alex*, 791 F. Supp. 723 (N.D. Ill. 1992) ............................................................ 3

*United States v. Bases*, No. 18 CR 48, 2021 WL 6621284 (N.D. Ill. July 15, 2021) .................. 31

*United States v. Bogan*, 267 F.3d 614 (7th Cir. 2001) ............................................................... 24

*United States v. Breland*, 356 F.3d 787 (7th Cir. 2004) .............................................................. 9

*United States v. Chaimson*, 760 F.2d 798 (7th Cir. 1985) ......................................................... 28

*United States v. Chanu*, 40 F.4th 528 (7th Cir. 2022) .............................................................. 10

*United States v. Curescu*, 674 F.3d 735 (7th Cir. 2012) ................................................ 23, 38, 53

*United States v. Curry*, 79 F.3d 1489 (7th Cir.1996) ................................................................ 10

*United States v. Davis*, 890 F.2d 1373 (7th Cir. 1989) ......................................................... 9, 13

*United States v. Dean*, 705 F.3d 745 (7th Cir. 2013) ................................................. 21

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ............................................... 26

*United States v. Durham*, 211 F.3d 437 (7th Cir. 2000) ............................................ 29

*United States v. Estrada*, 39 F.3d 772 (7th Cir. 1994) .............................................. 22

*United States v. Ferguson*, No. 3:06CR137, 2007 WL 4240782 (D. Conn. Nov. 30, 2007) . 31, 32

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ........................................... 50

*United States v. Friedman*, 971 F.3d 700 (7th Cir. 2020) ......................................... 28

*United States v. Gajo*, 290 F.3d 922 (7th Cir. 2002) .............................................. 8, 9

*United States v. Gaytan*, 649 F.3d 573 (7th Cir. 2011) ............................................ 26

*United States v. Gilmer*, 534 F.3d 696 (7th Cir. 2008) ............................................ 25

*United States v. Glover*, 479 F.3d 511 (7th Cir. 2007) ............................................ 58

*United States v. Hanson*, 994 F.2d 403 (7th Cir. 1993) ........................................... 26

*United States v. Hickok*, 77 F.3d 992 (7th Cir. 1996) .............................................. 25

*United States v. King*, 627 F.3d 641 (7th Cir. 2010) ............................................... 48

*United States v. Leonard-Allen*, 739 F.3d 948 (7th Cir. 2013) ................................... 54

*United States v. Linwood*, 142 F.3d 418 (7th Cir. 1998) .......................................... 13

*United States v. Mezzanatto*, 513 U.S. 196 (1995) ................................................. 14

*United States v. Logan*, 250 F.3d 350 (6th Cir. 2001) ............................................. 31

*United States v. Malik*, 345 F.3d 999 (8th Cir. 2003) .............................................. 26

*United States v. McClellan*, 165 F.3d 535 (7th Cir. 1999) .......................................... 2

*United States v. Mezzanatto*, 513 U.S. 196 (1995) ................................................. 14

*United States v. Miller*, 276 F.3d 370 (7th Cir. 2002) ............................................. 58

*United States v. Molina*, No. 88 CR 823-2, 1989 WL 85011 (N.D. Ill. July 20, 1989) ............. 18

*United States v. Moschiano*, 695 F.2d 236 (7th Cir. 1982) ........................................ 50

*United States v. Nettles*, 476 F.3d 508 (7th Cir. 2007) ............................................. 9

*United States v. Novak*, No. 13 CR 312, 2015 WL 881154 (N.D. Ill. Jan. 31, 2015) ............... 3, 6

*United States v. Palivos*, 486 F.3d 250 (7th Cir. 2007) ............................................... 55

*United States v. Presbitero*, 569 F.3d 691 (7th Cir. 2009) ..................................... 39, 42

*United States v. Puglia*, 8 F.3d 478 (7th Cir. 1993) ..................................................... 41

*United States v. Quattrone*, 441 F.3d 153 (2d Cir. 2006) ....................................... 31, 32

*United States v. Rodriguez*, 975 F.2d 404 (7th Cir. 1992) ............................................ 3

*United States v. Rollins*, 862 F.2d 1282 (7th Cir. 1988) ......................................... 10, 12

*United States v. Santiago*, No. 04 CR 784, 2008 WL 351904 (N.D. Ill Feb. 8, 2008) ................ 36

*United States v. Schalk*, 515 F.3d 768 (7th Cir. 2008) ................................................. 9

*United States v. Spivey*, 859 F.2d 461 (7th Cir. 1988) ............................................... 28

*United States v. Suggs*, 374 F.3d 508 (7th Cir. 2004) ................................................ 11

*United States v. Suggs*, 703 F.App'x 425 (7th Cir. 2017) ............................................ 40

*United States v. Tolliver*, 454 F.3d 660 (7th Cir. 2006) ............................................... 9

*United States v. Torres*, 977 F.2d 321 (7th Cir.1992) ................................................. 10

*United States v. Tucker*, 714 F.3d 1006 (7th Cir. 2013) .............................................. 58

*United States v. Tucker*, 820 F.2d 234 (7th Cir. 1987) ............................................... 28

*United States v. Van Sach*, 458 F.3d 694 (7th Cir. 2006) ...................................... 8, 9, 13

*United States v. Velasquez*, 772 F.2d 1348 (7th Cir. 1985) ...................................... 49, 50

*United States v. Waldemer*, 50 F.3d 1379 (7th Cir. 1995) ........................................... 28

*United States v. Watson*, 594 F.2d 1330 (10th Cir.) .................................................. 55

*United States v. West*, 53 F.4th 1104 (7th Cir. 2022) ................................................. 10

*United States v. Westbrook*, 125 F.3d 996 (7th Cir. 1997) ........................................... 36

*United States v. Westerfield*, 714 F.3d 480 (7th Cir. 2013) ..................................... 22, 53

*United States v. Westmoreland*, 312 F.3d 302 (7th Cir. 2002) ........................................ 2

*United States v. Woods*, 301 F.3d 556 (7th Cir. 2002) ............................................. 9, 10

*United States v. York*, 572 F.3d 415 (7th Cir. 2009) .................................................. 25

## STATUTE

18 U.S.C. § 666 ............................................................................................... 21

## RULES

Fed. R. Crim. P. 6(e)(3)(E)(ii) ......................................................... 38

Fed. R. Crim. P. 12(e) ......................................................................... 38

Fed. R. Evid. 401 ...................................................................... 41, 50

Fed. R. Evid. 403 ................................................................................ 10

Fed. R. Evid. 701(a) ........................................................................... 50

Fed. R. Evid. 704(a) ........................................................................... 24

Fed. R. Evid. 801 ................................................................................. 8

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, respectfully submits the following consolidated response to defendants' motions *in limine* and reply in support of the government's motion to admit coconspirator statements. Dkts. 112, 124, 125, 127, 128, 129, 130, 131, 133, 141, 142.[1]

## ARGUMENT

I. **The Court Should Grant the Government's Motion to Conditionally Admit Coconspirator Statements (Dkt. 112).**

Defendants oppose the government's motion to conditionally admit all coconspirator statements under Federal Rule of Evidence 801(d)(2)(E). Dkts. 112, 129. Defendants assert that the government's *Santiago* proffer lacks the required particularity as to the specific coconspirator statements the government seeks to introduce at trial and does not establish a conspiracy to falsify books and records. Dkt. 129. Contrary to the defendant's contention, the government's *Santiago* proffer is extensive and comprehensive; accordingly, the Court should deny defendant's motion and conditionally admit all statements made by conspirators in furtherance of the charged conspiracy, as discussed below.

A. **The Government Adequately Identified the Conspiracy and the Categories of Statements that Should Be Admitted.**

To begin with, the government's 122-page *Santiago* proffer more than satisfies its legal obligation concerning the admissibility of coconspirator statements pursuant to Rule 801(d)(2)(E). Admission of coconspirator statements against the defendants is proper where the government establishes by a preponderance of the evidence that: 1) a conspiracy or joint venture existed; 2)

---

[1] The government further moves *instanter* for permission to file this response, which exceeds 15 pages. This consolidated response addresses multiple distinct issues, each of which could have been filed separately. For ease of reference, the government has filed these responses in a single filing.

defendants and/or the person making the statements were members of the particular conspiracy or joint venture; and 3) the statements were made during the course and in furtherance of the conspiracy or joint venture. *See United States v. Westmoreland*, 312 F.3d 302, 309 (7th Cir. 2002). Further legal standards concerning *Santiago* proffers are contained in the government's proffer at pages 2 through 13.

As part of their broad-brush attack on the government's *Santiago* proffer, defendants make the quizzical assertion that they are unable to discern which coconspirator statements the government intends to elicit at trial. Contrary to defendants' suggestion, the government's proffer provides a wealth of detail about the coconspirator statements it intends to introduce at trial, as well as about how the government intends to prove each defendant's participation in the charged conspiracy and how each statement was made in furtherance of the charged conspiracy. The proffer provides summaries of the recorded phone calls the government intends to play (which are rife with coconspirator statements), summaries of other consensually recorded conversations between Fidel Marquez and the defendants regarding acts committed or to be committed in furtherance of the conspiracy and attaches copies of sample emails and other communications. The proffer also includes detailed summaries of testimony to be provided by other civilian witnesses. The only way the government's proffer could have been any more specific is if the government had decided to append to its already extensive pleading the approximately 160 transcripts of the various recordings it may admit at trial, which were previously tendered to the defense. If the Court wishes to review these transcripts, the government can provide them upon request.

Defendants concede, as they must, that the government is not required to provide "each and every" coconspirator statement it intends to introduce at trial. Dkt. 129 at 6-7 (citing *United States v. McClellan*, 165 F.3d 535, 553-54 (7th Cir. 1999)). Here, the government's 122-page

*Santiago* proffer spells out in detail the types of statements it seeks to admit under Rule 801(d)(2)(E)—including numerous examples of false statements made in furtherance of the conspiracy—and provides specific examples of such statements. *See* Dkt. 112 at 55-113. The government's voluminous and detailed submission more than satisfies its threshold burden for the proposed admission of coconspirator statements.

Contrary to defendant's argument, the government is not obligated to identify every coconspirator in its *Santiago* proffer, where, as here, such identification is not necessary to permit the defendants to prepare for trial. *E.g., United States v. Alex*, 791 F. Supp. 723, 728 (N.D. Ill. 1992) (denying request for identity of unindicted coconspirators). At a minimum, the members of the conspiracy include the defendants, former Speaker Michael Madigan, Marquez (before he began cooperating), and the intermediaries who made payments, on behalf of ComEd, to "subcontractors" who were Madigan associates. The Court should conditionally admit all statements made by and between these individuals in furtherance of the conspiracy, as set forth in the government's proffer. *See, e.g., United States v. Rodriguez*, 975 F.2d 404, 411 (7th Cir. 1992) (holding that district court "committed clear error when it ruled that the Government had not demonstrated that it was more likely than not that [defendant] was a member of the alleged conspiracy" based on proffered statements).

Defendants claim that certain of the statements the government seeks to admit were merely "idle chatter" or "narrative descriptions of past events," and therefore could not have been made in furtherance of the conspiracy. Dkt. 129 at 8. But statements of historical fact are admissible when made by a coconspirator in furtherance of a conspiracy. *See, e.g., United States v. Novak*, No. 13 CR 312, 2015 WL 881154, at *4 (N.D. Ill. Jan. 31, 2015), *aff'd sub nom. United States v. Nagelvoort*, 856 F.3d 1117 (7th Cir. 2017) (statements admissible under coconspirator exception,

because "the discussion about historical events was not mere idle chatter; it provided pertinent background for how to proceed going forward").

Here, the coconspirators' references to historical fact that the government seeks to introduce were made in the specific context of current and future actions to be taken in furtherance of the charged conspiracy. For example, on April 24, 2018 (McClain Phone, Session 1087), McClain reminded Hooker, "if you remember we have some people that are, um, recommendations from our friend that, um, are, are paid by us, but they work under Jay Doherty." Of course, Doherty's consulting contract was used as a vehicle to indirectly pay the Madigan subcontractors. After Hooker acknowledged that he remembered, McClain told him that Madigan had asked "to add an additional person," Individual 23W-1, to the Doherty contract. Hooker agreed that paying Individual 23W-1 was a good idea, noting that "[t]hat has paid off for us in the past, Michael," and commenting, "[i]t took, it took me and you to think of that." McClain responded, "Yeah, exactly." McClain further commented that "Doherty's been uh, uh, wonderful doing it" and "he doesn't even blink about it." Hooker acknowledged that the scheme Doherty had facilitated was "off the beaten path." McClain and Hooker were not merely discussing the origins of their scheme to bribe Madigan as a matter of history; they were discussing their ongoing efforts to further the conspiracy by adding still another Madigan associate to the ComEd payroll.

McClain and Hooker continued their discussion regarding adding Individual 23W-1 as a ComEd subcontractor on May 8, 2018 (McClain Phone, Sessions 2076-77). At approximately 8:47 a.m., Hooker asked McClain, "should I get [Individual 23W-1] and call you back?" Thirteen minutes later, Hooker spoke to McClain again and asked, "how'd you make out with Anne with him [referring to Individual 23W-1] and Jay?" McClain responded, "she said there would be no problem, but she'd need to check something and get back to me." Explicitly connecting the hiring

4

of 23W-1 to past efforts in furtherance of their ongoing conspiracy to facilitate ComEd's hiring of no- or minimal-work subcontractors in return for legislative benefits, Hooker responded, "Alright. I think that I, I, that's one of those things that you and I put into place that I like a lot." McClain Phone, Session 2077.

The February 7, 2019 phone call between McClain and coconspirator Intermediary 3, who paid Madigan associate, referred to as Individual 13W-3, money funneled from ComEd (McClain Phone, Session 18977), is challenged by defendant. But that call is still another example of so-called references to historical events being intertwined with the discussions of ongoing efforts to further the conspiracy. McClain told Intermediary 3, "we got some people that are um, um, they're on contract with lobbyists," and explained that Marquez would need to justify the Doherty contract to ComEd's new CEO, "[c]ause Anne was all in, and [Marquez] thinks now [the New CEO] will push back" on the Doherty subcontractors. McClain elaborated that it was up to Doherty "to make sure these guys are doing some work." Once again, references to past events provide important context concerning the ongoing efforts of the conspirators to facilitate corrupt payments to Madigan's associates. McClain explained that, whereas Anne had been "all in," the new CEO was likely to push back on the subcontracts, and as a result, Doherty would be the person responsible for justifying the payments to subcontractors.

In sum, none of the coconspirator statements proffered by the government are properly excluded as inadmissible "idle chatter" or "narrative descriptions of past events."

## B. The Government's *Santiago* Proffer Amply Establishes a Conspiracy to Falsify Books and Records.

Defendants also incorrectly argue that the *Santiago* proffer does not establish by a preponderance of evidence that the defendants conspired to falsify ComEd and Exelon's books and records. Dkt. 129 at 11-14. The evidence proffered by the government does not show that

Doherty merely falsified records on his own, as defendant asserts. Dkt. 129 at 11. To the contrary, Pramaggiore signed off on those false statements. Numerous witnesses at trial will testify that it was critical that the scope of services for a consultant be accurate, and yet Pramaggiore and Doherty both submitted false information for the purpose of ensuring the payments to Madigan associates were approved, without informing ComEd and Exelon's administrative staff about the true nature of the payments.

Defendants also ignore conversations in which McClain and the other conspirators described ways to conceal payments. For example, Madigan asked McClain to help find a job for a representative's wife (as discussed in Section XI, *infra*), and noted: "one thought I had was with, um, Jay Doherty." McClain Phone, Session 7531. Madigan suggested, "we'd tell [the representative to] prepare some monthly reports on what she's doing . . . So he's got it on file." *Id.* McClain responded, "Right, right." *Id.* Both conspirators thus clearly understood the value of false reporting to conceal payments made for political favors.

During a call in which McClain informed Intermediary 2 that he would be discontinuing payments to Individual 13W-3 (because he had just become Recorder of Deeds), McClain suggested that Intermediary 2 cut off the contract, but suggested denominating a future payment as a fake "bonus": "Why don't ya do the, um, pay the November one and December just pay for like, you know, a half a month or something." Intermediary 2 responded, "Okay, like a bonus?" McClain responded, "Yeah, yeah." McClain Phone, Session 17973. Individual 13W-3 will testify that he did not do any work for those payments, so the notion that he was being paid a legitimate "bonus" was false.

Similarly, in other calls, Hooker bragged to McClain that the subcontractor payments that they had set up were "creative" and "off the beaten path." McClain Phone, Sessions 3077, 1087.

A telling example was a phone call between Hooker and McClain on February 11, 2019, in which the two men discussed how to convince the New CEO to renew Doherty's contract:

| | |
|---|---|
| McCLAIN: | We had to hire these guys because Mike Madigan came to us. That's, it's that simple. |
| HOOKER: | That's how simple it is. |
| McCLAIN: | That's how simple it is. So if you want to make it a Federal court suit, okay, but that's how simple it is. |
| HOOKER: | Right. Cause this was the best way to do it. That, this avenue is one of the best avenues. |
| McCLAIN: | Right. |
| HOOKER: | If, if, it's, it's, it's clean for all of us. |
| McCLAIN: | Right. |
| HOOKER: | You know? |
| McCLAIN: | Right. We don't have to worry about whether or not, I'm just making this up, whether or not [Individual 23W-1], is doing any work or not. That's up to Jay Doherty to prove that. |
| HOOKER: | That's right. |
| McCLAIN: | We're not, we're not, uh, monitoring his workload, whether, or not [Individual 23W-1's] earning his five grand a month. That's up to Jay Doherty. |
| HOOKER: | That's right. (Laughs.) |
| McCLAIN: | That's why we set it up like this, John. |
| HOOKER: | We came up with this plan and between him, our friend, and, and, and, and, uh, [first name redacted], and the alderman, they thought it was great. |

McClain Phone, Session 19533. These calls demonstrate the conspirators' efforts to make the conspirator payments falsely appear as if they were for legitimate work in ComEd's internal

records, when in reality they were intended to unlawfully influence or reward Madigan.[2] The *Santiago* proffer thus amply demonstrates a conspiracy to bribe Mike Madigan *and* to falsify ComEd and Exelon's books and records. Defendants' motion should be denied.

## II. The Statements Made by Marquez After He Began Cooperating Are Admissible (Dkt. 131).

Defendants Pramaggiore and Hooker move to exclude certain statements made by Fidel Marquez after he began cooperating with the government. Dkt. 131 at 24. As discussed below, Marquez's statements will not be offered for their truth, but instead to provide context to explain why the defendants were concerned with the new ComEd CEO's renewal of the Doherty contract after Pramaggiore's promotion to Exelon and to demonstrate that McClain did, in fact, follow through with his plans to meet with the New CEO to explain to him the importance of Doherty's subcontractors. The statements are also separately admissible for their effect on the defendants who were listening.

### A. Applicable Law

#### 1. Out-of-Court Statements Offered for "Context" Are Admissible.

Out-of-court statements are not hearsay when they are offered for background or context and not for the truth of the matter asserted. *United States v. Van Sach*, 458 F.3d 694, 701-2 (7th Cir. 2006); *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002); *United States v. Akinrinade*, 61 F.3d 1279, 1283 (7th Cir. 1995). Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Fed. R. Evid. 801. Whether a statement is hearsay depends on the purpose for which it is offered. *See, e.g.,*

---

[2] Statements made in furtherance of a conspiracy include statements to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008).

*United States v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004) (affirming admission of out-of-court statement when offered as background information to put the actions of a person in context). If an out-of-court statement is offered only to prove that it was made and not to prove the truth of the matter asserted, the out-of-court statement is admissible. *Id.*; *see also Anderson v. United States,* 417 U.S. 211, 220 n. 8 (1974).

The Seventh Circuit has routinely affirmed the admission of out-of-court statements as necessary non-hearsay "context" in the very situation presented here: consensual recordings involving a cooperating witness and a defendant. *See*, *e.g.*, *United States v. Schalk*, 515 F.3d 768, 775 (7th Cir. 2008) ("Meneghetti's statements, as a government informant during these conversations, were not admissible for their truth, but were admissible for the context they provided for [defendant]'s statements."); *United States v. Nettles*, 476 F.3d 508, 517 (7th Cir. 2007) (cooperating witness's recorded statements admissible because "they were merely used to provide context to Nettles's admissions"); *Van Sach*, 458 F. 3d at 701-02; *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006) ("[informant]'s statements were admissible to put [defendant]'s admissions on the tapes into context, making the admissions intelligible for the jury"); *United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002); *Gajo*, 290 F.3d at 930 (admitting cooperating witness's recorded statements because "they are offered for context and not for the truth of the matter asserted"); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989) (upholding admission of entirety of tape recorded conversations because informant's statements "are necessary to place the defendant's statements in a proper context" and "mak[e] them intelligible to the jury and recognizable as admissions").

## 2.     Adoptive Admissions Are Properly Admissible for their Truth.

"[A] statement of which the party has manifested an adoption or belief in its truth is not

hearsay." *United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988) (quoting Fed. R. Evid. 801(d)(2)(B)). A party need not expressly state, "I adopt [this person's] statements as my own," for a statement to be admissible as an adoptive admission. *Id.* Instead, an adoption can occur during a normal conversation when a defendant manifests a belief in the truth of another person's statements. *See United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (holding informant's side of telephone conversations with defendant admissible because they were adopted by the defendant during the course of the conversation when the defendant either led or responded to the informant's statements and at no time contradicted the informant's comments or questions).

3. **Relevant Evidence Is Excluded Where Its Probative Value Is "Substantially Outweighed by the Danger of Unfair Prejudice."**

Under Federal Rule of Evidence 403, relevant evidence should be excluded where its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." But mere prejudice to the defendant is not reason enough to exclude evidence. *United States v. Curry,* 79 F.3d 1489, 1496 (7th Cir. 1996). Because most relevant evidence presented in a prosecution is prejudicial to the defendant, to be excluded, the evidence must be unfairly prejudicial. *Id.*; *see also United States v. Chanu*, 40 F.4th 528, 545 (7th Cir. 2022). "'[U]nfair prejudice' means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, advisory committee note.

Thus, courts apply Rule 403 in a manner that favors the admission of relevant evidence and only exclude evidence when unfair prejudice threatens to overwhelm its probative value. The court has described proper Rule 403 analysis as a sliding scale, where, "as the probative value increases, so does our tolerance of the risk of prejudice." *United States v. West*, 53 F.4th 1104, 1108 (7th Cir. 2022) (internal quotations and citations omitted); *United States v. Torres,* 977 F.2d 321,

328 (7th Cir. 1992); *accord United States v. Suggs,* 374 F.3d 508, 516 (7th Cir. 2004).

**B.** **Marquez's Statements to Hooker, Doherty, McClain, and the New CEO Are Admissible for Context and as Adoptive Admissions.**

**1.** **The January 29, 2019 Recording Should Not Be Redacted.**

Pramaggiore and Hooker seek to redact the following portions of recordings involving Marquez, after he began cooperating, in which the defendants discussed payments that were made to political allies of Madigan. Dkt. 131 at 24. The government has copied the relevant portions below, with defendants' proposed redactions in bold.[3]

*January 29, 2019.* On January 29, 2019, Marquez and Hooker had the following conversation:

| | |
|---|---|
| MARQUEZ: | Okay. Um, well now it's, it's with [New CEO] now, and I've got to have [New CEO] approve it. He's gonna ask me what's, what. What's, what is this for? |
| HOOKER: | Right. |
| MARQUEZ: | Um, you know, he has no history-- |
| HOOKER: | Right. |
| MARQUEZ: | **--About it. Uh, you know, I've never had to explain, you know. Anne, Anne, for example, Anne approved it. I didn't have to go with her, cuz-** |
| HOOKER: | Right. |
| MARQUEZ: | **It was under her, and [Former CEO] was probably the same thing**, but [New CEO] is, is new on this and uh you know, he's got, uh, he's got a couple of subs. I think he's got three subs with him right now. You know, they come and go. |
| HOOKER: | Uh huh. |
| MARQUEZ: | I gotta figure out how to sit down with [New CEO] and |

---

[3] The transcripts of the relevant excerpts the government intends to play at trial are attached as under-seal Government Exhibits A, B, and C.

11

| | |
|---|---|
| | explain that. You never had to explain anything, did you? |
| HOOKER: | Well, I was the one that, me and McClain was, I was the one that created it. |
| MARQUEZ: | Okay. |
| HOOKER: | And I had to explain it to [the former CEO]. |
| MARQUEZ: | You did, okay, okay. |

Gov. Exh. A at 1, lines 23-25, 29 (bold portion).

Marquez's bold statements are adoptive admissions as to Hooker and can therefore be offered for their truth as to Hooker. *See Rollins*, 862 F.2d at 1296. Indeed, when Marquez points out that Pramaggiore had approved the contract, Hooker responds, "Uh huh," and further elaborated that "me and McClain was, I was the one that created" the arrangement with Jay Doherty to pay subcontractors. Thus, Hooker clearly adopted the prior statements by Marquez.

In addition, Marquez's statements about Pramaggiore's prior approval provide important context. Because Pramaggiore was no longer CEO of ComEd at the time of this recording, the other defendants had to justify the contract for the first time in almost a decade to ComEd's new CEO. Marquez's statements are therefore admissible as to all defendants for the non-hearsay purpose of providing context.

Furthermore, Hooker's explanation that he came up with the subcontractor scheme and had to explain it to the prior CEO of ComEd—without any mention of Pramaggiore—implies that Pramaggiore did not need convincing in the same way as either ComEd's prior CEO or new CEO did. Hooker's statements during this conversation are of course admissible for their truth as coconspirator statements, but without Marquez's corresponding dialogue providing necessary context, Hooker's comments would not make sense to the jury.

Defendants' request to redact Marquez's contextual statements is inconsistent with Seventh

Circuit precedent. Where, as here, evidence is offered for limited purposes, the proper course is to provide cautionary instructions to the jury. Such instructions, which the Seventh Circuit presumes that jurors follow, provide a sufficient safeguard to ensure that the jury is aware of the proper weight to give to such contextual non-hearsay statements. *See Van Sach*, 458 F.3d at 701-02 (approving the use of a limiting instruction that explained "that the CI's statements were only to provide context for the defendant's admissions on the recordings, and could not be used for the truth of the matter asserted therein"); *Davis*, 890 F.2d at 1380 (approving admission of tape-recorded statements "for the limited purpose of placing [defendant's] statements in context," where trial court issued "limiting instructions to that effect" and where courts "assume[]" that such instructions "were followed by the jury"). Such instructions here would be consistent with defendants' stated intention of seeking a limiting instruction regarding Marquez's status over the course of the investigation. *See* Dkt. 140 at 54 (defendants have proposed jury instructions stating that Marquez was not a conspirator once he began cooperating). The general instruction that what Marquez says in all conversations that post-date his cooperation is not evidence provides further protection against any risk of unfair prejudice. *See Van Sach*, 458 F.3d at 701-02; *Davis*, 890 F.2d at 1380.

Finally, in this case, defendants will have an opportunity to cross-examine the declarant. The government will call Marquez to testify. Thus, this case is unlike the numerous other cases discussed above—*Schalk*, *Nettles*, *Van Sach*, *Tolliver*, *Woods*, *Gajo*, and *Davis*—which involved a *non-testifying* cooperator's statements (and yet where the cooperator statements were still found admissible as non-hearsay statements that provided necessary context). Where the declarant will testify at trial, there is even less reason for concern about the admission of the declarant's statements that provide context. *See, e.g., United States v. Linwood*, 142 F.3d 418, 426 (7th Cir.

1998) (affirming admission of out-of-court statement, in part, because declarant testified at trial and defendant's attorney "had every opportunity while cross-examining [the declarant] to question her regarding . . . what she said to the officers").

Defendants' proposed redactions thwart the truth-seeking process because they would result in recordings that are incomplete, would fail to provide jurors with the entire context of the conversations between defendants and Marquez, and would fail to demonstrate the effect of these conversations on defendants. *See United States v. Mezzanatto,* 513 U.S. 196, 204 (1995) (the rules of evidence are intended to "enhance[] the truth-seeking function of trials, [which] will result in more accurate verdicts)." Indeed, the rules of evidence should further the "function of the courts of justice to ascertain the truth." *Jenkins v. Anderson,* 447 U.S. 231, 238 (1980).

Accordingly, the Court should deny defendants' request for the redactions discussed above.

**2.      The February 13, 2019 Recording Should Not Be Redacted.**

On February 13, 2019, Marquez and Doherty had the following conversation. The government has copied the relevant portions below, with defendants' proposed redactions in bold.

| MARQUEZ: | **Um, so Anne, you know, this was never, Anne, I never even touched it. She just, she just approved it.** |
|---|---|

(Simultaneous conversation.)

| DOHERTY: | Yeah, yeah. |
|---|---|
| MARQUEZ: | And now [new CEO], he's going to, this is coming up, and he's gotta sign off on it-- |
| DOHERTY: | Right. |
| MARQUEZ: | --under his budget, he probably does it. And I'm sure he's not aware. I know he's not aware. |
| DOHERTY: | Yeah. |
| MARQUEZ: | And, uh, I want to sit down with him and say, "Hey, by the |

| | |
|---|---|
| | way--" |
| DOHERTY: | Yeah. |
| MARQUEZ: | --"I think this is a $400,000 budget and here's what it is." And he's going to have questions and I'm just trying to prepare myself, Jay-- |
| DOHERTY: | Yeah, no, no, absolutely, I, I'm just trying to think where you can get fortification, you know, and just so, uh, let's see, he probably wouldn't, well you actually, it predated you, me collecting all that money. |
| MARQUEZ: | Yeah. |
| . . . | |
| DOHERTY: | Because you've been there, I tell everybody, no one more loyal, more grateful. But okay, so [New CEO], or Fidel, "Why would we pay a guy like Doherty, and these other three people, all this money?" I don't know about the other three people. That's, that, I guess, can be answered in Springfield with Madigan. And to keep, to keep Mike Madigan happy, I think it's worth it. I mean just, 'cause you'd hear otherwise-- |
| MARQUEZ: | Okay. |
| DOHERTY: | --I mean, my opinion, (unintelligible). I no, never talked to him about it- |

Gov. Exh. B at 9, lines 417-18 (bold portion).

Like the January 29, 2019 conversation discussed above, Marquez's bold statements are adoptive admissions as to Doherty and can therefore be offered for their truth as to Doherty. As with Hooker, when Marquez points out that Pramaggiore had approved the contract, Doherty responds, "Yeah, yeah." Doherty thus adopted the prior statements by Marquez. And like the January 29, 2019 conversation, Marquez's bold statement provides the jury with necessary context for why Marquez needed to explain the contract for the first time in years. Defendants' request for redactions should be denied.

3. **The March 5, 2019 Recording Should Not Be Redacted.**

The evidence will show that McClain orchestrated a meeting between Marquez and ComEd's new CEO for Marquez to explain to the new CEO why Doherty's contract needed to be renewed. There are multiple recorded phone calls in which McClain told others that he needed to meet with the new CEO to talk about the contracts with Madigan's allies. *See, e.g.,* McClain's Phone, Session 21779. As an example, on February 7, 2019, McClain met with Marquez and told him that the subcontractors under Doherty included two aldermen and one of Madigan's top precinct workers who "actually trains other precinct workers." Later in the same conversation, Marquez and McClain discussed how to convince the new CEO to renew the payments to the subcontractors. McClain advised Marquez that he should tell the new CEO, "I'd ask you to recommend that before you do anything, uh, can McClain and you have a sit-down?" *Id.*

McClain and Marquez ultimately met with ComEd's New CEO on March 5, 2019. Again, the government has copied the relevant portions below, with defendants' proposed redactions in bold.

| | |
|---|---|
| NEW CEO: | Now, but, ha--, Fidel, was there an, an issue with Jay's deal that I was holding it up or-- |
| MARQUEZ: | Well, [New CEO]-- |
| NEW CEO: | --because that's what I was unaware of- |
| MARQUEZ: | So, no, no, so here's the sit, the deal. **Jay's contract has always been under the CEO.** |
| NEW CEO: | Oh, okay. |
| MARQUEZ: | **And you, uh, you know you're the one that has to you know sign the single source letter. I want to make sure you know what you're signing**. |
| NEW CEO: | Yeah. |

| MARQUEZ: | That was the only thing. |
|---|---|
| NEW CEO: | Yeah. |
| MARQUEZ: | **That, that was it, you know, um, all of that, this has been in place for a long time. Frank took care of it. Anne took care of it. I'm not sure if Anne, in her transition, I know there wasn't much, I mean that's a level of detail that she probably doesn't even remember**. |
| NEW CEO: | Yeah. |
| MARQUEZ: | And I was always taught, you gotta know what you're signing. |
| NEW CEO: | Yeah (unintelligible). |
| MARQUEZ: | So, I was, I was just-- |
| NEW CEO: | I'm fine. |
| MARQUEZ: | --making sure, [New CEO], this is what it is. You know, it's coming out of your budget. It's four hundred grand, so that you, that, that was, that was it. |

Gov. Exh. C at 4, lines 178-79, 5, lines 183-85, 193-97 (bold portion).

The bold portions will not be offered for their truth, but rather for context. The fact that McClain followed through in setting up the meeting with ComEd's new CEO is probative of McClain's intent; that meeting was a step in furtherance of the conspiracy to bribe Madigan. The fact that McClain did not interrupt Marquez as Marquez advised the new CEO according to McClain's earlier guidance reflects McClain's adoption of Marquez's statements.

Without Marquez's explanations of the Doherty contract history to ComEd's new CEO, the conversations would make little sense to the jury and would also deprive the jury of probative evidence reflecting McClain's intent. Moreover, the government should not be required to sanitize this recorded call where a limiting instruction, as discussed earlier, could address any lingering concerns of unfair prejudice.

### 4. Redaction of These Recordings Is Unwarranted.

Pramaggiore argues that these three conversations must be redacted because she was not present during them. But she does not dispute that Marquez's statements are unquestionably adoptive admissions as to the Hooker and Doherty; they therefore provide relevant context for her coconspirators' statements.

As an initial matter, it is not necessary for one coconspirator to be present when a second coconspirator's statement is made for the statement to be admissible against the first coconspirator. *See Lutwak v. United States*, 344 U.S. 604, 617 (1953) ("Declarations of one conspirator may be used against the other conspirator not present on the theory that the declarant is the agent of the other, and the admissions of one are admissible against both under a standard exception to the hearsay rule applicable to the statements of a party."). Indeed, case law cited by Pramaggiore herself (Dkt. 131 at 19), makes clear that where an informant's statement is not an adoptive admission as to an absent coconspirator, that statement can nevertheless be "admissible to place the coconspirator statements in context." *United States v. Molina*, No. 88 CR 823-2, 1989 WL 85011, at *1 (N.D. Ill. July 20, 1989). Applying this principal, Marquez's statements are necessary to place Pramaggiore's coconspirators' statements and responses in context, and thus no redaction is appropriate.[4]

For all of these reasons and as discussed in more detail in the sections that follow, defendants' request to exclude statements made by Marquez during his conversations with defendants should be denied.

---

[4] Pramaggiore and Hooker argue that Marquez's bold statements above should be barred as "vague" and "unreliable." Dkt. 131 at 27. But there is nothing vague about Marquez's statements; in the context of the calls, it is clear that they are discussing the periodic renewal of Doherty's contract.

### III. Defendant Hooker's Motion to Exclude "Speculative" Testimony by Fidel Marquez And Evidence Concerning the Fair Maps Initiative Should Be Denied (Dkt. 128).

Hooker incorrectly contends that some of Marquez's anticipated testimony is speculative. Dkt. 128 at 4-5.

The government anticipates introducing a recorded conversation between Fidel Marquez and defendant Hooker from January 29, 2019, described above and attached as Government Exhibit A. During the recording, Marquez solicited Hooker's advice as to how to explain the need to renew Doherty's contract (which was used as a vehicle to indirectly pay the Madigan subcontractors) to ComEd's new CEO, who had replaced defendant Pramaggiore. During the conversation, Hooker informed Marquez that he and McClain had "created it," with reference to the subcontractor arrangement with Doherty, and that Hooker "had to explain it to" the new CEO. Hooker suggested that Marquez have a "write up on each one" and "what they do." Marquez is expected to testify that he was surprised that Hooker asked him to prepare such a write up because Marquez believed that Hooker knew the Doherty subcontractors performed no work.

Marquez is expected to testify as to the basis for his belief. Specifically, Marquez is expected to testify that he believed Hooker knew the subcontractors did no work because (i) Hooker had been the one to set up the subcontractor arrangement; (ii) Hooker previously occupied Marquez's position, and in this position, would have been expected to know what, if anything, the subcontractors did; (iii) even though he set up the arrangement and continued to be immersed in the activities of the external lobbyists after his retirement from the company, Hooker never discussed the Doherty subcontractors having performed or performing any work for ComEd; (iv) the Doherty subcontractors were doing nothing when Marquez found out about their existence; (v) when Hooker was asked how to present the subcontractors to the new chief executive officer, Hooker did not explain what they actually did for ComEd—even though he set up the arrangement

with McClain; (vi) during the conversation, Hooker agreed that the new CEO would "push back" on renewing the contract, which would not be expected if the subcontractors were performing legitimate, useful work; (vii) McClain mentioned Hooker's involvement in a conversation concerning the movement of one subcontractor from McClain to Doherty's contract before Marquez even knew of the existence of the subcontractors; (viii) of Hooker's comments during the meeting at the Union League Club—that suggested that the subcontractors were retained to assist Madigan; (ix) Hooker spent time explaining to Marquez what ComEd lobbyists did after he retired, and did not mention the subcontractors; and (x) the fact that Doherty told Marquez in a separate conversation that the subcontractors did no work, and that Hooker checked in with Doherty on the subcontractors periodically. Accordingly, Marquez can point to a number of concrete, specific facts informing his belief that Hooker was aware that the subcontractors did no legitimate work. Under such circumstances, his belief that Hooker knew the subcontractors did no work is not speculative. Hooker's motion seeking to bar this testimony should therefore be denied. Dkt. 128 at 4-5.

Defendant Hooker appears to seek the exclusion of any evidence demonstrating that Hooker acted as a plaintiff in what is commonly known as the "Fair Maps" litigation. Dkt. 128 at 7. This request should be denied. The government expects the evidence to show that Hooker made himself available as a plaintiff who took a position on the legislative remapping process that benefited Madigan. Hooker's willingness to act in this fashion at a time when he also served as a consultant for ComEd reflects another example of a benefit afforded to Madigan by the conspirators in order to corruptly influence Madigan in connection with the business of the State legislature. For this reason, evidence that Hooker effectively acted as Madigan's surrogate in connection with this litigation is properly admissible at trial. In addition, Hooker's association with

Madigan in this manner demonstrates the close association Madigan enjoyed with ComEd and its agents during the course of the conspiracy.  The motion should be denied.

Hooker also asks the Court to bar testimony about the reasons for the renewal of Hooker's contract for 2015. Dkt. 128 at 6. The government does not intend to elicit testimony on this subject, and therefore, the motion can be denied as moot.

## IV. Doherty's Consolidated Motions *In Limine* Should Be Denied (Dkt 133).

The Court should deny Jay Doherty's consolidated motions *in limine*. As a threshold matter, Doherty inaccurately claims to list "the sum of the evidence against Doherty" before the jury has heard any evidence and before the government has even tendered its witness and exhibit lists. Dkt. 133 at 12. Doherty is wrong to suggest that the government's evidence at trial will be limited to the evidence summarized in the *Santiago* proffer. Dkt. 112 at 5 (noting in the *Santiago* proffer that "this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses").[5] Doherty's motions *in limine* are similarly misguided, as discussed below.

### A. Marquez and Individual 13W-3 Can Testify About Their Understandings Consistent with Rule 701.

Doherty argues that the Court should bar Fidel Marquez and Madigan associate Individual 13W-3 from testifying about their understanding of their own conversations with Doherty and about the payments that they were involved in. Dkt. 133 at 14-17. Specifically, Doherty contends that the Court should:

(1) Preclude Marquez from testifying about what he understood Doherty to mean when Doherty said to Marquez: ". . . why would we pay a guy, like Doherty and these other three people, all this money? I don't know about the other three people.

---

[5] Doherty also incorrectly suggests that the government will be required to prove that he knew the solicitations were illegal to convict under 18 U.S.C. § 666. Dkt. 133. at 2. Yet "ignorance of the law is no defense." *United States v. Dean*, 705 F.3d 745, 748 (7th Cir. 2013) (citations omitted).

That's, that, I guess, can be answered in Springfield with Madigan. And to keep Madigan happy, I think it's worth it, because you'd hear otherwise."

(2) Preclude Marquez from testifying about the purpose of ComEd's payments to subcontractors, even though Marquez was part of the scheme to pay the subcontractors to influence Madigan, including to ensure that Madigan did not act against ComEd's legislative interests as a result of refusing to honor a hiring request; and

(3) Preclude Individual 13W-3 from testifying about what Individual 13W-3 understood Doherty to mean when Doherty told Individual 13W-3 to "keep knocking on doors" as a precinct captain, even though Doherty was paying Individual 13W-3 as an intermediary for ComEd.

Dkt. 133 at 14-17.

A lay witness may testify about his own perceptions and observations. *See United States v. Westerfield*, 714 F.3d 480, 487 (7th Cir. 2013). In addition, under Federal Rule of Evidence 701, a lay witness may offer opinion testimony that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Marquez and Individual 13W-3's testimony concerning what they understood the conspirators to mean is unquestionably proper lay witness testimony.

Consistent with Rule 701, cooperating witnesses are routinely permitted to testify about their opinions of a defendant's mental state based on their own involvement in the criminal conduct. *See Westerfield*, 714 F.3d at 487 (cooperator's testimony was proper under Rule 701, because it "was based on his perception because he had helped organize the scheme and had personally seen [defendant] facilitate fraudulent real estate transactions"); *United States v. Estrada*, 39 F.3d 772, 773 (7th Cir. 1994) (confidential informant permitted to testify about his understanding of recorded conversations with defendant in a drug case, because the "testimony assisted the jury's understanding of the content of the recorded conversations").

Doherty's argument is similar to the argument rejected by the Seventh Circuit in another bribery case, *United States v. Curescu*, 674 F.3d 735 (7th Cir. 2012). There, the defendant argued that it was improper for a witness to testify about what another person was thinking. The Seventh Circuit held that testimony about what a witness understood a defendant to mean is generally permissible under Rule 701(a), because "one is often able to infer, from what the person says or from the expression on his face or other body language, what he is thinking." *Id.* at 740. The court recognized the value to the jury of permitting such testimony in a bribery case:

> Just as dealers in illegal drugs do not name the drugs in their phone conversations but instead use code words, so parties to other illegal transactions often avoid incriminating terms, knowing they may be overheard electronically. So if they're involved in bribery, they don't use the words 'bribery,' 'bribe,' or 'bribes,' but instead use words that the other party to the conversation understands to refer to bribes—without that understanding there would be a failure of communication.

*Id.* (citations omitted). The court likened the cooperating witness to an interpreter translating a foreign language for the jury: "Strangers need an interpreter, and a party to the conversation is the obvious choice to be that interpreter." *Id.*

As in *Curescu,* all three of Rule 701's requirements are satisfied here. First, Marquez and Individual 13W-3 will testify based on their personal observations and experiences with the defendants, including Doherty. As a member of the conspiracy and Senior Vice President of Governmental and External Affairs at ComEd during the relevant period, Fidel Marquez is uniquely equipped to testify about what he knew about its unlawful purpose. He will be able to provide specific observations and examples that explain how he knew the purpose of hiring Madigan associates to no-work jobs was to influence Madigan with regard to ComEd legislation and to ensure ComEd wasn't punished by Madigan in terms of critical legislation. And Individual 13W-3 is in a position to know exactly why he was paid—not because of his skill in lobbying but

because of his value to Madigan's political operation as a precinct captain. The jury is entitled to hear Individual 13W-3's own understanding of why he was paid and what he was paid for.

Second, their description of the purpose behind payments and the meaning of conversations will aid the jury in determining a critical issue: defendants' intent in funneling payments to Madigan associates. Third, there is nothing technical or specialized about their testimony.

Doherty seeks to improperly sanitize the government's evidence. The Seventh Circuit rejected this same argument in *United States v. Bogan*, 267 F.3d 614 (7th Cir. 2001). There, a witness testified in a trial for assault with intent to commit murder that he observed the assault and that the defendants tried to kill the victim. The Seventh Circuit held that the witness's testimony satisfied Rule 701 because his "opinion was rationally based on his observation of the incident" and "was helpful to the jury." *Id.* at 619. The Seventh Circuit rejected defendant's "novel" argument that the witness's "statement would be too helpful to the jury—that [the witness] himself concluded that [defendant] intended to kill Degenhardt, and thus did not allow the jury to draw that conclusion for itself." *Id.*

Like the defendant in *Bogan,* Doherty suggests that Marquez's and Individual 13W-3's testimony about the purposes behind the conspiracy would be too prejudicial because it goes to the "ultimate issue" of defendants' intent. The *Bogan* court rejected the proposition that "any statement describing a third person's observations that forms the basis for a conclusion regarding a defendant's thoughts and motivations would be presumptively inadmissible." *Id.* Moreover, Rule 704(a) expressly contemplates opinion testimony in this context: "An opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue." Fed. R. Evid. 704(a). Thus, contrary to Doherty's contention, there should be no concern that Marquez's testimony relates to an "ultimate conclusion for the jury." Dkt. 133 at 16.

In short, Doherty's claim that a coconspirator like Marquez should be barred from testifying about the illegal purpose of the conspiracy flies in the face of the binding Seventh Circuit precedent discussed above.[6] Individual 13W-3 should similarly be permitted to testify about his understanding of the purpose of the payments made to him.[7] Such evidence is plainly proper under Rule 701. Marquez and Individual 13W-3 should be permitted to testify about their own first-hand knowledge and understanding, which is highly probative as to the defendants' intent.

## B.      Marquez's Recorded Statement about Rates Is Non-Hearsay.

The Court should deny Doherty's motion to exclude the bold statement below, which was recorded by Fidel Marquez on February 13, 2019 (part of the conversation challenged by Pramaggiore, above), after he began cooperating with the government. Dkt. 133 at 17.

| | |
|---|---|
| DOHERTY: | Here's how, here's how I might. Uh, number one, your money comes from Springfield. ComEd money, right? I mean, for the most part. |
| MARQUEZ: | You mean, that's how we make our money. |
| DOHERTY: | Yeah. |
| MARQUEZ: | **Yeah, yeah. Through our rates, yes, regulated.** |
| DOHERTY: | And, you know, I would, if it were me, and again, Mike Madigan's not my best friend, but if I called him right now, he'd call or he'd say, "Jay," if I want to go see him, I'd go see him. |

---

[6] Doherty further contends that "the defense has no evidence or any testimony from Marquez that anyone told Marquez the payments were to influence Madigan and ensure that Madigan did not act against ComEd." Dkt. 133 at 15. Marquez will explain the reasons he knew the payments were intended to influence or reward Madigan at trial. Moreover, contrary to Doherty's suggestion, there is no need for a specific conversation or a formal agreement for a conspiracy. *E.g., United States v. Gilmer*, 534 F.3d 696, 701 (7th Cir. 2008); *United States v. Hickok*, 77 F.3d 992, 1005 (7th Cir. 1996).

[7] Doherty cites *United States v. York*, 572 F.3d 415, 423 (7th Cir. 2009), but that case involved the proper scope of expert testimony under Rule 702. Dkt. 133 at 14. Marquez and Individual 13W-3 are not experts, they are lay witnesses. And even in *York*, the court held that seemingly unambiguous drug code words were the proper subject of expert testimony.

> But, my bottom line advice would be, 'if it ain't broke, don't fix it' with those guys-

MARQUEZ:     Okay.

Gov. Exh. B. Marquez's reference to regulated rates, immediately after Doherty observed that ComEd's money "comes from Springfield," is admissible not for its truth but as context and to show its effect on the listener, defendant Doherty.

As discussed in Section II, above, the Seventh Circuit has repeatedly held that a cooperating witness's portion of a conversation with a defendant is admissible non-hearsay. In addition, "[a]n out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay." *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993); *see also United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) ( "[A] statement offered to show its effect on the listener is not hearsay."); *United States v. Malik*, 345 F.3d 999, 1001 (8th Cir. 2003) ("When the out-of-court statement has relevance when we only consider the effect it had on those who heard (or read) it— not whether the statement was true or not, but just its effect on those who heard it-then the statement is not hearsay.") (citations omitted).

Here, the government will not offer Marquez's statement to prove that ComEd's rates were, in fact, regulated by the legislature. This fact will be established by multiple other witnesses at trial. The government intends to introduce the conversation to show that Doherty knew that ComEd's rates depended on favorable legislation in Springfield, as evidenced by the fact that Doherty said "yeah" in the middle of Marquez's description of how ComEd made money. This in turn demonstrates that Doherty knew the importance of keeping Speaker Madigan happy. *See United States v. Gaytan*, 649 F.3d 573, 580 (7th Cir. 2011) (recording of a confidential informant's conversation with defendant was not hearsay, because "government offered the challenged statements not for their truth but to put [defendant's] own words in context and to help the jury

make sense out of his reaction to what [the CI] said and did"). In fact, Doherty fails to adequately address the remainder of his conversation with Marquez on February 13, 2019, which further demonstrates that he knew the purpose behind the subcontractor payments. Doherty summarized what ComEd's new CEO might ask "'Why would we pay a guy like Doherty, and these other three people, all this money?' I don't know about the other three people. That's, that, I guess, can be answered in Springfield with Madigan. And to keep, to keep Mike Madigan happy, I think it's worth it. I mean just, 'cause you'd hear otherwise . . . I mean, my opinion." Dkt. 112 at 96. In short, Doherty's suggestion that he did not adopt Marquez's comment about regulated rates is misplaced.

**C.**  **Doherty's Motion to Bar Argument that His Use of Four Fingers Is Evidence of a Guilty Conscience Should Be Denied.**

During that same recorded conversation with Fidel Marquez on February 13, 2019, defendant Doherty explained how Individual 13W-1 was added as a subcontractor. Doherty prefaced the explanation by telling Marquez that "this is just you and me talking, I don't even know who else knows this." Doherty then explained that John Hooker had called him and said, "Jay, I've got a sub for you," and "We're gonna pay him every month and you just." At the time Doherty spoke the words, "pay him," Doherty held up 4 fingers, to reflect that Individual 13W-1 would be paid $4,000 a month. *See* Gov. Exh. B at 5, lines 191-92.

Doherty asks the Court to bar the government from arguing that Doherty's conduct—using inaudible hand signals instead of announcing how much he was asked to pay Individual 13W-1— suggests his consciousness of guilt. Dkt. 133 at 22-23. The motion should be denied. The government is entitled to argue to the jury that, in light of Doherty's prefatory comment "this is just you and me talking," as well as other statements he made during the same conversation reflecting his consciousness of guilt (such as his assurance to Marquez that the subcontractors

"keep their mouth shut" about the payment arrangement), that Doherty's hand gesture was part of a pattern of conduct signaling Doherty's awareness of the illicit nature of his conduct. Such argument is perfectly permissible and the jury is entitled to give whatever weight it desires; after all, the government is free to draw any reasonable inference from the evidence the jury has seen and heard. *Evans v. Jones*, 996 F.2d 766, 775 (7th Cir. 2021) (citing *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995)); *United States v. Spivey*, 859 F.2d 461, 466 (7th Cir. 1988) (citing *United States v. Tucker*, 820 F.2d 234, 237 (7th Cir. 1987)); *United States v. Chaimson*, 760 F.2d 798, 811 (7th Cir. 1985)). That Marquez might have drawn a different conclusion about Doherty's intentions is something the jury is entitled to consider in weighing the evidence; it is not grounds to bar the government from arguing the point.

### D. The Government Is Permitted to Argue that the Jury Can Use Its Common Sense.

Doherty asks the Court to bar the government from engaging in undefined "shenanigans," such as encouraging the jurors to use their common sense in assessing the evidence. Dkt. 133 at 21. This motion is frivolous. As the Court is aware, jurors are not only permitted, but are encouraged, "to draw upon their own life experiences and common sense in reaching their verdicts." *United States v. Friedman*, 971 F.3d 700, 714 (7th Cir. 2020). Indeed, the pattern instructions in this Circuit specifically instruct the jury to use its common sense in reaching its verdict. William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit § 2.02 (2022). The government is therefore permitted to call upon the jury to use common sense in weighing evidence and doing so would not constitute improper "shenanigans."

Doherty is, of course, wrong that the case against him is merely "speculative," and if to any extent he means to suggest that the jury may not rely on circumstantial evidence, he is wrong as a matter of law. *See, e.g.,* Seventh Circuit Pattern Instruction § 2.03 ("You are to consider both

direct and circumstantial evidence. The law does not say that one is better than the other."); *United States v. Durham*, 211 F.3d 437, 441-42 (7th Cir. 2000) ("While common sense is not a substitute for evidence, common sense should be used to evaluate what reasonably may be inferred from circumstantial evidence" (international quotation marks and citation omitted)). In short, the Court should deny Doherty's vague, ill-founded motion *in limine*.

### E. The Government Will Not Make Argument Comparing the Defendants to Organized Crime or Gang Members.

Doherty moves *in limine* to bar the government from arguing that the defendants' conduct is analogous to that of gang or organized crime members. Dkt. 133 at 21. The government does not intend to present such argument. Therefore, Doherty's motion should be denied as moot.

### F. The Government Should Be Permitted To Argue that Payments Were More Easily Concealed because They Were Paid Out of Defendant Pramaggiore's Budget.

Doherty moves to preclude any argument that Doherty's contract was placed under the CEO's budget in order to conceal the alleged crime. Dkt. 133 at 22. The government does intend to elicit testimony that Doherty was paid out of Anne Pramaggiore's budget as CEO, which was unusual for a consultant contract. While that fact standing alone may not demonstrate an intent to conceal, the government should be permitted to argue that the fact that JDDA was paid from Pramaggiore's budget made it easier for the increased payments to go unnoticed, as the CEO's budget was generally subject to less scrutiny, in that it was an expenditure approved by the head of the company. The fact that JDDA was paid out of Pramaggiore's budget is also highly relevant to establish Pramaggiore's knowledge and approval of the subcontractor payments. The government should be permitted to make this argument.

## V.	The Court Should Permit Evidence of Compensation Received from ComEd by McClain, Pramaggiore, and Hooker (Dkts. 125, 128, 131).

Defendants McClain, Pramaggiore, and Hooker separately move to exclude evidence of the compensation they received for their work on behalf of ComEd. Dkt. 125 at 2-3; Dkt. 128 at 2-4; Dkt. 131 at 11-15. Because this evidence is clearly relevant and not unfairly prejudicial, these motions should be denied.

The government expects to establish that Pramaggiore's compensation package as ComEd's CEO, and then as a senior executive at an Exelon affiliate, included significant financial incentives tied to the companies' performance. Specifically, the government anticipates that a ComEd representative will testify that a majority of Pramaggiore's compensation plan was tied to the company's financial and operational performance. For example, in 2012, Pramaggiore's base salary was approximately $530,000, but her total compensation was valued at approximately $2 million with performance-based incentives. Her compensation package was approximately $2.6 million in 2013 (which included a performance-based transition award); $2.0 million in 2014; $2.3 million in 2015; $2.8 million in 2016; $2.3 million in 2017; and $1.5 million in 2018 (the year during which she transferred to Exelon).

The evidence will show John Hooker's compensation before his February 2012 retirement from ComEd was similarly based on the company's financial performance. In 2012, Hooker's base salary was approximately $128,000 but his total compensation was valued at approximately $2.7 million including performance-based incentives and deferred compensation earnings.

The evidence further will show that both Pramaggiore and Hooker also received shares in the company as part of their executive compensation, the value of which was tied to the company's economic success.

Multiple witnesses will testify that ComEd and Exelon benefited financially from its legislative successes. Those legislative successes included passage of (1) the Energy Infrastructure Modernization Act, which allowed ComEd to more predictably set customer rates (referred to as the "formula rate") and enabled ComEd to make certain infrastructure investments, and (2) the Future Energy Jobs Acts, which extended that "formula rate," increased energy efficiency programs available to ComEd customers, and preserved two Exelon nuclear plants in Illinois by giving credit to the nuclear plants for their zero carbon emissions. *See* Dkt. 112 at 18-20.

Because these legislative wins directly impacted Pramaggiore's and Hooker's compensation, evidence of their compensation is directly relevant to their motive to corruptly influence Madigan. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (concluding evidence concerning defendant's compensation plan was relevant to proving motive); *United States v. Logan*, 250 F.3d 350, 369 (6th Cir. 2001) (same); *United States v. Ferguson*, No. 3:06CR137, 2007 WL 4240782, at *1 (D. Conn. Nov. 30, 2007) (same); *United States v. Bases*, No. 18 CR 48, 2021 WL 6621284, at *2 (N.D. Ill. July 15, 2021) (Lee, J.) (granting government's motion to admit evidence of defendants' compensation).

Regarding defendants McClain and Hooker, the government will present evidence that these men were contract lobbyists for ComEd and that their compensation significantly exceeded that of other ComEd lobbyists. Specifically, an FBI analyst is expected to testify that ComEd paid McClain's firm approximately $230,000 to $338,000 per year from 2011 to 2015, which increased to $514,000 in 2015 and $575,000 in 2016, the year FEJA was passed. These amounts demonstrate how valuable McClain was to ComEd and how his pay increased during the years leading up to ComEd's' most significant legislation, FEJA. Hooker was similarly paid approximately $304,000 to 365,000 per year as a consultant in the years after he retired. This compensation evidence further

shows the value to ComEd of the legislation that defendants McClain and Hooker promoted in Springfield. The evidence likewise speaks to the value of defendants McClain and Hooker to ComEd as associates of Speaker Madigan.

The defendants argue that evidence of compensation is unfairly prejudicial, and that it would cause undue delay, confuse the jury, or waste time. As an initial matter, the government does not plan to argue or suggest that defendants should be convicted because their wealth; indeed, the government has no intention of offering evidence of defendants' wealth or assets outside of their specific compensation plans from ComEd during the limited time-period in question. As discussed above, the evidence at issue will be offered for the limited purposes for which it is relevant—namely, to establish defendants' motive and intent and to establish the considerable value that ComEd executives placed on both the legislation for which McClain and Hooker advocated as well as their relationship with Michael Madigan. Any concerns about potential unfair prejudice can be addressed with an appropriate limiting instruction. *See Quattrone*, 441 F.3d at 187 ("While evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth."); *Ferguson*, 2007 WL 4240782, at *1 ("The Court will instruct the jury to consider this evidence [of defendant's compensation plan] only to assess [defendant's] motive to further reduce the risk of undue prejudice.").

Lastly, defendants Pramaggiore and McClain cite to an identical list of civil cases for the proposition that courts in this district routinely grant motions *in limine* to exclude any reference to a party's financial resources. Dkt. 125 at 3; Dkt. 131 at 13-14. None of the cited cases address whether a criminal defendant's compensation may generally be relevant to issues such as motive

and intent or shed any light on the question of the relevance of compensation to motive and intent in this case.

## VI. The Court Should Permit Evidence Concerning the Cancellation of Consulting Contracts and Termination of Pramaggiore's Employment After ComEd Learned About the Criminal Investigation. (Dkts. 127, 128).

Defendants move to exclude evidence of remedial measures taken by ComEd after the company learned about the government's criminal investigation. Specifically, McClain and Hooker separately seek to exclude evidence of ComEd's cancellation of their consulting contracts. Dkt. 127 at 10-11; Dkt. 128 at 9. Similarly, Pramaggiore seeks to exclude evidence of the circumstances surrounding her departure from Exelon. Dkt. 131 at 5-9. Lastly, defendants jointly move to exclude evidence concerning the termination of defendant Doherty's contract and the payments to his subcontractors, Law Firm A, and Individual BM-1. *Id*. at 9-11. Defendants incorrectly argue that this evidence is irrelevant and unfairly prejudicial.[8]

Pramaggiore's termination and the cancellation of ComEd's contracts with McClain, Hooker, and Doherty show that ComEd took immediate corrective action upon discovering defendants' misconduct. The company's actions are probative because they show that the payments to Madigan associates and allies were not, in fact, bona fide, ordinary course payments, as the defendants will likely argue at trial; instead, the payments were orchestrated to corruptly influence and reward Madigan.

---

[8] To the extent defendants challenge the admission of these categories of evidence as subsequent remedial measures under Federal Rule of Evidence 407, every court of appeals to address the question, including the Seventh Circuit, has held that Rule 407 does not apply to evidence of subsequent remedial measures taken by a non-party like ComEd. *See Lolie v. Ohio Brass Co*., 502 F.2d 741, 744 (7th Cir. 1974); *Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1302 (11th Cir. 2007) ("Rule 407 does not apply to a remedial measure that was taken without the voluntary participation of the defendant."); *Diehl v. Blaw-Knox*, 360 F.3d 426, 430 (3d Cir. 2004) (collecting cases); *see also* 23 Fed. Prac. & Proc. Evid. § 5283 (2d ed.) (stating that "it should be obvious that not all employee firings are within the scope of [Rule 407]").

ComEd's corrective action is also relevant to the books and records counts. The indictment alleges that the defendants conspired to and did falsify the company's books and records by essentially covering up the fact that payments were being made to Madigan associates. The fact that the company immediately stopped the payments upon learning about their true purpose supports the inference that defendant did in fact cause false entries to be made in the company's records. Likewise, with respect to the termination of the Doherty subcontractors, Law Firm A, and Individual BM-1, ComEd's reaction upon learning about reasons for their retention demonstrates that these arrangements were also improperly motivated.

ComEd's remedial actions are therefore relevant to key disputed issues: whether defendants engaged in efforts to corruptly influence Madigan and whether the hiring of certain individuals as subcontractors, the retainment of Law Firm A, and the appointment of Individual BM-1 to ComEd's board of directors was done to improperly influence and reward Madigan, rather than because of the value of their performance to ComEd. Whether evidence is relevant or unduly prejudicial is a fact-specific inquiry. *See Sprint v. Mendelsohn,* 552 U.S. 379, 387 (2008) ("Relevance and prejudice under Rules 401 and 403 are determined in the context of the facts and arguments in a particular case, and thus are generally not amenable to broad *per se* rules.").

Defendants speculate about other possible explanations for ComEd's actions. *See, e.g.*, Dkt. 128 at 9 ("Companies may terminate employees for a variety of reasons, including to distance themselves from individuals associated with a criminal investigation. For example, ComEd may have ended the employment relationship with Mr. Hooker and others to obtain its deferred prosecution agreement."); Dkt. 131 at 9. That there may be other possible explanations for ComEd's actions does not render the challenged evidence inadmissible. A juror may draw multiple

inferences from a given piece of evidence without making that evidence irrelevant or overly prejudicial. *See United States v. Cowan*, 30 F.3d 142 (Table), at *1 (10th Cir. 1994); *Matias v. Bartlett*, No. 91 Civ. 2132, 1992 WL 36127, at *3 (S.D.N.Y. Feb. 19, 1992).

In short, evidence of the remedial measures that ComEd took are admissible at trial.

## VII. The Court Should Permit Evidence Regarding Madigan's Efforts to Secure Public Board and other Governmental Employment for the Subcontractors (Dkt. 125).

McClain moves to exclude evidence concerning the appointments of subcontractors employed by Doherty to various public boards. Dkt. 125 at 4-5. McClain seeks to preclude this evidence on the grounds that it is irrelevant and unfairly prejudicial. This motion should be denied.

The government seeks to introduce evidence that Madigan arranged for the appointment of two Doherty subcontractors—Individual 13W-1 and Individual 13W-2—to different public boards. Dkt. 1 at 11. In particular, the government seeks to introduce evidence that Madigan arranged for the appointment of Individual 13W-1—a Madigan associate and a former Thirteenth Ward alderman—to Illinois' Motor Vehicle Review Board in 1997, that Individual 13W-1's term continued through 2019, and that Individual 13W-1 received approximately $20,000 per year for this appointment. The government also seeks to introduce evidence that Madigan arranged for the appointment of Individual 13W-2—another Madigan associate and a Thirteenth Ward precinct captain—to the Illinois Department of Employment Security Board in December 2013, that Individual 13W-2 served on that board until January 2017, and that Individual 13W-2 received approximately $15,000 per year for this appointment. In addition to these appointments, the evidence will show that Madigan arranged for a number of Doherty subcontractors to obtain lucrative patronage employment with local government entities as a reward for their political loyalty to Madigan.

In addition to helping his political associates obtain lucrative work in government, Madigan also conspired with the defendants to secure lucrative "subcontracts" for these same individuals. Dkt. 112 at 20. In particular, defendants caused payments totaling approximately $368,000 to be made to Individual 13W-1 and approximately $354,750 to Individual 13W-2, even though Individual 13W-1 and Individual 13W-2 performed little or no work for those payments.

The government appointments are relevant to show the close relationship between the subcontractors and Speaker Madigan and the extent to which Madigan valued their political work. In addition, these appointments are probative of Madigan's practice of arranging benefits for loyal political workers, which bears on defendants' motive and intent to bribe Madigan. *See generally United States v. Santiago*, No. 04 CR 784, 2008 WL 351904, at *3 (N.D. Ill Feb. 8, 2008) (citing *United States v. Westbrook*, 125 F.3d 996, 1007 (7th Cir. 1997)) (discussing that evidence of gang affiliation is relevant for the purposes of establishing relationships with gang members).[9]

## VIII. The Court Should Permit Argument That McClain Referred to Madigan as "Our Friend" In Order to Conceal Their Criminal Conduct (Dkt. 127).

McClain seeks to exclude evidence or argument that he and others referred to Madigan as "our Friend" or "a friend of ours"—instead of Madigan's true name—to conceal the nature and purpose of their conduct. Dkt. 127 at 1-7. At no point in his motion does McClain suggest that this evidence is irrelevant to the charges, nor could he. Instead, McClain incorrectly argues that the government, in alleging that McClain used the term "our Friend" to conceal the nature of his conduct, misleads the Court. His argument is unsupported and unsupportable as a matter of fact or law.

---

[9] To the extent the Court is concerned about any potential confusion, the Court could instruct the jury about the proper and improper uses of this evidence. *See Santiago*, 2008 WL 351904, at *3 (discussing jury instruction that evidence of gangs and gang affiliation does not mean that defendant committed the charged offenses).

The indictment alleges that, "in order to conceal the nature and purpose of their conduct, conspirators often referred to [Michael Madigan] as 'our Friend,' or 'a Friend of ours,' rather than using [Michael Madigan's] true name." Dkt. 1 at 18; *see also* Dkt. 112 at 86 n.20. McClain concedes that the phrase "our Friend" was designed to conceal, but claims that he wasn't intending to conceal anything *from the government* because he admitted that he used those phrases to the government.[10] Specifically, in two interviews in an unrelated investigation, McClain admitted that "our Friend" was a code word for Madigan designed to conceal. In an August 2014 interview,[11] McClain admitted that he "referred to MADIGAN as our friend in e-mails and in public conversations because people might be listening to or reading McClain's conversations." Dkt. 127, Ex. A at 4. And in an April 2016 interview, McClain admitted that he referred to Madigan as "our friend" because he "tries not to use names, such as MADIGAN, in conversation. MCCLAIN never knows who's listening to MCCLAIN's conversations. MCCLAIN extends this practice to not using names even in email conversations." Dkt. 127, Ex. B at 6. These admissions clearly show that McClain did not want any eavesdroppers to know the true subject of his communications and are therefore wholly consistent with the indictment and the government's evidence at trial: "our Friends" and "a friend of ours" were terms designed to conceal Madigan's identity.

McClain wrongly argues that these interviews somehow mean that he could not have subsequently used the phrase "Our Friend" with intent to conceal and could not have concealed anything from the government. He cites to cases in the civil securities fraud context for the proposition that someone cannot be said to conceal something they have previously disclosed. Dkt.

---

[10] The Indictment does not state that McClain's concealment was specifically intended to shield evidence from law enforcement, as McClain misleadingly indicates in his motion.

[11] The government does not intend to rely on these interviews the latter of which was proffer-protected but addresses them because McClain discusses them in his motion.

127 at 6. But a company's concealment of information from the market in a securities fraud case, where the market is presumed to absorb all relevant and public information, is easily distinguished from the circumstances present here. *See In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 600 (7th Cir. 2020) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988)). And McClain's private conversations, when he was being recorded without his knowledge, are certainly not the same as public securities disclosures.

As the Seventh Circuit observed in another bribery case, *United States v. Curescu*, 674 F.3d 735 (7th Cir. 2012), "Just as dealers in illegal drugs do not name the drugs in their phone conversations but instead use code words, so parties to other illegal transactions often avoid incriminating terms, knowing they may be overheard electronically." *Id.* at 740. That's exactly what McClain did over and over with respect to his work on behalf of Madigan, as the jury will hear at trial.

The government intends to introduce multiple conversations in which McClain referred to Madigan as "our Friend." Those conversations demonstrate that McClain and the other conspirators commonly used these and other coded language to hide the fact that they were talking about Madigan. For example, on June 26, 2018 (after both of the FBI interviews McClain relies upon), the government intercepted a phone call in which McClain discussed direction he was given by Madigan regarding legislation: "a friend of ours asked me to stop it," referring to the legislation. McClain then said that he would "explain it to you," but that the conversation should be "one-on-one. Not on the phone." McClain Phone, Session 7143. McClain thus was using the phrase "a friend of ours" and suggesting sensitive legislative details should not be discussed on the phone. The clear implication of these calls is that he was worried someone (like the government) might be listening in on the call.

Similarly, on August 13, 2018, the government intercepted a phone call with two lobbyists, in which McClain told them: "I generally never refer to the speaker. I just say our friend," and elaborated that "if you just say our friend, no one really knows what we're talking about so. So, uh that's the way I'm gonna talk, if that's okay?" McClain Phone, Session 11092.

These are just a handful of examples of McClain's use of the term "our Friend" to refer to Madigan to hide the nature of his dealing on behalf of Madigan. Other evidence at trial will demonstrate the lengths Madigan and McClain went to hide the nature of Madigan's requests to ComEd and others. For example, on May 2, 2018, Madigan called McClain and asked if he could talk, and McClain responded, "I'm in the car, but I have headphones on and there's no one else in the car." Madigan then proceeded to discuss Individual BM-1's appointment to the ComEd board. Despite pushback from ComEd concerning the hiring of Individual BM-1, Madigan instructed McClain, "I would suggest that we continue to support [Individual BM-1]" for a board position.

In short, McClain's statements to law enforcement in 2014 and 2016 have no bearing on his intent when he used the terms "Our Friend" and "a friend of ours" in private communications. To the extent McClain claims he had no intent to conceal, this is a factual question for the jury. *See generally United States v. Presbitero*, 569 F.3d 691, 705 (7th Cir. 2009) (concluding that the question of intent was one for the jury). The government should be permitted to argue that the jury may readily conclude from these and other communications that McClain was trying to conceal his dealings on behalf of Madigan.

## IX. The Court Should Deny McClain's Untimely Fishing Expedition for Grand Jury Materials (Dkt. 141).

The Court should deny McClain's related motion to compel grand jury materials concerning McClain's use of the phrases "our Friend" and a "friend of ours," filed on February

15, 2023—over 10 months after the deadline to file pre-trial motions in this matter. Dkt. 141. McClain's motion is untimely, and there is no indication of any error before the grand jury.

### A.     McClain's Request for Grand Jury Materials Is Untimely.

As a threshold matter, the government has already produced hundreds of pages of grand jury material, including the grand jury testimony of all potential government trial witnesses, to the defendants. Despite the fact that the government has exceeded its discovery obligations, McClain is pursuing an untimely fishing expedition to obtain additional grand jury material, just weeks before trial is set to begin.

Federal Rule of Criminal Procedure 12(e)(1) authorizes the Court to set deadlines for the filing of pre-trial motions, while Federal Rule of Criminal Procedure 12(e)(3) allows for consideration of untimely motions on showing of good cause. *United States v. Suggs*, 703 F.App'x 425, 428 (7th Cir. 2017). The deadline for defendants to file this type of pretrial motions passed over 10 months ago—on April 6, 2022—after numerous extensions. *See* Dkt. 88. Defendant McClain fails to show good cause for the Court to consider his motion despite its exceedingly late submission.

McClain concedes that the government produced the May 2016 interview, which should have put defendant McClain on notice of the argument in his instant motion, sometime in April 2021—nearly two years ago. Dkt. 141 at 4 n.2. McClain attempts to excuse his failure to timely file a request for grand jury material, because the interview was produced "along with hundreds of thousands of other documents and materials." *Id*. The May 2016 interview was produced a full year before the deadline to file pretrial motions—allowing for ample time to review and digest the

discovery materials.[12] The Court should refuse to entertain McClain's frivolous and untimely fishing expedition filed weeks before trial begins.

## B.     McClain Has Not Shown any Likelihood of Error in the Grand Jury Proceedings.

According to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), a court may allow for the disclosure of grand jury materials "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." To be entitled to grand jury materials under this provision, a defendant "must show a particularized need for the review to overcome the presumption of secrecy embodied in the grand jury process." *United States v. Puglia*, 8 F.3d 478, 480 (7th Cir. 1993). McClain has not shown that any grounds may exist to dismiss the indictment as would be required to order additional disclosure of grand jury material.

McClain incorrectly argues that the government presented to the grand jury false allegations about his use of the terms "Our Friend" and "a friend of ours" to mean Michael Madigan, rather than using Madigan's name. As discussed above, McClain *admitted* that he used those terms to conceal Madigan's identity, so the government could not have committed any error in asking the grand jury to draw that inference. McClain mischaracterizes the allegation in the indictment as concealment to hide Madigan's identity as *to the government*, when the indictment puts no such limitation on his efforts to conceal. McClain's cryptic language was an obvious effort to conceal. There is certainly nothing false about the government's allegations that McClain used

---

[12] McClain also attempts to excuse his delay by stating "these interviews involved an investigation that had nothing to do with ComEd." Dkt. 141 at 4 n. 2. It is unclear how this point justifies the delay in McClain's untimely filing. If anything, it supports the argument that McClain's subsequent use of the terms "Our Friend" and a "friend of ours" in private conversation were intended to conceal Madigan's identity, as his interviews involved a completely separate investigation unrelated to this case.

these terms to conceal Madigan's identity and, likewise, no reason to suspect any error in the grand jury proceedings. The Court should deny McClain's motion to compel the production of grand jury materials.

## X.   McClain's Motion to Exclude Evidence Regarding Payments to a Thirteenth Ward Employee Should Be Denied (Dkt. 127).

Defendant McClain moves to exclude evidence concerning his efforts to arrange payments to a former Thirteenth Ward employee who was accused of sexual harassment, on the grounds that it is irrelevant and unfairly prejudicial. Dkt. 127 at 12-13. Because it is neither, this motion should be denied.

The government expects the evidence at trial will show that McClain requested that Individual FS-1 and other lobbyists make "consultant" payments to this former employee and Madigan associate after he was fired from the Thirteenth Ward and suggested that the former employee should generate a fake "report" to show the Internal Revenue Service. *See* Dkt. 112 at 108. In a conversation about these payments, McClain joked that he previously had five consultants on his roster and "all they really ever did was give me pieces of paper." *Id.* In fact, one of those consultants who just gave McClain a "piece of paper" was Individual 13W-3; McClain acted as intermediary for payments from ComEd to Individual 13W-3 (before he was moved to Doherty's contract), as part of the corrupt scheme to influence Madigan. This call and other evidence concerning payments to the former Thirteenth Ward employee demonstrate McClain's awareness of, and intention behind, using intermediaries and false reporting about the reasons for payments in order to conceal the true nature of payments made for Madigan's benefit. The payments are therefore relevant, as they provide direct evidence of defendant McClain's work arranging for and concealing financial payments to Madigan's associates, like the Thirteenth Ward

employee.[13] As the government will prove at trial, the defendants set up the same structure to funnel payments from ComEd to other Madigan allies, through Doherty and other intermediaries, which is highly probative as to defendants' knowledge and intent. Indeed, McClain himself acted as an intermediary to direct ComEd payments to Individual 13W-3.

This evidence is not unfairly prejudicial. The government does not intend to argue that McClain's efforts to fundraise on behalf of the former employee signal that he condones any sexual misconduct. If the Court were concerned about potential misinterpretation of this evidence by the jury, it could provide a limiting instruction to consider it strictly for proper purposes. *See, e.g., Bruce v. Levy Premium Foodservice Ltd. P'ship*, No. 3:16 C 2734, 2019 WL 11704226, at *5 (M.D. Tenn. Apr. 2, 2019) (denying motion *in limine*, reasoning that a limiting instruction that the case was not about sexual harassment, but about retaliation from sexual harassment complaints, was sufficient to clarify issues for the jury and reduce any prejudicial effect); *Newmark Realty Capital, Inc. v. BGC Partners, Inc.*, No. 16-cv-01702-BLF, 2018 WL 6439133, at *3 (N.D. Cal. Dec. 7, 2018) (while recognizing that discussion of sexual harassment "can stir the passions of the jury," concluding an instruction limiting the use of such evidence to relevant issues can sufficiently reduce potential prejudice).

In short, the payments McClain arranged for a former Thirteenth Ward employee are highly probative and not unduly prejudicial.

---

[13] To the extent that defendant McClain challenges this evidence on the basis that it is impermissible under Federal Rule of Evidence 404(b), it is likewise admissible for the same non-propensity purposes, as discussed below.

**XI.    The Court Should Deny Hooker and McClain's Motions to Exclude So-Called Rule 404(b) Evidence (Dkt. 128, 142).**

Defendant Hooker and McClain move to exclude what they characterize as Rule 404(b) evidence related to defendant McClain. Dkt. 128 at 9-11; Dkt. 142. Hooker and McClain seek to preclude evidence that McClain gave direction and advice regarding gaming legislation pending before the Illinois General Assembly on Madigan's behalf in 2018 and 2019. Hooker seeks to preclude evidence that McClain facilitated payments to the former Thirteenth Ward employee who had been accused of sexual harassment, as discussed above. Hooker argues both types of evidence are inadmissible against him under Federal Rules of Evidence 401, 402, and 403. Dkt. 128 at 9-11. McClain also moves to exclude evidence concerning: (1) Madigan's efforts to help secure a job for a representative's wife; (2) a conversation between Marquez and McClain concerning efforts to extract payments from another regulated entity; and (3) a conversation in which McClain discussed another consultant who was placed on the payroll of a local hospital. Dkt. 142 at 8-11. These motions should be denied.

**A.    Background**

*Thirteenth Ward Employee*. McClain's orchestration of payments to a fired Thirteenth Ward employee and Madigan associate are described above.

*Gaming Legislation*. Regarding gaming legislation, McClain was recorded on multiple calls giving direction to elected officials (including the bill's sponsor, who will testify at trial and who was also the sponsor of ComEd's FEJA legislation), Madigan's staff, and representatives of the Governor's Office on behalf of Madigan. In one call in 2019, McClain spelled out his role in the gaming legislation; "I'm sort of Madigan's agent, so like the hearings that are going on that [the bill sponsor] is running, um, I'm, I'm guiding [him] on those hearings." McClain Phone, Session 14470. Madigan also used McClain's cell phone to call his Chief of Staff about the gaming

bill, and asked her to confirm the bill's sponsor was an active participant in certain gaming hearings. McClain Phone, Session 24007. McClain followed up with the bill's sponsor after that and told the bill's sponsor that Madigan wanted him to be a major participant in the gaming hearings. McClain Phone, Session 24088.

*Helping a Representative's* Wife. During an intercepted phone call on July 2, 2018, McClain and Madigan discussed Madigan's efforts to help secure a job for an elected representative's wife. McClain Phone, Session 7531. According to Madigan, the representative "came to me and same story, he needs money, and he had the thought that maybe I could help his wife on something." Madigan explained, "one thought I had was with Jay Doherty. . . . And um not necessarily with ComEd, but I had the thought that I could actually put Jay Doherty on a retainer." Madigan added, "we'd tell [the representative] to prepare some monthly reports on what she's doing." McClain said, "Right, right." Madigan said, "So he's got it on file." *Id.*

*Another Utility Company.* On May 23, 2018, at approximately 10:12 a.m., McClain and coconspirator Fidel Marquez, who had not started cooperating with the government, discussed a conversation that Marquez had with a representative from another regulated utility, People's Gas. McClain Phone, Session 3204. Marquez told McClain, "So I get a call from [a gas company employee], you know who she is at [the gas company]?" Marquez then described how the gas company was getting "pushed really hard" to hire someone and that Marquez had told her to consider the hire. McClain said, "Good, perfect" and further commented, "Well, not everyone likes getting the calls, right?" Marquez said, "Yeah, I don't know if, I don't know that anybody likes it, but people need to understand, how, what's behind all this." Marquez further stated, "I says, 'That maybe one day you'll have an ask and this will be remembered.'" McClain responded, "Right exactly." In other words, Marquez relayed to McClain that he told the gas company executive that

it was important to hire people when asked to do so by Madigan, so that when you need to ask for official action in return, the public official would oblige. McClain said, "Right, exactly."

On May 23, 2018, at approximately 5:09 p.m., McClain related his conversation with Marquez to Madigan's son. McClain commented "I mean that's how the sys—this is, you can't be offended with that. Oh, so you got pressure too, are you kidding me? Yeah, we got pressure…." McClain Phone, Session 3282. Later in the conversation, McClain said, "I just love these people that, they are in a regulatory body, right? And they are offended when people ask for favors. Hello? Dumb shits." In this conversation, McClain referred to the concept of "pay-to-play," where businesses give benefits to public officials and their associates, with the expectation that, in the future, the business will receive favorable official action in the future. McClain further criticized the gas company representative for not recognizing that she needed to hire somebody because the gas company was – like ComEd – "in a regulatory body" subject to legislative oversight.

*Hospital Consultant.* In the same December 2018 phone call in which McClain and then-coconspirator Fidel Marquez discussed terminating ComEd's payments to certain of Doherty's subcontractors, McClain also discussed another consultant who was engaged for many years as a lobbyist for a Chicago hospital. McClain told Marquez that he told a hospital employee that he could terminate that contract, because "[y]ou can't ask a company to be donating $50,000 a year when the guy can't even really talk very well anymore… You're setting up your friends in order to protect your friend." McClain Phone, Session 17803.

### B. Rule 404(b) Does Not Apply.

To the extent Hooker and McClain suggest that these categories of evidence are inadmissible under Federal Rule of Evidence 404(b), they are wrong. The evidence is direct evidence of McClain's relationship with Madigan, and thus Rule 404(b) does not apply.

Specifically, evidence of McClain's role in shepherding gaming legislation through Springfield and giving direction to state employees and legislators on Madigan's behalf is evidence of the close relationship between Madigan and McClain and the trust Madigan placed in him with regard to sensitive matters, as well as of Madigan's personal involvement in those matters. Similarly, McClain's efforts to obtain payments for a close Madigan ally after he was fired demonstrates McClain's close relationship with Madigan and the importance of loyalty in Madigan's political world. And Madigan and McClain's discussion of putting a legislator's wife on Jay Doherty's payroll, with pretextual reports to be prepared by the legislator for Doherty's "file," are relevant to McClain's and Doherty's knowledge and intent, not other acts evidence; they show that Madigan and McClain were aware of Doherty's role as an intermediary to make payments to Madigan's associates, as well as an awareness that there was not a bona fide business relationship between Doherty and those hired at Madigan's request—individuals were placed with Doherty for the purpose of funneling money to Madigan associates. This call demonstrates Madigan and McClain were aware that Doherty acted as a home for those being paid at Madigan's direction.

And the hospital lobbyist call is similarly relevant to the ComEd conspiracy because it took place during the same call in which the JDDA subcontractors were discussed. In this call, McClain drew a clear comparison between the JDDA subcontractors who were paid by ComEd to influence Madigan and who did little or no work, with another lobbyist paid by a private entity who similarly did no work. This interception also demonstrates McClain's knowledge and awareness of the true purpose of payments made to the JDDA subcontractors—to benefit Madigan.

One of the gas company interceptions is between two conspirators in this case—Marquez and McClain—and is thus proof of McClain's understanding of the corrupt purpose and intent

underlying payments solicited from and made by regulated entities such as ComEd at the request of Madigan.

The work McClain did on Madigan's behalf in these and other contexts is thus direct evidence of the charged conspiracy, as this evidence helps to explain McClain's relationship with Madigan as his trusted agent and advisor. *See, e.g., United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010) (affirming admission of evidence that "helped establish the relationship among" gang members, "the rank of those men within the gang, and King's criminal intent," in a drug conspiracy case, which helped explain incriminating statements between the conspirators). This evidence is particularly probative here, because at least one of the defendants has suggested that McClain did not act on Madigan's behalf—this evidence is a direct and powerful refutation of that defense theory.

**C.     Even If Rule 404(b) Applies, These Events Are Admissible.**

Even if Rule 404(b) did apply, and it does not, McClain's role in these other contexts is admissible for non-propensity purposes. As stated above, evidence of McClain's efforts to raise funds for the former Thirteenth Ward employee accused of sexual misconduct would demonstrate to the jury McClain's work arranging for financial payments to Madigan's associates and his awareness and intention to employ methods to conceal the true nature of such payments. Indeed, in one of the same calls in which McClain described making payments to the Thirteenth Ward employee, he stated that he had concepts who just gave him "pieces of paper" in the past, which was a reference to McClain's payments on behalf of ComEd to Individual 13W-3, another Madigan associate from the Thirteenth Ward organization.

McClain's efforts to shake down another regulated entity and his laughter about it with Marquez is proof of McClain's understanding of the corrupt purpose and intent underlying payments solicited from and made by regulated entities such as ComEd at the request of Madigan.

McClain and Madigan's discussion of having a representative's wife potentially on the Doherty payroll who would prepare phony reports is further evidence of McClain's intent to conceal and knowledge of the nature of the corrupt payments in the context of this case.

In short, even if these communications are viewed as potential other act evidence, they are admissible for non-propensity purposes of demonstrating intent and knowledge.

**D.    The Challenged Evidence Is Not Unfairly Prejudicial.**

Hooker's primary argument is that this evidence should be excluded pursuant to Rule 403, because the evidence involves McClain's conduct, and is therefore irrelevant to the charges against *him*. Specifically, Hooker argues, "Both the alleged Gaming Legislation Evidence and the alleged K.Q. Consulting Evidence would never be introduced in a prosecution of Mr. Hooker alone." Dkt. 128 at 10. But an appropriate jury instruction would address this concern, as routinely is done in multi-defendant trials.

Hooker also raises potential "spillover" prejudice that the evidence involving McClain's prior conduct might have against him. Dkt. 128 at 11. Even if Hooker were correct that such evidence is not relevant to him, this argument lacks merit. When individuals are charged with participating in the same crime, they are ordinarily tried together even though the evidence might be stronger against one or some than others. *See United States v. Velasquez*, 772 F.2d 1348, 1352 (7th Cir. 1985). This is because "[t]he danger of prejudice to the least guilty, or perhaps prejudice to all from the sheer confusion of a multi-defendant trial, is in all but the most unusual circumstances considered outweighed by the economies of a single trial in which all facets of the

crime can be explored once and for all." *Id*. Hooker has not provided any reason why this trial presents any unusual circumstance that distinguishes it from any other trial in a multi-defendant case.

Lastly, Hooker cites *United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980), in support of his argument that the evidence involving McClain's other acts is unduly prejudicial to him, but that citation is unpersuasive. *See* Dkt. 128 at 11. In *Figueroa*, a divided panel of the Second Circuit reversed the convictions of two defendants because of prejudice resulting from the admission of prior crime evidence against a third. Notably, the court emphasized that its finding that the prior crime evidence was inadmissible even with respect to the defendant against whom it was offered impacted its assessment of undue prejudice. *Id*. at 947; *see also United States v. Moschiano*, 695 F.2d 236, 247 n.18 (7th Cir. 1982) (distinguishing *Figueroa* for the same reason).

McClain similarly claims that these other materials are unfairly prejudicial to him. Dkt. 142. But they are prejudicial because they demonstrate his corrupt intent, the key issue that will be in dispute in this case. They are thus highly probative as to the key issue in dispute. For the reasons previously stated, the evidence with which defendan-t Hooker and McClain take issue is admissible in this case and a limiting instruction can be given if appropriate.

## XII. Keisha Parker's Prepared Remarks Are Probative of ComEd Leaders' Relationship With and Motivations About Speaker Madigan (Dkt. 131).

Defendants Anne Pramaggiore and John Hooker move *in limine* for an order excluding evidence concerning remarks drafted by then-ComEd employee Keisha Parker for Pramaggiore to use in introducing then-Speaker Michael Madigan at a September 18, 2012 fundraiser for the Democratic Party of Illinois. Dkt. 131 at 14-23. These remarks, however, drafted by a member of the ComEd legislative team who worked to pass a key piece of legislation for ComEd in the Illinois General Assembly, are probative of how ComEd, and Pramaggiore and Hooker in particular,

perceived Madigan's value in enacting legislation it favored, and its probative value is not outweighed by the danger of unfair prejudice.

Parker joined ComEd in August 2006 as a communications specialist. In approximately 2008, Parker switched to ComEd's Governmental Affairs division. Hooker, as the ComEd Executive Vice President in charge of the Legislative and External Affairs, was Parker's supervisor. Parker also managed ComEd's Political Action Committee (PAC).

In 2010 and 2011, ComEd worked to secure the Illinois General Assembly's passage of the Energy Infrastructure Modernization Act (EIMA), or "SmartGrid." During this period, Parker spent more time in Springfield and became a registered lobbyist for ComEd so that she could interact with legislators. Pramaggiore, Hooker, and Parker, as well as other ComEd employees and lobbyists, worked to secure EIMA's passage. Parker understood from her work that Madigan's support for EIMA was extremely important.

In 2012, after EIMA was signed into law, Pramaggiore became Chief Executive Officer of ComEd. Hooker retired from ComEd and became a ComEd lobbyist. Parker continued to work in ComEd's Governmental Affairs division and as part of ComEd's PAC. Parker's PAC responsibilities in 2012 included coordinating ComEd fundraisers for the Democratic Party of Illinois, including one on September 18, 2012. Pramaggiore was one of the fundraiser's hosts. Parker's responsibilities with respect to this fundraiser included raising voluntary contributions from inside and outside ComEd and Exelon, arranging for speakers, and formulating the agenda of events. In July 2012, defendant Michael McClain confirmed with Parker that Madigan would attend the September 18, 2012 fundraiser. (EXE00422011.) Pramaggiore was designated as the ComEd representative who would introduce Madigan at the event.

On September 14, 2012, four days before the fundraiser, Parker emailed an update about the fundraiser to Pramagiorre, Fidel Marquez, and their assistants. (EXE00348564.) The email contained as attachments a list of key attendees, a proposed order of events, and draft remarks for Pramaggiore to use in her introduction of Madigan. (EXE00348565-EXE00348566.) The remarks acknowledged the role of the Democratic Party of Illinois (which Madigan led) as a statewide organization and the important roles played by DPI and Madigan in the success of the SmartGrid legislation. The remarks included, in pertinent part, the following suggested bullet-pointed statements for Pramaggiore to make when introducing Madigan:

- Last year, during the 2011 Session, we discussed the need to move the energy industry into a new direction to enable us to deliver on our promise of innovation for our customers, and adapt our business to the digital age of the 21st Century.
- Those discussions led to the formulation of what we call our Formula Rate and Smart Grid legislation.
- Once the Speaker and his Leadership team felt confident they could support the policy and approach of that bill, his leadership was the main ingredient to our success at navigating that legislation through the General Assembly.

EXE00348566 (emphasis in original).

The indictment charges Pramaggiore and Hooker with participating in a conspiracy to, among other things, corruptly give, offer, and agree to give jobs, contracts, and monetary payments associated with those jobs and contracts, for the benefit of Madigan as the Speaker of the Illinois House of Representatives (Dkt. 1 at 9, ¶ 1(u)), and his associates, with intent to influence and reward Madigan in connection with legislation affecting ComEd and its business. *Id.* at 12, ¶ 2(b). According to the indictment, the conspiracy operated between in or around 2011 and in or around 2019. *Id.* at 11, ¶ 2. As alleged in the indictment, during this period, ComEd's legislative team worked to pass EIMA. *See id.* at 7, ¶ 1(p).

Pramaggiore and Hooker have moved to exclude the remarks drafted by Parker for Pramaggiore's use, arguing that, because Parker is not charged in this case, her opinions and beliefs concerning Madigan are not relevant. Dkt. 131 at 15. Their argument lacks merit.

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action. Fed. R. Evid. 401. ""To be relevant, evidence need not conclusively decide the ultimate issue in a case, nor make the proposition appear more probable, 'but it must in some degree advance the inquiry.'" *E.E.O.C. v. Indiana Bell Telephone Co.,* 256 F.3d 516, 533 (7th Cir. 2001).

Parker did not draft herself all of the remarks Parker circulated as part of the September 14, 2012 email and Parker does not recall speaking directly with Pramaggiore about the remarks. Parker compiled the remarks based in part on input she received from other internal ComEd departments. Parker circulated the remarks to Pramaggiore and others on September 14, 2012 because the remarks reflected the sentiments of ComEd at the time and because Parker knew ComEd was okay with the remarks as drafted. Parker also knew the importance of Madigan's role with EIMA from her own involvement with the ComEd legislative team. *See* Fed. R. Evid. 701(a); *United States v. Westerfield*, 714 F.3d 480, 487 (7th Cir. 2013) (lay witness may testify about his own perceptions and observations); *United States v. Curescu*, 674 F.3d 735, 740 (7th Cir. 2012) (noting that "one is often able to infer, from what the person says or from the expression on his face or other body language, what he is thinking").

Parker will testify that the draft remarks she prepared and compiled reflected those views as she understood them from her own experience and from the input she received from within ComEd; thus they are probative of Pramaggiore's motivation, and the motivation of the other coconspirators, to influence and reward Madigan in connection with legislation affecting ComEd

and its business during the period of the charged conspiracy. Parker is an appropriate witness through whom to offer these remarks because of her informed knowledge about the views of ComEd as to the value of Madigan's role in getting the EIMA legislation passed. Parker's remarks are probative and relevant to the case.

Pramaggiore and Hooker argue that Parker's remarks should be excluded because that there is no evidence that Pramaggiore read or agreed to present Parker's proposed remarks, or that Pramaggiore delivered the remarks unaltered at the September 18, 2012 fundraiser. Dkt. 131 at 16. This type of evidence, however, is not necessary because government is not seeking to admit the remarks as an adopted admission by Pramaggiore pursuant to Rule 801(d)(2)(B). The remarks are also not offered for their truth but instead as evidence of Parker's informed understanding of Pramaggiore's state of mind regarding Madigan's role with respect to EIMA. *See United States v. Leonard-Allen,* 739 F.3d 948, 954 (7th Cir. 2013).

Pramaggiore and Hooker claim that, even if Parker's remarks are relevant, the introduction of the remarks would be unfairly prejudicial because there is a serious risk that the jury would conflate Parker's remarks with Pramaggiore's own opinions about Madigan. Dkt. 131 at 16. This, the defendants argue, would allow the jury to decide the case against Pramaggiore based on how Parker, and not Pramaggiore, viewed Madigan's value.[14] *Id.* There is no danger here of unfair prejudice. Parker's testimony will make clear that although Parker viewed the remarks as consistent with Pramaggiore's views as she understood them, she, not Pramaggiore, drafted the

---

[14] Defendants cite *Old Chief v. United States*, 519 U.S. 172, 180 (1997), and *Thompson v. City of Chicago,* 472 F.3d 444, 456-57 (7th Cir. 2006), for the broad proposition that it is unfairly prejudicial to a defendant if some evidence, while relevant, might cause the jury to find guilt on a ground different from proof specific to the offense charged. There is no such risk here. Parker's remarks are tethered specifically to her knowledge—based on her own observations—that Pramaggiore and other members of the ComEd team viewed Madigan as integral to the passage of the EIMA legislation. Pramaggiore's and Hooker's efforts to influence Madigan, given his central role to its legislation, are one of the central issues in the case.

remarks, and Parker gave the remarks to Pramaggiore to consider. The jury will easily be able to keep Parker's remarks in their appropriate context and assess them together with other evidence of the relevant state of mind of the defendants.

## XIII. The Court Should Deny McClain, Pramaggiore, and Hooker's Motion to Exclude Evidence Regarding Campaign Contributions (Dkt. 131).

Defendants McClain, Pramaggiore, and Hooker argue that evidence of campaign contributions to Michael J. Madigan, Friends of Michael J. Madigan, and the Democratic Party of Illinois are irrelevant because they are legal. Dkt. 131 at 20-23. The government does not dispute that campaign contributions generally are protected by the First Amendment. *See Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1653 (2002). This, however, does not mean that they are irrelevant.

Count One of the indictment alleges that defendants conspired to confer a stream of benefits on Madigan, intending to corruptly influence and reward Madigan's efforts to assist legislation beneficial to ComEd's business. Dkt. 112 at 15. An overt act of a conspiracy may be lawful. *See* William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit, Instruction 5.08(A) Conspiracy—Overt Act Required (2022)[15]; *see also United States v. Palivos*, 486 F.3d 250, 258 (7th Cir. 2007) (stating that jury instructions on conspiracy containing the instruction that "the overt acted proved may itself be a lawful act" "fairly and accurately informed the jury of the elements of the crime"); *see also United States v. Watson*, 594 F.2d 1330, 1341 (10th Cir.), *cert. denied*, 444 U.S. 840 (1979) ("the requisite overt act need not be criminal in itself."). While campaign contributions and fundraising efforts designed to curry favor with Madigan may have been lawful standing alone, they serve to demonstrate the close and cozy relationship Madigan

---

[15] The Seventh Circuit Pattern Jury Instructions are presumed to accurately state the law. *United States v. Foy*, 50 4th 616, 623 (7th Cir. 2022).

cultivated with ComEd and will refute defense theories (which have been previously advanced to the government) that Madigan did not trust or wish to associate with ComEd. On the contrary, the evidence of campaign contributions and events hosted for Madigan's benefit serves to illustrate the close relationship Madigan maintained with ComEd and helps demonstrate that Madigan and ComEd acted in unison with respect to legislative matters and goals.

## XIV. The Government Will Not Elicit Evidence of the ComEd DPA Unless A Defendant Opens the Door (Dkt. 131).

Defendants jointly move to exclude evidence or argument concerning the deferred prosecution agreement against ComEd in Case Number 20 CR 368, in which the company agreed to pay $200 million as a criminal penalty. Dkt. 131.

Reference to the ComEd DPA is proper in this case. For example, if a defendant suggests that the company, rather than the defendants, are culpable for the crimes alleged in the indictment (or that the company or its employees are simply seeking to point the finger at the defendants), the government should be permitted to elicit the fact that ComEd cooperated with the government in its investigation pursuant to the DPA and accepted responsibility for the defendants' criminal conduct. The DPA is also relevant to the testimony of certain ComEd and Exelon employees, as the DPA requires truthful testimony of the company's employees and demonstrates their motivation for testifying truthfully. For all of these reasons, the ComEd DPA may be relevant at trial.

## XV. The Government Will Not Elicit Evidence of the Indictment Against Madigan Unless A Defendant Opens the Door (Dkt. 127).

McClain seeks to exclude reference to the 2022 indictment of Michael Madigan and Michael McClain in Case Number 22 CR 115. Dkt. 127 at 7-10. In principle, the government does not wish to refer to the separate Madigan indictment at trial, but the government may be required

to do so if a defendant opens the door or otherwise puts it in issue. For example, from conferences with counsel, it appears defendant Doherty may argue or elicit as part of his defense that Madigan was not charged in this case and is not being called as a witness by the government in this trial. In the event this or a similar argument is permitted (the government does not believe it is proper), the government should be permitted to elicit the fact that Madigan was, in fact, charged in a criminal action for the same and other similar conduct to explain why he will not appear as either a defendant or witness at trial. Without this information, the jury would be invited to speculate about the reasons Madigan is not on trial.

The government agrees with McClain's suggestion that any such examination or argument be limited to evidence of separate charges against Madigan, without reference to those separate charges against McClain. Dkt. 127 at 8-9. This would avoid any of the prejudice concerns raised by McClain.

## XVI. Other Motions Should Be Denied As Moot.

The motions discussed below should be denied as moot. The government does not object to defendant McClain's motions to bar evidence and argument concerning an alleged rape in Champaign, Illinois and the deferred prosecution agreement against AT&T Illinois in Case Number 22 CR 525 (N.D. Ill.). Dkt. 124.

The government will not elicit evidence of a fundraiser for former Chicago Alderman Ed Burke. Dkt. 131 at 23. The government has agreed to redact certain recordings as requested by the defendants.

The government will not make improper comments on any defendant's decision not to testify, as requested by McClain. Dkt. 125. The government notes, however, that, so long as its comments do not implicate the defendant's right against self-incrimination or misstate the burden

of proof, the government is permitted to discuss the lack of evidence supporting factual and legal theories offered by any defendant. *See United States v. Tucker*, 714 F.3d 1006, 1014-15 (7th Cir. 2013) (prosecutor's comment characterizing the proceedings as "nine witnesses against [defendant]" was not improper); *United States v. Glover*, 479 F.3d 511, 520 (7th Cir. 2007) ("If the evidence at issue does not implicate a defendant's right against self-incrimination, and the jury has been properly instructed as to the burden of proof, a prosecutor may comment on a defendant's failure to present evidence contradicting the government's proof at trial."); *United States v. Miller*, 276 F.3d 370, 374 (7th Cir. 2002) ("[A]s long as it is clear to jurors that the government carries the burden of proof, the prosecutor may tell the jury that a defendant has the power to subpoena witnesses."). The government intends to follow the law in this area.

## **CONCLUSION**

For the reasons stated above, the government respectfully asks the Court to deny the defendants' challenged motions *in limine*.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Amarjeet S. Bhachu*
AMARJEET S. BHACHU
DIANE MacARTHUR
SARAH STREICKER
JULIA K. SCHWARTZ
Assistant United States Attorneys
219 South Dearborn Street
Fifth Floor
Chicago, Illinois 60604
(312) 353-5300