UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 20 CR 812 |
| -v- | ) | |
| | ) | Honorable Harry Leinenweber, |
| MICHAEL MCCLAIN, *et al.*, | ) | Judge Presiding |
| | ) | |
| Defendants. | ) | |

**DEFENDANT JOHN HOOKER'S MOTION FOR
<u>JUDGMENT OF ACQUITTAL AS TO ALL COUNTS</u>**

JOHN HOOKER ("Hooker"), by counsel, pursuant to Rule 29 of the Federal

Rules of Criminal Procedure renews and supplements his previous request for a

judgment of acquittal made at the close of the government's case and moves for a

judgment of acquittal at the close of all the evidence before the case is submitted to

the jury.[1] The following is offered in support of this motion.

## I.     Motion for Judgment of Acquittal Pursuant to Rule 29

Rule 29 requires the entry of a judgment of acquittal where "after viewing the

evidence in the light most favorable to the United States, the trial court finds that

no rational trier of fact could have found the essential elements of the crime beyond

a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v.*

---

[1] At the close of the government's case, Hooker moved for a judgement of acquittal pursuant to Rule 29 as to all counts as set forth in the title and subtitles of the motion. Count Eight, the bribery count, was inadvertently included as part of the false records counts. Nonetheless, the motion argued insufficiency of the evidence as to any intent to bribe Michael Madigan. Rule 29 permits a motion for judgment of acquittal at the close of the evidence and as such Hooker renews the prior motion as to all counts and explicitly includes an argument of Count Eight here. In addition, Hooker adopts and incorporates by reference all applicable arguments advanced by the other defendants.

*Brown*, 2021 WL 1561854 at \*1. A "sufficiency of the evidence standard does not require the defendant to demonstrate that no evidence at all supports the conviction, but rather that the evidence cannot support a finding of guilty beyond a reasonable doubt." *United States v. Rahman*, 34 F.3d 1331, 1337 (7th Cir. 1994). While a defendant is not required to prove there is no evidence, the government cannot satisfy its burden with a "mere modicum" of evidence. *Id; Jackson*, 443 U.S. at 320.

## II. The Government has failed to prove Hooker's membership in a conspiracy or corrupt intent to participate in a conspiracy to bribe Michael Madigan in connection with ComEd legislation.

The Government failed to present any evidence that Hooker joined a conspiracy or acted with corrupt intent to influence Michael Madigan ("Madigan") in connection with ComEd legislation.

### A. The JDDA subcontractors

The principal thrust of the Government's case against Hooker revolves around the placement of Frank Olivo ("Olivo") and Raymond Nice ("Nice") under the Jay D. Doherty and Associates ("JDDA") contract in 2011. Olivo was placed on the JDDA contract in August 2011, only seven months prior to Hooker's retirement from ComEd. Nice was placed on the contract weeks before Hooker's retirement and, according to the Government's accounting records, was not paid until after Hooker left ComEd. Both Olivo and Nice were highly qualified to work as lobbyists. Olivo was a former alderman with over 15 years of experience, and Nice had spent decades working on Cook County matters. Both lobbyists were registered with

either the City of Chicago or Cook County, defeating the Government's claim that these hires were a secret. Contrary to the Government's speculation, Hooker testified he expected the subcontractors to work.

Hooker's retirement on March 1, 2012, divested him of any authority to approve or bind ComEd to subcontractor arrangements. The Government's strenuous effort to link Hooker to the JDDA contract renewal in December 2012 is belied by the fully executed contract signed by Fidel Marquez ("Marquez"). Hooker had no input as Marquez testified he never spoke with Hooker about the subcontractors until after Marquez was cooperating with the government in 2019, despite learning that Olivo and Nice were subcontractors on the JDDA contract in June of 2013. Mamie Takagi's email offers little support to the Government's argument as it failed to call her as a witness and her own email makes clear that any alleged verbal approval by Hooker was irrelevant since Takagi still had to go to the CEO's office for approval. Keisha Parker, Tracey Favre, and Fidel Marquez all testified Marquez possessed the authority to approve and renew contracts on behalf of ComEd after March 1, 2012.

In 2014, Marquez added Edward Moody ("Moody") as a subcontractor on the JDDA contract. Marquez testified there was no discussion with Hooker about adding Moody nor is there any evidence that Hooker was aware of Moody being added as a subcontractor. Likewise, when Michael Zalewski ("Zalewski") was added as a subcontractor on the JDDA contract, Hooker was not involved. In a 2018 call, McClain tells Hooker about Zalewski's inclusion in the JDDA contract, however, the

context of the call makes clear that McClain is simply relaying information. When McClain goes on to say it is Doherty's responsibility to determine whether work occurred, Hooker is listening to McClain, but he has no authority regarding the hiring of Zalewski. The call noticeably omits any reference to whether the subs Hooker added in 2011 – Olivo and Nice – are even still on the contract. Any inference that Hooker was aware of such a fact is pure speculation.

None of the taped conversations involving Hooker reveal that he ever intended to bribe or conspired to bribe Madigan. At best, the recorded conversations show Hooker's awareness of subcontractors on the JDDA contract, but beyond the mention of Zalewski, the recorded conversations say nothing of which subcontractors were then on the JDDA contract, how long they had been on the contract, or whether or not they were working. Mere knowledge of subcontractors on the JDDA contract is insufficient to establish corrupt intent.

Furthermore, Hooker's manner of speaking in phrases is not evidence of illegal activity. Getting "a leg up" to obtain access or goodwill is not illegal. Saying "it's clean for all of us" to refer to placing subcontractors on Doherty contract – and getting your boss's approval – so you do not have to directly take on more work is not illegal. The Government's attempt to weaponize Hooker's lifelong use of phrases, or "Hookerisms", does not equate to corrupt or unlawful intent.

Placing subcontractors under existing contracts was common within ComEd. Marquez placed Anazette Collins and Lula Ford under Hooker's contract. Later, Hooker's subcontract with Awerkamp and McClain was approved by Tom O'Neill

4

("O'Neill"), the general counsel. Neither Marquez nor O'Neill believed it was improper to place subcontractors on existing ComEd lobbying contracts.

Most importantly, the Government has provided no evidence that Hooker hired Olivo or Nice with the corrupt intent to influence Madigan in connection with ComEd legislation in Springfield. To the contrary, Marquez's secret recording of Hooker at the Union League Club on January 29, 2019 confirms Hooker's belief that any subcontractors were working. At the meeting, Marquez said he needed to clear the arrangement with Joe Dominguez ("Dominguez"), the new CEO, because the contract was under the CEO's budget. Marquez never inferred there was anything nefarious about the arrangement and from Hooker's perspective, there was nothing secretive about it as the subcontractors were hired with the approval of his boss, Frank Clark, who was CEO at the time. Hooker recommended being direct and transparent with Dominguez, saying "you oughta have a write up on each one. Who they are. What they do." Gov. Ex. 118-T. The Government points to the fact that Hooker never suggested simply finding out what legitimate work the subcontractors performed as evidence of guilt, but the actual evidence clearly shows he did exactly that. Hooker suggested Marquez do a write up on each subcontractor and the work they performed. As the Senior Vice President of Legislative Affairs, this is information that Hooker rightly assumed Marquez would know and be able to provide. Hooker no longer worked internally at ComEd, and thus had no reason to know the identity or workload of the subcontractors, but because Hooker believed

the subcontractors would perform work, he envisioned Marquez would have that same understanding and be able to easily provide a written outline to Dominguez.

Marquez never identified the subcontractors by name or referenced that Olivo and Nice were still on the contract. It was Marquez's job to review and renew the contract as evidenced by his role at ComEd and the December 2012 agreement. Since Marquez never spoke to Hooker about the subcontractors prior to this meeting, and never named them during the meeting, there is no evidence that Hooker would know Olivo and Nice remained on JDDA.

Most notably, Marquez never confirmed Hooker's knowledge the subcontractors were not working. Despite meeting with Hooker for over an hour and a half, Marquez never broaches the topic. The following month, Marquez made another video recording of a meeting with Hooker and again failed to mention the subcontractors allegedly did not work. Marquez omitted this critical fact because he knew Hooker was unaware. Hooker already told Marquez to be honest and transparent about the subcontractors with Joe Dominguez as Hooker had done with Frank Clark in 2011.

The Government has failed to draw any connection between the hiring of subcontractors recommended by Madigan and ComEd legislation pending in Springfield. The best the Government can do is vaguely assert that these events occurred around the same time period. Mere temporal proximity is nowhere near enough to convict Hooker of bribing or conspiring to bribe Madigan. As O'Neill made clear, at the time the Reyes-Kurson contract was executed, Madigan, Senate

6

President Cullerton, and numerous other stakeholders were already in favor of the bill. Similarly, when Hooker was contacted about Olivo and Nice, EIMA had already passed the house months earlier. While the veto override was needed, the wave of support for the legislation made any alleged bribery of Madigan a moot point since so many legislators, stakeholders, and businesses supported the bill. In addition, FEJA was a coalition bill that was not initiated by ComEd. At best, the Government has shown legal attempts to create goodwill with Madigan and that, in the span of seven years, ComEd also passed favorable legislation in Springfield.

The existence of these two facts does not equate to a bribery conspiracy without evidence of corrupt intent.

### B. Reyes-Kurson Law Firm

Hooker denied telling O'Neill that the Reyes-Kurson law firm "had" to be hired. Nonetheless, O'Neill admitted Hooker never told him why it was important. According to O'Neill, he already decided to hire the firm months earlier after Darryl Bradford and Frank Clark recommended it. O'Neill met with the firm and believed it would be a good fit and meet diversity objectives. As general counsel, O'Neill already made the decision to hire Reyes-Kurson, a decision that was solely in his discretion, prior to any meeting with Hooker. According to O'Neill, hiring the law firm was not a bribe because at the time of hire, both Madigan and Senate President Cullerton had already committed to EIMA. Consistent with ComEd's lobbying strategy, building a coalition would have made it impossible for Madigan to withdraw his support at that time.

7

The crux of the government's claim regarding Reyes-Kurson centers around the renewal of the contract in 2014 and 2016 when the firm wanted a set amount of hours in billable work. There is no evidence Hooker had any involvement, knowledge, or opinion regarding the renewal. Moreover, the hours of the firm were diminished, with no repercussion by Madigan.

### C.    Interns and Job Recommendations

Hooker had no input or knowledge of the 13th Ward interns being hired by ComEd as Marquez testified that Hooker was not involved in the summer internship program. While McClain included Hooker in some emails related to job recommendations, being copied on an email is woefully insufficient to prove criminal intent and participation in a crime. Moreover, there is nothing improper about acting on job recommendations as the Government failed to connect this evidence with the passage of legislation.

### D.    Juan Ochoa Board Seat

There was no evidence Hooker was aware of, much less participated in, naming Juan Ochoa to the Board of ComEd.

## II.    The Government has failed to prove Hooker bribed Michael Madigan as alleged in Count Eight.

There is no evidence Hooker corruptly offered a new annual JDDA contract in 2019 by adding Frank Olivo, Raymond Nice, and Michael Zalewski as subs for the benefit of Madigan in connection with legislation. As argued more fully above, Hooker had been an external lobbyist for seven years with no authority to bind ComEd. After March 1, 20212, he had no specific information about the

continuation of Doherty subcontractors, the identity of the subs, how long they had been on the contract, or whether or not they were performing any work on behalf of ComEd. The government offered no evidence of Hooker's involvement, knowledge, or corrupt intent to bribe Madigan in 2019 as charged in Count Eight, nor that any conduct was performed in connection with the passage of legislation. The evidence falls miles short of proving any criminal conduct on Hooker's behalf.

## III. The Government has failed to prove Hooker willfully falsified records in Counts Three, Four, Seven, and Nine.

Counts Three, Four, Seven, and Nine charge records violations under 15 U.S.C. §§ 78m(b)(5) and 78ff(a). As such, the government must prove beyond a reasonable doubt the defendant acted both willfully and knowingly. *United States v. Jensen*, 532 F. Supp. 2d 1187, 1191 (N.D. Cal. 2008). Here, the government failed to present any evidence of John Hooker's personal participation in any acts involving the renewal of the JDDA contract in 2017, 2018, or 2019. Hooker retired from ComEd on March 1, 2012. He had no responsibility, authority, input, or knowledge of the JDDA contracts during that time. Hooker never advised anyone not to disclose the subcontractors. Hooker understood that Marquez would review and renew the contracts annually and, in fact, Marquez did so, approving the first JDDA renewal in December 2012. There was no evidence Hooker participated or knew about the creation of ComEd records in 2017 through 2019 — over five years after he retired. On the contrary, there was testimony from multiple witnesses, including Keisha Parker, Tracy Favre, Anne Pramaggiore, and Marquez that Hooker had no

authority to hire lobbyists or to approve any internal ComEd contracts after his retirement on March 1, 2012.

These offenses cannot be proven under the theory that Hooker aided and abetted the falsification of these records by creating the JDDA subcontractor arrangement in 2011, five years before the earliest charge. As argued above and evidenced at trial, Hooker placed Olivo and Nice on Doherty's contract because it allowed him to honor a request without having to personally oversee their lobbying activities. As Hooker testified, he had announced his retirement and was in charge of multiple departments and over three hundred employees, effectively doing the work of two employees. He also disclosed the arrangement to his boss, Frank Clark, the CEO of ComEd.

There was no evidence Hooker knew the subcontractors he added to the contract in 2011 remained on the contract five to seven years later. Marquez never discussed the subcontractors with Hooker prior to his cooperation, and even once he began recording his meetings with Hooker, there was no identification of the subs or whether or not they worked. Doherty's comment that Hooker contacted him about the subs every few months is belied by the lack of phone records and Hooker's denial. Likewise, the Mamie Takagi emails where Doherty indicates Hooker approved the subcontractors in December 2013 is directly contradicted by the fact that Mamie still required approval from the CEO's office before the contract was ultimately approved by Marquez.

In the context of this case, aiding and abetting requires proof of a securities law violation by a primary violator, rendering of substantial assistance to the primary violator, and knowledge of the primary violation on the part of the aider and abettor. *E.g., SEC v. Espuelas,* 905 F.Supp.2d 507, 517 (S.D.N.Y. 2012); *In the Matter of Lemmerman,* 1991 SEC LEXIS 2192. Hooker rendered no assistance to the alleged primary violators as he had no knowledge or control over the internal documents or JDDA subs once he retired.

WHEREFORE, Defendant respectfully requests the Court enter a judgment of acquittal for John Hooker on Counts One, Three, Four, Seven, Eight, and Nine of the Indictment.

Respectfully submitted,

JOHN HOOKER

By:     /s/ Jacqueline S. Jacobson
        One of his attorneys

Michael D. Monico
Barry A. Spevack
Jacqueline Jacobson
Ryan Mitsos
MONICO & SPEVACK LLC
53 West Jackson Blvd.
Suite 1315
Chicago, IL 60604
312-782-8500

Susan M. Pavlow
53 West Jackson Blvd.
Suite 1215
Chicago, IL 60604
312-322-0094

Attorneys for John Hooker

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of April, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Ryan W. Mitsos
Monico & Spevack
53 W. Jackson Blvd., Suite 1315
Chicago, Illinois 60604
(312) 782-8500