IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,               )
                                        )
                    Plaintiff,          )
                                        )
        -vs-                            )    No. 20 CR 812-1, -2, -3,
                                        )    and -4
MICHAEL McCLAIN, ANNE                   )
PRAMAGGIORE, JOHN HOOKER,               )
and JAY DOHERTY,                        )    Chicago, Illinois
                                        )    April 13, 2023
                    Defendants.         )    2:00 p.m.

VOLUME 18-B
TRANSCRIPT OF PROCEEDINGS - Trial
BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

APPEARANCES:

For the Government:     HON. MORRIS O. PASQUAL
                        ACTING UNITED STATES ATTORNEY
                        BY:  MR. AMARJEET SINGH BHACHU
                             MS. SARAH E. STREICKER
                             MS. DIANE MacARTHUR
                             MS. JULIA K. SCHWARTZ
                        219 South Dearborn Street, Suite 500,
                        Chicago, Illinois  60604
                        (312)353-5300

For Defendant           GREENSFELDER, HEMKER & GALE, PC
McClain:                BY:  MR. PATRICK J. COTTER
                             MR. DAVID P. NIEMEIER
                        200 West Madison Street
                        Suite 3300
                        Chicago, Illinois  60606
                        (312) 345-5088

Court Reporter:

                    CHARLES R. ZANDI, CSR, RPR, FCRR
                         Official Court Reporter
                       United States District Court
                219 South Dearborn Street, Room 2118
                       Chicago, Illinois  60604
                      Telephone:  (312) 435-5387
                email:  Charles_zandi@ilnd.uscourts.gov

4219

```
1    APPEARANCES:   (Continued)

2    For Defendant            SIDLEY AUSTIN, LLP
     Pramaggiore:             BY:   MR. SCOTT R. LASSAR
3                                   MR. DANIEL C. CRAIG
                                    MS. JENNIFER M. WHEELER
4                                   MS. EMILY A. ROSENBERG WOODRING
                              One South Dearborn Street
5                             Chicago, Illinois  60603
                              (312) 853-7668
6

7    For Defendant Hooker:    MONICO & SPEVACK
                              BY:   MR. MICHAEL D. MONICO
8                                   MS. JACQUELINE S. JACOBSON
                                    MR. RYAN W. MITSOS
9                             20 South Clark Street
                              Suite 700
10                            Chicago, Illinois  60603
                              (312) 782-8500
11

12                            LAW OFFICES OF SUSAN M. PAVLOW
                              BY:   MS. SUSAN M. PAVLOW
13                            53 West Jackson Boulevard
                              Suite 1215
14                            Chicago, Illinois  60604
                              (312) 322-0094
15

16   For Defendant            LAW OFFICES OF GILLESPIE AND
     Doherty:                 GILLESPIE
17                            BY:   MR. MICHAEL P. GILLESPIE
                              53 West Jackson Boulevard
18                            Suite 1062
                              Chicago, Illinois  60604
19                            (312) 588-1281

20                            MS. GABRIELLE R. SANSONETTI
                              53 West Jackson Boulevard
21                            Suite 1062
                              Chicago, Illinois  60604
22                            (312) 588-1281

23

24

25
```

1    (Proceedings in open court.  Jury out)

2         MR. COTTER:  Your Honor, I learn every day that I'm

3    in this courtroom.  And I used my time to rethink my cross,

4    and I have no further questions.  So I'll just put that on the

5    record.

6         THE COURT:  All right.

7         MR. COTTER:  Okay.

8         THE COURT:  So who is next then?

9         MR. COTTER:  I don't --

10        MS. JACOBSON:  There is no cross on behalf of John

11   Hooker.

12        THE COURT:  Ms. Jacobson, you'll go next.  Is that --

13        MS. JACOBSON:  No, no.  We have no cross.  We have no

14   cross.

15        THE COURT:  Okay.

16        MS. JACOBSON:  We are finito.

17        Ms. Sansonetti, do you have questions?

18        MS. SANSONETTI:  Just a couple of stipulations to

19   read through him.

20        THE COURT:  All right.  Then go to the cross.

21        MR. BHACHU:  Stipulations through the witness?

22        MS. SANSONETTI:  Well, now with this witness, it

23   makes sense to read them.

24        MR. BHACHU:  Is the witness going to stipulate?

25        MS. SANSONETTI:  Yes, to everything I want him to

 1   say.
 2     (Discussion off the record)
 3              MR. COTTER:  Judge?  Your Honor?
 4              THE COURT:  Yes.
 5              MR. COTTER:  When the jury comes back, would you like
 6   me to just on the record say "I have no further questions"?
 7              THE COURT:  I'll say -- yes.  And then you can say,
 8   "I have no further questions."
 9              MR. COTTER:  Right.
10              THE COURT:  And they'll say, Oh, thank God.
11              Everybody is getting along.  That's good.
12              MS. SANSONETTI:  Amar is not that funny.  I'm just a
13   little punchy.
14              MR. BHACHU:  She's had to endure me for like a
15   decade, so at this point --
16              MS. SANSONETTI:  That's true.
17              MR. MONICO:  Are you saying Amar has a sense of
18   humor?  Really?
19              MS. SANSONETTI:  I just laugh at him.
20              MR. MONICO:  I find that hard to believe.
21     (Jury in)
22              THE COURT:  Please be seated.
23              Mr. Cotter, any further questions on behalf of
24   Mr. McClain?
25              MR. COTTER:  No, Your Honor, not at this time.  Thank

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 5 of 127 PageID #:6694
Dominguez - cross by Sansonetti
4222

1    you.

2              THE COURT:  Okay.  Ms. Sansonetti, do you have some

3    questions?

4              MS. SANSONETTI:  Judge, just really quickly.

5         JOSEPH DOMINGUEZ, DEFENDANT PRAMAGGIORE'S WITNESS,

6                        PREVIOUSLY SWORN

7                       CROSS-EXAMINATION

8    BY MS. SANSONETTI:

9    Q.  Good afternoon.  I'm Gabrielle Sansonetti.  I represent

10   Jay Doherty.  I just have a couple of stipulations to read.

11             The first one is, you talked about the Chicago

12   Franchise Agreement.  Jay Doherty's Exhibit DX-3007 --

13             MS. SANSONETTI:  If we can put that up on the screen.

14   BY MS. SANSONETTI:

15   Q.  -- is a true and accurate copy of a contract entered into

16   by ComEd and the City of Chicago called the Chicago Franchise

17   Agreement.

18             MS. SANSONETTI:  You can publish that for the jury.

19   BY MS. SANSONETTI:

20   Q.  Have you seen the Chicago Franchise Agreement?

21   A.  I have.

22   Q.  Okay.

23             MS. SANSONETTI:  If you could just scroll through.

24   BY MS. SANSONETTI:

25   Q.  Just it looks to be the Chicago Franchise Agreement, does

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 6 of 127 PageID #:6695
Dominguez - cross by Sansonetti
4223

1   it not?

2   A.  Yes.

3   Q.  Okay.  Thank you.

4        And then I had a second stipulation.

5        You testified about providing campaign contributions

6   on behalf of ComEd to public officials?

7   A.  Yes.

8        MS. SANSONETTI:  Defendant Doherty Stipulation

9   Number 6:

10       "If called to testify, Mr. Newman, the custodian of

11  records at the Illinois State Board of Elections, would

12  testify that a diligent search of the State Board of Elections

13  system of electronic reporting records from the time frame

14  2011 to 2019 revealed no contributions were made to Illinois

15  political committees by Jay Doherty, Jay D. Doherty or Jay D.

16  Doherty & Associates."

17       So stipulated?

18       MR. BHACHU:  So stipulated.

19       MS. MacARTHUR:  So stipulated.

20       THE COURT:  Is that it?

21       MS. SANSONETTI:  That's it.

22       THE COURT:  On behalf of Mr. Hooker, any questions?

23       MR. MONICO:  No, Your Honor.  No questions.

24       THE COURT:  Okay.

25       Cross-examine, Mr. --

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 7 of 127 PageID #:6696
Dominguez - cross by Bhachu
4224

1    MR. BHACHU:  Could we actually have that franchise
2    agreement up on the screen again real quick that was just
3    showing.
4                    CROSS-EXAMINATION
5    BY MR. BHACHU:
6    Q.  Sir, the date of this Defense Exhibit 3007, it says it's
7    effective January 1, 1992, right?
8    A.  It's not up on my screen.
9    MR. BHACHU:  Could we publish that exhibit.  Thank
10   you.
11   BY THE WITNESS:
12   A.  Yes.
13   BY MR. BHACHU:
14   Q.  Okay.  You didn't have any involvement with this franchise
15   agreement from 1992, did you?
16   A.  No.
17   Q.  Okay.  Turning to another defense exhibit, this time it's
18   Defense Exhibit 1063, which I believe that you were shown
19   on --
20   MR. BHACHU:  And if we could publish that to the
21   jury, please.
22   BY MR. BHACHU:
23   Q.  -- you were shown on your direct examination.  This is
24   that exhibit that talked about what's going on with -- what's
25   happening with the Tenaska bill in May of 2011.  Do you

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 8 of 127 PageID #:6697
Dominguez - cross by Bhachu
4225

1   remember this email?

2   A.  I remember it, yes.

3   Q.  Okay.  At least you remember being shown it this morning?

4   A.  Yeah, that's what I remember.

5   Q.  Okay.  Do you know whether or not at this time an

6   individual by the name of Frank Olivo was receiving indirect

7   payments from ComEd in May of 2011?

8   A.  No.

9        MR. GILLESPIE:  Objection, Your Honor.  Beyond the

10  scope.

11       THE COURT:  Overruled.

12  BY MR. BHACHU:

13  Q.  Similarly, sir, do you know whether or not the firm Reyes

14  Kurson had gotten a contract with ComEd and whether or not

15  that contract was in effect in May of 2011?

16  A.  No.

17  Q.  Okay.  You were asked on direct examination about the

18  process or kind of procedure of hiring lobbyists and doing it

19  in situations where a lobbyist would be hired in order to

20  effectively conflict them off from representing somebody else?

21  A.  Yes.

22  Q.  And you had mentioned that that's not something you would

23  have done, as I understood it from your answer, is that right?

24  A.  I felt it was done to me in Texas and here in Illinois,

25  but it's my conjecture.  I never did that.

Dominguez - cross by Bhachu

4226

1  Q.  Okay.  Did you ever hear of it being done for a period of
2  seven or eight years continuously?
3  A.  No.
4  Q.  Okay.  You were shown some emails about strategy.  Do you
5  remember those emails that you were shown on your direct
6  examination about strategy as it related to legislation?
7  A.  Yes.
8  Q.  I'm going to show you Defense Exhibit 1108, at least just
9  the first page of that exhibit right there.
10  A.  Yep.
11  Q.  Okay.  This exhibit here, where it talks about strategy
12  and the like, whose company's strategy does this relate to?
13  A.  I think this would be -- I'd have to go through the whole
14  thing, but I think I was just communicating on behalf of
15  Exelon Generation.
16  Q.  Not on behalf of ComEd?
17  A.  No.
18  Q.  Okay.  At this point in time in January of 2014, did you
19  have any responsibility for approving Jay Doherty's contract?
20  A.  No.
21  Q.  You were working from time to time in Springfield over the
22  years on matters before you became a ComEd CEO in 2019, is
23  that right?
24  A.  That's right.
25  Q.  And that would include on matters you testified about on

Dominguez - cross by Bhachu

1  direct examination, is that right?

2  A.  Yes.

3  Q.  Fair to say that you had interaction with a variety of

4  different folks from ComEd that were also pushing forward

5  legislation for ComEd in Springfield?

6  A.  Yes.

7  Q.  Would that include the external lobbying team that was

8  devoted to trying to pass FEJA on behalf of ComEd?

9  A.  Yes.

10  Q.  Did you ever run into an individual by the name of Ray

11  Nice in Springfield at all?

12  A.  Not that I remember.

13  Q.  Okay.  You don't recall Ray Nice working for ComEd as it

14  relates to any legislation?

15  A.  Not that I recall.

16  Q.  How about Frank Olivo, did you run into him in Springfield

17  working on behalf of ComEd to try to pass legislation?

18  A.  No.

19  Q.  Edward Moody, did you ever run into an individual by the

20  name of Edward Moody in Springfield who was working for ComEd

21  trying to pass legislation?

22  A.  Not that I remember.

23  Q.  Do you know an individual named Eddie Acevedo?

24  A.  I don't think so.

25  Q.  Okay.  Do you recall running into him in Springfield or

Dominguez - cross by Bhachu

4228

1    finding out that he was working to pass legislation on behalf
2    of Springfield?
3    A.  On behalf of ComEd?
4    Q.  Yes.
5    A.  In Springfield?  I don't think so.
6    Q.  Okay.  You said at one point I think in your direct
7    examination that you had spent like three years of your life
8    on trying to get some legislation passed.  Which legislation
9    was that?
10   A.  FEJA.
11   Q.  Okay.  So in the context of trying to get FEJA passed, you
12   were living, eating, breathing FEJA for three years then, and
13   you don't recall any of those folks being involved in that
14   legislation at all, do you?
15   A.  No.
16   Q.  You know, I saw from some of these exhibits, you know, the
17   strategy, et cetera.  There are references to, you know,
18   communications that are going to be made to Mike Madigan.  Do
19   you recall those emails?
20   A.  Yes.
21   Q.  I think one of those emails was Government Exhibit 1047.
22   I'm going to just pull that out for you.
23         MR. BHACHU:  And if we could publish that to the
24   jury.
25   BY MR. BHACHU:

Dominguez - cross by Bhachu

4229

1  Q.  This is that email that you saw from Mike McClain to

2  yourself and John Hooker and David Fein.

3  A.  Right.

4  Q.  Do you see it?

5  A.  Yeah, I see it.

6  Q.  And just as a matter of clarification, who is David Fein?

7  A.  I think I mentioned David Fein worked for me.  He worked

8  for Exelon Generation, and he oversaw state, governmental

9  affairs for Exelon Generation.  At different points he was a

10  VP and then I think became an SVP.

11  Q.  What was his role in connection with trying to get FEJA

12  passed?

13  A.  He's my main point person on the ground for that.

14  Q.  So did he also eat, breathe and live FEJA as well?

15  A.  He did.

16  Q.  For three years?  Okay.

17          There is a focus on what to say, at least in this

18  email, to, you know, leadership and in particular, and some

19  other emails, there is talk about effectively, you know, what

20  to say to Mike Madigan.  Why all the focus on what to say to

21  Mr. Madigan in particular?

22  A.  I'm not sure it was in particular.  But, you know, the

23  three focus areas for us were the Governor's office, where

24  Governor Rauner was in play; the Senate Democrats, where John

25  Cullerton was the president; and the Speaker.  So when we were

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 13 of 127 PageID #:6702
Dominguez - cross by Bhachu
4230

1   drafting speaking points, the focus was on all three of them.

2           I would say that in terms of the three, historically,

3   probably the Speaker's office had been most engaged in energy

4   issues.  Rauner was a little bit of a -- you know, we didn't

5   really know what Rauner was going to be about because he

6   hadn't been around.  Obviously had just gotten elected when we

7   were doing this.

8           But between the Speaker's office and the Senate

9   President's office, it was my experience that the staff

10  engagement on the bills was more the Speaker's office, not to

11  say that the Senate President's office wasn't engaged, but the

12  Speaker's office was heavily engaged.

13  Q.  So would it be fair to say obviously for legislation to

14  pass, you try and get the buy-in of folks both in the House

15  and in the Senate?

16  A.  Oh, yes.

17  Q.  Those are both effectively obstacles or, you know, kind of

18  gates you have to get through in order to get legislation

19  passed, right?

20  A.  Yes.

21  Q.  Can't do one without the other, fair to say?  Same with

22  the Governor as well, right?

23  A.  Yes.

24  Q.  Okay.  I'd like to show you what has been previously

25  marked as Government Exhibit 250 -- actually, strike that.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 14 of 127 PageID #:6703
Dominguez - cross by Bhachu
4231

1          Let me actually show you a page from government

2   exhibit -- or sorry, Defense Exhibit 1098.

3          This was a page that you were shown on your direct

4   examination about 2016 talking points.

5          And if you could just remind the jury again, what did

6   you understand these talking points to be?

7   A.  So this was again about the economics of the nuclear

8   plants, the fact that they would retire if they weren't put on

9   a level-playing field with other zero emission resources in

10  terms of the financial credits that were awarded in Illinois.

11  Q.  Okay.  This bullet point number three, can you read that

12  bullet point to the jury?

13  A.  It says, "Since that time, based upon your sponsorship of

14  House Resolution 1146, the State published a report showing

15  that the premature closure of three of our nuclear plants

16  would result in decreased reliability, increased carbon

17  emissions and massive environmental costs, the loss of over

18  8,000 jobs, $1.8 billion in annual economic activity and an

19  electric rate increase of over $800 million."

20  Q.  When you say in that passage there "based upon your

21  sponsorship of House Resolution 1146," who is the "your

22  sponsorship" a reference to?

23  A.  Speaker Madigan.

24  Q.  Okay.  What is House Resolution 1146?

25  A.  Well, I think I mentioned on direct examination this

1   morning there was, in 2014, we were first identifying the

2   economic issues with the nuclear plants.  And you recall I was

3   talking about studies that would be done by the Illinois

4   Commerce Commission to determine a variety of impacts, rate

5   impacts, reliability impacts, environmental impacts.

6           And so the way the General Assembly directed the

7   Illinois Commerce Commission to conduct that analysis was

8   through a resolution authored by the Speaker.  So he was, in

9   effect, directing the ICC to answer these questions.

10  Q.  So he was the sponsor of a resolution to study the

11  problem.

12          Did you guys think that that resolution, House

13  Resolution 1146, sponsored by the Speaker, was beneficial

14  towards your efforts to try to get legislation passed to bail

15  out the nuclear power plants?

16  A.  We thought that any independent examination of the

17  reliability, the cost, the environmental issues would be

18  beneficial to our initiative because it would demonstrate the

19  overall importance of the nuclear plant to those things.

20          MR. BHACHU:  Your Honor, the government wishes to

21  publish for the benefit of the parties from the computer

22  Government Exhibit 253, which is I believe not in evidence.

23          So we would offer Government Exhibit 253.

24          THE COURT:  Any objection?

25          MR. LASSAR:  No objection.

Dominguez - cross by Bhachu

4233

1      THE COURT:  It's admitted.  You may publish.

2      (Government Exhibit 253 was received in evidence)

3  BY MR. BHACHU:

4  Q.  Okay.  With respect to the document that's on the screen

5  in front of you, sir, there is -- if we can just maybe go down

6  to the bottom of the page where it talks about -- or there is

7  an email from David Fein, where he says, "HR 1146 was just

8  introduced.  A copy is attached.  We will notify our IR as

9  well.  Fidel, can you please inform the ComEd team."

10      Do you see that?

11  A.  I do.

12  Q.  That's May 23, 2014, correct?

13  A.  That's right.

14  Q.  So fair to say before FEJA was passed in 2016, the Speaker

15  of the House, Mr. Madigan, had sponsored a resolution calling

16  for a study of nuclear power that would be beneficial

17  potentially towards ultimate passage of legislation relating

18  to the bailout?

19  A.  Yes.

20  Q.  Okay.  And then up higher in this email, you indicate to

21  the team, "FYI, the Speaker just introduced the resolution.

22  Fein and Humbard were able to secure both the sponsorship of

23  the Speaker as well as the Minority Leader Durkin, making this

24  bipartisan."

25      Is that right?

Dominguez - cross by Bhachu

4234

1    A.  Yes.

2              MR. BHACHU:  Okay.  I'd like at this time, Your

3    Honor -- sorry.  Yeah.  At this time we'd like to publish for

4    the purpose of consideration by the parties Government

5    Exhibit 254.

6              THE COURT:  Any objection?

7              MR. LASSAR:  No, Your Honor.

8              MR. BHACHU:  Okay.

9              THE COURT:  It is admitted.  You may publish it.

10       (Government Exhibit 254 was received in evidence)

11   BY MR. BHACHU:

12   Q.  And with respect to this, this is an email from Mr. Fein

13   to the team or to Scott Humbard forwarding on an email where

14   it says, "The resolution passed the House late yesterday."

15             Do you see that?

16   A.  Yes.

17   Q.  And that is dated May 30th, 2014, is that right?

18   A.  That's right.

19   Q.  And below it indicates that you had asked for an update to

20   be sent out on efforts in Springfield to enact House

21   Resolution 1146, which was outlined in last week's weekly

22   report, is that right?

23   A.  Yes.

24   Q.  So was this an important milestone for the company?

25   A.  You know, it was an important first step, I would say,

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 18 of 127 PageID #:6707
Dominguez - cross by Bhachu
4235

1  rather than a milestone.

2  Q.  Got it.

3  A.  We just thought the study results would be beneficial.  So

4  just getting that started and having the State author it, as

5  opposed to being something that we were saying, we thought

6  that that independent examination would be beneficial to the

7  efforts for sure.

8  Q.  And you got some sense from the Speaker as to what his

9  position was on the importance of this effort, is that right?

10 A.  Yes.

11 Q.  And can you read what this email provides in paragraph 2

12 of the email at the bottom of the screen there?

13 A.  "At today's environmental committee hearing, to ensure

14 unanimous bipartisan roll call, Speaker Madigan and Leader

15 Durkin substituted members 6 members" -- I think that's a

16 typo -- "of the committee for today's hearing.  The resolution

17 was presented by Speaker Madigan at today's hearing.  Speaker

18 Madigan delivered a very strong message that nuclear energy

19 remain an important part of our energy mix in Illinois.  A

20 copy of his prepared remarks are attached."

21 Q.  So it says that Mr. Madigan delivered a very strong

22 message on behalf of nuclear power, is that right?

23 A.  It is.

24 Q.  You were asked some questions on direct examination about

25 not really knowing what Mike Madigan's positions were on

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 19 of 127 PageID #:6708
Dominguez - cross by Bhachu
4236

1    certain issues, is that right?

2    A.  Yes.

3    Q.  Okay.  Can I go to page 13, please.

4        Is this the remarks that Speaker Madigan made with

5    respect to this resolution that was of benefit for the

6    company?

7    A.  It appears to be.  I don't remember.

8    Q.  Okay.  Well, let me read it for you:

9        "I am sponsoring House Resolution 1146, along with my

10   co-sponsor Leader Durkin, because I believe it's in the best

11   interests of everyone, consumers, public officials and those

12   concerned with the environment, that nuclear energy remain an

13   important part of our energy mix in Illinois."

14       Is that right?

15   A.  Yes.

16       MR. BHACHU:  And then why don't we go down a little

17   bit further if we could.  And then go down to the -- yeah,

18   that's right.

19   BY MR. BHACHU:

20   Q.  I am going to hone in on the bottom portion of the page:

21       "Unfortunately it is also clear that Exelon has faced

22   economic challenges recently.  Just last week, the results of

23   PJM's annual capacity auction were released.  We have learned

24   that Exelon's Quad Cities and Byron units failed to clear in

25   the auction, which is the first time those units, or any

1    nuclear units for that matter, failed to clear in the

2    auction."

3            Do you see that part of the message there?

4    A.  I do.

5    Q.  What does that mean to your understanding?

6    A.  In Illinois, northern Illinois belongs to part of a power

7    grid that extends from Illinois all the way to the

8    mid-Atlantic states, New Jersey, Washington, DC, Maryland,

9    Delaware and most of the states in between.

10            Unlike the old days, when states would direct people

11   to build power plants, have utilities build power plants, we

12   transitioned to a competitive market, meaning that all power

13   plants competed with each other.

14            And then the question then becomes how do we send an

15   economic price signal to build new power plants and retain

16   power plants on the grid.

17            And so as part of federal jurisdiction over energy

18   markets, the Federal Energy Regulatory Commission approved an

19   auction process whereby all thousand-plus power plants in this

20   grid from Illinois to the mid-Atlantic states would submit

21   bids in an auction.

22            And if they were cleared in the auction meant that

23   they were needed to ensure electric reliability in that

24   region.

25            If they didn't clear, it meant that at least

1    economically they weren't needed for electric reliability.

2            So what happened here is that for the first time --

3    and you have to bid your costs in these auctions, right.  So

4    we would get a certain amount of money from energy sales, and

5    then we would compare that to the costs of operating the

6    plants, all the women and men that work at the plants, the

7    capital that goes in the plants, the cost of fuel, everything,

8    all the way to taxes.

9            And if your energy revenues were less than what you

10   needed to operate the plant, it meant that you had a deficit.

11   You needed to go recover that in the capacity auction.  And it

12   was that delta, that difference between what you got in energy

13   revenues from your costs that you were allowed to bid into the

14   auction as your bidding price.

15           When it says it didn't clear, it simply means that

16   the nuclear plants weren't getting enough revenue from the

17   energy market to cover their operating costs.

18           And we submitted that as our bid price and it wasn't

19   accepted, meaning we weren't going to be able to recover those

20   moneys, and that is the first indicator that a plant is going

21   to be retired in these competitive markets.

22           I know it's complicated, but that's --

23   Q.  It sure was.  But it effectively means that, you know, the

24   power plants are not able to generate revenue to sustain their

25   operation, is that fair?

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 22 of 127 PageID #:6711
Dominguez - cross by Bhachu
4239

1   A.   That's right.

2   Q.   Okay.  And then later on in this message that Mr. Madigan

3   provides as it relates to this resolution that he presented,

4   "Exelon's nuclear fleet does more than provide a reliable

5   baseload of clean energy to Illinois citizens.  It also

6   provides well-paying jobs.  It serves as an economic engine to

7   the municipalities where the plants are located.  It provides

8   significant property taxes.  I cannot overstate the importance

9   of these nuclear plants to union workers and local economies.

10  I want to protect those jobs.  I want to protect those local

11  economies."

12          Is that what it says?

13  A.   Yes.

14  Q.   And those are Mr. Madigan's words?

15  A.   I believe so, yes.

16  Q.   Okay.

17          MR. BHACHU:   Your Honor, at this time the government

18  would seek to admit Government Exhibit 1015 and publish it to

19  the jury.

20          MR. LASSAR:   No objection.

21          THE COURT:   No objections, it is admitted.

22          You may publish it.

23    (Government Exhibit 1015 was received in evidence)

24          MR. BHACHU:   Thank you, Judge.

25  BY MR. BHACHU:

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 23 of 127 PageID #:6712
Dominguez - cross by Bhachu
4240

1   Q.  Sir, I'm going to direct your attention to the second page

2   of Government Exhibit 1015.

3           This is an email from David Fein that's addressed on

4   May 27, 2014 to Mr. McClain and copied to you, Scott Humbard,

5   Marlow Colvin, Fidel Marquez.

6           Do you see that?

7   A.  I do.

8   Q.  Who is Scott Humbard?

9   A.  Scott worked for David Fein and then on my team.

10  Q.  Okay.  And can you read the top of that email message to

11  the jury?

12  A.  "Mike, as a follow-up, here is what we have so far ... our

13  current roll call has 9 confirmed yes votes.  We will get a

14  10th with an outside chance of flipping one" -- again, I think

15  it's a typo, one no at this -- oh, no -- "flipping one no at

16  this point.  The roll call is as follows."

17          And then it lists names with yes or no.

18  Q.  Okay.  And so it's got a bunch of names listed here.  Some

19  are yes and some are no, is that right?

20  A.  Yes.

21  Q.  So, for example, you've got Carol Sente turns out to be a

22  no, is that right?

23  A.  Yes.

24  Q.  Then you also have nos, Robyn Gabel?

25  A.  Yes.

Dominguez - cross by Bhachu

4241

1   Q.  Greg Harris?

2   A.  Yes.

3   Q.  Naomi Jakobsson?

4   A.  Yes.

5   Q.  Elaine Nekritz?

6   A.  Yes.

7   Q.  Brandon Phelps?

8   A.  Yes.

9   Q.  Okay.  And there is a Mike Zalewski who is a yes down

10  there, is that right?

11  A.  I don't see the bottom, but I'll take your word for it.

12  Q.  Oh.

13  A.  Yes.

14  Q.  Okay.  Turning to the first page of this exhibit, is this

15  an email from Michael McClain that's addressed to Will

16  Cousineau and copied to Tim Mapes, Steve Brown and Jessica

17  Basham?

18  A.  It appears to be.

19  Q.  And is the subject "Roll Call"?

20  A.  Yes.

21  Q.  And is the date May 27, 2014?

22  A.  Yes.

23  Q.  You've been dropped from this email, right?

24  A.  I'm not on this email.  I've never seen this before.

25  Q.  Okay.  And this is in -- it says, "I love you," doesn't

Dominguez - cross by Bhachu

4242

1    it?

2    A.  Yeah, it does.

3    Q.  Okay.  And it's in response to an email from Will

4    Cousineau on May 27, 2014?

5    A.  Yes.

6    Q.  Can you read what that email says from Mr. Cousineau?

7    A.  "The opponents won't have contemplated all the subs we're

8    lining up since I don't like to rely on Republicans."

9    Q.  Okay.  And then with respect to the table that appears

10   there, there is a reference to Sente.  Do you see that?

11   A.  Yes.

12   Q.  And in red, there is a reference to Jackson.  Do you see

13   that?

14   A.  Yes.

15   Q.  And in red it's turned -- there is a Y there.  Do you see

16   that?

17   A.  Yes.

18   Q.  And then with Gabel, there is a name next to that,

19   Hoffman?

20   A.  Yeah.

21   Q.  There is also another Y there, is that right?

22   A.  Yeah.

23   Q.  Now the folks that are presented with the red name that

24   appears next to them, those are all the folks that we read

25   that were voting no, is that right, on the prior page?

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 26 of 127 PageID #:6715
Dominguez - cross by Bhachu
4243

1    A.  I think so, yeah.

2    Q.  Okay.  And they're all yeses now because of --

3    A.  It looks like they substituted members on the committee,

4    and the folks in the red are the five substituted members.

5    Q.  Okay.  You're not on this email, right?

6    A.  No, I'm not.

7    Q.  Okay.  And then Mr. Mapes writes back, "I will be your

8    lobster, friends.  Haven't given this a thought.  Are you in

9    charge of Exelon lobbying," Mr. Mapes asks.

10           Do you see that?

11   A.  Yes.

12   Q.  And then Mr. McClain responds to Mr. Mapes on the 28th of

13   May, is that right?

14   A.  Yes.

15   Q.  And he writes, "No, but we're going to have a little bit

16   of a discussion after session about the quality of their

17   lobby."

18           Do you see that?

19   A.  Yes.

20   Q.  That would be the lobby that you were spearheading at that

21   point in time?

22   A.  Apparently appears to be, yeah.

23   Q.  Okay.  And it says, "They are, as Devin would say, at the

24   101 level."  Do you see that?

25   A.  Yes.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 27 of 127 PageID #:6716
Dominguez - cross by Bhachu
4244

1  Q.  Do you have an understanding what 101 generally means?

2  A.  Freshman level.

3  Q.  Okay.  Now, you were asked some questions about what, if

4  anything, Mr. Madigan did with respect to FEJA over the course

5  of its progression.  Do you have any personal knowledge of

6  what conversations or instructions Mr. Madigan may have given

7  to Will Cousineau about the legislation?

8  A.  Not at all.

9       MR. COTTER:  Your Honor, I object.  That's wild

10  speculation.  If he's going to ask him about what two other

11  people might have talked about in private, that's certainly

12  not something this witness can testify about.

13       THE COURT:  Well, he said he doesn't know.

14       MR. BHACHU:  Okay.

15  BY MR. BHACHU:

16  Q.  And do you know whether or not -- did you know whether or

17  not Mr. McClain attended internal meetings of Mr. Madigan's

18  staff as it concerned FEJA?

19       MR. COTTER:  Objection, Your Honor, beyond the scope,

20  and also again wild speculation for this witness.

21       MR. BHACHU:  It's not beyond the scope because the

22  witness was asked questions on --

23       THE COURT:  Well, if he knows it.  If he doesn't

24  know, he just says no.  And the answer is probably he doesn't

25  know.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 28 of 127 PageID #:6717
Dominguez - cross by Bhachu
4245

1           But go ahead.

2           THE WITNESS:  I don't know, Your Honor.  I don't

3    know.

4           THE COURT:  Go ahead.

5           MR. BHACHU:  Thank you.

6    BY MR. BHACHU:

7    Q.  With respect to coalitions, you talked a lot about how

8    coalitions are used to help develop a broad base of support

9    for legislation.  And in that regard, legislation still needs

10   to pass in the Senate, doesn't it?

11   A.  It has to pass both chambers, yes.

12   Q.  So you have to have a plan to get legislation passed in

13   the Senate, is that fair to say?

14   A.  Yes.

15   Q.  And a plan to have it pass in the House as well, right?

16   A.  Pass in the Senate and House, signed by the Governor.

17   Q.  So you have to convince all these stakeholders.  Okay.

18          You were asked some questions about whether or not

19   Exelon and ComEd got everything that they wanted as it relates

20   to FEJA.  Do you remember those questions?

21   A.  I think so.

22   Q.  Okay.  You were -- you talked at some length about the

23   benefits of the legislation and what you didn't get.  You were

24   asked in particular with respect to Heather Wier Vaught, that

25   she and you had back-and-forth about the legislation as part

1   of the drafting process and negotiation process, is that

2   right?

3   A.  Yes.

4   Q.  Okay.  And one of the things you talked about was the

5   subsidy that FEJA effectively provided for to recognize that

6   ComEd -- or excuse me, Exelon Generation was effectively a

7   clean energy generator, is that right?

8   A.  Yes.

9   Q.  And you had mentioned I think during the course of direct

10  examination that she had whittled down the amount of that

11  subsidy to a certain degree during the course of the

12  negotiations, is that right?

13  A.  That's right.

14  Q.  And I think you had suggested that the number was

15  somewhere in the neighborhood of over $200 million in terms of

16  what that credit ended up being after the negotiation process

17  or in that ballpark?

18          MR. LASSAR:  Objection.  He said 500 million.

19  BY THE WITNESS:

20  A.  I think, if I may, I think --

21          THE COURT:  Correct.  Go ahead.

22  BY THE WITNESS:

23  A.  I think, if I may, I think the maximum allowable amount,

24  there is a cap on it, it's -- I should know this, but it's

25  either 218 or 235.  We started at 285.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 30 of 127 PageID #:6719
Dominguez - cross by Bhachu
4247

1    BY MR. BHACHU:

2    Q.  Okay.  You started at 285.  Is that the total value of

3    the -- is that on an annual basis or over the life of the

4    legislation?

5    A.  It's an annual cap.

6    Q.  Okay.  An annual cap.  So the annual subsidy that the

7    company could realize from FEJA's passage and the subsidy that

8    was provided to Exelon Generation was capped at approximately

9    $218 million per year, right?

10   A.  About that, yes.

11   Q.  Okay.  So that's $218 million more than the company had

12   before the passage of FEJA, right?

13   A.  Yes.

14   Q.  On an annualized basis?

15   A.  Yeah.  But keep in mind we were losing money running the

16   plants.

17   Q.  That's fine.

18   A.  So it's not --

19   Q.  That's fine.  That's fine.  I don't have any question

20   about that.

21          But the subsidy that you were able to get potentially

22   was up to 218 million a year?

23   A.  Right.

24   Q.  Okay.

25   A.  And it offset the losses of running the plants.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 31 of 127 PageID #:6720
Dominguez - cross by Bhachu
4248

1  Q.  Got it.  And that was on an annualized basis.  And when
2  you did some math on direct, you talked about maybe what the
3  savings were based on the compromise that you had struck with
4  Heather Wier Vaught.  Do you remember that?
5          And you said 50 million over 10 years?
6  A.  Roughly.
7  Q.  Okay.
8  A.  It was 50 million a year times 10 years.
9  Q.  Okay.  Effectively what you kind of came down on was a
10  savings of half of the $500 million roughly?
11  A.  $500 million in theory, yeah.
12  Q.  But if we look at the potential upside to the company from
13  the legislation on an annual basis being in excess of 200
14  million times $10, that's over $2 billion, right?
15  A.  No.  That's where we're kind of missing each other.
16  Q.  Okay.
17  A.  The company was losing a lot of money.  We could avoid the
18  losses by shutting down the plants.  So say, for example, that
19  we were losing a couple hundred million dollars a year.  We
20  were losing over a hundred million dollars a year.
21          But say, for example, you were losing couple hundred
22  million dollars.  We could exercise self-help, shut down the
23  plants and we would avoid the $200 million in losses.
24          What the legislation effectively did is give us a
25  little bit more than that, but we had to continue to incur

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 32 of 127 PageID #:6721
Dominguez - cross by Bhachu
4249

1    those costs.

2          So the net delta isn't between 218 and zero.  It's

3    between 218 and the losses that you're avoiding, right.  So it

4    was actually quite a bit less.

5    Q.  But it still provided a substantial benefit each and every

6    year for the company.  Fair to say?

7    A.  Well, look, we thought it was a win-win situation.  It

8    allowed us to continue to operate the plants.  Did we make a

9    profit on the plants?  Yeah, we did.  But at the same time, it

10   had enormous benefits for the State of Illinois as

11   demonstrated by the independent ICC studies.

12   Q.  So absent the $200 million potential subsidy that you

13   would get every year, what would have happened?

14   A.  It would have shut down the plants.

15   Q.  Okay.  And would you have been able to derive any revenue

16   from those plants going forward?

17   A.  No.

18   Q.  What would you have done after you shut down the plants?

19   A.  Under NRC guidelines, you have about 60 years to

20   decommission the asset and turn it back into a Brownfield

21   site.

22   Q.  Okay.  And decommissioning is an expensive process, isn't

23   it?

24   A.  But it's paid for.  So all of that money as, again, part

25   of NRC regulations, we had to start setting aside money from

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 33 of 127 PageID #:6722
Dominguez - cross by Bhachu
4250

1    the very first day we began operating the plants.  So that

2    money had been accumulated and it was sitting effectively in a

3    bank account.

4                So from a net company impact, we already had that

5    money.  There was no cost of decommissioning.

6    Q.  But you wouldn't have to spend that money if the plant

7    continued to operate?

8    A.  But if we didn't have to spend that money, all of the

9    money would go right back to ratepayers and they would get

10   that benefit.

11               There was no -- you know, there was no corporate

12   impact of having to decommission.  That was all part of the

13   analyses that were done in connection with us.

14   Q.  All right.  So let me ask you this then:  With respect to

15   the company's desire, why such a big desire to try to keep

16   those plants open on behalf of the company?

17   A.  Well --

18   Q.  Why spend three years of your life on it?

19   A.  Look, we're real believe -- you know, I'm a believer,

20   Mr. Bhachu.  I went to college to become an environmental

21   engineer.  I've studied climate change for most of my career,

22   right.  And I believe that once you start shutting them down,

23   you're shutting them all down, and the business is going to go

24   away.

25               And we wanted to have these assets.  We wanted to

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 34 of 127 PageID #:6723
Dominguez - cross by Bhachu
4251

1   have a live business.  So there is no doubt we wanted to be

2   able to make money and continue to earn money from the plants,

3   but we also passionately cared about the underlying issues.

4   Q.  Okay.  Well, without the plants, there wouldn't be a live

5   business.  Fair to say?

6   A.  That's right.

7   Q.  Okay.  In terms of being asked questions about what Mike

8   Madigan did in terms of speaking publicly on behalf of FEJA,

9   fair to say you don't know what he was doing entirely behind

10  the scenes to try to pass FEJA, do you?

11  A.  No, I don't.

12  Q.  Okay.  I want to show you -- well, let me ask you, David

13  Fein you said was with your team for a long period of time.

14  He was really kind of living and breathing FEJA with you as

15  well.  Do you recall that?

16  A.  Yes.

17  Q.  Do you understand, would he share kind of your same

18  assessment of the importance of Mr. Madigan and gaining

19  Mr. Madigan's support on behalf of legislation that you were

20  pursuing?

21  A.  It was critical.

22  Q.  Okay.  I want to show you what has been marked and offered

23  into evidence Government Exhibit 1012.

24          MR. LASSAR:  No objection.

25          THE COURT:  It's admitted.  You may publish it.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 35 of 127 PageID #:6724
Dominguez - cross by Bhachu
4252

1    (Government Exhibit 1012 was received in evidence)

2  BY MR. BHACHU:

3  Q.  I'm going to direct your attention to the page -- I'm

4  sorry, the email at the top of this page where it is in a

5  document that's addressed to Mr. Fein.  Do you see that?

6  A.  Yes.

7  Q.  And it says, "Attached is a first pass at the memo insert.

8  I've included primarily relevant, factual information, but

9  have added anecdotal notes where I had them and thought they

10  would provide useful context.  I'm sure that all of you, Bill

11  and Scott will have others and they'll want to add as well.

12        Please let me know what edits you'd like me to make

13  to this to ensure it is useful."

14        Do you see that?

15  A.  I do.

16  Q.  Okay.  Then down below there is a reference to a

17  background on all the key players.  Do you see that?

18  A.  Yes.

19  Q.  And there is a reference to having an outline and one or

20  two sentence of who they are.  Do you see that?

21  A.  Yes.

22  Q.  And there is a list of folks including the Governor of the

23  State of Illinois?

24  A.  Yes.  Just be mindful though that by March 21, Fein no

25  longer works for me.  He stopped working for me on August 1,

Dominguez - cross by Bhachu

4253

1   2018 --

2   Q.  Okay.

3   A.  -- when I made the move.  So I haven't seen this document

4   before, but it appears to be what you are saying it is.

5   Q.  Okay.  That's fine.

6        Do you see there is a reference to House Speaker Mike

7   Madigan there?

8   A.  Yes.

9   Q.  Okay.  And do you see that there is a notation about

10  Mr. Madigan?

11  A.  Yes.

12  Q.  Do you see it says, "It is impossible to accomplish

13  anything politically in the state without Madigan knowing

14  about it and having some say as to whether it succeeds or

15  fails"?

16  A.  I see that.

17  Q.  Okay.  And Mr. Fein worked with you on FEJA for three

18  years, right?

19  A.  He did.  I'm not sure I agree with that characterization.

20  But he did.

21  Q.  Well, he actually did a lot of the same things that you

22  did each and every day to try to get FEJA passed, is that

23  right?

24  A.  Yeah, for sure, Mr. Bhachu.  I'm simply saying we beat

25  Mike Madigan during the rate freeze stuff.  So I lived the

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 37 of 127 PageID #:6726
Dominguez - cross by Bhachu
4254

1 history that perhaps David didn't live in 2007 and 2008, where

2 we beat his --

3 Q.  And Mr. Madigan in 2007 and 2008 actually sponsored that

4 rate freeze legislation, is that right?

5 A.  He ultimately did.  But that never passed.  It was

6 defeated by us.

7 Q.  And where was it defeated?

8 A.  Where was it defeated?

9 Q.  Yeah.

10 A.  It just never got the votes.

11 Q.  Where?

12 A.  Never got the votes in the Senate, and I don't think -- it

13 might have gotten the votes in the house.  I'm not sure it

14 came out of the House.

15 Q.  So your recollection is it didn't get the votes in the

16 House?

17 A.  I don't remember.

18 Q.  Okay.

19 A.  We ended up resolving it.  But to put a fine point on it,

20 I'm not fighting you on this, I thought any legislation that

21 you're going to successfully achieve, right, as opposed to

22 blocking something, any piece of legislation that was going to

23 ultimately pass in Illinois, you had to get the Speaker's

24 support on it, otherwise it wasn't going to happen.  That was

25 my take on it.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 38 of 127 PageID #:6727
Dominguez - cross by Bhachu
4255

1   Q.   Okay.  So his support was critical then?

2   A.   Yeah.  That's what I said.

3   Q.   All right.  You were asked some questions about what Anne

4   Pramaggiore had, you know -- or what Fidel Marquez told you

5   about a conversation he had with Anne Pramaggiore the day

6   before he talked to you about the Jay Doherty contract.

7        Do you remember that?

8   A.   Yes.

9   Q.   And you were asked a series of questions.  Did Fidel

10  Marquez tell you this and did Fidel Marquez tell you that

11  about his conversation with Anne Pramaggiore.

12        Do you remember that?

13  A.   I remember.

14  Q.   I'm showing you what has been entered into evidence as

15  Government Exhibit 131T.  I am going to publish it on the

16  screen here.

17        I'd like you to read line 56 there and continuing on

18  with the highlighted text.  Do you see that?

19  A.   Yes.

20        "Pramaggiore:  Here hears the -- you do -- but here

21  is the problem" --

22  Q.   You can read it to yourself.

23  A.   Oh.

24  Q.   Do you recall Mr. Marquez, as it relates to that

25  highlighted text, do you remember him telling you that's what

Dominguez - cross by Bhachu

1    Anne Pramaggiore had said about you being able to do a victory
2    lap around her?
3    A.  No, never.
4    Q.  Did Mr. Marquez tell you that Anne Pramaggiore had given
5    him advice about not discontinuing the contract with Doherty?
6    Did he tell you that?
7    A.  No.
8    Q.  Did he tell you that Anne Pramaggiore had said that you
9    "don't want to get into a disruptive battle where, you know,
10   somebody gets their nose out of joint, and we're trying to
11   move somebody off, and then we get forced to give him a
12   five-year contract because we're in the middle of needing to
13   get something done in Springfield."
14          Do you see that?
15   A.  No.  He never said that.
16   Q.  He never told you that, did he?
17   A.  No.
18   Q.  Okay.  You had said or mentioned during your direct
19   examination that Anne had encouraged you not to make any
20   changes in terms of continuity of lobbyists as a general
21   matter when you took over the reins as the CEO of ComEd.
22          Do you remember that?
23   A.  Yes.
24   Q.  Was she your boss at that time?
25   A.  Yes.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 40 of 127 PageID #:6729
Dominguez - cross by Bhachu
4257

1  Q.  So you reported directly to her in her capacity as the CEO

2  of Exelon Utilities?

3  A.  Yes, I did.

4  Q.  Fair to say you don't want to disobey the advice and

5  directives given by your boss?

6  A.  Of course.

7  Q.  You were asked about Juan Ochoa and his appointment to the

8  board.  And in the context of answering some of those

9  questions, you had briefly mentioned that Bill VonHoene was

10  opposed to a degree.  Can you elaborate on that?

11  A.  Sure.  Bill VonHoene was a big fan of this fellow named

12  Jesse Ruiz, who had served on the ComEd board.  And it was

13  clear he -- well, let me back up, just put this in context.

14       I had a call with Bill, just kind of a -- just a

15  catchup call with him and mentioned that I understood Juan

16  Ochoa is coming on the board, which is what Anne had told me

17  she and Chris had decided, Chris Crane.

18       And Bill was furious.  And he said that Ochoa wasn't,

19  you know -- I forget exactly what he said, but basically

20  caused me to believe that Ochoa was not a good guy and bad

21  things had happened or there were bad things about him that

22  got revealed in diligence.

23       And then he went on to say that he had been

24  instructed by Chris to tell Jesse Ruiz that he could come back

25  on the board.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 41 of 127 PageID #:6730
Dominguez - cross by Bhachu
4258

1    So Bill had two objections, at least that he had

2  lodged with me, one was Ochoa is not a good guy, and he's got

3  this background stuff.  And then separately, what are Chris

4  and Anne doing?  I already promised Ruiz that he could come

5  back on the board, and this is my own personal credibility

6  because I had the conversation with Jesse.

7    So I reached back out to Anne and I said, look it,

8  Bill says there is stuff in Ochoa's background that's not good

9  and mentioned the Ruiz stuff.  And I said, you know, do you

10  want me to call Carter, Carter Culver was our corporate

11  secretary, and dig in, try to figure out what the due

12  diligence had actually determined with regard to Ochoa.

13    And she told me, no, I'll take it.  You know, I got

14  this.

15  Q.  Okay.  And with regards to Bill VonHoene's position within

16  the Exelon corporate kind of hierarchy, where was he in that

17  constellation?

18  A.  He was number two at Exelon, I would say.  I mean, there

19  wasn't, there wasn't a formal position, Mr. Bhachu, but in

20  terms of how the company ran, Bill was effectively the number

21  two.

22  Q.  You were asked a bunch of questions about lobbying

23  practices in other jurisdictions by Mr. Cotter.  And he asked

24  you was it commonplace to accept recommendations from public

25  officials.  Do you remember that question?

Dominguez - cross by Bhachu

4259

1    A.  Yes.

2    Q.  Was it usual for the company in other jurisdictions to

3    hire people that were unable to pass entry-level tests to give

4    them a job anyway?

5    A.  No, never.

6    Q.  Was it normal in these other jurisdictions for public

7    officials to demand that people be hired by the company?

8    A.  No.

9            MR. COTTER:  Objection, Your Honor.  There is no

10   evidence of any demands in this case.  That's based on a false

11   statement of the evidence.

12           MR. BHACHU:  So I think the jury is free to conclude

13   that after they've looked at all the evidence whether or not

14   that's the case.

15           MR. COTTER:  I'm happy for the jury to rely on the

16   evidence, Your Honor, but I don't want Mr. Bhachu misstating

17   the evidence.

18           THE COURT:  Well --

19           MR. BHACHU:  Judge, I can move on.

20           THE COURT:  He can answer that question, the one that

21   you asked, I think.

22           You answered it.

23           He answered it.

24           MR. BHACHU:  Okay.

25   BY THE WITNESS:

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 43 of 127 PageID #:6732
Dominguez - cross by Bhachu
4260

 1   A.   The answer is no.
 2   BY MR. BHACHU:
 3   Q.   Okay.  Do you recall ever in any of these other instances
 4   being told by somebody that was making a job recommendation
 5   when they were providing a resume that there was a sort of
 6   code that accompanied any resume that was provided which
 7   indicated that you were basically supposed to drop whatever
 8   you were doing and hire a person?
 9   A.   No.
10   Q.   Okay.  And I take it that in terms of other
11   recommendations that you received from other folks, was that
12   in relation to people that were expected to actually do work?
13   A.   Always.
14   Q.   Okay.  You were asked some questions about, you know,
15   about this, you know, what was going on at ComEd at varying
16   points in time relating to the hiring of individuals and the
17   like.  Do you remember those questions?
18   A.   I do.
19   Q.   Let me ask it this way:  I think you were asked if you
20   ever saw anything while you were associated with ComEd that
21   made you think that ComEd was bribing Mike Madigan.  I believe
22   that was the way the question was phrased to you.
23        Do you remember that question?
24   A.   Yes.
25   Q.   Okay.  Let me show you what's marked and in evidence as

Dominguez - cross by Bhachu

4261

1  Government Exhibit 319.

2  A.  I'm not on this.

3  Q.  Okay.  You are not on that email, is that right?

4  A.  No.

5  Q.  Did you have --

6         MR. LASSAR:  Object to his being shown an email that

7  he's not on.  This is not relevant to his statement.

8         MR. BHACHU:  Well, the question is what he was aware

9  of.  And if the individual is asked "Were you aware of

10 anything going on," and he says "No," it's fair to ask him

11 what he was actually aware of at the time.

12        MR. LASSAR:  Judge, there is millions of things he

13 wasn't aware of.

14        MR. BHACHU:  Well, let me follow up on that

15 observation from counsel.

16 BY MR. BHACHU:

17 Q.  Is it fair to say there is millions of things you were

18 unaware of that were going on at ComEd between 2011 and 2019?

19 A.  Yes.

20 Q.  Okay.  And have you since learned of some of those things

21 that were going on at ComEd that you were not aware of between

22 2011 and 2019?

23        MR. COTTER:  Your Honor, the objection has been

24 sustained.  I'd like to have that document taken off

25 everybody's screens.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 45 of 127 PageID #:6734
Dominguez - cross by Bhachu
4262

1        MR. BHACHU:  Was it sustained?

2        MR. COTTER:  No question pending about it.

3        THE COURT:  This is a document that's in evidence,

4    right?

5        MR. BHACHU:  Correct.

6        MR. COTTER:  But I don't think they can put up, you

7    know, prosecution wallpaper while they talk about other

8    things.

9        THE COURT:  Well, if he is not familiar with it and

10   he says he's not familiar with it, then that should end it.

11   BY MR. BHACHU:

12   Q.  You're not familiar with this document, are you?

13   A.  I don't think so, no.

14   Q.  Okay.  Let me ask you this:  Do you recall Anne

15   Pramaggiore ever telling you anything about the summer intern

16   program at ComEd and Mr. Madigan's association with that

17   program?

18       MR. COTTER:  Objection, far beyond the scope.  Never

19   came up.

20       THE COURT:  I believe he did not go into the summer

21   intern program.  So that is sustained.

22       MR. BHACHU:  Judge, there was a question that was

23   asked on direct, "Did you see anything that made you think

24   that ComEd was bribing Mike Madigan?"  And so it's fair to

25   inquire what he knew about.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 46 of 127 PageID #:6735
Dominguez - cross by Bhachu
4263

1          THE COURT:  All right.  I think that's right.  You
2    may --
3          MR. COTTER:  Your Honor, if I may, just to make my
4    record, on that theory, the government can ask this witness
5    and show them every piece of evidence they put in in this
6    case.
7          MR. BHACHU:  Well, I don't think we're going to do
8    that.
9          MR. COTTER:  And that's why it's beyond the scope,
10   because you're not allowed to just put in every bit of piece
11   of evidence in your case with every witness.
12         THE COURT:  Well, the broader subject was covered,
13   the object of bribing or giving benefits to Madigan.  So he
14   may go into that, see if he's familiar with certain actions.
15         THE WITNESS:  Judge, I don't know, I don't know
16   anything about the summer intern program.  I mean, just --
17   BY MR. BHACHU:
18   Q.  Did she ever talk to you about a pathway that Mike Madigan
19   had with respect to the summer intern program?
20   A.  No.
21   Q.  Okay.  With respect to Juan Ochoa, did Ms. Pramaggiore
22   indicate to you that she had told Mr. McClain in July 2018
23   that Juan Ochoa would be appointed to the board?
24   A.  No.
25   Q.  Okay.  Did you know at around that time that she had given

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 47 of 127 PageID #:6736
Dominguez - cross by Bhachu
4264

1   the okay for Mr. Madigan to inform Mr. Ochoa that he would be

2   appointed to the board?

3   A.  No, I didn't.

4   Q.  And in terms of explaining the rationale for the

5   appointment of Mr. Ochoa to the board --

6              And I'm going to put up on the screen Government

7   Exhibit 90T, lines 122 to 124.

8              -- did she ever explain the appointment in terms of

9   from her perspective "You take good care of me and so does our

10  Friend"?

11             MR. LASSAR:  Objection, Your Honor.  This is just

12  throwing other evidence in the case that the witness has no

13  knowledge of.

14             MR. BHACHU:  Again, Judge, counsel --

15             THE COURT:  Wait.  You can ask him if he's aware of

16  that.

17  BY THE WITNESS:

18  A.  I'm not aware of that.

19             MR. BHACHU:  Yes.  If we could publish that to the

20  jury, just so the jury sees.

21  BY MR. BHACHU:

22  Q.  You're not aware of her giving that sort of rationale to

23  you about why she was supporting the appointment of Juan Ochoa

24  to the board?

25  A.  I'm unaware of this.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 48 of 127 PageID #:6737
Dominguez - cross by Bhachu
4265

1   Q.   Okay.

2        In early 2019, did you know who Ray Nice was?

3        MR. COTTER:  Your Honor, can we have the screen

4   cleared, please, if there is not a question pending.

5   BY THE WITNESS:

6   A.   No.

7        MR. BHACHU:  I'll take it off the screen.

8   BY MR. BHACHU:

9   Q.   You didn't know who Ray Nice was in early 2019, is that

10  right?

11       You hadn't heard any of the wire interceptions in

12  this case at that point in time, had you?

13  A.   No, of course not.

14  Q.   Okay.  You hadn't seen any emails that have been produced

15  by ComEd or Exelon?

16  A.   Any emails?

17  Q.   That were produced during the course of the federal

18  investigation by ComEd and Exelon?

19  A.   No.

20  Q.   Okay.  I'd like to briefly talk to you about one of the

21  other questions that was asked by counsel.  He made note of

22  the fact that you served as an assistant United States

23  attorney, is that right?

24  A.   That's right.

25  Q.   And it was sometime in the 1990s, is that right?

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 49 of 127 PageID #:6738
Dominguez - cross by Bhachu
4266

1   A.  Yeah.  It was, I think, '94 through '99.

2   Q.  Okay.  Fair to say that your work focused on bank robbery

3   cases, narcotics cases and some fraud cases?

4   A.  Probably the opposite.  Mostly fraud cases, wire, mail

5   fraud cases, some RICO stuff.  But in that office, I was

6   assigned to financial frauds, but you did a little bit of

7   everything.  So everybody did some bank robbers, everybody did

8   guns and drugs because that was the overwhelming number of

9   cases coming forward.

10   Q.  And you didn't investigate any public corruption cases,

11   did you?

12   A.  I did not.  I didn't do any public corruption work.

13   Q.  Can you speak up a little bit?

14   A.  Yeah.  I'm sorry.  I keep leaning back.  My apologies.

15        No, I did not do any public corruption work at the US

16   Attorney's office.

17   Q.  Okay.  Never charged somebody with a public corruption

18   offense?

19   A.  No.

20   Q.  Did you ever try a public corruption case like this one?

21   A.  No.

22   Q.  Do you ever prepare proposed jury instructions for public

23   corruption trial?

24        MR. COTTER:  Your Honor, he's answered the question.

25        THE COURT:  I think the answer, yeah, that would

Dominguez - cross by Bhachu

4267

1   cover instructions.

2   BY MR. BHACHU:

3   Q.  Was it your job, was it your job after you left the

4   US Attorney's office to kind of keep up on public corruption

5   law at all?

6   A.  I don't think so, no.

7   Q.  Okay.  Now, you, speaking of the US Attorney's office, you

8   came to our office to be interviewed on two occasions, is that

9   right?

10  A.  I did, yeah.

11  Q.  And before coming for your first interview, your attorney

12  asked for a proffer letter from the government, right?

13  A.  Yeah, standard proffer agreement.

14  Q.  Okay.  And because you were a former AUSA, you knew what a

15  proffer letter was, right?

16  A.  Yeah.

17  Q.  And it generally provides that your statements that you

18  make during an interview with the government effectively can't

19  be used against you in the case in the event you are

20  prosecuted, is that right?

21  A.  That's right.

22          MR. BHACHU:  Your Honor, I am going to offer

23  Government Exhibit 1011 into evidence.

24          THE COURT:  Any objection?

25          MR. LASSAR:  I object to the relevance of the proffer

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 51 of 127 PageID #:6740
Dominguez - cross by Bhachu
4268

1    letter.

2           MR. BHACHU:  It's relevant because it informs what

3    happens during the course of the interviews, Judge.

4           THE COURT:  Well, what is the relevance?

5           MR. BHACHU:  The relevance is, A, that it requires a

6    completely truthful statement, and B, that it also limits the

7    ability of the government to use the proffer in its case in

8    chief.

9           THE COURT:  Yeah, you can use it if he is

10   inconsistent, if you can point out any inconsistency.

11          MR. BHACHU:  Judge, this is just a proffer letter

12   right here.  This is just the agreement we had in terms of the

13   interview that was done with Mr. Dominguez in our office, the

14   terms of the interview.  It's not a statement from the

15   witness.

16          THE COURT:  Wait a minute.

17          I mean, what is the relevance?

18          MR. BHACHU:  Just to demonstrate the understanding

19   that, A, that he was to be completely truthful in his meetings

20   with the government.

21          THE COURT:  You can ask him that.

22   BY MR. BHACHU:

23   Q.  You understand you have to be completely truthful in your

24   meetings with the government?

25   A.  I do.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 52 of 127 PageID #:6741
Dominguez - cross by Bhachu
4269

1  Q.  Did you also understand that in the event you were

2  prosecuted, the statements that you made during those

3  interviews could not be used against you in the government's

4  case in chief?

5  A.  Yes.

6  Q.  Okay.  The interview that you first attended, that was in

7  September of 2019, is that right?

8  A.  I don't remember, but it sounds right.  You would know.

9  Q.  Well, you were there, too, weren't you?

10  A.  Yeah, but I don't -- I'm not, you know -- I don't remember

11  if it was September or August or whatnot, but ...

12  Q.  Okay.  Well, let me ask you this question.  Do you recall

13  when you became aware of the government's investigation?

14  A.  Yes.

15  Q.  When was that?

16  A.  May of 2019.

17  Q.  Okay.  And you received a subpoena at that time for

18  information, right?

19  A.  Yes.

20  Q.  Information relating to Jay Doherty and other matters

21  relating to the investigation, is that right?

22  A.  Yes, yes.

23  Q.  Okay.  And about two months prior to that, you had had a

24  conversation with Michael McClain and with Fidel Marquez about

25  the Jay Doherty contract, is that right?

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 53 of 127 PageID #:6742
Dominguez - cross by Bhachu
4270

1    A.  Yes.

2    Q.  So within basically 60, 70 days of that conversation,

3    federal law enforcement contacted you with a subpoena, right?

4    A.  Yes.

5    Q.  And you also know that federal law enforcement contacted

6    ComEd and served a subpoena on the company as well, right?

7    A.  Yes.

8    Q.  And you knew shortly thereafter that the government was

9    looking for documents relating to the Jay Doherty contract, is

10   that right?

11   A.  I think so, yes.

12   Q.  And you know now that the conversation you had with

13   Mr. Marquez and Mr. McClain was recorded --

14   A.  Yes.

15   Q.  -- isn't that right?  Okay.

16          I'm showing you what's marked Government

17   Exhibit 147T, which is in evidence.

18   A.  Yes.

19          MR. COTTER:  Objection, Your Honor.  This

20   conversation never came up in direct.  It never came up in

21   either of the crosses.  It's beyond the scope.  It shouldn't

22   be an opportunity for the government --

23          THE COURT:  I'm not sure what it's about.

24          MR. COTTER:  It's the March 5, 2019 conversation.

25   Judge, it was never mentioned.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 54 of 127 PageID #:6743
Dominguez - cross by Bhachu
4271

1           THE COURT:  Well, the subject may have been.  I

2    haven't seen this.  So it's hard for me to say whether it is

3    or not.

4           What is it about?

5           MR. BHACHU:  Judge, this is the meeting where

6    Mr. McClain describes the hiring of the Doherty subcontractors

7    to Mr. Dominguez.

8           THE COURT:  You can go into this.  Overruled.

9    BY MR. BHACHU:

10   Q.  Okay.  So, sir, in this conversation at the time you came

11   to the US Attorney's office, you didn't know this recording

12   existed, did you?

13   A.  I didn't.

14   Q.  Okay.  And in this recording, on line 16, it says, "I

15   don't know if it's his view of ComEd for even the '70s when,

16   you know, he got to name people to be meter readers.  You

17   know, it's the old-fashioned patronage system."

18          Do you see that?

19   A.  Yes.

20          MR. COTTER:  Your Honor, I'm going to object on

21   relevance.  He doesn't know it, and now he's simply reading

22   him things he doesn't know.

23          THE COURT:  Overruled.  This is cross-examination.

24   BY MR. BHACHU:

25   Q.  And then you see on line 25 there is a reference to you

Dominguez - cross by Bhachu

4272

1    saying, "Like a chip."  Do you see that?

2    A.  Yes.

3    Q.  Okay.  And then it goes on to say where Mr. McClain says,

4    "We have seven meter readers in your -- in your ward, and you

5    can name four of them, you know.  And that's just the way

6    ComEd was for years."

7            Do you see that?

8    A.  Yes.

9    Q.  And then he told you later on in this conversation about

10   how things had morphed into a different type of situation.  Do

11   you recall that?

12   A.  Yeah.  He said we can't do that anymore.

13   Q.  "How else can we help you?"  Is that what it says?

14   A.  Yes.

15   Q.  All right.  And then there is a mention on page 3, at line

16   91, that says, "You know, over 20 years now, we can't really

17   do meter readers, we can't do them anymore."

18           Do you see that as well?

19   A.  Yes.

20   Q.  All right.  And then there is a mention of Mike Zalewski

21   right after that.  Do you see that?

22   A.  Yes.

23   Q.  And then there is also a reference to Ray Nice.  Do you

24   see that as well?

25   A.  Yes.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 56 of 127 PageID #:6745
Dominguez - cross by Bhachu
4273

1   Q.  Okay.  When you came in for your first interview with the

2   government, you were represented by a criminal defense

3   attorney, weren't you?

4   A.  Yes.

5   Q.  And you knew a large federal investigation was going on?

6   A.  Yes.

7   Q.  By September, it was common knowledge that was the case?

8   A.  Sure, yeah.

9   Q.  You had plenty of time to prepare for that interview,

10  didn't you?

11  A.  I guess so.

12  Q.  Well, you had been first approached in May of 2019, is

13  that right?

14  A.  Yeah, I did.  Yeah.

15  Q.  All right.  So you don't guess, you know.

16  A.  Yes, sir.

17  Q.  All right.  What was your defense attorney's name?

18  A.  Vince Connelly.

19  Q.  When you came in for that interview, you didn't know about

20  that recording, did you?

21  A.  I think I just said I didn't.  That's right.

22  Q.  And when you were initially asked questions during that

23  meeting, sir, when you were asked, aside from Mr. Marquez, if

24  you had talked to anybody else about the Doherty contract with

25  anyone else, you initially said that you didn't remember,

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 57 of 127 PageID #:6746
Dominguez - cross by Bhachu
4274

1  isn't that right?

2  A.  I think that's right.  I think I said I talked to McClain

3  about Mike Zalewski, and that's what I remembered about the

4  conversation.

5  Q.  So your testimony here today is that your initial response

6  to the question of whether or not you had talked to anybody

7  else about the Doherty contract is what?

8  A.  I think you asked me if I had a conversation.  I said I

9  had a conversation with McClain about Mike Zalewski.

10 Q.  No.  During the course of your interview in the US

11 Attorney's office --

12 A.  Yeah.

13 Q.  First of all, the US Attorney's office is in this

14 building, is that right?

15 A.  Yes.

16 Q.  Okay.  So you came here with your attorney?

17 A.  Yes.

18 Q.  You had that proffer letter?

19 A.  Yes.

20 Q.  And you were asked questions by myself and other agents,

21 is that right?

22 A.  Yes.

23 Q.  You were asked, other than Mr. Marquez, who else you

24 talked to about the Doherty contract.  Do you recall that

25 question?

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 58 of 127 PageID #:6747
Dominguez - cross by Bhachu
4275

1   A.  No, I really don't.

2   Q.  Okay.  Do you recall giving the answer at some point, when

3   you were asked a question about who you talked to, that you

4   couldn't remember talking to anybody else other than

5   Mr. Marquez?

6   A.  I don't remember.

7   Q.  Okay.  Later in your interview you were specifically asked

8   about Mr. McClain.  Do you recall that?

9   A.  Yes.

10  Q.  And during your interview, you did not disclose

11  Mr. McClain's comments to you about the old-fashioned

12  patronage system, did you?

13  A.  I didn't remember them.

14  Q.  You didn't reference in that interview, that initial

15  interview, when you were asked by federal law enforcement what

16  happened in your conversation with Mr. McClain, you didn't

17  mention anything about him telling you about Mr. Madigan

18  selecting meter readers for ComEd, did you?

19  A.  I didn't.

20  Q.  Your testimony here today is that you told the government

21  in your first interview in September that Mr. McClain had told

22  you about selecting meter readers for ComEd?

23  A.  Could you repeat that?

24  Q.  In your first interview in September when you came to the

25  US Attorney's office, did you tell law enforcement that

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 59 of 127 PageID #:6748
Dominguez - cross by Bhachu
4276

1    Mr. McClain had described to you that Mr. Madigan selected
2    meter readers, ComEd meter readers?  You didn't do that, did
3    you?
4    A.  No.
5    Q.  Okay.  Did you mention in your first interview your
6    comment that ComEd had played that like a chip?
7    A.  No, which clearly relates to what they were doing in the
8    1970s, right.
9    Q.  Well, the question is did you give a full and accurate
10   account of your conversation with Mr. McClain from March?
11   A.  I did to the best of my ability.
12   Q.  Okay.  And so let's talk about the best of your ability.
13            Within two months of that interview -- sorry.
14            Within two months of that meeting with Mr. McClain
15   and Mr. Marquez in March, you knew there was a large federal
16   investigation going on, right?
17   A.  Yes.
18   Q.  So six or seven weeks had passed since you had that
19   meeting?
20   A.  Yes.
21   Q.  And you knew it was a corruption investigation?
22   A.  Yes.
23   Q.  And during your first interview, you didn't tell the FBI
24   about the meter readers, the old-fashioned patronage system or
25   using things as a chip.  You didn't mention those things, did

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 60 of 127 PageID #:6749
Dominguez - cross by Bhachu
4277

1 you?

2 A.  No, I don't think I did.  No, I didn't.

3 Q.  Okay.  You came in for a second interview.  Do you

4 remember that?

5 A.  Yes.

6 Q.  Several weeks later, is that right?

7 A.  Yes.

8 Q.  And again you were asked what transpired during your

9 meeting with Mr. McClain when you talked about the Jay Doherty

10 contract, is that right?

11 A.  Yes.

12 Q.  Fair to say again you didn't tell the FBI about the chips,

13 meter readers, the patronage system?

14 A.  No.  I didn't remember the conversation.

15 Q.  Okay.  And then you were played that recording, right?

16 A.  Yes.

17 Q.  All right.  And, in fact, you told the FBI during the

18 meeting as it concerned that conversation that you had with

19 Mr. McClain and Mr. Marquez that "the connection to the

20 Speaker just didn't ring to me based on the meeting you had

21 had with Mr. McClain and Mr. Marquez."

22         Isn't that what you told law enforcement?

23 A.  I don't recall saying that.

24 Q.  Okay.  And you were also asked in that first meeting about

25 that separate conversation you had with Mr. Marquez before you

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 61 of 127 PageID #:6750
Dominguez - cross by Bhachu
4278

1  met with Mr. McClain and Mr. Marquez.  Do you remember that?

2  A.  Yes.

3  Q.  And in describing that conversation, you didn't mention

4  the fact that you had told Mr. Marquez, after he explained to

5  you that people were getting paid for doing no work and said

6  that you needed to understand it, you told him "There is stuff

7  I want to understand, and there is stuff I don't want to

8  understand."

9       You didn't tell us that, did you?

10  A.  And I quickly also --

11  Q.  Please answer the question.

12  A.  Let me --

13  Q.  Did you tell us?

14  A.  I -- I did not say that.  But the full context is that

15  there is stuff I need to know, stuff I don't need to know.

16  And then I said, "If you guys need this, I'm okay with it.

17  I'm okay moving forward."

18       So I just don't like to have that hang out there as

19  if it were I don't want to know.

20       And as you full well know, I went on to tell

21  Mr. Marquez that everything we need to do here needs to be on

22  the up-and-up, in the light of day.  People have to provide

23  value.  It's an issue if they don't.

24  Q.  So when you came --

25  A.  I went on to direct him to prepare information that

1    explained what these people were going to do.

2            But before I came out of hospital leave, Mr. Marquez

3    again approached me, What do you need to do?  And it was at

4    that point in time that I said, Look, I don't have the time to

5    study this.  It's obviously got to get done.  So I wrote a

6    text message that you have that says, Look, I'm going to go

7    forward with the contract, but we're going to need to see the

8    value here from a lobbying perspective.

9    Q.  True or false:  Mr. McClain told you during that meeting

10   that was recorded that these guys were doing no work?

11   A.  False.

12   Q.  He didn't tell you that?

13   A.  No.

14   Q.  But you did say there were things you want to understand

15   and things you don't want to understand after being told they

16   were doing no work?

17   A.  Are you saying -- you said Mr. McClain.  Are you talking

18   about --

19   Q.  Mr. Marquez.

20   A.  -- Mr. Marquez?  He said that at the moment they were

21   doing no work.

22   Q.  Did he say "at the moment" or did he just say --

23   A.  That's the way I understood it.

24           THE COURT:  Wait.  You're talking on each other.

25   BY MR. BHACHU:

Dominguez - cross by Bhachu

4280

1  Q.  Okay.  That's your understanding of what he said?
2  A.  Yes.
3  Q.  Okay.  But according -- you've seen the transcript, have
4  you not?
5  A.  Years -- it's been a couple years now.
6  Q.  You heard the recording?
7  A.  Yes.
8  Q.  Okay.  And in that recording, after being told that they
9  weren't doing work, you said, "There is things I want to
10  understand and things I don't want to understand," is that
11  right?
12  A.  And if you guys think you need them, I don't need to get
13  into it, the details of it --
14  Q.  Okay.
15  A.  -- is the point I made.
16  Q.  And then later in the call you said in the light of day,
17  you know, things, you know, need to --
18  A.  Right.  We discussed this.  And you said, you said a lot
19  of good things on this tape, didn't you?
20  Q.  Sorry?
21  A.  The meeting I had with you in the office, you portrayed
22  this conversation slightly different.
23  Q.  Wait a second.  Wait a second.  If you are going to start
24  talking about what I said, you might to not do that --
25  A.  All right.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 64 of 127 PageID #:6753
Dominguez - cross by Bhachu
4281

1    Q.   -- because that might not work out well for you, okay.

2            MR. LASSAR:  Objection.

3            THE COURT:  Wait a second.

4            MR. MONICO:  That's threatening.

5    BY MR. BHACHU:

6    Q.  Sir, in that meeting --

7            MR. COTTER:  There is an objection.

8            THE COURT:  Wait, wait, wait.

9            You're losing me a little bit.

10           MR. BHACHU:  Let me rephrase the question if I could.

11           THE COURT:  You're talking about this is a

12   conversation between you, Mr. Bhachu, and the witness?

13           MR. BHACHU:  What's that?  He's referring to comments

14   that I made during the meeting.

15           THE COURT:  All right.

16           MR. BHACHU:  And the problem is, Judge, obviously

17   whatever I say during a meeting is not admissible.  That's not

18   fair.

19   BY MR. BHACHU:

20   Q.  Sir, you were interviewed twice, is that right?

21   A.  Yes.

22   Q.  Okay.  And in either of those two meetings before you were

23   played that recording, did you tell the government that you

24   had said to Mr. Marquez, "There is things I want to understand

25   and things I don't want to understand"?

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 65 of 127 PageID #:6754
Dominguez - cross by Bhachu
4282

1   A.  No, I didn't.

2   Q.  Okay.  And then you had said after that point in time that

3   if you thought there was value, just to go forward and keep on

4   that contract, right?

5   A.  Yes.

6   Q.  Okay.  You were asked also during your first interview

7   with federal law enforcement about the Foreign Corrupt

8   Practices Act, weren't you?

9   A.  Yes.

10  Q.  And you were asked about questions about domestic

11  companies keeping accurate books and records as well?

12  A.  Yes.

13  Q.  And you said that you didn't know about that, is that

14  right?

15  A.  I think I told you that I didn't know the Foreign Corrupt

16  Practices Act applied to domestic companies.  You were asking

17  me about whether I worked any Foreign Corrupt Practices Act

18  cases.

19  Q.  And you weren't aware of that?

20  A.  No.

21  Q.  Okay.  And with respect to the situation that Mr. Marquez

22  described to you where he said people weren't doing work,

23  after you found out about it, you had to go to the hospital,

24  is that right?

25  A.  I was on my way out to get an operation, yes.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 66 of 127 PageID #:6755
Dominguez - cross by Bhachu
4283

1    Q.  Okay.  And when you came back from that operation, you

2    then thereafter met with Mr. McClain and Mr. Marquez together?

3    A.  Before I came back from the operation, Mr. Marquez sent me

4    a text message, presumably at the government's direction,

5    "What do you want to do with the contract?"

6            And I responded that I'll go forward for now, but I

7    need to see the value produced.

8            And in the course of these conversations, no fewer

9    than six times, to my knowledge, I emphasized the importance

10   that every lobbyist that we hire provide value in their

11   lobbying duties.  You have that.

12   Q.  Before the government's investigation became known, did

13   you do anything to investigate what was going on with the

14   ComEd contract as it related to Mr. Doherty?

15   A.  Well, what I did was I set up a meeting with Jay after the

16   elections were concluded.  Tom Donovan was -- it was in Tom

17   Donovan's office.  And I sat down with him.  And Jay had kind

18   of a pad.  He'd walked down -- obviously we knew that

19   Lightfoot had won.  And then he walked down each individual

20   person where there was a change in the race.

21           What we were focused on was the rise of the

22   Democratic Socialists in Chicago because they were the ones

23   that were going to be pushing for the franchise agreement to

24   be revoked, effectively not recovered.

25           And so Jay proposed at that point in time a change in

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 67 of 127 PageID #:6756
Dominguez - redirect by Lassar
4284

1    strategy.  He said, Look, we don't -- we can't just focus on

2    the individual committee members.

3    Q.  Let me stop you for second.

4    A.  We need to --

5    Q.  Did you do anything to investigate what Ray Nice and Frank

6    Olivo were doing after Mr. Marquez told you they were doing

7    nothing?

8    A.  I'm sorry, Mr. Bhachu.  The answer is I didn't investigate

9    what they had done.  I was focused on what we needed to do to

10   approve the franchise agreement.  That was the reason I met

11   with Jay and gave him the work assignments.

12   Q.  Fair to say you knew when you came in for an interview

13   that the questions that you were being asked were very

14   important to the government's investigation?

15   A.  Yes, of course.

16        MR. BHACHU:  May I have a moment, Judge?

17     (Discussion off the record)

18        MR. BHACHU:  No further questions, Judge.

19        THE COURT:  Any redirect?

20        MR. LASSAR:  Briefly, Judge.

21        THE COURT:  Mr. Lassar.

22                   REDIRECT EXAMINATION

23   BY MR. LASSAR:

24   Q.  Mr. Dominguez, you said that in the transition, Anne

25   talked to you about keeping all the lobbyists' structure in

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 68 of 127 PageID #:6757
Dominguez - redirect by Lassar
4285

1    place?

2    A.  Yes.

3    Q.  Was that a recommendation or an order?

4    A.  A little bit of both.

5    Q.  She didn't say you have to do this, did she?

6    A.  Look, I'm coming in to a place I've never worked before,

7    taking over her job.  She's my boss.  When she's making a

8    recommendation like that, it carries more weight than just a

9    recommendation.

10   Q.  Okay.

11   A.  At that point I felt like I'm going to preserve the status

12   quo and get my own eyes on this stuff.  I had a long-standing

13   practice of ensuring that lobbyists were producing value, and

14   that's exactly what I was going to do here.

15   Q.  And Mr. Marquez did not tell you that she had recommended

16   that you make changes with regards to the Doherty lobbyists?

17   A.  He never said anything about any conversation he had with

18   Anne about the Doherty contract.

19   Q.  You were also asked questions about the House resolution

20   that called for a study of what would happen if the nuclear

21   plants were closed?

22   A.  Yes.

23          MR. LASSAR:  Could I show the witness Defense

24   Exhibit 1107, please, Judge, and offer it in evidence.

25          THE COURT:  Any objection?

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 69 of 127 PageID #:6758
Dominguez - redirect by Lassar
4286

1        MR. BHACHU:  No objection, Judge.

2        THE COURT:  It's admitted.

3        You may publish it.

4     (Defense Exhibit 1107 was received in evidence)

5        MR. LASSAR:  I don't think that's the right one.  Can

6    we take that down?  Sorry.

7    BY MR. LASSAR:

8    Q.  Do you recall that Mr. McClain told you that the reason

9    that the Speaker was sponsoring the resolution was to show his

10   leadership and to show what was happening in California and

11   New York?

12   A.  I don't remember.  I don't remember if that's -- my take

13   on it was the resolution was a freebie for the Speaker and for

14   Durkin.  It's one thing to go out there and say, look it, the

15   nuclear plants are important, which is plainly obvious to

16   anybody who has any connection to the energy industry, and

17   saying that they're going to get $200 million a year in

18   support.

19        So when I mentioned earlier that I didn't see this as

20   being the Speaker's support, what I'm saying is everybody

21   understood the issue.  Everybody was sympathetic to the issue.

22   Everybody intuitively knew that these assets that powered

23   millions of customers in the ComEd zone were important.  But

24   that was a far cry from saying -- understanding that and

25   buying into the legislation that would provide Exelon over

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 70 of 127 PageID #:6759
Dominguez - redirect by Lassar
4287

1   $200 million annually.

2   Q.  And that freebie resolution that you talked about, that

3   was sponsored by both the Speaker and the leading Republican

4   in the House, who was Jim Durkin, is that right?

5   A.  That's correct.

6   Q.  And you were also asked about switches that were made in a

7   committee to make the vote unanimous.  Do you remember those

8   questions?

9   A.  Yes.

10  Q.  And that was done both by Speaker Madigan and by

11  representative Durkin, right?

12  A.  I don't remember.  If you pull up that government exhibit,

13  I could tell you maybe if they were Democrats, but I'm not --

14  and Republicans, but I'm not --

15  Q.  This thing about making a committee vote unanimous, this

16  is inside baseball in the House.  This isn't something that

17  was requested by Exelon, was it?

18  A.  We wanted to win the resolution, and we wanted to win it

19  overwhelmingly.  But I think at that point the Speaker was

20  really more messaging what the labor unions wanted, which was

21  a recognition of the value of their jobs.

22          MR. LASSAR:  And can we try again with Defense

23  Exhibit 1107.  Apparently it was the right one, but I was

24  impatient.

25  BY MR. LASSAR:

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 71 of 127 PageID #:6760
Dominguez - redirect by Lassar
4288

1  Q.  Here we go, yeah.  This is from you?

2  A.  Mm-hmm.

3  Q.  And do you see in the middle of the first paragraph you

4  say, "On Thursday night, Mike McClain indicated that the

5  Speaker's office is interested in exploring a resolution

6  showing the General Assembly's interest in preserving

7  nuclear."

8          MR. BHACHU:  The jury can't see it.

9          MR. LASSAR:  I'm sorry.  Thank you.

10          Can we offer it and show it to the jury, please?

11          MR. BHACHU:  No objection.

12          THE COURT:  It was already in, wasn't it?

13          MR. LASSAR:  I guess I did before.  Well, I thought

14  it was the wrong one.

15          THE COURT:  You may publish it.

16          MR. LASSAR:  All right.

17  BY MR. LASSAR:

18  Q.  So you're reporting what McClain told you, that the

19  Speaker was interested in preserving nuclear.  In particular,

20  the Speaker wants to educate members on the California and

21  Germany situation and show leadership."

22  A.  Yes.

23  Q.  Is that what she said?

24  A.  Yes.

25  Q.  And what was the California and Germany situation?

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 72 of 127 PageID #:6761
Dominguez - redirect by Lassar
4289

1   A.   The situation in Germany was that the German government

2   made the decision to shut down the nuclear plants and

3   transition to a power system based entirely on renewables.

4   And the result was, because of the intermittency of

5   renewables, the fact that solar doesn't run at night and wind

6   doesn't operate during times when it's not windy obviously,

7   there was a further dependence on fossil fuel plants.

8          And instead of reducing emissions, emissions actually

9   skyrocketed.  Customer costs increased dramatically and air

10  pollution increased dramatically in Germany.

11         Likewise in California, after the shutdown of a dual

12  unit reactor in the San Diego area, we witnessed the same

13  things.  Prices spiked.  Air pollution spiked.  Reliability

14  was thrown into doubt.

15         So these became the very same issues that in the

16  resolution Leader Durkin and the Speaker directed the ICC to

17  investigate.

18         What were the risk profiles for reliability?  What

19  were the environmental consequences?  What were the increased

20  costs that consumers might pay if the plants were shut down?

21         MR. LASSAR:  Thank you.  Nothing further.

22         THE COURT:  Mr. Cotter, anything further?

23         MR. COTTER:  No, Your Honor.  Thank you.

24         THE COURT:  Anybody else?

25         If not, you can step down, sir.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 73 of 127 PageID #:6762
Kuta - direct by Woodring
4290

1    THE WITNESS:  Thank you.

2      (Witness excused)

3          THE COURT:  Call your next witness.

4          THE WITNESS:  Your Honor, I'm just going to leave

5    this here.

6          THE COURT:  Yes.  That'll take care it.  Thank you.

7          MS. WOODRING:  Your Honor, the defense calls Susan

8    Kuta.

9          THE COURT:  All right.  Please raise your right hand.

10     (Witness duly sworn)

11         THE WITNESS:  I do.

12         THE COURT:  Please be seated.

13         You may question the witness.

14         MS. WOODRING:  Thank you.

15      SUSAN KUTA, DEFENDANT PRAMAGGIORE'S WITNESS, SWORN

16                    DIRECT EXAMINATION

17   BY MS. WOODRING:

18   Q.  Good afternoon.

19   A.  Hi.

20   Q.  Would you please state your name for the record.

21   A.  Susan Kuta.

22   Q.  Thank you, Susan.

23         And, Susan, would you mind spelling that for the

24   court reporter?

25   A.  K-U-T-A.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 74 of 127 PageID #:6763
Kuta - direct by Woodring
4291

1  Q.  And I think just for purposes of our hearing, we might

2  have you adjust your mic just a little closer.  Thank you so

3  much.

4          Susan, are you currently working?

5  A.  I'm not.  I'm retired.

6  Q.  And where did you retire from?

7  A.  ComEd.

8  Q.  How long were you at ComEd for?

9  A.  I was there for 15 years.

10 Q.  And could you briefly walk us through what you did for

11 ComEd?

12 A.  I started out in the legal department and then I went over

13 to the corporate side.

14 Q.  And in the course of your time at ComEd, did you come to

15 know Anne Pramaggiore?

16 A.  I did.  I started working for Anne in 2000.

17 Q.  What was the position that you held when you were working

18 for Anne?

19 A.  Executive administrative assistant.

20 Q.  And how long were you Anne's executive administrative

21 assistant?

22 A.  Nine years.

23 Q.  And what were your responsibilities as her executive

24 administrative assistant?

25 A.  Everything.  Excuse me.  I went through emails.  I typed

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 75 of 127 PageID #:6764
Kuta - direct by Woodring
4292

1    documents.  I worked with her calendar.  A little bit of

2    everything.  Took phone calls, scheduled meetings.

3    Q.  And did you have the opportunity to observe Anne on the

4    job while you were working for her?

5    A.  I did.

6    Q.  What do you remember observing?

7    A.  How hard she worked.

8    Q.  And did you get a sense of her schedule?

9    A.  Her schedule was packed from morning 'til night.  She had

10   meetings, she had conference calls, documents to prepare.  And

11   she would often go after work to company functions.

12   Q.  And I'm not going to ask you about any specific acts, but

13   did you develop a personal relationship with her in addition

14   to this professional one?

15   A.  I did.

16   Q.  And did you stay in touch with her following your

17   retirement?

18   A.  I retired, and I've been retired for 13 and a half years,

19   and we've maintained contact.

20   Q.  And in the course of the decades that you have known her,

21   in the nine years that you worked for her, did you have the

22   opportunity to develop an opinion with respect to her

23   integrity?

24   A.  Anne has the utmost integrity.  She has a high moral

25   compass.  She's honest.  She's genuine.  I can't say any more

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 76 of 127 PageID #:6765
Kuta - cross by MacArthur
4293

1  than that.

2  Q.  Thank you very much.

3          THE COURT:  Cross-examine?

4          Ms. MacArthur.

5          MS. MacARTHUR:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7  BY MS. MacARTHUR:

8  Q.  Ms. Kuta, my name is Diane MacArthur.  I'm one of the

9  prosecutors in this case.

10          I think you mentioned that you worked for Ms.

11  Pramaggiore for nine years?

12  A.  Mm-hmm.

13  Q.  Am I correct then the years that you worked for

14  Ms. Pramaggiore would have been from 2000 to 2009?

15  A.  Yes.

16  Q.  To state the obvious, you did not work for Ms. Pramaggiore

17  then between 2009 and 2011, correct?

18  A.  No.

19  Q.  You have no idea what was going on in the office during

20  that time?

21  A.  I do not.

22  Q.  You don't know anything that Ms. Pramaggiore was working

23  on at that time, correct?

24  A.  I don't.

25  Q.  You weren't able to review her emails?

Kuta - cross by MacArthur

4294

1   A.  No.

2   Q.  You don't know who it was that she was speaking with

3   during --

4   A.  At that time, no.

5   Q.  Okay.  You talked then about the time that you have known

6   Ms. Pramaggiore and how it extended into your retirement

7   years, correct?

8   A.  Mm-hmm.

9   Q.  And you gave us your opinions about her integrity.

10          Would you say that Ms. Pramaggiore in those years

11  that you have worked with her and have known her, that she

12  follows through on things?

13  A.  She does.

14  Q.  Have you also found that she stays on top of things?

15  A.  As much as she can, yes.

16  Q.  Would you also say that she is very detailed oriented?

17  A.  I think so, yes.

18          MS. MacARTHUR:  If I may have just a moment, Your

19  Honor?

20          Nothing further, Your Honor.  Thank you.

21          THE COURT:  You can step down.

22    (Witness excused)

23          THE COURT:  We'll take our afternoon recess now 'til

24  a quarter to 4:00.

25    (Recess)

1    (Change of reporters.)

2    (Proceedings heard in open court, jury not present:)

3         THE COURT:  Who is the next witness?

4         MS. WOODRING:  Your Honor, the defense calls Mary

5    O'Toole.

6         THE COURT:  Is this the emotional one?

7         MS. WOODRING:  No.

8    (Jury in.)

9         THE COURT:  Please be seated.

10    MARY O'TOOLE, DEFENDANT PRAMAGGIORE'S WITNESS, SWORN

11         THE COURT:  Ms. Woodring, you may question the

12    witness.

13         MS. WOODRING:  Thank you, your Honor.

14                     DIRECT EXAMINATION

15    BY MS. WOODRING:

16    Q.  Good afternoon.

17    A.  Good afternoon.

18    Q.  Would you please state your name for the record.

19    A.  Certainly.  Mary O'Toole.

20    Q.  And, Mary, would you mind spelling that also for the court

21    reporter?

22    A.  Sure.  Mary, O, apostrophe, T-o-o-l-e.

23    Q.  Thank you.

24         And, Mary, are you currently working?

25    A.  No.

1  Q.  Is it fair to say you're retired?

2  A.  I am.

3  Q.  Okay.  When did you retire?

4  A.  December of 2019.

5  Q.  And I'd like to briefly discuss your career prior to that

6  point.  Would you give us an overview?

7  A.  Sure.  I graduated in civil engineering from Marquette

8  University.  Joined ComEd right after, joined their

9  environmental department.  Went from there to work in their

10  generating stations and then back to their environmental

11  department that I ended up heading up several years later.

12         I then worked designing energy efficiency and

13  renewable energy programs for the company.  Left short of my

14  25th year.  Started my own company.  Worked for every utility

15  in the state on environmental and regulatory matters.  I had a

16  consulting practice.  And I grew that into a larger practice,

17  brought that in-house to Premiere Engineers in 2014 and

18  retired from there in '19.

19  Q.  Thank you.

20         And in the course of your work, especially with

21  respect to ComEd, did you come to know Anne Pramaggiore?

22  A.  I did.

23  Q.  How did you and Anne meet?

24  A.  I was introduced to Anne shortly after she joined the

25  company by another regulatory attorney.  As luck would have

O'Toole - direct

4297

1 it, we shared office walls twice over our career.  And I moved

2 on to her same train line at one point in my career, so we

3 were commuting.  I would see her on the train, walking back

4 and forth.  We'd see each other at company events.  We got to

5 know each other well.

6       Being in close proximity -- our homes were in close

7 proximity -- we ended up, later in our career, driving back

8 and forth to events; you're going to this one, why don't I

9 drive.

10       So, we got to know each other very well.  And, as I

11 said, we had a close relationship.

12 Q.  And did you -- you discussed having departed ComEd

13 around -- what year was that?

14 A.  2005.

15 Q.  And after you left ComEd, did you have further contact

16 with the company after departure?

17 A.  I did.  Several.  I came back within two or three months

18 of leaving.  Anne had called and asked me if I'd work on a

19 special energy efficiency program development for the company.

20 So, I ended up working back for the company, in that instance,

21 several months.

22 Q.  And I'm curious, are you familiar with legislation known

23 as EIMA or Smart Grid?

24 A.  I am.

25 Q.  Did you have any involvement with the efforts to pass

1  EIMA?

2  A.  I did.  I was actually a stakeholder manager for the EIMA

3  legislation for ComEd.

4  Q.  And could you explain to us what a stakeholder manager

5  does?

6  A.  Sure.  Stakeholder management is really about organizing

7  and educating stakeholders in the interest of legislation.

8          This was a huge bill and would need lots of -- lots

9  of support and lots of work.  There would be -- our union

10  workforce was going to be working full-time; and, yet, we'd

11  need all this work on top of that that was part of the EIMA

12  legislation.

13          Anne had started to talk with contractors -- she

14  talked with the union; she had a great relationship with the

15  union -- but would talk with contractors about -- construction

16  contractors that we would -- there would be potential work for

17  lots of other people.

18          And the contractors were enthusiastic.  Well, yeah,

19  it meant that they'd have a potential for more work; but they

20  were also our customers.  And back when I was reliability

21  manager, they were also our customers.  They had experienced

22  outages.  We -- the poor -- we had poor performance back in

23  the '05 area when I left.

24          And EIMA was -- half of it was about reliability

25  programs, about making sure the infrastructure was

1    straightened and strengthened to reduce outages.

2          So, we -- my job -- I had hundreds of vendors --

3    engineering firms, construction firms -- that wanted to

4    support the legislation and offered, volunteered, to get

5    educated on the legislation and talk to other business owners.

6    Because these vendors and contractors in our area, as I said,

7    they were our customers.  They understood it.  But they wanted

8    to make sure other business owners that they knew understood

9    how important the legislation was; less outages, businesses

10   could run more consistently --

11   Q.  And --

12   A.  -- and -- sorry.

13   Q.  To be clear, so, the stakeholders that you were managing,

14   these were the vendors that you were --

15   A.  Yeah.  They're --

16   Q.  -- interacting with?

17   A.  -- they've -- vendors, I think we used several different

18   nouns to describe, but contractors, engineering firms,

19   technology firms.

20          Anne's grassroots program was about getting anybody

21   that would be touched by the benefits of EIMA should be

22   knowledgeable about what was happening and how it would

23   improve ComEd.

24   Q.  And were you advising these vendors and other stakeholders

25   to do anything after their education?

1  A.  Education and mobilization.

2          So, all of the vendors that had volunteered to work

3  on the legislation also would volunteer to go to their

4  legislators.

5          So, they would go to mayors and managers and

6  legislators and talk about the benefits of EIMA.  And we kept

7  track of which legislators they were going to and talking with

8  and any feedback they would get from those interactions.

9  Q.  And after EIMA passed, did you have any further

10  involvement with the legislation?

11  A.  I was actually brought in -- hired to -- by the

12  engineering department.  The vice president of engineering

13  brought me in because I knew the details of the EIMA

14  legislation.  And having been reliability manager, I helped --

15  small team that I managed, we streamlined the engineering

16  processes because so many engineering projects were needed to

17  get out to accomplish what was set out in the EIMA

18  legislation.

19  Q.  And circling back to Ms. Pramaggiore, I'm curious, did you

20  continue to have a relationship with her following your

21  retirement?

22  A.  Yeah.  She's a person I know well.

23  Q.  And I'm curious, in the -- is it fair to characterize as

24  decades that you've known her?

25  A.  Yeah.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 84 of 127 PageID #:6773
O'Toole - cross by Streicker
4301

1  Q.  In the decades that you have known her, did you have the

2  opportunity to develop an opinion with respect to her

3  integrity?

4  A.  Absolutely.

5  Q.  Would you share it with us?

6  A.  Anne's the consummate professional and has the highest

7  degree of integrity.  She's ethical, honest, and true to her

8  word.

9       I loved working for her, with her, because she's the

10  kind of person that when she walks in the room, people pay

11  attention.  They trust she's going to do the right thing.

12       And when she was named CEO and president, I was

13  thrilled.  And I know a lot of others that were sitting up

14  straighter in their chairs that day to have someone like Anne

15  run that company.

16  Q.  Thank you.

17       MS. WOODRING:  No further questions.

18       THE COURT:  Cross-examine.

19       Ms. Streicker.

20       MS. STREICKER:  Thank you.

21       CROSS-EXAMINATION ON BEHALF OF THE PLAINTIFF

22  BY MS. STREICKER:

23  Q.  Good afternoon.

24  A.  Good afternoon.

25  Q.  Ms. O'Toole, you left ComEd in 2005 --

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 85 of 127 PageID #:6774
O'Toole - cross by Streicker
4302

1    A.  Correct.

2    Q.  -- is that right?

3    A.  Correct.

4    Q.  Ad, so, after 2005, you were no longer a ComEd employee?

5    A.  Correct.

6    Q.  But you did, it sounds like, some consulting work for

7    ComEd?

8    A.  Yes.

9    Q.  And that was at Ms. Pramaggiore's request?

10   A.  The first was Anne's request.  I worked as a consultant a

11   couple other times at other -- at the request of other ComEd

12   executives.

13   Q.  And you actually did work as a contractor, right?

14   A.  Yes.

15   Q.  And did Michael Madigan recommend you to be hired by

16   ComEd?

17   A.  No.

18   Q.  Did Mr. McClain ever pass along a hiring recommendation

19   from Speaker Madigan to you while you worked at ComEd?

20   A.  No.

21          MS. WOODRING:  Outside of the scope of the direct,

22   your Honor.

23          THE COURT:  Objection sustained.  That is beyond.

24          MS. STREICKER:  I'll move on, your Honor.

25   BY MS. STREICKER:

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 86 of 127 PageID #:6775
O'Toole - cross by Streicker
4303

1  Q.  You mentioned that Anne follows through on what she says

2  she's going to do; is that right?

3  A.  Very much so.

4  Q.  When she says she's going to get something done, she gets

5  it done, right?

6  A.  Yes.

7  Q.  And in your experience, I believe you also said

8  Ms. Pramaggiore's a genuine person, right?

9  A.  Yes.

10  Q.  When she says something, she means it?

11  A.  Yes.

12  Q.  And if she wrote something, she meant it, right?

13  A.  I don't know.  I would assume so.

14  Q.  In your experience, if she wrote something to you, did she

15  mean it?

16  A.  Yes.

17  Q.  And is it fair to say that you don't have any personal

18  knowledge of the allegations in this case?

19  A.  No.

20  Q.  Thank you.

21          MS. STREICKER:  No further questions.

22          THE COURT:  You can step down.

23      (Witness excused.)

24          THE COURT:  Call your next witness.

25          MS. WOODRING:  Your Honor, the defense calls Kevin

Brookins - direct

4304

1    Brookins.

2        KEVIN BROOKINS, DEFENDANT PRAMAGGIORE'S WITNESS, SWORN

3              THE COURT:  You may question the witness.

4              MS. WOODRING:  Thank you, your Honor.

5          (Brief pause.)

6              THE WITNESS:  Uncooperative water bottle.

7                       DIRECT EXAMINATION

8    BY MS. WOODRING:

9    Q.  Good afternoon.

10   A.  Good afternoon.

11   Q.  Would you please state your name for the record.

12   A.  My name is Kevin Brookins.

13   Q.  And, Kevin, do you mind spelling your name for the court

14   reporter, as well?

15   A.  Sure.  It's B-r-o-o-k-i-n-s.

16   Q.  Thanks very much.

17          And, Kevin, are you currently working?

18   A.  No.  I'm retired from ComEd.  I retired at the end of

19   2016.

20   Q.  And how long were you with ComEd?

21   A.  I was with ComEd for 33 years.  I joined the company in

22   1983.

23   Q.  And do you mind briefly walking us through what you did

24   for ComEd?

25   A.  Briefly, in 33 years?  Okay.

1       I was hired into ComEd as an electrical engineer

2   straight out of college in 1983.  For roughly about the next

3   ten years, I was -- I worked individual assignments --

4   assignments as an individual contributor.

5       In about 1993, I became a engineering supervisor and

6   then an engineering manager.  And by 2000, I was the director

7   of operations for one of ComEd's region.

8       I became an executive for ComEd in 2005, I believe it

9   was, and remained a vice president in different capacities

10  until 2012, when I was promoted to senior vice president of

11  strategy and administration, reporting directly to the CEO of

12  the company, who was Anne Pramaggiore.

13  Q.  And what did you do as senior vice president?

14  A.  My responsibilities included an organization that we call

15  OSBI, which was like an internal consultant for the company.

16  We also facilitated the business planning and risk management

17  processes.  I also had responsibility for communications,

18  marketing, real estate, facilities, and security.

19  Q.  And you mentioned that you were working for Anne

20  Pramaggiore.  And I'd like to talk about your relationship

21  with her.

22      How did you first meet Anne?

23  A.  I met Anne over 20 years ago.  I think it was around 1998.

24  She was just hired into the company as a regulatory engineer.

25  I was on a project team that was implementing the Customer

1  Choice legislation back then, and she was my legal support in

2  the regulatory filings that we had to provide back then.

3  Q.  And I'm curious what your interactions were with her over

4  the years that you were at the company.

5  A.  After that -- after I left that project team, I probably

6  didn't see -- run into Anne probably until 2007.  A number of

7  years.  About eight years.  By that time, she was an executive

8  vice president in regulatory; and she had customer operations.

9  And I was a vice president in operations.  And, so, we had

10 some overlap there.

11          And over the years, from 2007 to 2012, I moved on to

12 two, three different assignments where my interactions with

13 her became more and more frequent.

14 Q.  And you said they ultimately culminated with you being a

15 direct report of hers as senior vice president?

16 A.  That's correct.

17 Q.  And can you describe the nature of your interactions when

18 you were in that position?

19 A.  I would see Anne regularly.  In fact, some days I would

20 see her all day.  In fact, some days not only all day, I would

21 see her through the evenings because each -- both of us were

22 involved in civic organizations, so we would attend dinners

23 during the evening, fundraising dinners of those civic

24 organizations, like the Lincoln Park Zoo or the Urban League

25 or something like that.  So, I would see her pretty common.

1       My office door -- my office was just three doors down

2  from hers.  So, we would see each other outside of our staff

3  meetings, which was every other week, and other meetings I

4  would have specific to my organization.  I'd stick my head in

5  her door, she'd stick her head in my door, and we would talk

6  about business issues, or we might just talk about personal

7  issues, ask how the family's doing.  That kind of thing.

8  Q.  And how many years were you in that relationship reporting

9  to her?

10  A.  Five years.

11  Q.  And you've mentioned being a fellow executive at the

12  company.  And I'm curious, did you ever hear people say the

13  expression "I'm on it"?

14  A.  That's pretty common -- it's a pretty common expression in

15  the company.

16  Q.  And what did you understand that to mean?

17  A.  When I would use it, which I would, it meant that I had an

18  issue, and I would see an issue through its conclusion.

19  That's pretty much what everybody meant by that.

20       In fact, in my organization, as we would talk through

21  an issue, I would make sure that whatever the issue was, that

22  we had someone who was accountable for it.  And I would wait

23  for someone to say, "I've got it."  "I'm on it."  "I'm on it."

24  Some indication that they owned it, and they would be

25  accountable to seeing it through to its conclusion.

1  Q.  And when you say "conclusion," what would that conclusion
2  be?
3  A.  Whatever -- whatever came out at the other end of the
4  process.  There wasn't necessarily a predetermined decision
5  about what that conclusion was going to be.  Sometimes you
6  might have had an idea -- many times you might have an idea of
7  what it might be.  And many times you were surprised by the
8  time you worked it through the issue, that it turned out to be
9  something else.
10 Q.  You say you were surprised.  So, does that mean it could
11 be a yes or a no?
12 A.  Sometimes it was a yes -- it could be a yes or no.  It
13 could be a numeric answer.  It could be any number of things.
14 It depends on what the issue is.
15 Q.  And in the course of the decades that you've known Anne?
16 A.  Uh-huh.
17 Q.  Yeah, that's correct?
18         Did you have the opportunity to develop an opinion
19 with respect to her integrity?
20 A.  Oh, Anne's integrity is of the -- is of the highest.
21 She's a very honorable person.  In fact, Anne -- not only
22 would she make sure that everyone was doing the right thing,
23 she was really good at making sure that no one was doing
24 anything that could be misinterpreted as doing the wrong
25 thing.  She was really good at that.  I mean, she's just a

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 92 of 127 PageID #:6781
Brookins - cross by Pavlow
4309

1  good and decent person, something I recognize, I picked up on

2  when I first met her in 1998, and she just validated it in the

3  five years I worked directly for her.

4  Q.  Thank you.

5        MS. WOODRING:  No further questions.

6        THE COURT:  Cross-examine.

7        MS. PAVLOW:  Briefly, Judge.

8        THE COURT:  Ms. Pavlow.

9        CROSS-EXAMINATION ON BEHALF OF DEFENDANT HOOKER

10  BY MS. PAVLOW:

11  Q.  Good afternoon, Mr. Brookins.

12  A.  Good afternoon.

13  Q.  You were at ComEd for decades?

14  A.  Yes.

15  Q.  And, so, do you know John Hooker?

16  A.  Oh, I know John very well.

17  Q.  And how long have you known John?

18  A.  Most of my career.  So, I probably met John in the late

19  '80s, early '90s.  I don't want to say how many years.  That

20  makes me look old.

21  Q.  And since that time, you knew John -- both of you worked

22  at ComEd; is that right?

23  A.  Right.  We kind of grew up in the company together.  John

24  was 10, 15 years my senior, but we kind of grew up in the

25  company together.  John was one of many mentors that I had

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 93 of 127 PageID #:6782
Brookins - cross by Pavlow
4310

1   along the way.  He was very helpful to me and counselled me in

2   my career.

3          We came from different backgrounds.  John came in

4   probably straight out of high school, started in the mail

5   room.  I came out of college.  I was an engineer.  He was a

6   community relations kind of guy.  I knew how the electric grid

7   worked.  John knew how people worked.  And John knows people

8   about as well as anybody I know.

9   Q.  Okay.

10         And did you also serve on any sort of associations

11  with John?

12  A.  Yes.  In fact, John -- John was the founder of our

13  African-American Employee Network Group, which was a very good

14  career development organization.  And that second year -- I

15  think that was 1991.  In the second year, I believe that was

16  '92, I actually was the vice president of that organization.

17  Q.  In the 30-plus years that you've known John, have you had

18  the ability to form an opinion as to his integrity and his

19  honesty?

20  A.  John, again, had the utmost integrity.  In fact, John was

21  always known for saying, Do the right thing; just do the right

22  thing.  As we contemplated issues, on how to address something

23  and wondered how to get it done, he would say do the right

24  thing.  He would also say -- very well-known to say just tell

25  the truth.

Case: 1:20-cr-00812 Document #: 306 Filed: 08/03/23 Page 94 of 127 PageID #:6783
Brookins - cross by Schwartz
4311

1            I specifically remember a time when I was -- when I
2   had to meet with an elected official, and I wasn't sure how to
3   explain something.  And John's comment was -- typical John --
4   tell the truth.  That's just kind of how he would say it.
5   Q.  Thank you, Mr. Brookins.
6            THE COURT:  Cross-examine.
7            CROSS-EXAMINATION ON BEHALF OF THE PLAINTIFF
8   BY MS. SCHWARTZ:
9   Q.  Good afternoon, Mr. Brookins.  My name is Julia Schwartz.
10  A.  Good afternoon.
11  Q.  I'm one of the prosecutors on the case.
12           You testified earlier that the phrase "I'm on it" was
13  something that was commonly spoken at ComEd?
14  A.  Yes, I did.
15  Q.  And "I'm on it" meant you were accountable for that item?
16  A.  That's correct.
17  Q.  That you had to see it through to conclusion?
18  A.  That's correct.
19  Q.  Now, Mr. Brookins, were you ever registered as a lobbyist?
20           MS. WOODRING:  Objection.  This is outside the scope
21  of the direct.
22           THE COURT:  He can answer.
23  BY THE WITNESS:
24  A.  I think at one point in time I was a registered lobbyist
25  for the City of Chicago.  That was when I was head of regional

Pramaggiore - direct

4312

1   operations for the City of Chicago.  But that's it.

2   BY MS. SCHWARTZ:

3   Q.  In your decades-long career at ComEd, you didn't lobby

4   down in Springfield?

5   A.  No.

6   Q.  Didn't have day-to-day interaction as to how ComEd sought

7   to achieve its legislative agenda?

8   A.  No, I did not.

9   Q.  Fair to say you don't have personal knowledge of the facts

10  of this case?

11  A.  I do not.

12  Q.  And you haven't seen all the evidence that the jury has

13  heard over the last many weeks; fair to say?

14  A.  All I know is what's being reported in the media.

15          MS. SCHWARTZ:  No further questions, your Honor.

16          THE COURT:  You can step down.

17      (Witness excused.)

18          THE COURT:  Call your next witness.

19          MR. LASSAR:  Anne Pramaggiore calls Anne Pramaggiore.

20          ANNE PRAMAGGIORE, DEFENDANT HEREIN, SWORN

21          THE COURT:  Mr. Lassar, you may question the witness.

22                      DIRECT EXAMINATION

23  BY MR. LASSAR:

24  Q.  I think we know who you are, but state your name for the

25  record, please.

1    A.  Anne Pramaggiore.

2    Q.  And -- are you close enough to the microphone?

3    A.  Yes.  Getting situated.

4    Q.  Tell us a little bit about yourself.  Where did you grow

5    up?

6    A.  I grew up in Dayton, Ohio, outside of Dayton, Ohio.

7    Q.  Did you -- you went to school there?

8    A.  I went to -- yes, I -- elementary school and high school.

9    Q.  Did you work during school?

10   A.  I did.  Started working pretty early in life baby-sitting,

11   cutting grass, substitute paper boy.  And then when I went to

12   high school, I got real jobs working in restaurants.  I was a

13   waitress at JCPenney's coffee shop, Ponderosa.

14   Q.  Were you involved in athletics in high school?

15   A.  I was.  I will date myself with this, but I was very

16   enthralled with the 1968 Olympics and decided that I wanted to

17   run track and field.  At the time, schools didn't really have

18   girls' track and field teams pre-Title IX.  But, amazingly, I

19   found an AAU, or Amateur Athletic Union, team, kind of a club

20   team, in the area and joined that team.

21          Once I joined the team, I found that I wasn't quite

22   as speedy as I thought that I was and didn't really stack up

23   with the other girls on the team who were some -- some of them

24   were world-class runners.

25          But I found a niche in racewalking, which is not what

1  you want to do when you're a 12-year-old girl.  But it was my

2  niche.  And I won the state championship a couple years in a

3  row and went to the nationals one year.

4  Q.  And did you attend college after high school?

5  A.  I did.  I went to Miami University in Ohio; cornfields of

6  Ohio, not the beaches of Florida which it's often mistaken

7  for.

8  Q.  And after college, what did you do?

9  A.  My first job was as a receptionist in a hair salon.  And

10  then I got a job working at one of the department stores in

11  town and then worked my way into the buying office there, and

12  I was a buyer for department store chains for about six years.

13  Q.  And did you have occasion to move to Chicago?

14  A.  I did.  I came up here -- my husband got a job up here.

15  And, so, I moved to Chicago.  And I went to -- I went back to

16  school at that point.  I went to DePaul law school.

17  Q.  Did you graduate from DePaul?

18  A.  I did.

19  Q.  And what did you do after graduation?

20  A.  My first job was actually clerking in the courts here for

21  Judge Kocoras.  I spent a year as a law clerk.  Great job.

22  Learned a tremendous amount.

23  Q.  And after your clerkship, what did you do?

24  A.  I went to work for a firm in town, McDermott Will & Emery.

25  And I spent about eight years there.

1  Q.  What kind of law did you practice at McDermott?

2  A.  I was an antitrust lawyer, which is the law around

3  competition between businesses.

4  Q.  And did you leave McDermott after about eight years?

5  A.  I did.

6  Q.  How did that come about?

7  A.  I got a call from a recruiter who was recruiting for

8  Commonwealth Edison.  And the company -- the State of Illinois

9  had just passed a law called the deregulation law.  It was

10  deregulating the electric industry.  And the company was

11  looking for lawyers who had competition law background.

12          And, so, I interviewed for the job and made a move at

13  that point in my career.

14  Q.  Why did you decide to move to ComEd?

15  A.  I had several reasons.  One was I had a very young child

16  at home, and I knew that the life of a litigation attorney

17  would have me on the road a lot, and I really didn't want to

18  do that.

19          When I interviewed for the job, the person who was

20  the General Counsel at the time, her name was Pam Strobel, and

21  she was one of the first female General Counsels of a big

22  company in the United States.  And she was just wonderful.

23  Impressive and gracious and had a great team around her.  And

24  that was really enticing to me.

25          And, then, it was also the fact that, for an

1    antitrust lawyer who deals with competition law, to see the

2    last sort of fully regulated industry go through deregulation

3    was just a great opportunity from a career standpoint.

4    Q.  And what do you mean by deregulation?

5    A.  So, the electric industry historically has been regulated.

6    They are regulated monopolies.  The utilities serve a specific

7    territory, geographic territory.  And because they don't have

8    competition, the state regulates many, many aspects of their

9    business; setting price, the quality of their service, even to

10   the point of where you can place poles.  You know, all of that

11   is regulated by the state.

12          And, so, what was happening in the late '90s was

13   there was a trend toward taking at least pieces of the

14   business and sending them out to competition.  I think the

15   theory in our economy is that competition always works better.

16   You know, it does a better job of reducing price and raising

17   quality for consumers.  And, so, many regulated businesses

18   were seeing deregulation trends.  And the electric industry

19   was seeing it at the end of the 1990s.

20   Q.  What was your first job at ComEd?

21   A.  I worked in the law department, and I was in charge of

22   dockets or legal proceedings at the Illinois Commerce

23   Commission.

24          The Illinois Commerce Commission is the agency that

25   has the regulatory authority over the utilities.  So, the

1  legislature sort of sets what I think of as sort of the
2  architecture for how they want these companies managed and
3  regulated.  And then the ICC, or the Illinois Commerce
4  Commission, kind of comes in and does the engineering
5  drawings, the detail work around how that's supposed to
6  happen.

7          And, so, I was in charge of dockets or litigation in
8  front of the Commerce Commission that dealt with all this
9  deregulation, the pulling apart of the company and taking
10 pieces of it and moving it out to competitive markets, free
11 markets.
12 Q.  Did you get any promotions within the legal department?
13 A.  I did.  After a couple years, I was moved up to what I
14 think they called lead lawyer at ComEd.

15         The company at that point in time had actually merged
16 with another company and split up into several companies, and
17 they had lead lawyers at each of the sort of operating
18 companies at the time.  And I was put in place at ComEd.
19 Q.  Did you leave the legal department at some point?
20 A.  Yeah.  A few years after that, I was offered a job running
21 the regulatory area, which is not so different from the work I
22 was doing in legal, but it's actually on the business side of
23 the company, which is a little bit different.

24         But regulatory is in charge of all the work that's
25 done at the Illinois Commerce Commission.  So, our rate cases

1    is the biggest piece of it, the price setting that is done by

2    this agency.  And I was in charge of managing that.

3           There's also litigation around -- if we wanted to

4    build a new transmission line, we would go to the Illinois

5    Commerce Commission and get permission to do that.  We would

6    have to submit engineering drawings and go through a very

7    lengthy process where parties would come in and comment on it.

8           So, those were the types of things that I was doing

9    in that role.

10   Q.  And what was happening at Exelon and ComEd at that time?

11   A.  Well, certainly deregulation and all that that was sort of

12   creating, all that change that was being created in the

13   company was, you know, sort of taking a lot of time and

14   attention.

15          But the company actually -- ComEd merged with the

16   Philadelphia Electric Company during that time, as well.  And

17   Exelon was created at the time.  And, so, that merger,

18   bringing together of those two companies, was also taking up a

19   lot of time and attention at the company.

20   Q.  Around 2005 were other responsibilities added to you?

21   A.  They were.  At that point, I was given external affairs,

22   which is our relationship management function with the

23   400-plus municipalities that ComEd serves.

24   Q.  And in 2007 was more responsibility put underneath you?

25   A.  Yes.  At that point, I was put in charge of -- not on a

1    day-to-day basis; there was somebody who was actually running

2    the customer operations area on a day-to-day basis, but I had

3    sort of an oversight function.

4            And customer operations is meter reading, the

5    billing, and the customer representative or customer service

6    department.  An it's the second largest group in the company,

7    probably somewhere between 1,500 and 2,000 employees.

8    Q.  Did you know why you were be given -- why you were given

9    these added responsibilities?

10   A.  Yes.

11   Q.  And why was that?

12   A.  I was -- they were starting to groom me to be -- Frank

13   Clark was the CEO at the time, and they were starting to groom

14   me to be his successor.  And they wanted to give me experience

15   in these different areas in the company so that I could move

16   into that role.

17   Q.  And in 2009, did you get another group in the company

18   under you?

19   A.  Yes.  In 2009, I was made the COO and president.  So,

20   that's chief operating officer.

21           And the new area in that move was the electric

22   operations area, which is really the core of the company.

23   It's probably what most people know about ComEd or what

24   ComEd's known for.  It's the design and engineering,

25   construction of the whole wires and poles system that serves

1    customers, delivers power to you.

2         It's also the operation of that system, which is the

3    people who actually make sure that when there's a storm, you

4    get restored; that if we have to repair a line, that that line

5    is actually out so our employees don't get hurt.  It is the

6    maintenance of the whole system.  It is the restoration and

7    repair when there's a storm or some other problem that occurs

8    on the system.  So, it's all of that.

9         And then there's a support group that is -- includes

10   fleet.  The company, at the time I was there, had 3,500

11   vehicles.  And these are serious vehicles, bucket trucks and

12   digger derricks.  So, we had a whole department dedicated to

13   managing the fleet.

14        We had a facilities group.  We had a training group.

15   We had safety experts who would develop rules and policies

16   around safety to keep our people safe.  An environmental group

17   that, you know, would make sure that if we had a spill or a

18   transformer blew, that when we cleaned it up, we followed all

19   the rules and regulations associated with cleanups of that

20   type.

21        So, it was the biggest area in the company, I want to

22   say 3,000 to 3,500 employees.  Somewhere in that range.

23   Q.  And had you had any background in electric operations

24   before then?

25   A.  No.

1   Q.  How did you get to understand that department?

2   A.  It was -- it took a while and some work.  I really just

3   sort of followed my instincts.  And I started by trying to

4   listen to people who knew something about it.

5           I started out by doing road shows.  I would go out

6   and meet with our employees.  We had about 40-some-odd

7   reporting centers.  And these are areas where our linemen

8   report to, and they're spread out over the service territory,

9   which is about 11,000 square miles.  And they're situated so

10  that they're a certain distance from population centers, so

11  that somebody in Joliet doesn't have to wait for a crew from

12  Chicago to get there to fix something.  So, we would have a

13  Joliet office.

14          But we have about 40 of them.  And I went out to each

15  of them.  I think we consolidated a few, but pretty close to

16  40.  And I would do these road shows.  I just got up and

17  introduced myself.  I talked about what I thought the

18  challenges were for the company, where we were heading, the

19  direction we were heading in.  And then I would open it up for

20  Q and A.

21          And the first time I did this -- it was actually the

22  first day on the job as chief operating officer.  And I went

23  to our Chicago North center, which is at California and

24  Addison.  And I had probably 300 linemen and customer service

25  representatives and underground operators there, and I did my

1   road show.  And I finished my spiel, and I opened it up for Q
2   and A.  And I got crickets.  Nothing.  Dead silence in the
3   room.
4          And I had followed General Colin Powell's 23
5   principles of leadership.  And one of them was, if the troops
6   aren't talking to you, that's your worst day on the job; and
7   it means they don't trust you.  So, I waited.  Nobody said
8   anything.  So, I finally kind of challenged them; and I said,
9   so, you're telling me that everything's perfect here, you
10  don't have a problem, everything's lined up?  And if that's
11  the case, you're going to have to explain to me why the system
12  performs so poorly.
13         Well, that got them going.  And people jumped up.  I
14  actually -- it started with one lineman in particular, and he
15  let me have it.  Basically said our trucks stink.  We can't
16  raise the buckets half the time.  We don't have the tools to
17  work with.  The scheduling's a mess.  And then everybody
18  joined in.
19         And that was the beginning of just taking in all that
20  information.  I did that, as I said, at about 40 different
21  reporting centers.
22         I then -- I met with our union leaders.  We had had
23  very troubled union relationships for like 20 years.  And I
24  sat down with the union leaders.  I invited them in, set about
25  an hour on my calendar to meet with them.  It was about a

Pramaggiore - direct

4323

1    four-hour meeting, and I took pages of notes.

2            I got feedback from business customers.  I made it a

3    point to get out to visit our business customers.

4            I went out in the field.  I watched our crews.  I

5    went out during storms.  I went out to watch projects on blue-

6    sky days.

7            I spent time in the call center.  I listened to the

8    kind of calls that our customer service reps were getting.

9            And really just took all this information and tried

10   to bring it together and develop a plan and a strategy to go

11   forward and fix this system that was incredibly degraded and

12   had not been really appropriately invested in for decades.  It

13   was in terrible shape.

14   Q.  I want now to leave your career progression for a little

15   bit and ask about your relationship with certain people.

16           First of all, do you know Jay Doherty?

17   A.  Yes, I do know Jay Doherty.

18   Q.  How do you know Jay?

19   A.  I knew him as a lobbyist for ComEd, and I knew him largely

20   through his role as the president of the City Club.

21   Q.  Okay.  And remind us what the City Club is.

22   A.  The City Club is a forum.  It's like a lunch forum.  I

23   think it meets about once a month.  And it attracts leaders in

24   government, leaders in the academic community, business

25   leaders, the media.  It just -- it's a great audience for

1    ComEd to get messages out.

2              But it meets about once a month.  It's a lunch

3    meeting.  They always have a speaker.  And that's what the

4    City Club is.

5    Q.  And if you wanted to address the City Club, would you be

6    able to do that?

7    A.  Yes.  Jay was very, very helpful in getting us on the

8    agenda when we wanted to get a message out to talk about

9    legislation that we were trying to pass, other issues that the

10   company had going on.  And as I said, it was a very good

11   audience.  It targeted influencers who were very important to

12   what -- and stakeholders -- who were very important to what we

13   were doing at ComEd.

14   Q.  And did Jay Doherty also control the seating assignments

15   at tables?

16   A.  He did.

17   Q.  And could that be valuable to ComEd?

18   A.  Yes.  He would set up the seating.  He would often put

19   myself or other executives of the company together with people

20   who were stakeholders of the company.  Sometimes it was the

21   head of a city agency.  It might be the head of a university

22   in the community.  I remember one time I sat next to a woman

23   who was developing a not-for-profit sort of activity center

24   for kids, and she was having trouble getting connected up once

25   her facility was finished.  And, so, I ended up sitting next

1    to her.  And we solved her problem ultimately.

2    Q.  And did you ever work with Jay as a -- with Jay working as

3    a consultant to ComEd?

4    A.  I -- not often.  There was one project in, I think, 2017

5    where the City of Chicago was looking to change all its

6    streetlights to energy-efficient streetlights, LED

7    streetlights.  And they were doing a competitive bid on that.

8    And we wanted to -- we wanted to bid on it.  We wanted that

9    work, that job.  And I think -- Jay was on the team that was

10   working on that, and I think I was -- I know there was one

11   meeting that we had with City officials at one point.  And I

12   think there was a meeting or two internally that I was in that

13   Jay was probably part of.

14          Before I left ComEd and moved to Exelon, there was

15   a -- the franchise agreement was coming up for renewal after

16   about 30 years.  And there was a team put together to work on

17   that, and it didn't get very far by the time I left -- but he

18   was -- left to go to Exelon -- but he was on that team.  So, I

19   saw a little bit of him there.

20   Q.  Now, I want to ask you about your relationship with Mike

21   McClain.

22          How did you first meet Mike McClain?

23   A.  I think the first time I met him was probably 2001 or

24   2002.  The company had gone down to Springfield in an effort

25   to purchase another utility in the state that was failing.

1    Exelon was going to purchase that company.  And it was part of
2    a legislative package.  And that's -- I went down as sort of a
3    regulatory expert, subject matter expert is what we would call
4    it, and I met Mike in that initiative.
5    Q.  And did you work with him on other legislative initiatives
6    after that?
7    A.  Yes, several times.
8    Q.  Did you have occasion to get to know him and become
9    friends?
10   A.  I did.  We took a trip -- it was like a study mission --
11   to Turkey in late 2010.
12   Q.  Yeah.  What the heck was this trip to Turkey we keep
13   hearing about?
14   A.  Well, I'll tell you.  So, there was an organization called
15   the Niagara Foundation, and they were sponsoring trips for
16   business leaders and governmental leaders to Turkey as a sort
17   of cultural exchange study mission.
18           And, you know, at the time, if you think about it,
19   the Syrian war is starting; we're in Iraq; we're in
20   Afghanistan; and Turkey sort of sits at the crossroads of Asia
21   and Europe and the Middle East.  And I think Turkey felt that
22   they might have a role in sort of, you know, creating some
23   balance and peace in that region.  So, they were bringing over
24   people to sort of get to know Turkey.
25           But Mike and his wife Cinda were on that trip, and

1   myself and my son were on that trip.  And that was -- I got to
2   know him both a little more on the professional side and
3   personally, you know, got to know him and his wife.  And we
4   got to be friendly.  I got to know them well.
5   Q.  Who else was on that trip?
6   A.  The Speaker, Speaker Madigan, and his son.  I think in
7   total there was probably about 12 people.  But the two of them
8   were on it, as well.
9   Q.  I'd like to show you a government exhibit that's been
10  admitted, 432, if I can.
11         And this is a note from you to Mike McClain?
12  A.  Yes.
13  Q.  Okay.  And would -- could you read this paragraph, please?
14  A.  Sure.
15         "Hi there.  Thanks for the lovely note.  I love the
16  wall.  And I am forever grateful that you did not win that
17  race.  Because of that loss and because of you, ComEd was
18  saved."
19  Q.  What race are you talking about?
20  A.  Mike had been a state legislator.  And he, I think,
21  lost -- I don't know how many terms he served, but he
22  ultimately lost the race and then moved into lobbying and
23  consulting at that point.
24  Q.  Go ahead.
25  A.  "And Illinois won number one in Smart Grid policy across

1    the U.S.  And Northern Illinois customers had the best

2    reliability in the country in 2016.  And J.D. Power voted

3    ComEd most improved utility in customer satisfaction in the

4    U.S.  And Illinois is now moving to first place in clean

5    energy.  And thousands of jobs were saved and thousands have

6    jobs that wouldn't otherwise have been able to find work.  And

7    tens of thousands avoided having the lights go out on them and

8    their families because they hit hard times.

9         "And Fidel and I have been able to hold our heads up

10   inside ComEd, barely.  And Red Jack found his passion in life.

11   And Red Jack got to work at two conventions and had other

12   incomparable experiences.  And I have had the great benefit of

13   your counsel and incredible loyalty and friendship for all

14   this time.

15        Anne."

16   Q.  Is this one of your thank you letters?

17   A.  It -- yes.

18   Q.  And who is Red Jack?

19   A.  That is my son.

20   Q.  And who named him Red Jack?

21   A.  Mike McClain did.  He likes to give people nicknames.

22        MR. LASSAR:  And, your Honor, may the record reflect

23   that her son Jack is actually red.  He's in the first row

24   there.

25        THE COURT:  He has red hair is what you're saying?

1    MR. LASSAR:  Yes.

2    THE COURT:  The record will reflect that.

3    MR. LASSAR:  Thank you, Judge.

4  BY MR. LASSAR:

5  Q.  And was Mike McClain, in addition to a friend, was he a

6  valuable adviser to you?

7  A.  Tremendously valuable.

8  Q.  In what ways?

9  A.  Well, both in terms of his legislative strategy and his

10  work in the legislature, but personally, as well.

11  Q.  How personally?

12  A.  Personally, he -- so, when I moved into the CEO role at

13  ComEd, it was quite a challenging move.  I was the first woman

14  to run and operate a company for Exelon.  And I think I was

15  the last.  So, that -- that was, you know, quite a shift.

16    The people who had supported me or sponsored me for

17  that role, John Rowe and Frank Clark, were retiring.  And when

18  you move to a role like that and make that kind of shift, you

19  really want the people who sponsored you and supported you in

20  that role to be there because it is a big transition and you

21  want them to help you make a smooth transition.  But they were

22  retiring, so I was kind of on my own.

23    The new group that was coming in was different.  It

24  was -- they were all men.  It was a bit of a club.  Kind of

25  had a group mentality.  They were kind of hard partiers, and

1    they were ferociously competitive.  And I wasn't really a fit.

2            And, so, I needed some help in that transition.  And

3    I leaned on Mike McClain quite a bit.  He was somebody who had

4    worked for the company for decades.  So, he knew the company

5    and the culture and he knew the people.  And he was a very,

6    very good student of humans and human behavior.  And, so, he

7    became very helpful to me as I sort of navigated through that,

8    you know, trying to move into that role and to be successful

9    and impactful.

10   Q.  In your thank you letter, you say that Red Jack got to

11   work at two conventions and other incomparable experiences.

12           What was that about?

13   A.  Mike helped get him some volunteer work at the -- for the

14   Democratic Party of Illinois at the DNC, the Democratic

15   National Convention, two of them.  So, he was kind of a

16   runner; but it was, you know, just a great experience for a

17   teenager.

18   Q.  Did you think Speaker Madigan might have had some role in

19   that?

20   A.  I think he would have, yeah, had to approve that.

21   Q.  And was McClain valuable as a political strategist for

22   ComEd?

23   A.  Yeah.  He was exceptional.  The best, clearly, in the

24   State of Illinois.  The best I've ever run into.  You know, he

25   brought so many different pieces of value to the table.

1    He was our lobbyist to the Speaker, Speaker Madigan.

2  And that, in and of itself, is quite a challenging role, in

3  part because the Speaker is, you know, a bit mysterious.  He

4  doesn't always sort of let you know what he's thinking.  So,

5  Mike as much had to sort of prognosticate about where things

6  might be going as -- you know, bring information in an

7  information flow, which he did both.

8    He -- but he had relationships that were beyond just

9  Speaker Madigan.  He knew probably more legislators than, you

10  know, our top 20 lobbyists put together.  He had relationships

11  with stakeholders, the environmental groups, the consumer

12  groups, the labor groups.  And, you know, I -- and he -- when

13  we were, you know, trying to get legislation done, he would go

14  out and meet with all these different entities and sort of

15  bring back information.

16    I always think of him like a -- it was like, you

17  know, kind of a radar screen, air traffic control.  He would

18  bring back all these data points and you could kind of plot

19  them and you would know, you know, what planes were taking

20  off, what planes were landing, and what planes were just

21  circling.  But, you know, he was -- you know, all the

22  lobbyists would bring in data, but he would bring in the most.

23    He taught us the -- you know, the strategy of getting

24  things done in Springfield, which was, you know, this idea of

25  coming together with other stakeholders, coalition building.

1    And then, you know, using those stakeholders, those coalitions
2    to bring votes on.  And then when you had enough votes and you
3    had the right groups that were interested in a piece of
4    legislation, the leaders, whether it be Speaker Madigan or
5    Senate President Cullerton, kind of got forced to call the
6    bill because they had so many constituents that were
7    interested in this bill.  But that was -- you know, that
8    was -- he taught us that strategy.
9          He was also a good tactician, phone calls, letter-
10   writing campaigns, busloads of employees down to Springfield
11   to lobby their district legislators.
12         And he was a smart lawyer.  He understood our
13   regulatory issues; and they are very, very complex.  They are
14   very difficult.  And he understood them well enough to help us
15   translate them to, you know, people who just didn't have a lot
16   of time to learn our business.
17   Q.  Like legislators?
18   A.  Like most people.
19   Q.  And did -- was he also able to pass communications back
20   and forth with Speaker Madigan?
21   A.  He did.  He did some of that.  Some of that came through
22   the Speaker's staff when we were trying to pass legislation.
23   He did some of that.
24   Q.  What kind of information flow was there?
25   A.  Well, you know, we were, you know, trying to figure out

Pramaggiore - direct

4333

1   where the Speaker was, you know, positioned on issues; and

2   that was always a little hard to decipher.  But we would get

3   requests for memos on certain legal issues that were part of

4   bills, issues that either the Speaker or his staff wanted to

5   understand better.  And, so, we would get requests for those.

6   And, you know, we got some hiring requests, as well.

7   Q.  Did Mike McClain ever tell you that Speaker Madigan would

8   help to get ComEd bills passed?

9   A.  No.

10  Q.  Did he ever tell you that Speaker Madigan owed ComEd a

11  favor?

12  A.  No.

13  Q.  Now, let me ask you about your relationship with John

14  Hooker.

15        When did you first meet Mr. Hooker?

16  A.  I think I met John probably the same time I met Mike

17  McClain, which was that 2002 time frame, that particular

18  initiative down in Springfield when we were trying to purchase

19  the other Illinois utility.

20  Q.  And what was his role then in the company?

21  A.  I think he was head of legislative affairs because I think

22  he was sort of running the effort down in Springfield.  I

23  don't know whether he was a vice president or what his title

24  was, but he was running governmental affairs at the time.

25  Q.  Did you also value John Hooker's advice on political

1  strategy?

2  A.  Absolutely.  John -- you know, John spent 20 years running

3  governmental affairs and external affairs for ComEd.  He knew

4  a tremendous number of people in the legislature and all those

5  municipalities that we serve, 400.  He was -- he knew a lot of

6  those people.  Not all of them, but he knew a lot of them.

7  And he knew how different municipalities thought about things

8  and worked.  He knew how different legislators thought about

9  things.  So, he was -- yeah, he had a tremendous store of

10  knowledge that -- it was not -- you couldn't really replace

11  it.

12  Q.  Was he familiar with the African-American community in

13  Illinois?

14  A.  Yes.

15  Q.  And did he help to introduce you around that community?

16  A.  Yes.

17  Q.  How did he do that?

18  A.  Well, John was revered in the black community.  He was the

19  first black head of a governmental affairs organization,

20  certainly in the state and maybe beyond.  And he was well-

21  known and well-regarded in the black community.

22          He kind of took me under his wing and, you know, took

23  me to school.  I didn't grow up in Chicago, so I didn't really

24  understand Chicago.  But he introduced me to business leaders

25  in the black community, community leaders, the faith-based

1    community.  We went to church.

2              He took me to a convention of black ministers one

3    time.  I'll never probably forgive him for that.  It was a

4    thousand Baptist ministers.  And they put me up on stage after

5    three Baptist ministers and a gospel choir.  And I got up

6    there and gave my spiel.  I think it was during the FEJA

7    legislation.  And it was -- to say it was a humbling

8    experience is really an understatement.  But it was a

9    tremendous experience.

10             But he -- we walked neighborhoods during storms;

11   Englewood, Chatham.  We sat at churches when they were doing

12   assistance programs.  And, so, he really, you know, gave me a

13   sense of that community.  And I just hadn't really had that

14   sense before.

15   Q.  Did that affect how you operated some things at ComEd?

16   A.  Yeah.  When I took over as CEO, I kind of had -- you know,

17   there were two things that I think had in mind with respect to

18   the experience and the education that John gave me.

19             First, I think what I saw in some of those

20   neighborhoods during storms was that the impact on those

21   people from our failures, our outages, was much greater than

22   other communities.  You know, you had people who lived in

23   high-rises or small houses, and they were out of air-

24   conditioning, or fans even, and they had to move out of their

25   houses and, you know, sit in the front yard with their kids.

1  And some of the neighborhoods were, you know, tough
2  neighborhoods.  And, so, you know, they were very much put at
3  risk because of what we weren't doing well.

4          So, I was very committed to making sure that when we
5  put our plan together for Smart Grid and, you know, rehabbing
6  the system, that we made sure our investments in certain
7  neighborhoods were robust.  And, in fact, we proportionately
8  overinvested in certain neighborhoods to make sure that we got
9  that grid up to speed.

10          I think the second way that it impacted me was just
11  my understanding of diversity and my commitment to it.  ComEd,
12  I think, was -- has always been a great company and was way
13  ahead of the curve on its commitment to diversity.  When I
14  stepped into the role, I think 50 percent of our employees
15  were diverse.

16          But I -- but I felt there was a lot more that we
17  could do.  We -- I would hear all the time that, you know,
18  we'd go out to hire in certain specialties, engineering, other
19  specialties, and, you know, people would tell me, well, we
20  just -- you know, the pool of candidates isn't as diverse as
21  we would like it and so, you know, we weren't able to hire
22  as -- you know, as strongly or robustly as we'd like.  And,
23  so, I thought, well, then we should help create the pipeline.
24  We really have the capacity to do some of that.

25          And, so --

1          MS. STREICKER:  Your Honor, I'm just going to object
2   on relevance grounds.
3          THE COURT:  Overruled.
4   BY THE WITNESS:
5   A.  So, you know, we created programs, a summer program to
6   bring high schoolers in to give them some exposure to the
7   corporate environment and the energy business and make sure
8   they got, you know, paid for the summer and sort of got a work
9   experience.
10         We put together a summer program called the ice box
11  derby, which was for girls who were interested in engineering.
12  We separated them into teams and gave them a recycled
13  refrigerator from our energy-efficiency recycling program and
14  basically gave them a set of engineering drawings and a ComEd
15  engineer and they turned the refrigerator into an electric
16  vehicle by the end of the summer and then raced them.
17         So, we put together a number of programs.  A solar
18  spotlight program teaching kids how to build solar cells
19  during Black History Month and Hispanic Heritage Month.
20         So, again, the other piece that I think John brought
21  to me was just a commitment to, you know, really helping our
22  communities and helping the kids, in particular.
23  BY MR. LASSAR:
24  Q.  Was -- did John have contacts with the Black Caucus in
25  Springfield?

1    A.   He did.  He knew every single member of the Black Caucus.

2    Q.   And was that an important caucus in Springfield?

3    A.   Extremely important caucus.  The Black Caucus and the

4    Hispanic Caucus -- to some extent the Green Caucus, but the

5    Black Caucus and the Hispanic Caucus were the most important

6    groups of legislators, in part because of the constituencies

7    they represented; but also in part because they tended to vote

8    as a block more than any other groups that were down there.

9         And, so, you know, if you made some headway in the

10   Black Caucus or the Latino Caucus, you were very likely to get

11   more of their votes.  So, it was -- you know, that was all the

12   reasons.  And the leadership paid attention to them.  Both the

13   Speaker and the Senate President considered those caucuses to

14   be very important in their memberships.

15   Q.   Did John Hooker also advise you as to corporate issues at

16   ComEd and Exelon?

17   A.   He did.  John and Mike -- you know, I both -- I had

18   personal relationships with them both.  And they both were

19   helpful to me in terms of, you know, navigating some of the

20   things that were going on at the company.

21   Q.   I want to ask you next about your relationship with

22   Michael Madigan.

23        When did you first meet Michael Madigan?

24   A.   I think it was that same 2002 Springfield initiative with

25   the other -- Exelon trying to buy the other utility in

Pramaggiore - direct

4339

1    Illinois.

2    Q.  And did you get to know him better during that trip to

3    Turkey that he and his son were on?

4    A.  I did.  As I said, he and his son Andrew were on the trip.

5    And so -- he's a very quiet person.  Doesn't say a lot.  But I

6    did get to know a bit about him.

7    Q.  And how would you describe your relationship with Michael

8    Madigan?

9    A.  I would describe it as professional.  I think we had

10   mutual respect for each other.  It was, you know, somewhat

11   remote.  I didn't see him a lot.  But when I did, I think we

12   had regard for each other.

13   Q.  Was it a social relationship?

14   A.  No.  I -- only in that I would see him at --

15   infrequently -- but at fundraisers and things like that, and

16   we would have, you know, social conversation.  But that was

17   group events.

18   Q.  At a typical fundraiser, would there be a dinner

19   associated with it?

20   A.  So, when Exelon hosted a fundraiser -- and I don't know

21   how frequently the company did that; every two years or every

22   year, I can't remember -- we would -- the company would host a

23   fundraiser for the Democratic Party of Illinois.  And

24   afterwards the Speaker and his staff would stay for a dinner

25   with the executive group at Exelon.

1    Q.  And who would sit next to the Speaker?

2    A.  Chris Crane and Bill Von Hoene would sit on either side of

3    the Speaker, and I was usually down at the kids' end of the

4    table.

5    Q.  Did you and the Speaker, the two of you, ever meet for

6    lunch?

7    A.  I think I had one lunch with him with Chris Crane.

8    Q.  Just the two of you?

9    A.  No.

10   Q.  Did the two of you ever have dinner together?

11   A.  No.  Just the two of us?  No.

12   Q.  What did you understand to be important to the Speaker?

13   A.  Staying the Speaker.

14   Q.  What do you mean by that?

15   A.  Well, he -- I think the most important thing to the

16   Speaker, as I understood it, was to remain in the seat as the

17   Speaker of the House.  And, so, what that meant was he had to

18   elect a democratic majority in the House every two years.  And

19   what that meant is he had to raise the money to do that.  So,

20   that was -- in, again, my view -- that was sort of his -- sort

21   of where he placed his priorities, in that sort of cycle.

22   Q.  Did you know him to take sides in bills as a regular

23   matter?

24   A.  Not typically.  We usually were trying to figure out --

25   you know, for our purposes, we were usually trying to figure

1    out where he stood.

2            But I think the leaders in general, the four leaders

3    in both the House and the Senate, kind of sat back when bills

4    came in; and they generally didn't take positions.  They would

5    kind of wait to see where their membership was lining up and

6    what sort of interest groups were lining up behind the bills.

7            So, they initially didn't really, you know, let you

8    know where they were -- where they were coming from.

9    Q.  And what did you understand his attitude to be toward

10   Exelon and ComEd?

11   A.  I thought he was skeptical of us, I think in part because

12   we were just a business.  I mean, he was, I think, a classic

13   Democrat and pro consumer.  So, I think he was skeptical

14   because we were part of the business community and I think, in

15   part, because we were ComEd.  I mean, ComEd, you know, was

16   just kind of one of those companies that, you know -- they

17   call it a target company, that people tend to not look kindly

18   upon.

19   Q.  Did you view Speaker Madigan as a friend or an ally of

20   ComEd?

21   A.  No.

22   Q.  Did that ever change?

23   A.  No.

24   Q.  Did your view ever change that you thought he was

25   skeptical toward ComEd and Exelon?

Pramaggiore - direct

4342

1  A.  No.  I thought he was motivated by what was of interest to

2  him, which was remaining Speaker, and public policy that

3  would, you know, be supported by the groups that were

4  important to him.

5  Q.  And I think we've heard that his daughter was the Attorney

6  General?

7  A.  Yes, Lisa Madigan.

8  Q.  And was she a good friend of ComEd?

9  A.  She was not.  Not on a personal level.  That was never the

10 issue.  But she, as a regular rule, took positions that

11 opposed ComEd constantly.

12 Q.  And did you think that Speaker Madigan would ever try and

13 round up democratic votes on behalf of ComEd or Exelon?

14 A.  No, I didn't think that.

15 Q.  Did you think that ComEd had influence with Speaker

16 Madigan so you could call on him to help you get legislation

17 passed?

18 A.  No.

19 Q.  And did that ever change?

20 A.  No.

21 Q.  Would you meet with him regarding legislation?

22 A.  We would.  We -- typically our practice was to meet with

23 all four leaders, the governor usually, the City -- someone in

24 the City of Chicago, the AG's office, head of the labor

25 unions.  When we were looking to introduce a bill into

Pramaggiore - direct

4343

1   Springfield, we would typically meet and, you know, explain

2   what we were trying to do.  And the Speaker would be part of

3   that group.

4   Q.  And when you talked to the Speaker about what you were

5   looking for for legislation, would he tell you whether he

6   would support that legislation or not?

7   A.  No.

8   Q.  Did he say, if you hire some people at my request, I'll

9   help you out with your legislation?

10  A.  No, never.

11          MR. LASSAR:  I'm going to change topics, now, Judge,

12  if you you'd like to break.

13          THE COURT:  Probably a good time then.

14          We'll suspend until Monday at 10:00 a.m.

15          Don't forget, don't discuss the case with anybody.

16  Don't do any research in the case.  Don't read about the case.

17  And don't go on social media and discuss the case.

18          But have a nice weekend.  We'll see you Monday at

19  10:00 a.m.

20      (Jury out.)
        (Adjournment taken at 5:00 o'clock p.m., until April 17,
21  2023, at 10:00 o'clock a.m.)
                            *   *   *   *   *

22  We certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
23
    /s/ Jennifer Costales                 April 13, 2023
24  Official Court Reporter

25  /s/ Joseph A. Rickhoff                 April 13, 2023
    Official Court Reporter

Pramaggiore - direct

4344

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25