**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 20 CR 812** |
| **MICHAEL McCLAIN, ANNE PRAMAGGIORE, JOHN HOOKER, And JAY DOHERTY,** | **Judge Harry D. Leinenweber** |
| **Defendants.** | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Defendants move pursuant to Federal Rule of Criminal Procedure 29(c) for judgements of acquittal and Rule 33 for a New Trial in the alternative.

## I.     <u>BACKGROUND</u>

In this case, the Government brought charges against four defendants for activity related to the Speaker of the Illinois House of Representatives Michael J. Madigan and Commonwealth Edison Company ("ComEd"). The four Defendants are former ComEd external lobbyist Michael McClain ("McClain"), former ComEd CEO Anne Pramaggiore ("Pramaggiore"), former ComEd Vice President of Legislative and External Affairs and ComEd external lobbyist John Hooker ("Hooker"), and former ComEd external consultant Jay Doherty ("Doherty"). ComEd, a company headquartered in Chicago, delivered electricity to customers across northern Illinois. ComEd was a subsidiary of Exelon

Corporation ("Exelon"), a utility services holding company that provided energy to customers in multiple states.

## A. Indictment

In the indictment (Dkt. No. 1), Count One charged the defendants with participating in a conspiracy between 2011 and 2019 to confer a stream of benefits on Speaker Madigan, intending to corruptly influence and reward Madigan's efforts to assist ComEd with respect to legislation affecting ComEd's business, and seeking to conceal this illegal activity by falsifying books and records to disguise the true nature of benefits provided to Madigan.

Counts Two, Five, Six, and Eight of the indictment charged the defendants with corruptly offering and agreeing to give things of value, with the intent to influence and reward Michael Madigan in connection with state business, in violation of Title 18, United States Code, Sections 666(a)(2) and 2.

Counts Three, Four, Seven, and Nine charged the defendants with falsifying or causing to be falsified the books and records of ComEd and Exelon, in violation of the Foreign Corrupt Practices Act of 1977, Title 15, United States Code, Sections 78m(b)(5) and 78ff(a) (the "FCPA") and Title 18, United States Code, Section 2. The charges are summarized in the table below.

| Count | Defendants | Violations | Description |
|---|---|---|---|
| 1 | McClain Pramaggiore Hooker Doherty | 18 U.S.C. §§ 371, 2 | Conspiracy to commit an offense against the United States<br>• Object 1: Violation of 18 U.S.C. § 666(a)(1)(b)<br>• Object 2: Violation of 18 U.S.C. § 666(a)(2)<br>• Objects 3 and 4: Violation of 15 U.S.C. §§ 78m(b)(5), 78ff(a) |
| 2 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the ComEd contract with Reyes Kurson |
| 3 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2017 JDDA contract |
| 4 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the January to March 2018 JDDA contract |
| 5 | McClain Pramaggiore | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to ComEd's Board position for Ochoa |
| 6 | McClain Pramaggiore | 18 U.S.C.§§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the 2018 amendment of the JDDA contract<br>(payment of Michael Zalewski) |
| 7 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2018 amendment of the JDDA contract |
| 8 | McClain Pramaggiore Hooker Doherty | 18 U.S.C. §§ 666(a)(2), 2 | Corruptly offering a thing of value, related to the 2019 renewal of the JDDA contract |
| 9 | McClain Pramaggiore Hooker Doherty | 15 U.S.C. §§ 78m(b)(5), 78ff(a) and 18 U.S.C. § 2 | Falsification of records in connection with the 2019 JDDA contract |

**B. Trial**

At trial, the Government's case, spanning roughly six weeks, did not contain the proverbial smoking gun in evidence, but it did include: emails and business records; recorded phone conversations; video surveillance surreptitiously gathered by Government cooperator; photographs taken by FBI agents in the homes of Defendants and their alleged co-conspirators; and testimony of law enforcement officers corroborating the surveillance.

This evidence showed that ComEd had business before the legislature frequently throughout the eight-year period of the alleged conspiracy. (*See* Tr. at 2343:7-9.) For example, in 2011, the Illinois General Assembly passed the Energy Infrastructure and Modernization Act ("EIMA"), and in 2016, the General Assembly passed the Future Energy Jobs Act ("FEJA"). It also showed that over the course of approximately eight years, ComEd paid, indirectly through intermediaries such as Jay D. Doherty & Associates (JDDA), $1.3 million dollars to former Speaker Michael Madigan's political allies, namely former Alderman Frank Olivo ("Olivo"), precinct captain Ray Nice ("Nice"), precinct captain Ed Moody ("Moody"), former Alderman Mike Zalewski ("Zalewski"), and former legislator Eddie Acevedo ("Acevedo"), who did little to no work to work for ComEd. (*See* Government Exhibit ("GX") GX876.)

On April 11, 2023, once the Government expressed its intention to rest shortly thereafter, defendants filed Rule 29(a) motions for judgment of acquittal. (Dkt. Nos. 213, 214, 215, 218, 220, 238, 240; Transcript ("Tr.") 5127:16-19.) The Court denied the motions. (Dkt. No. 222; Tr. 3884:24-3887:15; 5127:20-25.)

The Defense case contained witnesses, documents, and even testimony from Defendants Pramaggiore and Hooker, who took the stand. The Court denied Doherty's motion to bring an expert to testify about common lobbying procedures but allowed Defendants to bring character testimony limited to honesty, truthfulness, and integrity.

On May 2, 2023, the jury returned a verdict of guilty against all Defendants on all counts with which they were charged, specifically against all Defendants for Counts One, Three, Four, Seven, Eight, and Nine, and against Defendants McClain and Pramaggiore for Counts Two, Five, and Six.

Each Defendant filed separate post-trial motions, seeking judgments of acquittal on various counts and a new trial on other grounds of claimed error. (Dkt. Nos. 262–266; 270–271.) For the reasons discussed below, the Motions are denied.

## II. <u>MOTIONS FOR ACQUITTAL</u>

Faced with a motion for a judgment of acquittal, a federal district court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." FED. R. CRIM. P. 29; *United States v. Garcia,* 919 F.3d 489, 496 (7th Cir. 2019). Affording "great deference" to the jury's verdict, the Court thus views the evidence in the light most favorable to the conviction, asking "whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt." *United States v. Love,* 706 F.3d 832, 837 (7th Cir. 2013) (citing *Jackson v. Virginia,* 443 U.S. 307, 318–19 (1979)). While this is a high hurdle for defendants to clear, the "height of the hurdle depends directly on the strength of the government's evidence," and a properly instructed jury may occasionally convict even when no rational trier of fact could

find guilt beyond a reasonable doubt. *United States v. Snyder,* 71 F.4th 555, 571 (7th Cir. 2023) (citations omitted).

A motion for judgment of acquittal calls on the court to distinguish between reasonable and speculative inferences, and the line between the two "is by no means a sharp one." *United States v. Jones,* 713 F.3d 336, 346–347 (7th Cir. 2013). An ambiguous statement paired with only little support, for example, is speculation. *See Jones,* 713 F.3d at 350 (citing *Piaskowski v. Bett,* 256 F.3d 687 (7th Cir.2001)). Evidentiary gaps cannot reasonably be filled with mere "gut feelings and suspicions." *Garcia,* 919 F.3d 499. Likewise, a jury cannot find guilt by mere association. *Jones,* 713 F.3d 336. However, a juror may, indeed must, use its common sense. *See, e.g., United States v. Chester,* 2017 WL 3394746, at *28 (N.D. Ill., Aug. 8, 2017).

## A. Conspiracy Count

To sustain a conviction of conspiracy, the Government must prove three elements beyond a reasonable doubt: (1) the conspiracy as charged in Count One existed; (2) the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the conspirators committed an overt act in an effort to advance a goal of the conspiracy within five years of the indictment. (Jury Instructions ("Instr.") 1; Dkt. No. 249.) Here, that was five years from November 18, 2015. (*See* Dkt. No. 1.)

As to the third element, there was evidence of payments made from ComEd to intermediaries, arrangements between the intermediaries and the recipients, and relationships between these recipients and Madigan that Madigan valued. Each of these occurred within five years of the indictment. These receipts, even if obscuring details,

- 6 -

were straightforward insofar as they were payments from ComEd to intermediaries, so a jury could easily find these receipts met the threshold of an overt act whereby Madigan's people received payment from ComEd to appease him.

The first and second elements are not as plain, yet the jury still found support for these over the seven-week trial. The Government has summarized its Count One conspiracy charge (consistent with the Indictment, *see* Dkt. No. 1) as follows: the defendants conspired: "(1) to corruptly influence and reward Michael Madigan in connection with his official duties as the Speaker of the Illinois House of Representatives, in order to assist ComEd with respect to the passage of legislation favorable to ComEd and its business and to defeat of [sic] legislation unfavorable to ComEd and its business; (2) to create false contracts, invoices, and other books and records to disguise the true nature of benefits paid to Madigan's associates; and (3) to circumvent internal controls." (Resp. by USA ("Resp.") at 8 (Dkt. No. 325).) Because this evidence came through various parts of the trial and connected to other counts, the Court refers to the rest of this opinion in reaching its conclusion that a reasonable jury could find the existence of the conspiracy. For evidence of the first object of the conspiracy, see discussion of Counts Two, Five, Six, and Eight, and for evidence of the second and third objects, see discussion of Counts Three, Four, Seven, and Nine. Additional evidence that a conspiracy existed, not discussed elsewhere in this opinion, includes that when Moody became Cook County Recorder of Deeds, it was Madigan who made the decision to halt ComEd's payments to Moody because, at that point, State Representative John Bradley was paying Moody on behalf of ComEd. (GX109.) McClain delivered the news to Bradley, suggesting that

Bradley characterize the final payment Bradley made to Moody as a holiday "bonus." (GX111; (*see also* Tr. 3762:1-12.))

There was plenty of evidence of the value of these subcontractors to Madigan, particularly to his political operation. For example, McClain told Marquez, "Ray Nice, he's, um, one of, um, he's one of the top three precinct captains, and he also trains, uh, people how to go to door to door." (GX23.) Ed Moody testified that Madigan ranked him and his twin brother, Fred, first among all precinct captains and workers. (*See, e.g.,* Tr. 3648:21-3651:6.) Moody explained that Madigan rewarded him for his political efforts by arranging for him to receive payments from ComEd lobbyists — first McClain, then Doherty, then Shaw Decremer, and finally John Bradley — even though he performed little or no work. Tr. 3617:13-3618:16. Ed Moody testified that he understood the purpose of the payments from McClain was "to stay active in my politics." (Tr. 3680:22-3682:12, 3689:25-3692:16.4.)

Evidence as to the second element can be adduced through the various counts. While referring to those counts, the Court will briefly discuss additional evidence as to each defendant that could have guided the jury in finding that the defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy.

McClain acted as the conduit to convey Madigan's direction to those within ComEd who could facilitate them, ensured that Madigan's demands were complied with, monitored the payment of the Madigan associates, and oversaw contract adjustments. For example, he facilitated the hiring of former Alderman Michael Zalewski, a beneficiary of the Madigan conspiracy. See Count Six *infra* II.B.3.i.

During the April 24, 2018 call, when McClain told Hooker that Madigan had asked for Zalewski to "work under Jay Doherty," Hooker remarked, "that has paid off for us in the past," then described the arrangement as being "off the beaten path" because there's "just no flow through there." (GX12.) Hooker acknowledged, "it took me and you to think of that." (*Id.*) McClain remarked, "He's just used to asking and then the other people figure it out and uh, it's, it, it's done perfectly. Doherty's been uh, uh, wonderful doing it . . . he doesn't even blink about it." (*Id.*) In another call, McClain and Hooker discussed that they were "creative" in the arrangement they had set up with the Madigan subcontractors. (GX17.)

In January 2019, when Marquez wore a wire to lunch with Hooker and brought up the subcontractor arrangement, Hooker told Marquez that "me and McClain was [sic], I was the one that created it." (GX118); (Tr. 2001:1-11.) Hooker suggested to McClain that he explain the subcontractors to Pramaggiore's successor as ComEd CEO, Dominguez, because "with the Jay Doherty stuff . . . [McClain's] got a little leg up." (GX148.) The context allows for a reasonable inference that this comment references the advantage ComEd gained with its legislative agenda by vice of the payments to Madigan allies. Hooker added: "that which is understood need not be mentioned." (*Id.*) One can reasonably infer that Hooker was promoting the concealment of the subcontractor arrangement.

On February 18, 2019, after she had been promoted to CEO of Exelon Utilities, a position that gave her oversight authority over ComEd's operations (Tr. 1990:9-16,

4635:7-14), Pramaggiore instructed Marquez to wait to change Doherty's contract (including payments to the ghost payrollers) until the legislative session ended. (GX131.)

Evidence of Doherty's knowledge of joining this conspiracy with an intent to advance is not as clear. As President of the City Club of Chicago, he facilitated connections and built a network, and he indeed demonstrated skill in making meaningful connections in the community. Several witnesses mentioned his role in Special Olympics and other volunteer work that does not pay yet presumably added value to his lobbying clients because he was garnering goodwill across the community.

That said, the record contains enough evidence to render a finding of Doherty's knowledge and corrupt intent. Moody testified that while he was receiving ComEd paychecks via Doherty, the only work he did was knocking door-to-door for Madigan's political organization. (Tr. 3699:8-13; 3714:15-21.) Doherty knew this. On February 13, 2019, When Marquez asked Doherty about the work the subcontractors performed, Doherty responded, "[T]hey keep their mouth shut . . . [D]o they do anything for me on a day-to-day basis? No." (GX129.) And he communicated his understanding of the link between the subcontractor payments to ComEd's legislative success: When Marquez asked Doherty if the subcontracts should be renewed even though the subcontractors did not work, Doherty replied, "Your money comes from Springfield, right?" He followed up: "[I]f it ain't broke, don't fix it with those guys." (GX129.)

* * *

Because the evidence was sufficient for a reasonable jury to convict on the conspiracy count, the Court will not overturn the verdict as to Count One.

- 10 -

* * *

These conspiracy convictions open pathways to conviction on the other counts, namely pursuant to *Pinkerton v. United States,* 328 U.S. 640, 647 (1946). *See United States v. Ailsworth,* 867 F.Supp. 980, 987 (D. Kan. 1994) (A defendant in a case charging a conspiracy may be liable for each of the substantive counts charged in an indictment under any of three separate theories: (1) Actual commission of the crime; (2) Participation in the crime as an aider or abettor; and (3) Liability under a *Pinkerton* theory.) Under *Pinkeron*, a defendant can be held vicariously liable for a substantive offense committed by another member of a conspiracy if: (1) the defendant was a party to the conspiracy; (2) the offense was "within the scope of the unlawful project"; (3) the offense was committed in furtherance of the conspiracy; and (4) the defendant could have reasonable foreseen the offense as a "necessary or natural consequence of the unlawful agreement." 328 U.S. 647.

## B. Corruption Counts

Counts Two, Five, Six, and Eight charge Defendants with corruption in violation of 18 U.S.C. § 666 as to contracts between ComEd and various actors connected to Madigan. Count Two of the Indictment charged Defendants Pramaggiore and McClain with violating Section 666 by causing ComEd and Exelon to contract with the Reyes Kurson law firm "with intent to influence and reward [Madigan] . . . in connection with . . . legislation affecting ComEd and its business." Count Five of the Indictment charged Defendants Pramaggiore and McClain with violating Section 666 by causing ComEd and Exelon to offer "a position on the ComEd board of directors and monetary payments associated

with that position [to Juan Ochoa] . . . with intent to influence and reward [Mr. Madigan] . . . in connection with . . . legislation affecting ComEd and its business." (Indictment at 46 ¶ 2.) Count Six of the Indictment charged Defendants Pramaggiore and McClain with violating Section 666 by 2018 amendment to JDDA contract to include payment to Madigan associate and former Alderman Michael Zalewski. Count Eight of the Indictment charged all Defendants with violating Section 666 by the 2019 renewal of the JDDA contract.

Under 18 U.S.C. § 666(a)(2), it is criminal to offer, give, or agree to give things of value to another person, where the giver acts "corruptly, with the intent to influence or reward" an agent of a State or local government agency in connection with some business, transaction, or series of transactions of the government agency. Thus, to convict Defendants of bribery, or aiding and abetting bribery, the Government needed to prove two elements beyond a reasonable doubt: (i) that the alleged things of value were given or offered to influence or reward Madigan "in connection with . . . legislation affecting ComEd and its business," and (ii) that Defendants possessed corrupt intent. *See* 18 U.S.C. § 666(a). (*See also* Indictment at 43 ¶ 2, 46 ¶ 2, 47 ¶ 2, 49 ¶ 2.)

Defendants individually raise several challenges to the corruption convictions together and separately. Specifically, they have argued: the Government was required to show quid pro quo and it did not; the Government was required to prove the payments did not fall under the 18 U.S.C. § 666(c) safe harbor, *i.e.,* were not bona fide in the usual course of business, and it did not; and ultimately even if the jobs were subject to 18

- 12 -

U.S.C. § 666, no reasonable jury could have found that Defendants had corrupt intent or that the contracts were in connection with legislation.

The Court will first address Defendants' arguments about the requirement of quid pro quo and the applicability of the safe harbor provision to this case. Then, the Court will address the Defendants' arguments about sufficiency of evidence in proving the elements of these counts.

### 1. Quid Pro Quo

The Seventh Circuit has held that a quid pro quo is not required for a conviction under 18 U.S.C. § 666. *See United States v. Snyder,* 71 F.4th 555, 579 (7th Cir. 2023) *cert. granted,* 2023 WL 8605740 (2023) (reaffirming the Seventh Circuit's "refus[al] to import an additional, specific quid pro quo requirement into the elements of § 666," and explaining (cleaned up), ("[a] bribe requires a quid pro quo — an agreement to exchange this for that, to exchange money or something else of value for influence *in the future.* A gratuity is paid as a reward for actions the payee has already taken or is already committed to take . . . The statutory language 'influenced or rewarded' easily reaches both bribes and gratuities.") (emphasis in original).

Pramaggiore, joined by all Defendants, argues that because the Government explicitly accused Pramaggiore of *bribery*, it took on the burden of showing a quid pro quo. The Court is not convinced because the Government case was consistent with gratuities, and the record contained sufficient evidence of a "this" (rewards named in the indictment) for "that" (multiple legislative activities).

First, the Government's case was consistent with gratuities. Although the Government repeated the term "bribe" and derivatives thereof during trial more frequently than "gratuity," (*see* Pramaggiore's Mot. for Acquittal ("Pramaggiore Mot.") (1) Appxs. A, B, Dkt. Nos. 264-1, 264-2 (recording Government's language during trial)), the jury was not misled, and Defendants were on notice. The activities the jury condemned might be understood as "bribery" in regular parlance because although the terms' legal meanings differ, *see Snyder,* 71 F.4th 579 (explaining that bribes involve something "in the future" and a gratuity rewards past acts), the words are somewhat synonymous in ordinary understanding, *see Snyder,* 71 F.4th at 579-80, 579 n.6 (holding that that although "[t]he title of the codified § 666 refers to '[t]heft or bribery concerning programs receiving Federal funds,' without mentioning gratuities," the text of the statute clearly applies to gratuities). The lawyers here are aware of the general guidance to address juries using common parlance, and the Court takes judicial notice that "bribe" is far more commonly used than "gratuity."[1] The corruption counts of the indictment contains statutory language rather than specifying either "bribery" or "gratuity" in the charges. (Indict. ¶ 1) The jury had a redacted version of the indictment when deliberating.

In any event, the jury may have reasonably found that an earlier event, *e.g.,* the 2011 passage of EIMA, was the act for which Defendants were granting a gratuity. Defendants acknowledge that EIMA was passed before the first payment to Olivo in

---

[1] *See* GOOGLE NGRAM VIEWER, https://books.google.com/ngrams/ (last visited Dec. 28, 2023) (searching "bribe,gratuity" in American English, non-case-sensitive, reveals that of all the unigram words contained in its 2019 corpus of books the term "bribe" (.0002176%) was used nearly nine times more frequency than "gratuity" (.0000265%)).

August 2011. (Pramaggiore Mot. at 12); (*see also* Tr. at 887:6-8.) Defendants do not dispute that this was a viable "business, transaction, or series of transactions of the [Illinois government]" as required by 18 U.S.C. § 666(a)(1)(B), (a)(2). *See e.g.,* Pramaggiore Mot. at 10 ("The Government's evidence at trial revealed only one possible 'business, transaction, or series of transactions' of the State of Illinois that could form the basis of the Section 666 charges: legislation impacting ComEd.") At trial, Illinois legislators testified that Madigan played an influential role in bringing EIMA to a vote, and people who worked with ComEd at the time testified about the importance of this legislation for the company's revenue generation (and in turn for the compensation of ComEd executives). (Tr. 791:3-12; 817:16-16 1459:18-23.)

Indeed, EIMA was but one of many legislative activities the Government argued was of interest to ComEd. For example, FEJA was passed in 2016, and in 2019 ComEd sought, unsuccessfully, Madigan's support in bringing to a vote a standalone formula rate extension bill. (*See* Tr. at 4067:15-4069:8.) That more legislative activity followed EIMA does not necessarily negate EIMA's significance, and any such legislative activity could have formed the "quo" for bribery and remains consistent with a stream of benefits theory. Several legislative actions occurred during the same relatively short time period in which the defendants gave jobs to Madigan people. "A rational juror could conclude from the activities of these defendants that there was an implicit agreement to exchange things of value for official acts." *United States v. Menendez,* 291 F.Supp. 3d 606, 616 (D.N.J. 2018) (citing *McDonnell v. United States,* 579 U.S. 550, 572 (2016) ("The

agreement need not be explicit, and the public official need not specify the means that he will use to perform his end of the bargain.").

## 2. § 666(c) Safe Harbor

Defendants argue that there was insufficient evidence that the corruption counts survive the 666(c) safe harbor provision. Subsection (c) states that § 666 "does not apply to bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business."

Similarly, at the motion to dismiss stage, Defendants argued that the corruption counts could not stand because the Government failed to allege in the indictment that payments were not bona fide in the ordinary course of business. *See United States v. McClain,* WL 488944, at *2 (N.D. Ill., Feb. 17, 2022). The Court rejected the argument that negating the safe harbor was an element of the offense burdening the Government at the charging stage, and instead treated it as an affirmative defense, which the Defendants were entitled to invoke at trial. *Id.; see also United States v. Burke,* WL 1970189, at *30 (N.D. Ill., June 6, 2022). Defendants did indeed invoke this argument at trial, and the jury was instructed according to the Seventh Circuit pattern. The jury just did not buy it. In accordance with Rule 29, this Court must determine whether that was reasonable.

The Court finds this conclusion reasonable. Even if the Government does not bear the burden to negate an affirmative defense, a conviction cannot stand if the evidence would not support a conviction beyond a reasonable doubt. And while acknowledging that "[w]hether wages are bona fide and earned in the usual course of business is a

- 16 -

question of fact for the jury to decide," *United States v. Lupton,* 620 F.3d 790 (7th Cir. 2010), the Court heeds precedent and guidance about the scope of this inquiry as a matter of law, this time evaluating the record rather than merely the indictment.

Defendants point to *United States v. Blagojevich,* 794 F.3d 729, 736 (7th Cir. 2015), for its language, "Compensation for a job by someone other than a ghost worker is a bona fide salary," and then to evidence in the record showing that multiple recipients of the funds at issue did some work, and therefore could not be ghost workers, and thus those counts should be eliminated by § 666(c).

*Blagojevich* classified non-ghost workers as bona fide, but the opinion leaves no doubt that the 666(c) inquiry must consider the "usual course of business." *Id.* Indeed, the Court would not expect the jury to adopt a ghost worker theory as to the Reyes Kurson law firm (Count Two) or Juan Ochoa (Count Five). There was plenty of evidence, discussed *supra*, that they worked. The Government offered no evidence that the Reyes Kurson firm did not do the work they were assigned or that Juan Ochoa did not perform his duties for the board. But the evidence presented – when looking at the evidence the prosecution brought, the lack of evidence the defense brought, or as a whole – can reasonably lead to a conclusion that the hires were not in the "usual course of business," as our case law understands it.

*Blagojevich* promulgated that logrolling *among public figures* is a usual course of business in politics. 794 F.3d 734–736 ("[T]he 'usual course of business' in politics includes logrolling," which the Court described as "the swap of one official act for another" and including "a proposal to trade one public act for another."). It explicitly distinguished

- 17 -

potential exchanges involving only public offices from potential exchanges also involving a private payment. *Blagojevich,* 794 F.3d at 734 ("[Logrolling] is fundamentally unlike the swap of an official act for a private payment.").

It is clear to the Court that the transactions here constituted private payments rather than public acts. ComEd is a private company, and the intermediaries received personal income from this private company. Perhaps ComEd, with its monopoly over public utilities in northern Illinois, was effectively acting as a public officeholder by pursuing the customers' interests through legislation that would purportedly improve public access to reliable energy, embrace the efficiencies of technology, and champion environmental sustainability. But Defendants understandably did not argue that the payments were public acts, and still a jury might have believed that advocacy for good policy could be honest.

Other courts assessing the bounds of § 666(c) regarding employment related compensation emphasized various facts, including an underlying corrupt intent for the job, the actions and behavior of the defendant, how the money was spent, and whether the defendant was entitled to the money. *See United States v. Whiteagle,* 759 F.3d 734, 755–56 (7th Cir. 2014) (affirming a conviction under 18 U.S.C. § 666(b) for a corrupt solicitation of a job for a legislator's cousin, explaining that although "more than one witness testified [the cousin] was a good employee, . . . the jury nonetheless reasonably could have construed the employment request as yet another bribe solicitation"); *Lupton*, 620 F.3d 801–02 (affirming that a payment did not fall within the § 666(c) exception because the defendant's "unusual maneuvering . . . reveal[ed] that this was not to be

- 18 -

a payment in the ordinary course of business," and that additionally, evidence showed the defendant misled others regarding its use); *United States v. Bravo-Fernandez,* 913 F.3d 244, 247 (1st Cir. 2019) (holding "[t]hat the payments were made for a legitimate purpose . . . does not render them bona fide under the statute if they were intentionally misapplied, as they were here via sham contracts that skirted conflict of interest rules"; and describing § 666(c) exception as support for contention that "not all federal funds constitute 'benefits' under the statute."); *United States v. Williams,* 507 F.3d 905, 908 (5th Cir. 2007) (collecting cases where legitimate employees received payments that were not covered by § 666(c)); *United States v. Walsh,* 156 F.Supp. 3d 374, 385 (E.D.N.Y. 2016) (explaining § 666(c)'s safe harbor only protects "fixed compensation for services obtained without fraud or deceit and in the normal routine of a business"); *United States v. Bryant,* 556 F.Supp. 2d 378, 427 (D.N.J. 2008) (holding payments are not bona fide paid in the usual course of business when "a public official sells his office for wages, even if some legitimate work is performed in exchange for those wages").

Doherty posits that he sought expert testimony from Lee Drutman to explain lobbying and that the Court erred in denying the motion to admit this testimony. (*See* Doherty Mot. for New Trial at 3, Dkt. No. 270; *see also* Dkt. 230-1.) Doherty explains that Drutman would have testified:

> [A]cross federal and state jurisdictions, politicians routinely recommend individuals who campaign for them or work on their staff. This is also done so that the politician has someone trusted on staff and can rely on what the information that person provides. Referrals from powerful politicians make a lobbyist more valuable. A lobbyist routinely engages in multiple activities with the purpose of making a politician happy. . . A typical lobbyist is paid $5,000 to

> $20,000 per month (the subcontractors were paid $5,000 or less). The retainer is not dependent on the volume of work (the subcontractors in this case did not preset reports of work activity with their invoices). Companies may hire lobbyists that go unused for long periods of time (the subcontractors in this case may have remained inactive for period of time). In addition, a lobbyist will be hired in order to prevent them from working for a competitor. Lobbyists do not perform consistent work, but at a time when a company needs a particular relationship that lobbyist becomes extraordinarily important. *Id.*

Doherty argues that the failure to admit Drutman's testimony "altered the outcome of the trial on a crucial element of the offense for Doherty, 18 U.S.C. § 666(c)." *Id*.

Such a perspective about standard lobbying practices could support the § 666(c) defense that these actions were bona fide in the usual course of lobbying business, but this testimony did not need to come from an expert. (*See* Tr. 3887:21-23); *see also United States v. Lundy*, 809 F.2d 392, 395 (7th Cir. 1987) ("Courts agree that it is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend."). The defendants elicited testimony from multiple Government witnesses concerning legitimate business lobbying. An ordinary lobbyist is well suited to tell the jury about the ordinary course of lobbying. Doherty's arguments did not pass muster for expert testimony. (*See* Dkt. 230-1; *see also* FED. R. EVID 702.) As stated, the Court's reasoning in denying this motion reflected its reasoning in granting Defendants' motion to prohibit the expert testimony of Professor Richard Simpson, whom the Government proffered to explain common corruption practices in Chicago (*see* Dkt. No. 144): the jury did not need an expert gloss on corroborating testimony. (*See* Dkt. No. 159.)

The jury did need jury instructions explaining the 666(c) defense, and it received them. (*See* Instr. 24, 30, 36). The Court also rejects Doherty's argument that the Court erred in rejecting his proposed amended jury instruction to specify that the Government carried the burden to prove beyond a reasonable doubt that the jobs were not bona fide and in the normal course of business. The Court adopted the Seventh Circuit pattern, which did not direct such a message. Doherty cites *United States v. Johnson*, 605 F.2d 1025, 1026 (7th Cir. 1979), which urges courts to instruct the jury that the Government bears the burden in "close cases." Even if this were a close case, the jury was instructed that the "burden of proof stays with the Government throughout the case" (*See* Instr. 3), and the Court appropriately declined to give repetitive instructions so as not to add clutter that would dilute the rest.

For these reasons, the Court will not acquit as a matter of law or fact pursuant to § 666(c).

The Court will now address Defendants' arguments for acquittal based on the elements of the corruption charges.

### 3. Elements

#### i. Corrupt Intent Evidence

A conviction under § 666 for gratuities requires a reward be transmitted "'corruptly,' i.e., with the knowledge that giving or receiving the reward is forbidden." *Snyder*, 71 F.4th 555, 580 (7th Cir. 2023). In other words, a defendant must understand "that the payment given is a bribe, reward, or gratuity." *Id.*; *see also* Fed. Crim. Jury Instr. 7th Cir. 666(a)(2) (2022 ed.) (quoting *United States v. Bonito,* 57 F.3d 167, 171

(2nd Cir. 1995)) ("person acts corruptly, for example, when he gives or offers to give something of value intending to influence or reward a Government agent in connection with his official duties").

Co-conspirator turned cooperator Marquez testified that he understood his actions as intending to influence or reward Madigan. (Tr. 1903:18-1904:13); *see infra* Section II.B.1. Defendants argue that Marquez's state of mind cannot be reasonably transferred to a co-conspirator without speculation. In the same briefings, they also say that no reasonable jury could find corrupt intent when other people involved testified to lacking it. For example, attorneys with backgrounds in white collar criminal law did not think their behavior was wrong. The Court agrees that the testimony of similarly situated people as to their intent is relevant, but it is not in and of itself conclusive one way or the other, and admissibility depends on the context. *See infra* Sections II.B.1.

Even if each piece of evidence were too weak to outshine a shadow of reasonable doubt, collectively, they can do so. The Court will address each Defendant's arguments separately as to each count.

*Count 2 (Kurson)*

*Pramaggiore*

The evidence shows that Reyes Kurson was paid only for work it completed, and its guaranteed hours were cut, rather than increased as McClain requested. ( Tr. at 1377:9-17, 1380:20-23, 1411:10-16, 1413:15- 1414:4.) Pramaggiore argues that the evidence was insufficient to establish corrupt intent because former ComEd General Counsel Tom O'Neill testified that Pramaggiore had nothing to do with the decision to

retain the law firm and then talked openly about renewing the contract once informed of it, and still played an insignificant role in its renewal.

In an email dated January 2016 — nearly 11 months before FEJA ultimately passed — concerning Reyes Kurson's contract, McClain wrote that non-action on the "issue of 850 [hours] for his law firm per year" would "provoke a reaction from our Friend." (GX318.) McClain directly wrote to Pramaggiore, "I know the drill and so do you." *Id.* Pramaggiore quickly replied, "Sorry. No one informed me. I am on this." (GX320.) She then forwarded this email to Marquez (GX318), who testified that he understood she took "action to avoid provoking problems with Speaker Madigan." (Tr. at 1205:18-20.)

Pramaggiore argues, that the "contractual negotiation between ComEd and Reyes Kurson took months" further undermines the possibility that it was a bribe, and "[i]t is nonsensical that a reduction in hours would constitute a bribe." But a compromise could, of course, include a thing of value: a contract with fewer than requested hours could still appease Madigan, if absent the Madigan connection there would have been no contract at all (*see* Resp. at 17 (citing testimony from Nicole Nocera, Pramaggiore's chief of staff, that she did not like Reyes Kurson's work)); (*but see* Tr. at 1377:9-17 (O'Neill's testimony that he approved of the firm's work product)). Her argument that it took a while may not have resonated with a jury informed by their own experience that little happens immediately in multi-layered organizations and that subtlety could suggest an intention to conceal true motives.

Pramaggiore tells McClain in an email that she and Marquez will discuss the renewal because O'Neill moved into a new role. (GX393.) O'Neill, who was copied on the

email, replies that he would help with the renewal, and he testified that he was the ultimate decisionmaker in the renewal of the contract. (*Id.*); (Tr. at 1259:12-16.) Defendants argue that evidence shows that O'Neill "handled" the 2017 renewal of the Reyes Kurson contract, and only through speculation could a jury conclude otherwise. However, that O'Neill ultimately "handled" it does not foreclose the involvement of others, namely his boss Pramaggiore who was party to email correspondence with McClain and assured him that she would make it a priority.

*McClain*

The corrupt intent is even clearer for McClain. McClain, while not a ComEd employee, was making demands on its executives. His email warning that Pramaggiore's failure to get involved "will provoke an action from our friend" could be reasonably understood as pressuring ComEd to appease Madigan. (GX318.)

*Count 5 (Ochoa)*

Defendants Pramaggiore and McClain argue that the evidence was overwhelming that Juan Ochoa was qualified, met expectations of the position, and performed required work as a member of ComEd's Board. Specifically, former ComEd General Counsel O'Neill testified that both Madigan and former Mayor of Chicago Rahm Emanuel recommended Ochoa for a "Hispanic board seat," and that Ochoa had served as the head of the Latino Chamber of Commerce. (*See* Pramaggiore Mot. at 18, citing Tr. at 1381:18-25, 1382:9-21.) Ochoa himself testified about his qualifications for the position, including having made deep connections in the Latino community and having been appointed to many other boards for reasons unconnected to Madigan. (Tr. at 3565:24-3571:24.) Ochoa

- 24 -

also described his close connection to two influential Latino politicians in Illinois—Congressman Jesús "Chuy" García and then-Congressman Luis Gutiérrez. (*Id.* at 3526:4-23.) Pramaggiore's successor as CEO of ComEd, Joe Dominguez, "liked [Ochoa] a lot" and was "impressed" by Ochoa's qualifications, including that he had a "lot of business acumen" and "seemed to know a lot about the Latino community." (*Id.* at 4195:1-11.)

The Government argues that regardless of Ochoa's qualification and work, the appointment of Ochoa was not a typical hiring decision; the evidence reflected there was internal resistance within ComEd to the appointment of Ochoa; the resistance was stiff enough that Pramaggiore offered to find another placement for Ochoa within the company that would pay Ochoa $78,000 a year — an offer she conveyed to Madigan through McClain. (GX15.) Despite the internal resistance and challenges to Ochoa's appointment, Madigan told McClain to "continue to support" and "go forward with" Ochoa's appointment to the Board, because he wanted to stay in good favor with Congressman Gutierrez, who had recommended Ochoa to Madigan. (GX15; GX21); (*see generally* Tr. 3531:15-3539-2.) McClain passed that message to Pramaggiore, who confirmed she would "keep pressing" to get Ochoa appointed to the Board, as Madigan requested. (GX22); *See United States v. Whiteagle*, 759 F.3d 734, 755 (7th Cir. 2014) (affirming a conviction for a corrupt solicitation of a job for a legislator's qualified cousin under 18 U.S.C. § 666(b)).

*Pramaggiore*

Pramaggiore argues no reasonable jury could have found corrupt intent amidst plenty of evidence of a clear conscience. Specifically, she argues that the fact that she

spoke openly about Madigan's interest in having Ochoa on the Board indicates an understanding that it was acceptable. The Government produced evidence that McClain relayed to Pramaggiore Madigan's direction to "keep pressing" for Ochoa (after she offered to secure some other position that paid the same amount of $78,000 per year). (GX22; GX15.) Pramaggiore said she would do so, indeed did, and took credit for the push to appoint Ochoa and overcoming the resistance she experienced: "I got that done" (GX22; Gx550; GX551; GX554; GX65). Pramaggiore knew that Madigan sought to deliver Ochoa the news once his appointment was confirmed and notified McClain when time was right for Madigan to share the news. (GX64; *see also* GX3; GX548; GX63; GX128.) When McClain thanked her for her efforts, Pramaggiore responded: "[Yo]u take good care of me and, and so does our friend and I will do the best that I can to, to take care of you." (GX90.)

It is possible that a different jury might have found that the evidence showed Pramaggiore was merely acting diligently as CEO to promote ComEd's interests, which include a prominent figure in Chicago's Latino community on its board and a rapport with powerful Illinois politicians replete with innocuous mutual favors. And that it was proper that Madigan's recommendation was but one factor in ComEd's pursuit of Ochoa for a board position it sounded like it might have sought to fill in the ordinary course of business. When Pramaggiore only promised to "do the best I can" to take care of McClain and Madigan, this caveat may have sincerely meant "within the law."

However, the record reflected that Pramaggiore "didn't want" a record of her efforts "in writing." (GX90 ("I wanted to respond to your text on — " "Yes ma'am." "Juan

- 26 -

Ochoa . . . I didn't want to put it in writing.")); (*see also* GX148-T (Hooker: "which is understood need not be mentioned.")). Thus, there is enough evidence for a jury to reasonably reach the conclusion that this jury did, in fact, reach after five days of deliberation. (Dkt. Nos. 244-250.) The Court cannot overturn the conviction of Pramaggiore to Count Two.

### McClain

McClain argues that there is insufficient evidence of corrupt intent because the evidence shows he made no effort to conceal the job recommendations in his calls and emails, people well-versed in criminal law accepted McClain's job recommendations from Madigan, and again that Moody, Ochoa, and Reyes were qualified and did meaningful work. For the reasons discussed regarding Pramaggiore, McClain's evidence of corrupt intent was sufficient, and surely stronger because the emails and recorded phone calls show he proactively facilitated the hire at Madigan's bequest. Like Pramaggiore, who had a colorable, though ultimately unpersuasive defense that she was merely acting in ComEd's best interest by hiring a qualified person for the job, McClain may have been legitimately lobbying for the interests of at least one of his clients, ComEd and/or Madigan, but again the jury did not buy it. *See also, infra,* Section II.C.2.

### Count 6 (Zalewski)

### McClain

The evidence shows that on May 16, 2018, Madigan instructed McClain to talk to Pramaggiore about adding former Zalewski as a ComEd subcontractor. (GX21.) That same day, following Madigan's direction, McClain asked Pramaggiore if she had given

more thought to adding Zalewski as a subcontractor. (GX22.) Pramaggiore confirmed that she had told Marquez to add Zalewski, *id.*, then, later that day, McClain told Marquez that ComEd would pay Zalewski "five," or $5,000, per month. (GX23.) That same afternoon, McClain called Madigan to confirm that Madigan — with Pramaggiore's blessing — would give Zalewski the good news. (GX25.) Ultimately, consistent with the pattern of the other subcontractors to ComEd connected to Madigan, Zalewski was engaged as a subcontractor under the Doherty contract, (Tr. 1953:25- 1955:13), with no record of performing work for ComEd. (Tr. 1954:25-1956:4.)

*Pramaggiore*

When McClain asked Pramaggiore if she had given more thought to adding Zalewski as a subcontractor, Pramaggiore confirmed that she had told Marquez to add Zalewski: "Yeah, I told Fidel [Marquez] to hire him. To get it done." (GX22.) She gave her blessing to McClain that Madigan would give Zalewski the good news. (*See* GX25.)

To justify the mid-year addition of former Zalewski to Doherty's payroll in 2018 that would increase payment by $5,000 per month to $37,500 per month, Pramaggiore signed a contract amendment stated that JDDA was retained for June 1, 2018 to January 13, 2019 to provide "Government and Public Affairs Professional Services for the following: City Council, Department heads and Mayor's Office, plus expanded role with Cook County Board President's office and Cook County Commissioners Department Heads." (GX544; *see also* GX546.) The internal documentation in ComEd's books and records said nothing about Zalewski. (*Id.*) To the jury, this omission may have seemed

- 28 -

material to evince her corrupt intent. Moreover, the jury had no evidence that Zalewski contributed to the initiatives Pramaggiore claimed justified the increase.

For these reasons, there was reasonable evidence of corrupt intent as to Count 6.

### Count 8 (JDDA 2019 Renewal)

The Government's proffered evidence of corrupt intent surrounding ComEd's renewal of the JDDA contract in 2019 includes occurrences many years earlier. Pramaggiore wrote to Doherty in an October 11, 2014 email, "It has been a long path with each of [Speaker Madigan and Governor Quinn] and relationships always require care. Thanks for your help in creating an understanding with both of those gentlemen." (GX268.) That this communication occurred years before Count 8 does not render the connection merely speculative because the people involved were the same, and the means for creating this understanding of which they spoke could understandably continue for many years; indeed, the charged conspiracy spans these years.

Defendants argue that Doherty's organization, the City Club, was a key forum for communicating issues of importance to ComEd to key community stakeholders, including politicians. (Tr. 1306:14–1307:10, 2405:15-2406:8, 4543:2-9.) They also argue that the Government's argument that she was speaking in code about the subcontractors is further undercut by the absence of any suggestion that ComEd was bribing former Governor Quinn via subcontractors paid through JDDA. The jury was appropriately instructed not to speculate on why certain people were not charged. Their obedience with this instruction could not make their reasoning speculative.

- 29 -

ii. *"In Connection With" Evidence*

Defendants insist the link between the ComEd contracts and legislation is too speculative. Specifically, Pramaggiore argues that there is no evidence showing her actions with regards to hiring were "in connection with" legislation. In light of Defendants' arguments at trial that the professional responsibilities of Pramaggiore and the other Defendants included pursuing optimal legislation, it is reasonable to infer that the CEO of a state-regulated utility company sees a connection between the Speaker of that state legislature and legislation. In an email to Doherty in October 2014, Pramaggiore wrote, "Thanks for your help in creating an understanding." (GX268.) While a "thank you" is not an "ask," and this one was not explicit, it does lend support for the connection. Moreover, on a February 20, 2019 phone call, McClain, Hooker, and Pramaggiore, discuss ComEd's legislative strategy. (GX136.) Defendants argue that the contents of the call constitute legal lobbying. Nevertheless, legal lobbying connects to legislation.

Defendants' point that no evidence shows an explicit ask on the part of ComEd to Madigan for help with their legislative agenda is of no matter. *See United States v. Curescu,* 674 F.3d 735, 740 (7th Cir. 2012) (explaining that parties involved in bribery do not explicitly describe their conduct with these words and "instead use words that the other party to the conversation understands to refer to bribes"). The evidence reflected Pramaggiore's practices of writing thank you notes and of recognizing others' contributions to ComEd. (Tr. 3401:4-12, 4562:24-4563:14.) Obviously, neither appreciation nor "nice relationship[s]" could on their own support a corruption conviction beyond a reasonable doubt, *see Garcia,* 919 F.3d at 503 (". . . inferences focused on a

- 30 -

defendant's presence or association with criminals or their criminal activity—will fail to carry the government's burden."), but they do support this element of the corruption charges, alongside other evidence, discussed herein.

Defendants also argue that the alleged "things of value" did not personally support Madigan. However, they concede that Madigan wanted to hoard power, and a jury could reasonably find based on evidence of the importance of precinct captains, as well as plenty of Madigan's own remarks on wiretaps indicating his interest in what ComEd provided, that Madigan valued the jobs. It is "not necessary for the government to prove [that the targeted public official] actually received the bribes." *United States v. Whiteagle,* 759 F.3d 734, 753 (7th Cir. 2014).

The Court now explains the established connection with legislation of the specific counts.

*Count 2 (Reyes Kurson)*

In 2016, FEJA was passed and the pre-existing Reyes Kurson contract was renewed. For one, Reyes Kurson was engaged on favorable terms because Victor Reyes was one of Madigan's top fundraisers. (Tr. 1180:1-12; 1182:11-19.) ComEd first engaged Reyes Kurson in 2011, at a time when defendants sought to influence and reward Madigan in connection with the EIMA legislation. (Tr. 1180:23-11:82-10.) When the contract came up for renewal in 2014, Pramaggiore told General Counsel Tom O'Neill to go forward, despite O'Neill telling her that "there is not a ton of work" for them to do. (Tr. 1188:6-20.) And in 2016, when Tom O'Neill sought to reduce the number of hours that ComEd guaranteed Reyes Kurson, McClain looped Pramaggiore and Hooker into the

conversation to make sure the contract was negotiated on favorable terms — all while ComEd was working to get its Future Energy Jobs Act ("FEJA") legislation passed. (Tr. 1202:9-1205:20, 1141:13-1142:1) (discussing the multi-year effort to pass FEJA from later 2014/early 2015 to the end of 2016).

Pramaggiore points out that the Government conflated the 2014 renewal and the 2016 renewal of the Reyes Kurson contract to incorrectly imply that O'Neill testified that Pramaggiore directed him to renew the Reyes Kurson contract in 2016. (*See* Tr. at 1188:6-20.) Moreover, on cross examination, O'Neill admitted Pramaggiore instructed him only to work with McClain, rather than explicitly to renew the contract. (*Id.* at 1378:7-1379:23.) The Court agrees that the strength of this particular evidence in connecting Kurson with FEJA would be greater if her instruction were explicit and in closer proximity to the passing of FEJA, but this is insignificant because the charge did not require a connection to FEJA's passage, and this was but one piece of evidence showing a connection.

Defendants argue that no evidence or testimony supports the conclusion that anyone expected that non-renewal of the contract would provoke an adverse action from Madigan affecting legislation. But the jury could draw the rational inference that a lobbyist known to speak for the Speaker of Illinois House of Representatives was communicating with ComEd employees using their ComEd email addresses about business regarding the two entities.

In an email dated January 2016, McClain raised to Pramaggiore and Hooker that ComEd was trying to cut Reyes' hours. He said to them: "I know the drill and so do you.

If you do not get involve[d] and resolve this issue of 850 hours for his law firm per year then he will go to our Friend. Our Friend will call me and then I will call you." (GX318.) McClain threatened that such a step would "provoke a reaction from our Friend," or Madigan. (*Id*.) This email vividly demonstrated what motivated McClain, Hooker, and Pramaggiore in contract negotiations with Reyes Kurson: influencing and rewarding Speaker Madigan, to avoid an adverse outcome in the General Assembly. *Id*. Pramaggiore apologized for the delay before responding, "I am on this." (GX320.) Ten days later, she reported back to McClain: "I asked Fidel [Marquez] and Tom [O'Neill] to address this." (GX321.) The project manager of FEJA, Marc Falcone, was enlisted to ensure that the law firm got what it wanted — even though Falcone was responsible for ensuring that nothing was an obstacle to the passage of FEJA and had nothing whatsoever to do with the retention of law firms by the company. (Tr. 1228:18-1230:15.) As promised, ComEd renewed the contract with Reyes Kurson in 2016. (Tr. 1252:7-12.) ComEd did the same for 2017, after Pramaggiore again stepped in to ensure the renewal. (Tr. 1257:11-13; GX393.)

### Counts 5 (Ochoa) and 6 (Zalewski)

The facts that then-Speaker Madigan gave the news of both Zalewski (GX25) and Ochoa (GX 64; *see also* GX3; GX548; GX63; GX128) of their positions at ComEd permits a reasonable inference that the hires were in connection with legislation.

### Count 8 (JDDA 2019 Renewal)

The connection between the JDDA contract renewal in 2019 and legislation is also straightforward. For example, in a recorded phone call with Marquez, Pramaggiore

explained that Doherty's contract should be renewed for 2019 because, otherwise, the company would be "forced" to give someone a five-year contract "in the middle of needing to get something done in Springfield." (GX 131.) Marquez confirmed that, at the time of this call, ComEd was working to pass the "Skinny Bill" rate legislation. (Tr. 2024:2-7.) Marquez expressly testified that the purpose of ComEd's payments to Doherty's subcontractors was to influence Madigan so he could help ComEd's legislative agenda. (*See, e.g.,* Tr. 1904:10-1905:14.) Additionally, on February 13, 2019, when Marquez asked Doherty if the subcontracts should be renewed even though the subcontractors did not work, Doherty expressly linked the subcontractor payments to ComEd's legislative success: "Your money comes from Springfield, right?" He followed up: "[I]f it ain't broke, don't fix it with those guys." (GX129.)

* * *

Viewing the evidence in the light most favorable to the jury's decision, the Court affirms that a reasonable jury could have weighed the evidence in favor of the corruption convictions. The Court cannot then overturn the verdict.

### C. FCPA Counts

Counts Three, Four, Seven, and Nine charge defendants with falsification of records in connection with Jay Doherty and Associates ("JDDA") contracts, in violation of the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78m(b)(5), 78ff(a) and the federal aider and abettor statute, 18 U.S.C. § 2.

Section 78m(b)(5) of the FCPA makes it a crime to "knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify

any book, record, or account described in [the above] paragraph." 15 U.S.C. § 78m(b)(5). Section 78ff(a) sets forth the penalties for violating the statute. *See id.* § 78ff(a).

Defendants challenge their direct liability, as well as their conviction on an aider and abettor theory and a *Pinkerton* theory. Because the counts are for similar contracts that recurred annually, the Court will discuss these counts together where proper. The Court will first address why the evidence shows a crime was committed, and then will address facts supporting liability for each Defendant.

### 1. False Documents

Defendants argue they are entitled to acquittal because the Government failed to demonstrate that the JDDA contracts and single source justification ("SSJ") forms were false. In support, they point to a laundry list of evidence presented which clearly establishes that the records did not need to list the subcontractors. (*See, e.g.*, Tr. at 2357:13-2360:14, 3353:12-15, 3354:1-9; GX868.) They contend this evidence conclusively shows that the contracts and SSJ forms themselves contained no falsehoods. However, this both mischaracterizes the Government's theory and overlooks supporting evidence.

The Government's theory was not limited to a technical deficiency; instead, the Government's indictment alleged that Defendants "created and caused the creation of false contracts, invoices and other books and records to disguise the true nature of certain of the payments and to circumvent internal controls." (Indict. ¶ 3) Whether the contracts or justification forms were mandated to list the subcontractors is relevant, but whether the whole of the evidence rendered the documents false was a question for the jury.

To that point, the Government introduced plenty of evidence upon which a jury could reasonably conclude that the contracts did contain falsehoods. This included Pramiaggore's approval of the 2017 Doherty contract, which specified that all payments made under the contract were "as consideration for the monthly services" to Doherty for advising ComEd on legislative issues relating to its business. (GX868.) The SSJ forms the Government introduced justified ComEd's retainment of Doherty because of his "unique insight and perspective to promote ComEd and its business matters." Subsequent contracts and justification forms "expanded [his] role". (*Id.*; Tr. 1929:11-19.)

ComEd used SSJ forms when the company engaged the services of a vendor outside of its typical competitive bidding process. (Tr. 1928:12-13.) Marquez testified that this usually occurs when goods or services are uniquely provided by a specific firm or company. (Tr. 1928:19-20.) Carrie Bourque, employed as a principal category manager at Exelon, was involved in the preparation of the ComEd contracts. Bourque testified that it is "really important" that the justification forms are "really accurate" because they are auditable, they help maintain public trust, and they typically identify the individuals that are contracted so that background checks can be performed and confidentiality can be maintained. (Tr. 3297:4-3305:15.) Therefore, the documents at issue were at least incomplete, in part, because no subcontractors were mentioned on the two justification forms signed and approved by Defendant Pramaggiore. (*See, e.g.,* GX868, GX484.) The forms also conveyed that Doherty provided expertise as a consultant that could not be obtained elsewhere, but there was little evidence that his team contributed any expertise, let alone unique expertise. (*Id.*)

- 36 -

To the contrary, the Government introduced evidence that Doherty and the subcontractors did not do any work. At trial, Marquez testified that he "didn't expect for [the subcontractors] to be doing work for ComEd" because he "knew they were brought on as a favor to Michael Madigan." (Tr. 1903:18-1904:13.) Marquez further testified that it was his understanding that Pramaggiore did not expect the subcontractors "to be doing anything" because the payments were made so that Madigan "could perhaps be helpful in [ComEd's] legislative agenda" with no expectation of working at all. (Tr. 1959:2-13, 1904:10-1905:14, 1925:25-1926:2.) Thus, what appeared distinctive about Doherty's team was not its expertise but its connection to Madigan.

This testimony alone is sufficient for a jury to reasonably conclude that the contracts were false because they failed to disclose the intent guiding the payments; that is, the payments were not for professional expertise but instead for something else. The jury also heard a recorded conversation where Doherty told Marquez that ComEd's motivation for paying these individuals was not so that they could assist Doherty, but instead to corruptly influence Madigan. (GX129) (Doherty: "And, uh, [the subcontractors] keep their mouth shut, and you know, so. But, do they, do they do anything for me on a day to day basis? No."). The is substantially more than a "mere modicum" of evidence that defendants falsely represented the reasons for retaining and paying the subcontractors on the Doherty contracts and associated justification forms. *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see United States v. Vorley,* 2021 WL 1057903, at *4 (N.D. Ill., Mar. 18, 2021) (holding that testimonial evidence "standing alone" could

sufficiently support jury's conclusion that the defendants' technically accurate contracts were lies).

Defendants also accuse the Government of eschewing specificity and changing their theory throughout the case. They argue that the Government failed to articulate a consistent theory supporting the books-and-records charges "refusing to identify which documents it believed were false. And when [the Government] was compelled by the Court to provide information about these charges, it adopted a kitchen-sink approach, claiming that nearly every document associated with the JDDA contract was false," permitting Government to offer "shifting theories" throughout trial in violation of the Fifth Amendment. (Pramaggiore Mot. at 21).

The Fifth Amendment bars prosecutors from presenting different and incomplete sets of facts in support of different theories of culpability for the same crime. *See Stumpf v. Robinson,* 722 F.3d 739, 749 (6th Cir. 2013) (citing *Thompson v. Calderon,* 120 F.3d 1045, 1056 (9th Cir. 1997) (en banc) (plurality op.), *vacated on other grounds,* 523 U.S. 538 (1998)). On the other hand, prosecutors may introduce relevant evidence — including contracts, e-mails, and recorded calls that the Government relied on here — to substantiate their overall theory of liability. *See id.*

Here, the Government was not presenting different and incomplete theories of liability when it alleged that the documents were false, in part, for failing to disclose the subcontractors or the reason for hiring the subcontractors. Instead, Defendants' failure to disclose information on contracts were pieces of evidence that the Government introduced to illustrate how the documents — specifically the 2017 Doherty contract, its

renewal, and the documents otherwise associated with executing the payments under the contract — were full of lies, even where the documents might have been accurately procured. This, too, is no basis for acquittal. *See, e.g., Vorley,* 2021 WL 1057903, at *4 (finding no error in the Government's reliance on information and testimony other than the documents at issue to establish that technically accurate documents contained misrepresentations).

## 2. Knowing and Willful Intent

Defendants next contend that the Government introduced no evidence to find the requisite mens rea. As noted, the Government must prove that the defendants acted with knowing and willful intent. A defendant acts knowingly if the defendant "realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake or accident." Pattern Crim. Fed. Jury Instructions for the Seventh Circuit 4.06 (*see* Instr. No. 41) "A person acts willfully if he or she acts knowingly and with the intent to do something he or she knows is against the law." *Id.* 409 (Instr. 42.) This intent need not be to falsify records but can be the intent to join a conspiracy to do as much. *Pinkerton v. United States,* 328 U.S. 640, 647 (1946). Viewing the evidence in the light most favorable to the verdict, the Court must deny Defendants' motions, as explained herein for each argument Defendants raised.

### Doherty

Doherty argues the Government's evidence does not sufficiently show a willful and knowing intent. He believes the Government's showing was insufficient as it only showed Doherty's "mere" suspicion that "something was amiss." (Doherty Mot. at 17).

In essence, Doherty disagrees with the jury's interpretation of the evidence: Doherty, a long-time businessman in a position to understand that falsely describing the nature of payments would — and ultimately did — cause the creation of false entries, provided false justifications to ComEd in his invoices and in the contract requisition process. Doherty's contract was under Anne Pramaggiore's (ComEd CEO) budget, which meant that from time to time, Pramaggiore was required to sign the single source justification forms explaining why it was necessary to pay for Doherty's services at the rate invoiced. Doherty was aware that he was asked to provide accurate information so there could be an internal justification as to why the payments under the contract were being increased. (*See, e.g.,* Tr. 2887:17-2889:21; 2890:9-2891:8.) Yet the signed justification forms explained that Doherty was being paid hundreds of thousands of dollars each year on account of his expertise and omitted the detail that a portion of the payments were destined for the subcontractors who were Madigan associates. (*See* GX484; GX868.)

The Government's evidence showed other efforts by Defendants directly associated with Doherty to ostensibly conceal the subcontractors. Janet Gallegos (Doherty's administrative assistant) and Elizabeth Lynch (Director of Corporate Accounting at Exelon) testified that Doherty's invoices said nothing about subcontractors. (*See, e.g.,* Tr. 2811:18-20; 2853:2-6; 3489:20-3489:23.) Gallegos and Carrie Bourque (principal category manager for Exelon, who created and executed contracts for ComEd consultants) likewise testified that the contracts between Doherty and ComEd said nothing about the subcontractors. (*See, e.g.,* Tr. 2889:16-18; 3295:19-3298:20; 3304:6-

19; 3309:25-3310:10.) Lynch further testified that ComEd's internal accounting records also said nothing about the subcontractors, and instead stated that the payments to the intermediaries were for categories such as "legislative services," without any mention of the fact that a substantial portion would be passed on to Madigan associates. (*See, e.g.*, Tr. 3503:4-7; 3505:10-12; 3507:3-10; 3509:5-8; 3511:4-13.)

The Seventh Circuit has recognized that inconsistent assertions put in books and records suggests willfulness. *U.S v. Mansfield*, 381 F.3d 961, 965 (7th Cir. 1967) (citing *Spies v. United States*, 317 U.S. 492 (1943)); *see also U.S. v. Mullins*, 355 F.2d 838, 886 (finding endorsement of fraudulent checks demonstrates willful conduct). In *Mansfield*, for instance, the defendant, a doctor, failed to fully disclose his income to IRS agents. When visiting the Internal Revenue Office, he made no mention of his personal injury patients, who were the "most lucrative" aspects of his practice. 381 F.3d at 964. The Court reasoned that withholding these records were inconsistent with his assertions that he put his books and records at the agents' disposal, thereby having the effect to conceal or mislead, suggesting willful intent. *Id*.

The Court cannot repeat the entire record, but the above showing made by the Government already mirrors *Mansfield*. As there, a jury here could reasonably infer that Doherty's failure to disclose was an effort to conceal and mislead, thereby suggesting willful intent. Therefore, the Court cannot acquit on this basis.

*Pramaggiore*

Pramaggiore also challenges the sufficiency of the evidence of her intent to falsify documents. (Pramaggiore Mot. at 25-27.) First, she argues that the Government cannot

prove she intended to falsify the Doherty contracts for 2017 and 2018 (Counts Three and Four), because she did not personally sign these contracts, and the 2019 contract amendment (Count Nine), because she had already left ComEd CEO. (Dkt. No. 264 at 26.) This argument fails for several reasons.

As discussed above, Pramaggiore did sign false single source justifications for the Doherty contract in 2017 and 2018. (GX868; GX484.) Although the forms did not require mention of subcontractors, they did require truthful justifications of the payments. As with Doherty, a jury can reasonably infer that Pramaggiore's omissions were an effort to conceal and mislead, suggesting willfulness to hide the true reason why the Doherty payments were so high (to pay Madigan associates for no work). *See Mansfield,* 381 F.3d at 964.

Moreover, as Elizabeth Lynch (Director of Corporate Accounting at Exelon) testified, Pramaggiore was responsible not just for signing the single source justifications, but for approving payments under the contract on an ongoing basis. (*See, e.g.*, GX702; Tr. 3497:4-3499:12.) Accordingly, each payment under the contract enerated a false entry in the general ledger of the company for which Pramaggiore was directly responsible. And while Pramaggiore did not personally sign each contract with Doherty, a reasonable jury could conclude that she caused their creation and authorized their scope, as demonstrated by, for example, her direction to Marquez to hire Zalewski, (*see* GX22), or her involvement in pushing for the contracts continued into 2019, even when she had moved to Exelon, (*see* GX131). Such evidence established her liability as an aider and abettor (*see infra* Section II.B.1.iv). In addition, as discussed further below in

- 42 -

response to the arguments presented by Hooker, a reasonable jury could have found Pramaggiore guilty under a *Pinkerton* theory of liability as to the books-and-records charges.

*Hooker*

Hooker argues that he cannot be held liable (directly or otherwise) for violating the book-and-records provisions of the FCPA because he had retired as a full-time employee from the company. (John Hooker's Mot. for Judgment of Acquittal ("Hooker Mot.") at 7). But Hooker claimed that he created the illegal payment arrangement in 2011 and set it in motion when he was head of the company's legislative affairs department. (*See* GX126 (Hooker: "We came up with this plan"); GX118 ("me and McClain was — I was the one that created it")); (Tr. 2001:1-11 (Marquez explaining that Hooker meant that Hooker and McClain had "created the mechanism or process by which the subcontractors were added")). In one call, Hooker described the arrangement as being "off the beaten path" and, in another call, McClain and Hooker joked that they were "creative" in the arrangement they had set up with the Madigan subcontractors. (GX17.)

The Government introduced plenty of evidence showing that Hooker, in his post-retirement role as a consultant for ComEd, continued to play a role in the contracts. For example, he continued to monitor the subcontractors throughout the existence of the conspiracy. (*See* GX129 (Doherty stated that Hooker would call to check on the subcontractors and report back to Madigan).) Additionally, he continued to provide co-conspirator McClain advice about how to have the contract renewed in 2019 when

Dominguez became ComEd's CEO. (*See* GX126; GX148.) In sum, a reasonable jury could find that he knowingly and willfully caused false records to be created.

*McClain*

McClain also contends that there was no evidence that he knowingly or willingly falsified a book or record, because he did not have responsibility or access to internal ComEd documents, did not have any role in creating, signing, approving, or reviewing JDDA contracts or single source justification forms, and was not aware of ComEd's internal accounting practices. (Michael McClain Motion for Acquittal ("McClain Mot."), Dkt. No. 265). But, as discussed herein (Section II.B.4), McClain's liability does not depend on his personal signature where he played an integral part in the conspiracy as the conduit between ComEd and Madigan and caused the creation of false documents. In addition to his calls with Hooker discussed above, McClain enlisted Shaw Decremer and John Bradley to act as intermediaries for payments to individuals such as Ed Moody. (Tr. 1911:1-1913:4; 1934:11-1938:6.) Invoices, as well as associated payment records, sent by both individuals to ComEd made it appear that the payments were for legitimate lobbying services, when the payments were instead made to corruptly influence Madigan for no work. (Tr. 3490:14-3491:22; 3492:7-3494:3.) A jury could reasonably infer that McClain knew that he was causing false documentation to be created as part of ComEd's books and records because they affirmatively mispresented why payments were being made to Doherty. *Mansfield,* 381 F.3d 961, 965.

- 44 -

### 3. Circumvention of Internal Controls

Defendants Hooker and Pramaggiore take further issue with their convictions under 78(m)(b)(5) for willfully and knowingly circumventing internal accounting controls. They argue that the only internal control the Government presented was Exelon's Corporate Code of Business Conduct, which, she asserts, are not internal accounting controls for the purposes of 15 U.S.C. §§ 78m(b)(5) and 78ff(a) (Pramaggiore Mot. at 39).

This argument fails for two reasons. First, Exelon's Code was not the only internal control the Government presented. For instance, the previously discussed testimony from Fidel Marquez, Elizabeth Lynch. and Carrie Bourque also detailed how the Defendants' failure to disclose the true nature of the payments required the Defendants to circumvent multiple ComEd and Exelon accounting procedures. These internal controls included requiring the submission of invoices before payment, the requirement that invoices be approved by someone "familiar with the charges," and the requirement that payments be for services actually rendered. (Tr. 3513:20-3514:19.)

But even if the Code were the only control Defendants were alleged to have violated, Exelon's Code directly concerns the organization's internal accounting practices. The Seventh Circuit has clarified that internal controls for §§ 78m(b)(5) purposes include "manual or automated review of records to check for completeness, accuracy and authenticity; a method to record transactions completely and accurately; and reconciliation of accounting entries to detect errors." *McConville v. SEC,* 465 F.3d 780, 790 (7th Cir. 2006). Here, the 2015 and 2016 Code of Business Conduct describes internal

controls related to ComEd's accounting systems, including mandates to: (i) "Never make an entry in any record that intentionally misrepresents, conceals or disguises the true nature of any transaction, event or condition," and (ii) "Record all business transactions, events and conditions accurately, completely, and in a timely fashion." (GX739.) This makes the Code, as well as the procedural testimony, characteristic §§ 78m(b)(5) and 78ff(a) accounting procedures, as they (among other things) ensure accuracy and authenticity. There was more than sufficient evidence that Pramaggiore approved transactions that did not comply with these standards in order to circumvent these internal safeguards—namely, by misrepresenting or concealing the true nature of the Doherty transactions and creating inaccurate records to do so. This was enough to convict her on a direct liability theory. And the following section illustrates how there was more than sufficient evidence to convict Hooker on a *Pinkerton* theory of liability.

### 4.  *§ 2, Pinkerton Liability*

McClain, along with Doherty, challenge their convictions under 18 U.S.C § 2 and *Pinkerton*. The Court affirms each count in turn.

For § 2 aider and abettor liability, the Government must prove that the defendant: (1) took an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission. *Montana v. Cross,* 829 F.3d 775, 780 (7th Cir. 2016) (citing *Rosemond v. U.S.*, 572 U.S. 65, 71 (2014)). Once it has been established that an aider and abettor had knowledge of an underlying crime, it "does not take much to satisfy the facilitation requirement." *United States v. Woods,* 148 F.3d 843, 848 (7th Cir. 1998) (citation omitted). Secondary liability charged via 18 U.S.C. § 2 generally applies

regardless of whether the defendant himself is capable of committing the substantive offense. *See Salinas v. United States,* 522 U.S. 52 (1997); *Ocasio v. United States*, 578 U.S. 282 (2016) ("A conspirator need not agree to commit the substantive offense — or even be capable of committing it — in order to be convicted.") Of course, a crime must have taken place.

The Court already concluded in greater detail above that the Government presented sufficient evidence for a jury to reasonably conclude each Defendant had knowing and willful intent. The Court also concluded that a jury could reasonably find that Doherty and McClain took several affirmative acts in furtherance of the conspiracy to corruptly influence Madigan; for his part, Doherty provided dishonest justifications for the payments he received and concealed subcontractors on invoices, and McClain played an integral part in this "creative" arrangement as the conduit between ComEd and Madigan. (GX17.) A reasonable jury could therefore conclude they aided and abetted the underlying conspiracy.

The same reasoning applies in force to Hooker's challenge to his circumvention of internal controls conviction: a reasonable jury could therefore conclude he aided and abetted the underlying conspiracy to pay off Madigan associates when he took credit for creating the mechanism to circumvent ComEd and Exelon's internal controls to pay the subcontractors illicitly (*see supra,* Section II.B.2).

Under the *Pinkerton* theory of liability, one conspirator can be held liable for the crimes of another if committed in furtherance of the conspiracy. *United States v. Manzella,* 791 F.2d 1263, 1267 (7th Cir. 1986) (citing *Pinkerton v. United States,* 328 U.S. 640, 666

(1946)). To convict under *Pinkerton,* the Government must prove that: 1) "the offense defined in the substantive count was committed pursuant to the conspiracy," and 2) "that the defendant was a member of the conspiracy at the time the substantive offense was committed," *Id.* at 1268, and that 3) the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy. *See United States v. Benabe,* 654 F.3d 753, 777 (9th Cir. 2011).

Here, Defendants challenge the foreseeability that their actions would result in the creation of false documents and the circumvention of internal accounting procedures. Doherty and McClain (and Hooker) were long-time professionals in positions to understand that falsely describing the nature of payments would cause the creation of false entries in the books and records of a company. Given their experience, and their roles in creating the subcontractor arrangement and taking steps to conceal the true purpose of the arrangement (*see supra,* Section II.B. generally), it was reasonably foreseeable that their fellow conspirators would continue to falsify internal records over the years that followed.

Drawing all reasonable inferences in favor of the verdict, the Court cannot acquit Defendants on counts here either.

* * *

Ultimately, the Court cannot acquit on any count. For the reasons discussed as to each conviction, the jury had sufficient evidence, and Defendants' arguments here amount to disagreeing with the strength with which the jury weighed it. The Court now turns to Defendants' arguments that the Court erred in ways that demand a new trial.

### III.    NEW TRIAL

"[T]he court may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33(a). The Court should grant a new trial "if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl,* 468 F.3d 428, 436, 438 (7th Cir. 2006) (affirming district court's grant of new trial). The Court has broad discretion in making this determination because it "heard all the evidence, watched both the witnesses and the jury," and is in the best position to determine whether any improper evidence "tipped the scale against" a defendant. *Id.* at 438. Additionally, if the Court "believes there is a serious danger that a miscarriage of justice has occurred — that is, that an innocent person has been convicted — [it] has the power to set the verdict aside, even if he does not think that he made any erroneous rulings at the trial." *United States v. Morales,* 902 F.2d 604, 606 (7th Cir. 1990) (citation omitted). To be sure, "[a] jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos,* 20 F.3d 280, 285 (7th Cir. 1994) (quotation marks and citation omitted).

#### A.    Jury Instructions

##### 1.    *Quid Pro Quo*

For reasons explained *supra* in Section II.B.1, the Court's instruction was proper.

##### 2.    *666(c) Instructions*

For reasons explained *supra* in Section II.B.2, the instructions were proper.

### 3. *Pinkerton*

Pramaggiore contends that the *Pinkerton* instruction impermissibly confused the jury by inserting "gratuitous . . . complexity." (Pramaggiore Mot. at 51). She points to jury deliberations, where the jury asked "[i]f on instructions pg 43 (Instruction #39) [the books-and-records instruction] you don't believe the Government proved 'beyond reasonable doubt, can pg 48 of the instructions [the Pinkerton instruction] still be applied? Yes or No . . . P.S. This includes the burden of proof by the Government." (Tr. 5516:17-22.) After some deliberation, the Court instructed the jury to, "Please reread Instruction No. 39 carefully and then reread Instruction No. 44. This should answer your question," without objection. (Tr. 5526:19-25.)

Pramaggiore argues that this question indicates the jury's inability to find Pramaggiore and/or her co-defendants guilty for an FCPA count as either a principal or an aider and abettor and thus their only avenue for conviction was via *Pinkerton*.

Pramaggiore points to the Seventh Circuit's ruling in *United States v. Manzella,* where a panel of judges found the trial court's version of a *Pinkerton* instruction "drastically compressed" the standard such that it failed to present the *Pinkerton* doctrine in an intelligible form to the jury. 791 F.2d 1263, 1268 (7th Cir. 1986). There is no similar concern here because the Court's instruction mapped precisely with the Seventh Circuit's pattern instruction. *Compare* Pattern Crim. Fed. Jury Instructions for the Seventh Circuit 5.09 *with* Pattern Instruction 48 (Dkt. No. 249).  Pramaggiore further mischaracterizes *Manzella* by asserting that the Seventh Circuit "generally discourage[s]" a *Pinkerton* instruction. (Pramaggiore Mot. at 50). The *Manzella* court expressly did not consider

whether a *Pinkerton* is an added complication to criminal trials, and nowhere did the court indicate that its instruction is discouraged. *Id.* at 1267 ("whether it really adds anything besides complication, given the possibility of basing liability on aiding and abetting—are not questions open to us to reexamine.")

Moreover, as the Government notes, Pramaggiore's objection is misplaced as her counsel consented to Court's clarification of the *Pinkerton* instruction during trial. (*See* Tr. 5526:22-5527:1 (all counsel affirmatively agree with Court's chosen clarification)). Under Federal Rule of Criminal Procedure 30(d), when a party disagrees with a jury instruction it "must inform the court of the specific objection and the grounds for the objection . . . ." Because no defendant objected to the court's answer to the jury's question at trial, the objection was forfeited, so the standard of review is plain error. *United States v. Ye,* 588 F.3d 411, 414 (7th Cir. 2009). Rule 30(d).  "An error is plain if it was (1) clear and uncontroverted at the time of appeal and (2) affected substantial rights, which means the error affected the outcome of the district court proceedings." *United States v. Wheeler,* 540 F.3d 683, 689 (7th Cir. 2008) (quotations and citations omitted). Obtaining reversal on these grounds is an "uphill battle," and unlike *Manzella,* Pramaggiore does not and cannot contend that the instructions here were intelligible, being drawn directly from regularly used language endorsed by the Seventh Circuit.

The only evidence of error Pramaggiore offers is the jury's question regarding the defendants' liability. In response, the Government argues that the question does not suggest gratuitous confusion, but that the jury was asking for clarification on the applicability of *Pinkerton* as an alternative theory of liability on the books-and-records

counts; the jury did not have to find a particular defendant committed all elements beyond a reasonable doubt specified in the books-and-records counts, provided that the jury found the Government proved all elements beyond a reasonable doubt set forth under *Pinkerton*, precisely as the question implies. (Resp. at 93.) The Court agrees with the Government. But even if the Court's instruction was impermissibly confusing to the jury, Pramaggiore still fails to bear her burden of persuasion with respect to prejudice, making no effort to articulate how this confusion affected her substantial rights or affected the case's outcome beyond conclusory assertions that she otherwise would not have been convicted. *Wheeler,* 540 F.3d at 690 ("plain error analysis 'calls for the same inquiry as 'harmless error' analysis, except that here the defendant bears the burden of persuasion with respect to prejudice.")

Since the Court finds no error — and no miscarriage of justice—in its *Pinkerton* instruction, the Court cannot grant Defendants a new trial on this basis.

### 4.  *Goodwill and Good Faith (Defs' proposed 30.2)*

Pramaggiore also finds err in the Court's refusal to adopt Defendants' proposed § 666 instruction that: "It is not a crime to give a thing of value to a public official to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." As before, the Court finds the instruction redundant.

"Although a defendant may have the jury consider any theory of defense that is supported by law and fact, a defendant is not automatically entitled to a particular jury instruction. Rather, to warrant a specific theory of defense instruction, the defendant

must demonstrate: (1) the instruction is a correct statement of the law; (2) the evidence in the case supports the theory of defense; (3) the theory is not already part of the charge; and (4) the failure to provide the instruction would deny the defendant a fair trial." *United States v. Choiniere,* 517 F.3d 967 (7th Cir. 2008) (*citing United States v. James,* 464 F.3d 699, 707 (7th Cir.2006)).

The Court previously rejected Defendants' proposed instruction, and instead instructed the jury that it must find a defendant acted with knowing and willful intent that something of value is given or offered to reward or influence an agent of State Government in connection with the agent's official duties. (Dkt. No. 249 at 37.) The Seventh Circuit has repeatedly clarified that "an action taken in good faith is on the other side of an action taken *knowingly.*" *United States v. Lunn,* 860 F.3d 574, 580 (7th Cir. 2017) (emphasis added). Here, it was not possible for the jury to find that the Defendants had the mens rea to conspire knowingly and willfully without finding that the Defendants did not wish to merely build a reservoir of goodwill. One necessarily negates the other, making the Defendants' goodwill theory of defense a redundant element of the Government's charge. *Id.* (affirming denial of theory-of-defense instruction that would have stated that defendant lacked the intent to defraud if he acted in good faith and honestly believed the accuracy of financial statements, because the instruction was "at best redundant" of the intent instruction given by the court); *see also United States v. Chanu,* 40 F.4th 528, 543 (7th Cir. 2022); *United States v. Johnson,* 874 F.3d 990, 1002 (7th Cir. 2017). The same rationale applies to Pramaggiore's contention that the Court erred when it denied a Good Faith defense instruction offered by Defendants for the

- 53 -

books-and-records counts (Defs' proposed 35.1), which similarly required the jury to find knowing and willful intent of the underlying crime. *See* Instr. 34-35.

The Court has a duty to omit redundancies to mitigate dilution and confusion. *Brown v. Packaging Corp. of America,* 338 F. 3d 586, 595 (6th Cir. 2003) (Clay, J., concurring) ("Ordinarily, a district court should give a requested jury instruction when such instruction offers a correct statement of the law and **is not** irrelevant, redundant, or confusing.") (emphasis added); *see United States v. Collins,* 223 F.3d 502, 507-08 (finding district court's *inaccurate* conspiracy instructions "not so misleading that the jury would likely be confused or misled by the district's error" because overall thrust of trial and instruction mitigated any effect of potential jury confusion); *see also Reinig v. RBS Citizens, N.A.,* 2019 WL 11273201, at *3 (finding inclusion of jury instruction would "only confuse the jury" when denying the proposed instruction). Since the Court, in following its duty, did not err in rejecting either instruction, the Court cannot order a new trial on this basis.

### 5. "Official duty" Instruction

Doherty takes issue with the Court's refusal to advise the jury that the Government carried the burden to prove beyond a reasonable doubt that the jobs held by Madigan associates were not "bona fide" and in the normal course of business. The analysis here is much the same as directly above; it was not possible for the jury to find that "something of value [was] given or offered to reward or influence an agent of State Government in connection with the agent's official duties" *without* also finding that the jobs were not legitimate. The jobs given to Madigan associates were a key element of the conspiracy.

The instruction would have been redundant, and the Court is satisfied that its omission of redundant instructions did not prejudice Defendants. (*See supra,* Section II.B.2.)

### 6. *Vicarious Liability in the Corporate Context (Defs' proposed 20.2)*

Pramaggiore, again joined by her co-Defendants, challenges the Courts decision to give Pattern Instruction 5.02:

> A person who acts on behalf of a corporation also is personally responsible for what he does or causes someone else to do. However, a person is not responsible for the conduct of others performed on behalf of a corporation merely because that person is an officer, employee, or other agent of the corporation.

Pramaggiore's proposal, which the Court rejected, omitted the first sentence and concluded with another one, to read:

> A person is not responsible for the conduct of others performed on behalf of a corporation merely because that person is an officer, employee, or other agent of a corporation. You may not convict a person on the basis that he or she should have known that he or she was participating in wrongdoing, rather than on the basis of his or her actual knowledge.

Pramaggiore argues that the Court's addition of the first sentence and the omission of her last permitted the jury to believe that a person who acted on behalf of a corporation could be convicted if she was negligent in causing someone else's actions that violated the law, "even if she herself did not have the corrupt intent necessary to violate the law." (Pramaggiore Mot. 49.)

Pramaggiore confuses the pinpoint of potential confusion here; as the Government notes, without the first sentence, the Court's instruction reads as if a person cannot be responsible for actions their subordinates completed — for example, at that person's direction — and therefore would have risked confusing the jury. At trial, Defendants noted

the confusion when they dubiously claimed that their modification from the pattern "dropped language suggesting that a person cannot hide behind a corporation, cannot say, 'I'm not guilty because I'm part of a corporation.'" (Tr. 4990:11-14.) This is precisely the language that Defendants kept as part of their proposed instruction.

More critically, jury instructions are considered as a whole, not in piecemeal fashion. *United States v. Andres,* 216 F.3d 645 (7th Cir. 2000) (finding that the jury instructions as given adequately covered the possible, "more argumentative" defense theory.); *see Brown v. Jess,* 521 F.Supp. 3d 801 (W.D. Wisc. 2021) (finding court's jury instruction error harmless in criminal conviction, considering both" the jury instructions that were, and were not, provided in this case."). The jury received a separate instruction requiring that it find corrupt intent. (*See, e.g.,* Instr. Nos. 30, 31, 33.) Thus, there was no risk the pattern instruction reduced the mens rea to a negligence standard, as Pramaggiore suggests. Thus, any failure to provide the proposed instruction could not have possibly denied Defendants a fair trial. *Choiniere,* 517 F.3d at 971.

Since the Court properly instructed the jury on vicarious liability, the Court must deny Defendants plea for a new trial on this basis.

### 7. Terms "Madigan" and "Legislation" for 18 U.S.C. § 666 Instructions

Invoking the Fifth Amendment, Defendants argue that the jury instructions for 18 U.S.C. § 666 should have used the terms in the Indictment, "Michael Madigan" or "Mr. Madigan" and limited "things of value" to "Legislation." Defendants further assert that inserting Madigan's name was important to prevent the jury from convicting defendants for influencing or rewarding a person who was not Madigan.

- 56 -

Trial covered the involvement of multiple public officials along the chain but specifying that "Madigan" was the object of the Defendants' conspiracy was unnecessary. It was clear throughout the weeks of trial that Madigan was the public official. (*See, e.g.,* Tr. 587:19 ("You didn't vote for Mr. Madigan as Speaker either, did you?), 1097:24-25 ("What was your understanding as to why David Ellis, Speaker Madigan's chief legal counsel, was involved in this process?"), 1098:14-16 ("During the course of these meetings, did you form an understanding as to whether Madigan was aware of the EIMA legislation"), 3048:23-24 ("his connection to Speaker Madigan is highly relevant in this case"), 4459:14-16 ("Did you tell him that, as CEO of ComEd, that he couldn't' fire anybody who had been hired at the request of Speaker Madigan?")). Even in closing, both Government and defense made clear that Madigan was the individual in question. (*See, e.g.,* Tr. 5132:13-15 ("The system of corruptly influencing Michael Madigan through a stream of benefits and rewards had been up and running for years."))

Pramaggiore also suggests the Government constructively amended the Indictment, challenging the use of the term "legislative activity" as opposed to "legislation." R. 264 at 53. The Seventh Circuit's ruling in *United States v. Heon Seok Lee* is both instructive and controlling. 937 F.3d 797, 806 (7th Cir. 2019). Lee, the defendant, was charged and convicted with executing a scheme to defraud local governments by falsely representing that his company manufactured its turbo blowers in the United States. *Id.* at 801. On appeal, Lee argued that the government constructively amended the indictment by presenting evidence of misrepresentations beyond specific certifications identified in the indictment. *Id.* He claimed that the indictment confined itself to the falsity

- 57 -

of the certifications, whereas the government's trial evidence focused on other lies, such as false statements to sales presentations, misrepresentations to sales representatives, and misleading emails to general contractors. *Id.*

In rejecting the defendant's challenge, the court reasoned that, "[e]ven if we accept as true Lee's interpretation of the indictment and his characterization of the trial evidence, it would not rise to the level of a constructive amendment. The government did not attempt to prove a crime different from the one alleged." *Id.*; *see United States v. Khilchenko,* 324 F.3d 917, 920 (7th Cir. 2003) ("To effect a constructive amendment, the evidence at trial must establish offenses different from or in addition to those charged by the grand jury."). Rather, the government in *Heon Seok Lee* "consistently maintained" its theory of defendant's fraud. 937 F.3d 806.

Likewise, Defendants here do not — and cannot — argue that the instruction was an offense different from or in addition to the counts charged in the indictment; the government remained consistently focused on the Defendants' efforts to falsify documents and to circumvent internal procedures in an effort to corruptly influence Public Official A. There is no confusion here who Public Official A is, much less a constructive amendment of the Indictment.

Moreover, Doherty argues that the statutory reference to "business, transaction and series of transactions" should have been limited to only EIMA, Senate Bill 9, and FEJA. Again, *Heon Seok Lee* is instructive, as the court approved of the government's reliance on evidence not expressly covered by the indictment's text because the evidence was "'part and parcel' of the same scheme described by the indictment." *Id.* at 807

(quoting Nye & Nissen, Corp. v. United States, 336 U.S. 613, 617 (1949 (no variance where indictment alleged a single scheme to defraud executed in various ways)). Again, the government in Heon Seok Lee relied on lies other than ones made on mere certifications, such as false statements during sales presentations, misrepresentations to sales representatives, and misleading emails to general contractors. Id.

Here, Defendants' scheme was similarly executed in various ways: the jury heard evidence about other ComEd related legislation, including a House Resolution that Madigan sponsored and advocated for and that was favorable to Exelon in 2014 (HR 1146); a bill proposed by Lisa Madigan that ComEd successfully defeated in 2018 (HB 5626); an extension of the formula rate that ComEd supported in 2015 (HB 3975); and another proposed extension of the formula rate in 2019 (which has been referred to as the "Skinny Bill" or SB 2080). Moreover, witnesses testified that ComEd monitored thousands of bills in the General Assembly each year and took an interest in many that did not involve energy legislation. (Tr. 1818:9-22.)

Activities like committee assignments, for example, are part and parcel to the ultimate passage or defeat of bills in the legislature. "Additional evidence regarding technical details about how a defendant executed an alleged scheme does not constitute an impermissible variance." Heon Seok Lee, 937 F.3d at 807. As in Heon Seok Lee, Defendants here cannot demonstrate that their Fifth Amendment rights were violated because the Court's instruction concerned "the same elaborate scheme ... as was described in the indictment." Id. (quoting United States v. Ratliff-White, 493 F.3d 812 (7th Cir. 2007)).

- 59 -

Because the Court cannot find a Fifth Amendment violation in its instructions, the Court cannot grant a new trial on this basis.

### 8. Listing Documents Alleged False

Again, invoking the Fifth Amendment, Pramaggiore insists the Court erred by failing to give Defendants' Proposed Instruction No. 31.1 which lists the particular documents the government alleged to be false. She contends that the instructions left open the possibility that the jury could find a defendant falsified or caused to be falsified "any" document, not just the ones charged. Hence, the Court's instructions were, according to Pramaggiore, "insufficiently tailored to [the government's] indictment — such that a jury is able to convict for an offense outside the indictment's scope." (Pramaggiore Mot. at 52.)

Beyond her conclusory statement that the jury might have accidentally convicted her for falsifying any document, Pramaggiore does not explain how the instruction allowed the government to prove a crime different from the one alleged. In *Stirone v. United States,* on which Pramaggiore relies, the indictment alleged that the defendant illegally interfered with interstate sand commerce, but the Court instructed the jury that it could convict the defendant for transporting steel. This instruction impermissibly broadened the indictment because the indictment could not "fairly be read as charging interference with movements of steel from Pennsylvania to other States." 361 U.S. 212, 217 (1960).

Here, Instruction No. 39 informed the jury that the government must prove "defendant falsified, or caused someone else to falsify the books, records, or accounts of

ComEd or Exelon as *specified in the particular count of the indictment*." (emphasis added). The indictment, in turn, outlined various categories of such documents. (*See, e.g.,* Indict. ¶ 12 (documents "in connection with the renewal of JDDA's contract for 2018"); at 48 (Count Seven) (documents "in connection with the amendment of JDDA's contract for 2018"); at 50 (Count Nine) (documents "in connection with the renewal of JDDA's contract for 2019")). The government likewise identified the false documents by category during closing argument. (*See, e.g.,* Tr. 5222:7-12 (focusing on the Doherty invoices, the single-source justifications that Pramaggiore signed, the Exelon contracts that Doherty signed, and the Asset Suite records); Tr. 5222:13-16 (focusing on "[i]nvoices, the 2018 amendment [that] has to do with a change in the description of the services rendered, as well as the contracts and the Asset Suite records")). Even a brief overview of this Order — which has focused on evidence such as invoices, contracts, single source justification forms, and testimony concerning these documents — will show that there was no risk of the jury thinking that the Defendants could have been convicted on the books-and-records counts because they lied about their email on a young fellow's petition for city council outside of their local Trader Joe's, for instance. The Court here directly referred to the documents in the indictment, whereas the trial court in *Spirone* *added* a new object of liability.

The Court finds no error in its instruction.

### 9. *Instruction Against Speculation*

Doherty argues the Court erred by refusing instructions he contends guarded against improper speculation. Specifically, defendants proposed to add to Pattern

Instruction 2.02: "However, you may not rely on speculation, gut feelings, or a strong suspicion. Circumstantial evidence that leads only to a strong suspicion that someone is involved in criminal activity is not a substitute for guilt beyond a reasonable doubt." Regarding Pattern Instruction 2.03, Defendants' version would have deleted the sentence pertaining to direct versus circumstantial evidence that reads, "The law does not say that one is better than the other." Defendants also proposed adding, "However, any inferences that you make must be reasonable and logically connected to the evidence — you must not speculate or guess."

It is well established that "[c]ircumstantial evidence is not less probative than direct evidence and, in some cases is even more reliable." *United States v. Rodriguez,* 53 F.3d 1439, 1445 (7th Cir. 1995) (internal citations and quotations omitted). Indeed, circumstantial evidence standing alone may be sufficient to support a conviction for conspiracy. *See United States v. Conley,* 875 F.3d 391, 399 (7th Cir. 2017). Defendants' proposed instructions would have misled the jury by improperly conflating circumstantial evidence and mere "speculation," "gut feelings" and "suspicion." They likewise would have encouraged the jury to minimize the import of circumstantial evidence in their deliberations. There was no error in refusing these modifications to the jury instructions.

### 10. *Special Verdict Forms*

Against Defendants' contentions, the Court is also satisfied that special verdict forms were unnecessary. The jury was not required to sift through every document, one by one, to find that each document was false or step in the auditing circumvented. The jury saw the documents (many signed by Defendants) and other associates and

employees testify regarding the contents and truthfulness of those documents. The jury was entitled to conclude that the documents highlighted by the Government were, in fact, representative of the documents charged in the indictment.

## B. Evidence

### 1. Evidence to Negate Pramaggiore's Corrupt Intent

During Pramaggiore's case-in-chief, the Court denied her motions to introduce evidence to negate the element of her corrupt intent. She argues the Court erred by limiting the scope of her testimony so that the jury never heard this evidence – namely, (1) that she asked to investigate ComEd lobbyists while the alleged conspiracy was underway; (2) that she denied Madigan's request for polling questions; (3) her understanding of "bribery"; (4) testimony about intent from similarly-situated individuals.

#### i. Pramaggiore's efforts to investigate ComEd lobbyists in 2012

Pramaggiore sought to testify that in June 2012 she requested to have *all* ComEd lobbyists investigated. (Tr. at 4549:25-4550:7.) As this was during the time that Olivo and Nice were subs for Doherty, she argued this would show that she lacked knowledge of illegal activity, *id., i.e.,* that she had corrupt intent and was a member of the conspiracy. This testimony would been elicited alongside the introduction of Defense Exhibit 1135, an email chain in which Pramaggiore asked for an investigation into the activities of the company's lobbyists and that the results be shared with individuals who were not part of the alleged conspiracy. For example, she asked to bring Darryl Bradford — then Exelon's General Counsel, and another individual who was not part of the alleged conspiracy — "into the loop" and make sure he was "fully briefed." (DX1135.)

- 63 -

The Government explained that DX1135 discusses the *Chicago-Sun Times* reporting of an investigation of a connection between a ComEd lobbyist and a company whose owners had been convicted of fraud. The government argues this scandal had no connection to the charged conduct, and thus Pramaggiore's acts as to this matter constituted impermissible evidence of a prior good act under Rule 405(a). "Evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment." *United States v. Reese,* 666 F.3d 1007, 1020 (7th Cir. 2012); *United States v. Heidecke,* 900 F.2d 1155, 1162 (7th Cir. 1990) (same); *United States v. Burke,* 781 F.2d 1234, 1243 (7th Cir. 1985)).

Pramaggiore contends that testimony about one email would have been simple. She also argues that the impact of this error was compounded by the fact that Marquez responded "no" (Tr. at 2025:1) when asked if Pramaggiore, upon learning about the subcontractors years later, "suggest[ed] that there ought to be some sort of investigation or something like that about how that might have happened under her watch?" (Tr. at 2024:23-25.) In other words, she says, "if the absence of the call for an investigation in 2019 can be evidence of corrupt intent, then conversely, the call for an investigation in 2012 is evidence [of the absence of] corrupt intent." (Pramaggiore Reply at 41, Dkt. No. 326.)

The Court excluded this testimony. While Pramaggiore makes a case that the timing of her request for an investigation could support her defense, the Court weighed the probative value against the prejudicial effect. Rule 403. As the Court explained, allowing this evidence would unnecessarily expand the scope of the trial by demanding

significant time on a narrow ancillary issue. (*See* Tr. 4551:22-4552:4); *see generally United States v. Carson,* 870 F.3d 584, 598 (7th Cir. 2017). The government would have presumably sought to argue that the email had to do with this other scandal, and sorting through another scandal could distract the jury. The government also argues that because Pramaggiore was addressing Marquez, her co-conspirator, while copying non-conspirators, she might have intended to conceal her true motives. A jury would have been appropriately charged with deciphering the email but given how much the jury was already hearing and the detour this evidence would cause for little probative value, the Court did not admit the evidence.

### ii. *Pramaggiore's denial of Madigan's polling request*

Pramaggiore challenges the Court's exclusion of testimony that Pramaggiore denied McClain's request that ComEd ask polling questions on his behalf and Defendants' Exhibit 1072. (*See* Tr. 4549:18-23.) She sought to introduce this example of a denial of a request from Madigan, to support her defense that she lacked corrupt intent, namely that she only agreed to hire Madigan recommendations when she thought it was appropriate — that is, when she thought the people would add value. The Court excluded this testimony as improper evidence of good acts pursuant to Federal Rule of Evidence 405(a).

To the government's argument that this evidence would have been irrelevant because "denying a request to issue polling questions for Madigan — a highly visible action that would have been susceptible to public scrutiny — has no bearing on her intent regarding the stream of benefits that ComEd covertly provided to Madigan over the

course of the eight-year conspiracy," (Resp. by USA at 110), Pramaggiore fairly points out that there is no evidence in the record that this polling would have been visible. Still, the Court agrees that it has little probative value to the specific counts charged.

To the government's argument that the evidence would have been redundant (citing other times on the record where ComEd declined to hire individuals affiliated with Madigan[2]), Pramaggiore fairly points out that those examples were ComEd decisions, and this evidence addressed *her* decision. However, the evidence showed that she played a role in several of these other denials. Because it was cumulative and tangential, any error in excluding this evidence was harmless. *See Tober v. Graco Childre"s Prod., Inc.,* 431 F.3d 572, 577 (7th Cir. 2005).

The Court notes the inconsistency in the government's objection to the introduction of this evidence and their arguments that "Madigan wanted, ComEd gave, and ComEd got," (Tr. at 5145:9-10) and "when Madigan said jump, these defendants said how high." (*Id.* at 5222:21-22.) Still, because the jury heard evidence of times when this is not the case, the jury could also have recognized this argument as an exaggeration. Because the evidence did not pass muster of Rules 405 and 403, the denial of this evidence was proper, otherwise harmless.

---

[2] *See, e.g.,* Tr. 1384:18-24 (Will Cousineau); Tr. 2190:18-2191:5 (Jim D'Amico); Tr. 2191:22-2194:3 (Elgie Sims); Tr. 2224:1-2226:6 (ComEd did not hire Ryan Aderman and Frank Glass); Tr. 2541:10-23 (Jordan Matyas); Tr. 2566:12-22 (ComEd did not hire some of the Speaker's recommendations).

### iii.  Defendant's own understanding of "bribery"

Pramaggiore argues that the Court erred by precluding her from explaining her subjective understanding of "bribery" during her testimony. The Court properly sustained the government's objection that counsel was attempting to elicit an impermissible legal conclusion.

As a threshold matter, mistake of law was no defense to the § 666 charges. *United States v. Blagojevich,* 794 F.3d 729, 738 (7th Cir. 2015). Accordingly, Pramaggiore's opinion of what bribery entails is irrelevant, and was properly excluded under Rule 401 and 403.

Moreover, "lay testimony offering a legal conclusion is inadmissible." *United States v. Noel,* 581 F.3d 490, 496 (7th Cir. 2009) (collecting cases). Legal conclusions offered by lay witnesses fail to meet the requirements of Federal Rule of Evidence 701, in that they are not helpful to the jury because "a witness's opinion that the facts in a case meet the elements of the charged crime will likely constitute unhelpful testimony because it merely tells the jury what result to reach." *United States v. Locke,* 643 F.3d 235, 241 (7th Cir. 2011). Based on this principle, courts have barred testimony concerning whether conduct was, or was believed to be, legal or illegal, legitimate or illegitimate, or proper or improper, or whether certain conduct satisfied an element at issue in the case. *See, e.g., United States v. Van Eyl,* 468 F.3d 428 (7th Cir. 2006) (affirming exclusion of testimony concerning "wrongfulness" of conduct as "there was no distinction between moral opinions and legal opinions."), *United States v. Baskes,* 649 F.2d 471, 478 (7th Cir. 1980) (affirming prohibition of cross-examination of co-conspirator witness regarding the

witness's views of whether he or the defendant "conspired" or otherwise engaged in conduct that was "unlawful" or "willful" — " terms that demand an understanding of the nature and scope of the criminal law").

The Court properly anticipated jury confusion when it prevented Pramaggiore from introducing her definition of bribery, which would effectively be a mistake-of-law argument. The denial of this evidence was proper, or otherwise harmless.

### iv. Testimony about intent from similarly-situated individuals

At trial, the Court limited testimony from fact witnesses who were present for, aware of, or participated in some of the events underlying the charges in this case. The testimony would have concerned the witnesses' perceptions of their own conduct and their own state of mind at the time of the relevant events. (Tr. 1050:19-21 ("the witnesses for ComEd that are attorneys will not be allowed to say that the actions were either legal or illegal.")) Instead, the Court allowed testimony as to "what they understood [the Defendants'] actions to be and be asked whether [the Defendants] did or not communicate any opinion or any advice as to those specific actions." (Tr. 1050:18-24.) Without much of an argument, Defendants claim the Court's ruling had the practical effect of preventing the Defendants from questioning ComEd attorneys about their own, personal intent, with prejudicial effect.

This fails for multiple reasons. First, as with Pramaggiore's bribery testimony, the testimony would have impermissibly offered a legal conclusion. *Noel,* 581 F.3d 490, 496. Except here, the witnesses were attorneys (not testifying as experts), and their testimony regarding the legality of conduct may improperly be given extra weight by the jury. The

sole objection Defendants point to, which the Court sustained, prevented a question concerning whether the witness had "corrupt intent to bribe Mr. Madigan." (Tr. 1409:11-15 ("Q. Okay. And so when you made the decision to go ahead and hire them did you have a corrupt intent to bribe Mr. Madigan by hiring Reyes Kurson? MS. STREICKER: Objection, Your Honor. THE COURT: Objection sustained.")). But that was among the essential questions of the case, the conclusion of which rested in the jury's deliberations, not the witness stand.

Second, testimony regarding the legality of a Defendant's conduct and testimony concerning a witness's intent do not operate in tandem such that limiting the former bars the latter. At trial, the Court itself clarified that Defendants could elicit testimony about "what they understood [a given] situation to be." (Tr. 1051:9-12.) This unsurprisingly elicited testimony on the witnesses' personal intent concerning particular actions. (*See, e.g.,* 1076:12 ("I understood it to mean that we had a good plan and a good strategy, and that John and I guess Mike felt that this time around, the company could be successful if we could pull together a good piece of legislation."); 1081:18-20 ("Did you understand that it was important to get Speaker Madiga"s buy-in to the concept of a formula rate?"); 1081:25-1082:4 ("[W]e wanted to move a piece of legislation in the General Assembly; and the Speaker is the leader of the House, and so as I came to understand in more detail, the Speaker controlled what bills were called in the House.")) The Court fails to observe the "practical effect" Defendants complain of.

Finally, the testimony here is irrelevant; "one person's state of mind is irrelevant to what another person actually believed." *United States v. Benalcazar,* 2011 WL 4553027

(N.D. Ill. 2011). *see also Kelley as Trustee of BMO Litigation Trust v. BMO Harris Bank N.A.,* 634 F.Supp. 3d 619, 633 (D. Minn. 2022) (excluding evidence of knowledge and state of mind of federal investigators as irrelevant to determine state of mind of other parties). To the extent that testimony concerning the Defendants' witnesses' states of mind would have informed the jury on what the Defendants intended, it was "at best minimal." *United States v. Kaplan,* 490 F.3d 110, 121 (7th Cir. 2007) (finding the erroneous admission of testimony concerning a witness's state of mind to be of "limited probative value" and "substantially outweighed by the risk of unfair prejudice.") The Court properly limited this irrelevant testimony and finds no other basis here on which to grant Defendants a new trial.

### 2. Campaign Contributions

Prior to trial, Defendants moved to exclude all evidence or argument regarding campaign contributions arguing that such evidence would be irrelevant, prejudicial, and confusing, *i.e.,* the jury may conflate legal campaign contributions with the bribery and gratuity charges. (Dkt. 131 at 21–23.) The Government responded that campaign contributions, while protected by the First Amendment, "serve to demonstrate the close and cozy relationship Madigan cultivated with ComEd." (Dkt. 147 at 55–56.) The Court denied Defendants' motion. (Dkt. 161 at 4.)

The Court will explain this decision, which remains unchanged. The Court weighed the probative value against prejudicial effect and found that the anticipated probative value far outweighed potential prejudice. FED. R. EVID. 303. In doing so, the Court heeded the First Amendment's reverence for campaign contributions. *See Fed. Election Comm'n*

*v. Cruz,* 142 S. Ct. 1638, 1653 (2022) ("the 'line between quid pro quo corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights.' . . . And in drawing that line, 'the First Amendment requires us to err on the side of protecting political speech rather than suppressing it.'") (cleaned up); *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 360 (2010); *McCormick v. United States,* 500 U.S. 257, 272–74 (1991) (The Supreme Court required the Government to prove an explicit quid pro quo to bring extortion charges based on campaign contributions because criminalizing campaign contributions "would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable. . . ."); *USA v. Martin,* 195 F.3d 961, 966 (7th Cir. 1999) ("the courts have made clear that criminal inducement of a legislator to take particular action cannot be inferred from the legislator's acceptance of campaign contributions from interests urging the action . . .") (collecting cases); *USA v. Allen,* 10 F.3d 405, 410-11 (7th Cir. 1993) ("Money fuels the American political machine. Campaigns are expensive, and candidates must constantly solicit funds. People vote for candidates and contribute to the candidates' campaigns because of those candidates' views, performance, and promises. It would be naive to suppose that contributors do not expect some benefit — support for favorable legislation, for example — for their contributions."); *United States v. Donagher,* 520 F.Supp. 3d 1034, 1043 (N.D. Ill. 2021).

Still, the right of free speech does not prohibit the Court from admitting free speech, including campaign contributions, as evidence. The Committee comment to the

revised Seventh Circuit Pattern Criminal Jury Instructions suggests, "In a case involving campaign contributions as the alleged thing of value, the parties and the court should consider whether to give an additional instruction explaining the lawfulness of contributions and distinguishing them from illegal bribes or illegal gratuities." Seventh Circuit Pattern Criminal Jury Instructions (updated 2022), Committee Comment to 18 U.S.C. § 666(a)(2) Paying a Bribe. The jury was instructed:

> You have heard evidence concerning campaign contributions made by ComEd and others to various public officials. This evidence was introduced to show relationships, not as evidence of a crime. There are no allegations that such campaign contributions were illegal or intended to bribe Michael Madigan.

(Instr. 38, Dkt. 249.) And, of course, evidence supporting elements of crimes can constitute lawful behavior. See e.g., USA v. Palivos, 486 F.3d 250, 258 (7th Cir. 2007).

Now, Pramaggiore, joined by her co-defendants, argues that at trial the Government's evidence of campaign contributions far exceeded what was necessary to show a relationship between ComEd and Madigan, and that by tying the campaign contributions to legislation at trial, the Government was effectively inviting the jury to convict on grounds of campaign contributions. In particular, during its direct examination of Marquez, the Government offered an August 2015 email chain discussing ComEd's campaign contributions to Madigan, then explicitly linked that discussion to legislation that was the supposed object of the conspiracy by asking, "[t]his is August of 2015. What's going on legislatively for the company right now," to which he answered, "[w]e're in the midst of negotiations for what would eventually become FEJA." (Tr. at 2233:10-

13.) Additionally, during the same direct examination, the Government offered an email into evidence in which McClain relayed a request from Madigan that ComEd and Exelon "raise close to [$]450,000" in campaign contributions. (*Id.* at 2253:25-2255:2; GX364.) The government asked Marquez, "[w]hat was the status of FEJA at this time when you received this – this request in August of 2016," to which he responded, "still in the process of trying to get FEJA passed." (Tr. at 2255:7-9.) Defendants objected to the government's questions tying of campaign contributions to legislative outcome as going beyond the allegations in the indictment. The Court overruled Defendants' objection (*id.* at 2255:20–2257:9), for the same reason it does today.

Notably, the Government did not charge Defendants with bribery where the thing of value was campaign contributions, *cf. Cruz,* 142 S. Ct. 1638, 1652–53 (2022) (citing *McCutcheon v. Fed. Election Comm'n,* 572 U.S. 185, 207 (2014); *Fed. Election Comm'n v. Nat'l Conservative Political Action Comm.,* 470 U.S. 480, 497 (1985)), and the jury was instructed specifically regarding things of value in the various counts (*see* Dkt. 249). Showing a connection between ComEd, Madigan, and legislation was an element for other counts, and this evidence was probative of their relationship. Additionally, Pramaggiore argued in her opening argument that Madigan wanted to distance himself from ComEd. Madigan's willingness to have a public connection to ComEd with these campaign contributions offers support to refute this argument.

Therefore, the Court maintains that its admission of evidence of campaign contributions was proper.

### 3. Improper Questioning

In a recorded call introduced by the Government at trial, Pramaggiore and Marquez discussed how to approach new ComEd CEO Joe Dominquez to reapprove the Doherty contracts. (GX131). Pramaggiore takes issue with several questions the Government asked her about the call during cross-examination, which she argues were facially improper and "designed to inflame and prejudice the jury against her." (Pramaggiore Mot. at 32.)

During cross examination, the Government asked Pramaggiore whether she recalled her February 2019 call with Marquez. Pramaggiore volunteered: "No. And I think I shared that with you when I came in for the interview." (Tr. 4627:10-12.) She then confirmed that the September 2019 interview occurred just four or five months after she was served a search warrant in May 2019, that she was represented by counsel for the interview, and that she prepared for the interview. (Tr. 4630:7-4631:4.) She testified that she told the government that she did not recall that Doherty employed subcontractors during the September 2019 interview. (Tr. 4631:5-21.) Pramaggiore then testified that she had forgotten the February 2019 recorded conversation with Marquez when she was interviewed in September 2019. (Tr. 4631:22-24); (4633:15-17).

Pramaggiore claims the entire line of questioning was improper and prejudicial because questions about the termination of Pramaggiore's proffer were "not probative of any fact at issue in the case." (Pramaggiore Mot. at 67.) But as the Government notes, the fact that she prepared for the September 2019 interview, was represented by counsel, and yet claimed during the interview that she forgot the February 2019 call about the

Madigan subcontractors – even though this call took place just four or five months after she learned about the government's investigation in May 2019 – was highly probative because it arguably demonstrated Pramaggiore's lack honesty regarding her memory and underlying credibility. (Tr. 4630:4-4631:24.)

Towards the end of this line of questioning, the following exchange occurred:

Q. So, Ms. Pramaggiore, after the February 18, 2019 call was played for you during the interview, very soon after that, the interview was terminated, correct?
A. It was the end of the day, yes. The interview was over.
Q. The interview concluded after the call, right?
A. Yes.

BY MS. STREICKER:
Q. You and your counsel ended the interview, correct?

MR. LASSAR: Objection, Your Honor.

THE COURT: Objection sustained. She's answered the question.

(*Id.* 4640:5-15.)

On this end, Pramaggiore claims that juries "should not be permitted to draw" inferences from a defendant's decision not to voluntarily interview and answer questions. Pramaggiore Mot. 67. Although sometimes true, *Salinas v. Texas* made clear that a defendant might also fall silent "because [she] was trying to think of a good lie, because [she] was embarrassed, or because [she] was protecting someone else. Not every such possible explanation for silence is probative of guilt, but neither is every possible explanation protected by the Fifth Amendment." 570 U.S. 178, 179 (2013). In *Salinas,* the petitioner voluntarily answered some of a police officer's questions about a murder but fell silent when he was asked about whether ballistics testing would match his shotgun

to shell casings found at the scene of the crime, and, over his objection, the government used his reaction to the officer's question as evidence of his guilt. *Id.* at 178. The Supreme Court explained that,

> [t]he critical question is whether, under the 'circumstances' of this case, petitioner was deprived of the ability to voluntarily invoke the Fifth Amendment. He was not. We have before us no allegation that petitioner's failure to assert the privilege was involuntary, and it would have been a simple matter for him to say that he was not answering the officer's question on Fifth Amendment grounds. Because he failed to do so, the prosecution's use of his noncustodial silence did not violate the Fifth Amendment. *Id.*

*Salinas* controls: the interview here was voluntary, and the mere fact that Pramaggiore decided to terminate (or, in other words, remain silent during) the interview after listening to her recorded call does not violate her Fifth Amendment rights. And unlike the *Salinas* petitioner, Pramaggiore was interviewed with counsel with months of notice. Moreover, her efforts to conceal her knowledge of the Doherty subcontractors was highly probative evidence of her attempt to cover up her crimes and her consciousness of guilt. As a statement of a party opponent, the Government was entitled to elicit this evidence.

She also claims that the question was a misstatement of fact because the question suggests Pramaggiore and her counsel decided to end the interview when, instead, she claims that the parties mutually decided to conclude the interview. (Pramaggiore Mot. at 68.) Pushing aside the fact that this argument further undermines any notion that Pramaggiore intended to invoke the Fifth here, at trial, her counsel admitted that to the Court that "as her attorney, we decided to terminate the interview" once the call was played. To the extent that the decision was, in fact, a collective effort with the

government, the Court will not blame the Government for relying on the Defendants' representation of the facts during trial.

The Court properly sustained Defendant's objection to the Government asking, "you [didn't] want to come in for the interview with the government, did you?" (Tr. 4633:6-7.) Whether the Government had a good or bad faith basis, the Court does not believe this one question — against the myriad of evidence otherwise introduced — had *any* effect, much less an "extraordinarily prejudicial" one. Defendants have not identified any cases where a *single* question which the court struck required a new trial, and the Court is not aware any exists.

Finally, Pramggiore newly objects to the government's questions about Pramaggiore's actions following the 2019 call about additional steps she should have taken to report the fact that certain subcontractors were not working after the February 2019 call with Marquez. Defense counsel did not object to any of these questions and has therefore forfeited any objection. (Tr. 4635:15-4636:20); *Ye*, 588 F.3d at 414.

In any event, the Government's questions were highly probative. Pramaggiore's state of mind was the key issue in dispute at trial, and the jury was charged with assessing Pramaggiore's credibility. The Government was entitled to explore whether Pramaggiore was truly "taken aback" when she learned there were no-work subcontractors on ComEd's payroll by inquiring about her subsequent actions. (Tr. 4634:16-18.) Had she really been "taken aback," as she claimed, it was appropriate to point out that she did absolutely nothing to address her purported discovery of ghost payrollers. She admitted that she

did none of those things, which was probative evidence that she was not being truthful. (Tr. 4635:15-4620.)

### 4. Expert

The Court properly denied Doherty's motion to bring an expert because he failed to establish a need for an expert consistent with the Federal Rules of Evidence standards, in the Court's view. (*See supra,* Section II.B.2, discussion regarding 666(c); Tr. 3887:21-23.)

### 5. Hearsay in Emails

Hooker argues that email Government Exhibits 627 and 217 contained inadmissible hearsay, *i.e.,* "that Gallegos told Takagi what Doherty told Gallegos that Hooker told Doherty." (Hooker Mot. at 31, Dkt. No. 262.) And while Hooker is correct that emails are not per se admissible as business records, the statements at issue here were properly admitted in accordance with the Federal Rules of Evidence.

Government Exhibit 627 is an email dated December 14, 2012, between Doherty's assistant Janet Gallegos and then ComEd employee Mamie Takagi, and Defendant Doherty is copied on the email. GX627. In that email, Gallegos (Doherty's agent per Rule 801(d)(2)(D)) states: "Yes, Jay spoke to John Hooker and he approved the $31,000 per month Contract for the entire 2013." Id. Government Exhibit 630 builds on the same email exchange contained in Government Exhibit 627. In Government Exhibit 630, Doherty responds to Gallegos's email saying, "Confirmed." GX630. By this statement, Doherty adopted Gallegos's statement that "Jay spoke to John Hooker and he approved the $31,000 per month Contract for the entire 2013." FED. RULE OF EVID. 801(d)(2)(B).

Government Exhibit 217 is an email string dated December 17, 2012. Here, Gallegos tells Doherty that she spoke to Takagi and Takagi told her that "she did speak to John Hooker regarding extending the $31,000 contract amount through 2013. She said she still has to get Anne Pramaggiore's approval too." (*See* Tr. 2835:10-13.) Hooker cites *Thakore v. Universal Mach. Co. of Pottstown*, Inc., 670 F.Supp. 2d 705, 726 (N.D. Ill., 2009) (Cole, M.J.) for the fair proposition that hearsay – even if part of the regular course of business – remains inadmissible for the truth of the matter asserted "unless the recorded declarations of the third party were admissible for a nonhearsay purpose." Indeed, there were nonhearsay purposes here, including Doherty's awareness, which is relevant for his intent to participate in the conspiracy and further this end. Within six minutes of Gallegos's email, Doherty responded, "verrrrry important," to Gallegos. (GX217.) This statement is admissible against Doherty as a statement of a party opponent, which demonstrated that Doherty knew Gallegos was talking to Mamie Takagi regarding the subcontractor arrangement. FED. DKT. NO. EVID. 801(d)(2).

And because Doherty's intention behind these statements appears to have been to move things forward with subcontractors, the statements were made in furtherance of the conspiracy. Because Hooker was a coconspirator of Doherty's, Doherty's statements made during and in furtherance of the conspiracy is admissible against Hooker. See *Loscalzo,* 18 F.3d at 383 (". . . evidence of [a] defendant's acts or statements may be provided by the statements of co-conspirators."); *Lindemann,* 85 F.3d at 1238 (a coconspirator's statements are admissible against other coconspirators where "the

declarant and the defendant were involved in an existing conspiracy, and that the statement was made during and in furtherance of that conspiracy").

That said, the Government did suggest in its closing that Takagi's words could be considered for their truth in telling the jury, "it's reasonable to infer based on these e-mails that Takagi did indeed reach out to Hooker as the person with knowledge of the contract to determine whether, in his view, the contract should be renewed . . .. And why would Takagi lie about speaking with Hooker?" (Tr. at 5187:2-11.) Hooker argues this prejudiced him as it directly contradicted his testimony that he had no authority to approve contracts after he left ComEd in March 2012. Hooker correctly points out that although Gallegos testified during trial as a Government witness, Tagagi did not, and thus Hooker was not able to confront her. See U.S. Const. Amend. 6; *see Crawford v. Washington,* 541 U.S. 36 (2004).

The Government responds that Hooker was entitled to call Takagi and chose not to. Counsel for Hooker confronted Gallegos with Government Exhibit 627, and elicited both that Takagi never sent her a contract from Hooker, and that, after Hooker retired from ComEd in 2012, she needed someone employed by ComEd to approve the contract. (Tr. 2984:4-21.) Counsel for Hooker likewise confronted Gallegos with Government Exhibit 217, and Gallegos again confirmed that, per that email, an internal ComEd employee needed to authorize approval of the contract. (Tr. 2984:23-2985:25). The jury therefore heard that Hooker did not have ultimate authority to approve the Doherty contract, minimizing any possible error from the admission of these emails. Moreover,

even if Hooker ceased his participation following his retirement in 2012, that would not have insulated him from liability. *See Schiro,* 679 F.3d at 528-29.

Ultimately, the government argues that any error was harmless: the jury heard ample evidence that Hooker stayed intimately involved in ComEd contracts after his 2012 retirement, including through 2019. (*See, e.g.,* GX12; GX17; GX129; GX148.) The Court agrees that this was harmless. *See Jordan v. Binns,* 712 F.3d 1123, 1138 (7th Cir. 2013) ("As a general rule, errors in admitting evidence that is merely cumulative of properly admitted evidence are harmless."); *United States v. Johnson,* 127 F.3d 625, 631 (7th Cir. 1997) (holding that the erroneous admission of hearsay that is "cumulative to other testimony already presented" was harmless because of its "limited (or nonexistent) prejudicial effect on the defendant"); *United States v. Carter,* 720 F.2d 941, 948 (7th Cir. 1983) (erroneous admission of hearsay was "harmless error due to the cumulative nature of the testimony"). These were two emails out of hundreds of emails and recordings that implicating Hooker in the conspiracy.

### 6. Marquez and Rate Legislation

Doherty sought to strike Marquez's statement in the following recording, in which Marquez qualifies Doherty's statement that ComEd makes its money from Springfield by narrowing the statement to rate legislation.

> DOHERTY:   Here's how, here's how I might. Uh, number one, your money comes from Springfield. ComEd money, right? I mean, for the most part.
> MARQUEZ:   You mean, that's how we make our money.
>
> DOHERTY:   Yeah.
> MARQUEZ:   Yeah, yeah. Through our rates, yes, regulated.

> DOHERTY:   And, you know, I would, if it were me, and again, Mike Madigan's not my best friend, but if I called him right now, he'd call or he'd say, "Jay," if I want to go see him, I'd go see him. But, my bottom line advice would be, 'if it ain't broke, don't fix it' with those guys-
> MARQUEZ:   Okay.

The Court admitted the statement not for truth, but to show the effect on the listener. (Dkt. No. 183.) Doherty argues that he never adopted the statement, but he didn't disagree either, and Doherty's impression of this conversation was properly given to a jury to interpret. Doherty points out that such an adoption would be inconsistent with testimony from O'Neill and others that ComEd always had legislation pending which affects its bottom line — not just rate legislation. (*See e.g.*, Tr. at 1440). Again, the jury regularly hears conflicting testimony and is charged with sorting through it and determining credibility.

### 7.  Ray Nice Texts

Doherty moved to exclude a text messages Doherty sent to Ray Nice, saying, "Fabulous. Thank you so much, Ray. Now I know why The Speaker thinks so highly of you." (Dkt. No. 191; GX- 314.) At the time, Doherty was paying Nice, and Nice also worked as a public official at the Cook County Recorder of Deeds.  Doherty argues that "[t]he jury could have used this as a basis to convict under §666, even though no such conduct was charged."  (Doherty Mot. at 11.)

The probative value as to Doherty's knowledge of Nice's connection to Madigan outweighs any prejudice that one could glean about Doherty cozying up to a public official. The text constituted normal, kind words among colleagues. It's the part about Madigan that would be interesting to the jury, who heard from Doherty's counsel in

opening statements that Doherty "stayed in his lane" and focused on city politics, not Springfield politics (Tr. 403:1-7), and that the subcontractors (including Nice, the recipient of the text message) brought "value to ComEd" (*see* Tr. 406:4-10). Doherty's comment about Nice's connection to Madigan showed the jury that he was attuned to Springfield politics and knew of Nice's value to Speaker Madigan. Because Doherty's intent was a crucial issue in dispute, the Court properly admitted this evidence.

### C.    Other Errors

#### 1.  *Heated Exchange Between Prosecutor and Witness*

Pramaggiore claims that the prosecutor threatened defense witness Joe Dominguez during cross examination, depriving her of testimony favorable to her case. (Pramaggiore Mot. at 79). This claim has no merit.

"Defense witnesses must be free to testify without fear of governmental retaliation." *United States v. Johnson,* 437 F.3d 665, 677 (7th Cir. 2006) (quoting *United States v. Burke*, 425 F.3d 400, 411 (7th Cir. 2005)). "Where . . . the substance of what the prosecutor communicates to the witness is a threat over and above what the record indicate[s] was timely, necessary, and appropriate, the inference that the prosecutor sought to coerce a witness into silence is strong." *Id*. at 847 (citation omitted).

We find no such threat. Dominguez took over as ComEd's CEO after Pramaggiore. During cross examination, the prosecutor questioned Dominguez about a conversation Dominguez had with cooperator Marquez in which he discussed the Doherty contracts. As the prosecutor asked about a statement Dominguez (who was himself a former federal

prosecutor) had made during that recorded conversation, Dominguez (the Defendant's witness) interrupted the prosecutor:

> Q: And then later in the call you said in the light of day, you know, things, you know, need to —
>
> A. Right. We discussed this. And you said, you said a lot of good things on this tape, didn't you? lot of good things on this tape, didn't you?

Tr. 4280:16-19.

As the Government explains, Dominguez asked the prosecutor a question in what appeared to an attempt to introduce the Assistant United States Attorney's opinion of how Dominguez behaved during the recorded conversation — in other words, to elicit the prosecutor's opinion about whether Dominguez had acted lawfully by implying the prosecutor thought Dominguez had "said a lot of good things on this tape." Dominguez even tried asking the prosecutor a question ("didn't you?") about the prosecutor's opinion from the witness stand.

Appearing to be confused, the prosecutor asked, "Sorry?" (Tr. 4280:20.) Dominquez, instead of responding to the question previously posed by the prosecutor (which sought to elicit what Dominguez had said during his recorded conversation with Marquez), continued to describe how the prosecutor allegedly viewed the recorded conversation and Dominguez's conduct as expressed during an earlier interview at the United States Attorney's Office: "The meeting I had with you in the office, you [meaning the prosecutor] portrayed this conversation slightly different." (Tr. 4280:21-22.)

The prosecutor responded by advising the witness not to make unsolicited comments about the prosecutor's opinion of Dominguez's conduct: "Wait a second. Wait a second. If you are going to start talking about what I said, you might want to not (sic) do that . . . because that might not work out well for you, okay." (Tr. 4280:23-4281:1.) Pramaggiore's counsel objected, and the prosecutor explained in response to a question from the Court on the objection that the Defendant's witness was trying to refer to comments the prosecutor had made at a prior meeting, and that "obviously whatever I say during a meeting is not admissible. That's not fair." (Tr. 4281:16-18.) There was no definitive ruling on the objection, nor was one sought.

The Court finds this interaction harmless. None of the cases Pramaggiore cites to support her contention that this interaction constituted a threat, much less deprived her of the right to defend herself. First, Dominiquez's response was not an out-of-court statement offered to show the effect on the listener state of mind and to establish the sequence of events; Dominiquez squarely interrupted the prosecutor to probe into the prosecutor's opinion of Dominguez's conduct, which was both irrelevant, outside the scope of cross examination and an attempt to use the prosecutor's supposed impression of the conversation to provide the impression to the jury that the phone call was proper (*i.e.,* inadmissible hearsay). This differs from *Sizelove v. Madison-Grant United State School Corporation,* on which Pramaggiore relies in part, where the court admitted testimony in a civil case to establish how the witness had learned of a fact and how that knowledge led to a sequence of events. 597 F.Supp. 1246, 1263 (S.D. Ind. 2022) (admitting testimony that the witness learned from his son's brother-in-law that a

proposal was being considered again to prove knowledge of the proposal — and not that the proposal itself was actually being considered — , establishing subsequent conduct).

Pramaggiore also misreads *United States v. Johnson,* which challenged the effect of a letter in which the government announced that it changed its position to the defendant (not the witness), "a rather inefficient medium for conveying threats to a witness," suggesting that the letter was probably not intended to deter the witness from testifying. 437 F.3d 665, 678. Importantly, the dispute was whether the government threatened the witness to deter the witness from testifying *at all,* a concern that does not arise in this case because Dominguez — the Defendant's witness — testified. And in *United States v. Burke,* the defendant argued that the government's refusal to grant his mother immunity prevented her from providing important exculpatory testimony on his behalf, thus distorting the fact-finding process. 425 F.3d 400, 411 (7th Cir. 2005). Again, the Seventh Circuit found that the prosecutor did not abuse his discretion when he denied potentially exculpatory testimony. *Id.* at 412. Most critically, this has nothing to do with threatening witnesses *on the stand,* as Pramaggiore accuses occurred here.

*United States v. Jackson,* 935 F.2d 832, and *United States v. Linder,* 2012 WL 3264924, are similarly inapposite. The *Jackson* defendant took issue with a witness who did not to testify *at all* after prosecutors reminded the witness that his statements in court could be used against him in an ongoing, related investigation. 935 F. 2d at 846 (7th Cir. 1991). And *Linder* concerned indirect allegations against prosecutors because a U.S. Marshal actively assisted prosecutors while also commanding employees who reported directly to the Marshal not to speak with the defendant and his counsel. 2012 WL

3264924, at *16 (N.D. Ill., Aug. 9, 2012). Again, Pramaggiore's witness *did* testify. The Court cannot otherwise find any case where a prosecutor impermissibly threatened a witness whose testimony broached irrelevant, inadmissible subject matter by reminding them that it "might not work out well." At worst, the statement was a curt reminder of potential consequences for misbehavior which obstructs the administration of justice. *Id.*; 18 U.S.C § 401(1).

The questioning continued without event. The Court finds no err here.

### 2. Mischaracterization during closing

At closing, the Government mistakenly asserted that O'Neill testified that an email forwarded from Pramaggiore meant "it was simply word from the boss in stark terms, or lack thereof, get this done." Tr. 5196:2-3. "Misstatements of evidence during closing argument can be improper, but it is rarely reversible error." *United States v. Mullins,* 800 F.3d 866, 872 (7th Cir. 2015) To prevail on her motion, Pramaggiore must establish that the misstatement was improper and that it prejudiced her by "so infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Johnson,* 655 F.3d 594, 602 (7th Cir. 2011) (affirming denial of motion for new trial when prosecutor immediately corrected a single misstatement during opening). Factors the Court considers include whether (1) the judge offered curative instructions, (2) the defense could have rebutted the misstatement, and (3) the weight of the evidence. *Mullins,* 800 F.3d at 872.

Pramaggiore satisfies the first prong easily; the Court overruled Defense Counsel's objection, failing to provide an immediately curative instruction to the government's

- 87 -

misstatement. However, minutes after the misstatement, the Government corrected itself, saying:

> Let me go back for just a moment and talk about the Reyes Kurson contract and correct something that *I just said*. I had mentioned something that O'Neill said in his testimony about what he understood the no-message forwarding of the e-mail to him. *I don't believe he did testify about that*, at least in putting it into so many words. But you can take your own interpretation from the fact that Anne Pramaggiore did not include any words, nothing to soften or buffer what it is that she said, to understand that it was an immediate signal from her to O'Neill to get it done.

(Tr. 5204:24-5205:8) (emphasis added).

This was a clear, unequivocal correction, followed by argument as to what inferences the jury could reasonably draw based on the fact that Pramaggiore had forwarded the email without comment. And that argument was fully supported by the evidence; in an email on January 30, 2016, Pramaggiore made clear what she meant when she forwarded the email to O'Neill a few weeks' prior; she told McClain: "I asked Fidel and Tom [O'Neill] to address this." (GX321.) The great weight of evidence pointed toward guilt, and the government ameliorated any impact their misstatement might have had. *Nelson,* 958 F.3d at 671, *see also Mullins,* 800 F.3d at 872 (finding no error where the prosecutor later corrected the misstatement.) Any error was therefore harmless; a new trial is not warranted.

### 3. Closing Arguments

Finally, Pramaggiore accuses the government of shifting theories at closing when invoking a tollway analogy. "It is settled in this circuit that, in their summations to the jury, prosecutors are entitled to respond to arguments articulated by defense counsel."

*United States v. Taylor,* 728 F.2d 930, 936 (7th Cir. 1984). To be sure, government counsel cannot develop new arguments on rebuttal, being restricted to answering the arguments put forth by defense counsel and to statements that are reasonably deducible from the record. *Id.; accord United States v. Reagan,* 694 F.2d 1075, 1081 (7th Cir. 1982) ("We believe that the comment in rebuttal was reasonably deducible from the evidence of record . . . and constituted a fair response to defense counsel's closing statement") (cleaned up).

Here, multiple defendants argued that Madigan did not help ComEd, rather, ComEd's legislative success was the result of legitimate coalition building. (*See, e.g.,* Tr. 5296:20-24 (McClain's counsel, arguing that ComEd legislation passed "[n]ot because of some jobs spread over a decade, but because they worked their heads off, because they boxed him in, because they built coalitions, because they spent millions and millions of dollars."); Tr. 5312:11-20 (Pramaggiore's counsel, arguing that ComEd legislation passed because of strong coalitions, "[n]ot based on the fact that we're hiring people")). During rebuttal, the Government responded to these arguments by comparing the corruption scheme to a "corruption toll," in which a driver pays the toll. (Tr. 5442:20-5443.))

This tollway analogy was not a new theory at all but simply "[a]nother way to think about" the case, as the prosecutor observed. (Tr. 5442:20.) It was consistent with the government's remarks throughout the case. (*See, e.g.*, Tr. 290:3-8 (Government's opening, describing theory that "defendants conferred a stream of benefits on Madigan over a long period of time," intending to influence Madigan's actions regarding ComEd's

legislation); Tr. 5132:13-4 (Government's closing, arguing that "Michael McClain convened a meeting of the ComEd inner circle of corrupt influence and reward.")). Here, the analogy elucidated the "stream of benefits" scheme wherein Madigan exerted influence, and not sole control, over the passage of legislation (as the jury instructions provided). (Tr. 5466:16-21.) This was an appropriate subject of rebuttal argument because the "stream" or "toll" both concern the broad set of actions defendants took to corruptly influence Madigan, and the direction of the toll or stream all flowed to support the same conspiracy. This conspiracy is both deducible from the extensive record, and the tollway fairly responds to the defense's case that the broad set of actions were instead legal coalition building. *See Reagan,* 694 F.2d at 1081 ("The record, however, contains sufficient evidence from which a jury could reasonably infer that defendant's receipts understated the cash received from Link. It was therefore proper for the Government to rebut that inference in closing.").

Again, a new trial is unwarranted.

## IV.   <u>CONCLUSION</u>

For the reasons stated herein, the Defendants' Motions for Acquittal or, in the alternative, New Trial are DENIED.

**IT IS SO ORDERED.**

_____
    Harry D. Leinenweber, Judge
    United States District Court

Dated: 1/4/2024

- 90 -

**MEMORANDUM OPINION AND ORDER** ........................................... **Error! Bookmark not defined.**

I.   Background ......................................................................................... 1

   A.   Indictment ................................................................................... 2

   B.   Trial ............................................................................................. 4

II.   Motions for Acquittal ....................................................................... 5

   A. Conspiracy Count ............................................................................. 6

   B. Corruption Counts .......................................................................... 11

      1.   Quid Pro Quo ........................................................................ 13

      2.   § 666(c) Safe Harbor ........................................................... 16

      3. Elements ................................................................................... 21

         i. Corrupt Intent Evidence ...................................................... 21

         Count 2 (Kurson) ..................................................................... 22

         Count 5 (Ochoa) ...................................................................... 24

         Count 6 (Zalewski) .................................................................. 27

         Count 8 (JDDA 2019 Renewal) ............................................... 29

         ii. "In Connection With" Evidence ........................................... 30

         Count 2 (Reyes Kurson) .......................................................... 31

         Counts 5 (Ochoa) and 6 (Zalewski) ....................................... 33

         Count 8 (JDDA 2019 Renewal) ............................................... 33

   C. FCPA Counts .................................................................................... 34

      2.  Knowing and Willful Intent ...................................................... 39

         Doherty ..................................................................................... 39

         Pramaggiore ............................................................................ 41

Hooker ..................................................................................................................... 43

McClain .................................................................................................................. 44

3. Circumvention of Internal Controls ..................................................................... 45

4. § 2, Pinkerton Liability ......................................................................................... 46

III. New Trial ...................................................................................................................... 49

A. Jury Instructions ....................................................................................................... 49

1. Quid Pro Quo ........................................................................................................ 49

2. 666(c) Instructions ............................................................................................... 49

3. Pinkerton .............................................................................................................. 50

4. Goodwill and Good Faith (Defs' proposed 30.2) ................................................. 52

5. "Official duty" Instruction ................................................................................... 54

6. Vicarious Liability in the Corporate Context (Defs' proposed 20.2) ................... 55

7. Terms "Madigan" and "Legislation" for 18 U.S.C. § 666 Instructions ................ 56

8. Listing Documents Alleged False ......................................................................... 60

9. Instruction Against Speculation .......................................................................... 61

10. Special Verdict Forms ......................................................................................... 62

B. Evidence .................................................................................................................... 63

1. Evidence to Negate Pramaggiore's Corrupt Intent ............................................ 63

(i) Pramaggiore's efforts to investigate ComEd lobbyists in 2012 ...................... 63

(ii) Pramaggiore's denial of Madigan's polling request ...................................... 65

(ii) Defendant's own understanding of "bribery" ............................................... 67

(iii) Testimony about intent from similarly-situated individuals ......................... 68

2. Campaign Contributions ...................................................................................... 70

3.    Improper Questioning .................................................................................. 74

4. Expert ............................................................................................................. 78

5. Hearsay in Emails ........................................................................................... 78

6. Marquez and Rate Legislation ....................................................................... 81

7. Ray Nice Texts ................................................................................................ 82

C.    Other Errors ....................................................................................................... 83

1.    Heated Exchange Between Prosecutor and Witness ....................................... 83

2.    Mischaracterization during closing ................................................................ 87

3.    Closing Arguments .......................................................................................... 88

IV.    Conclusion ................................................................................................................. 90